1

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TENNESSEE
 2                          WESTERN DIVISION

 3   _____
                                |
 4   UNITED STATES OF AMERICA,   |
                                |
 5             Plaintiff,        |
                                |
 6   vs.                         |   NO. 23-CR-20121
                                |
 7   ASHLEY GRAYSON AND          |
     JOSHUA GRAYSON,             |
 8                               |
               Defendants.       |
 9
     _____
10

11

12

13               TRANSCRIPT OF THE TRIAL

14             TESTIMONY OF OLIVIA JOHNSON

15                    BEFORE THE

16             HONORABLE JON P. MCCALLA

17

18                      TUESDAY

19                  MARCH 26, 2024

20

21

22

23
               TINA DuBOSE GIBSON, RPR, RCR
24                   OFFICIAL REPORTER
             FOURTH FLOOR FEDERAL BUILDING
25             MEMPHIS, TENNESSEE 38103
```

UNREDACTED TRANSCRIPT

```
1              A P P E A R A N C E S

2

3         Appearing on behalf of the Government:

4              PATRICK NEAL OLDHAM
               BRYCE PHILLIPS
5              United States Attorney's Office
               167 N. Main Street, Suite 800
6              Memphis, Tennessee 38103
               (901) 544-4231
7              neal.oldham@usdoj.gov
               bryce.phillips@usdoj.gov
8

9         Appearing on behalf of the Defendant Ashley Grayson:

10             SCOTT H. PALMER
               Scott H. Palmer, PC
11             15455 Dallas Parkway
               Suite 540
12             Dallas, Texas   75001
               (214) 987-4100
13             scott@palmerperlstein.com

14
               LESLIE I. BALLIN
15             Ballin, Ballin & Fishman, PC
               200 Jefferson Avenue
16             Suite 1250
               Memphis, Tennessee 38103-2007
17             (901) 525-6278
               lballin@bbfpc.com
18

19        Appearing on behalf of the Defendant Joshua Grayson:

20
               MICHAEL E. SCHOLL
21             The Scholl Law Firm
               200 Jefferson Avenue
22             Suite 1500
               Memphis, Tennessee 38103
23             (901) 529-8500
               mike@scholl-law-firm.com

24

25
```

UNREDACTED TRANSCRIPT

```
 1                      TUESDAY

 2                   MARCH 26, 2024

 3               ----------------------

 4

 5           THE COURT:  Who will our next witness be?

 6           MR. OLDHAM:  Olivia Johnson, Your Honor.

 7           THE COURT:  Certainly.

 8           If you would step to the podium and raise your

 9   right hand, please.

10                   (Oath administered.)

11           THE WITNESS:  Yes.

12           THE COURT:  You may have a seat up here, please.

13                   OLIVIA JOHNSON,

14   called as a witness on behalf of the Government, having been

15   first duly sworn, testified as follows:

16                   DIRECT EXAMINATION

17   BY MR. OLDHAM:

18   Q.   Good afternoon.

19   A.   Hi.  I mean, good afternoon.

20   Q.   Would you state your name, please.

21   A.   Olivia Johnson.

22   Q.   Would you spell your first and last name, please.

23   A.   O-L-I-V-I-A, J-O-H-N-S-O-N.

24   Q.   Okay.  Pull the microphone a little closer to you, and

25   whatever you say, say it half as fast as you just did.  Okay?
```

UNREDACTED TRANSCRIPT

1    A.   Okay.

2    Q.   A lot of people are trying to pay attention and we're

3    making a record of this, so you have to speak clearly.  Not

4    everybody speaks all the time like I do in front of people.

5    If you're nervous, take a breath.

6    A.   Okay.

7    Q.   Please spell your name.

8    A.   O-L-I-V-I-A, J-O-H-N-S-O-N.

9    Q.   Thank you.

10        Where are you from?

11   A.   Memphis, Tennessee.

12   Q.   Born and raised?

13   A.   Yes.

14   Q.   What was your profession back in 2017?

15   A.   A hairstylist.

16   Q.   Did you have a salon?

17   A.   No.

18   Q.   Where did you work?

19   A.   From home.

20   Q.   Working from home, how did you advertise?

21   A.   Social media.

22   Q.   Is there a preferred platform that you used?

23   A.   In 2017, Facebook.

24   Q.   Working with Facebook, did anybody ever reach out to

25   you to ask you to promote their services?

UNREDACTED TRANSCRIPT

1     A.    Yes, a lot of people have.

2     Q.    Okay.  One specific person who brought us here today,

3  did that person reach out to you?

4     A.    Yes.

5     Q.    And who is that?

6     A.    Ashley Grayson.

7     Q.    How did you meet Ashley Grayson?

8     A.    Through Facebook.

9     Q.    And what was the nature of y'all meeting?  How did

10  y'all meet?

11     A.    She inboxed me on Facebook.

12     Q.    And when she inboxed you on Facebook, what did she

13  say?

14     A.    She offered to repair my credit for promo.

15     Q.    And what does "repair your credit" mean?

16     A.    Well, like, take negative things off your credit and

17  help your credit score go up.

18     Q.    Okay.  And did you take her up on that offer?

19     A.    Yes.

20               MR. LEVINE:  No objection.

21               THE COURT:  You may approach.

22               MR. OLDHAM:  Thank you, Your Honor.

23               THE COURT:  Certainly.

24  BY MR. OLDHAM:

25     Q.    What is that I just handed you?

UNREDACTED TRANSCRIPT

1    A.   Just a message from Ashley.

2    Q.   Is that what we were just talking about, the first one

3    that was sent to you?

4    A.   Yes.

5              THE COURT:  I'm sorry.  I think some people

6    missed your first response.  So I'm going to let you start

7    over on that just because it was a little hard to hear.

8              MR. OLDHAM:  Yes, Your Honor.

9              THE WITNESS:  Okay.

10             THE COURT:  I'm watching in the back, and if

11   having trouble hearing, just say "I'm having trouble

12   hearing."

13             Everybody is pretty much okay?  Okay.  Good.

14   BY MR. OLDHAM:

15   Q.   What is that?

16   A.   That is the message from Ashley.

17   Q.   Ashley who?

18   A.   Grayson.

19   Q.   And is this the first message that you just described

20   to me when I was asking those questions?

21   A.   Yes.

22             MR. OLDHAM:  Your Honor, I move to make this

23   message the next numbered exhibit to this hearing.

24             THE COURT:  Marked and received as Exhibit 2

25   without objection.

UNREDACTED TRANSCRIPT

```
 1                    (Exhibit 2 marked and received.)

 2                    THE COURT:  Yes, sir.

 3                    MR. OLDHAM:  May I publish, Your Honor?

 4                    THE COURT:  You may.

 5    BY MR. OLDHAM:

 6      Q.    Ms. Johnson, is this the message we were just talking

 7    about, Exhibit 2?

 8      A.    Yes.

 9      Q.    And what does it say, please?

10      A.    "Hey, Olivia.  How are you?  You don't know me, but

11    one of my friends shared one of your posts.  So I came to

12    your page.  I have my own credit repair business, and I see

13    that you live in Memphis.  I'm going to start teaching credit

14    repair classes in September" --

15                    THE COURT:  It's not a race.

16                    THE WITNESS:  I'm just nervous, y'all.

17                    THE COURT:  And you do read fast.  So I know

18    you're going to have to be conscious about reading a little

19    more slowly.  Is that okay?

20                    THE WITNESS:  It's okay.

21                    THE COURT:  I think we're going to let Government

22    redirect that so we get the record solid.

23                    MR. OLDHAM:  Yes, Your Honor.  I'd be happy to.

24                    THE COURT:  Thank you.

25    BY MR. OLDHAM:
```

UNREDACTED TRANSCRIPT

1    Q.   Ms. Johnson, is this the message?

2    A.   Yes.

3    Q.   Okay.  You're the one testifying so you're going to

4    read it.  Okay?

5    A.   Okay.

6    Q.   But let's just take our time, remember taking the

7    breaths, and let's read this message that is the body of the

8    message in Exhibit No. 2.  Okay?

9    A.   Okay.  "Hey, Olivia.  How are you?  You don't know me,

10   but one of my friends shared one of your posts.  So I came to

11   your page.  I have my own credit repair business, and I see

12   that you live in Memphis.  I'm going to start teaching credit

13   repair classes in September for people who learn how to fix

14   their own credit.  Instead of hiring a company, Memphis is

15   one of those cities I'll be teaching in.  Would you be

16   interested in having your" own -- "having your credit

17   repaired for free in exchange to share my posts about credit

18   to your page?  If you don't need your credit repaired, you

19   could choose someone else to have their credit repaired in

20   your place.  Thanks, Hun."

21   Q.   Did you take advantage of that offer?

22   A.   Yes.

23   Q.   And was she able to help you with your credit?

24   A.   Yes.

25   Q.   And did you, in fact, then share her services with

UNREDACTED TRANSCRIPT

1    your followers?

2      A.   Yes.

3      Q.   One time or multiple times?

4      A.   Multiple.

5      Q.   Okay.  At some point, did you hear back from her

6    whether or not it was successful?

7      A.   Yes.

8      Q.   And what sort of information did you receive?

9      A.   I got deletions off my credit.  My credit score did

10   start going up a little bit.

11     Q.   And did Ms. Grayson tell you whether or not it was

12   successful for her business?

13     A.   Yes.

14     Q.   And what did she convey to you?

15     A.   She told me that she was getting a lot of clients from

16   my page.

17     Q.   Okay.

18              MR. OLDHAM:  Your Honor, if I can please approach

19   with a three-page document this time.

20              MR. LEVINE:  No objection.  Thank you.

21              THE COURT:  All right.

22              Yes, you may approach.

23              MR. OLDHAM:  Thank you, Your Honor.

24              THE COURT:  Certainly.

25   BY MR. OLDHAM:

UNREDACTED TRANSCRIPT

1    Q.   Would you please take a look at those three documents.

2    You don't have to read them out loud right now.  Just take a

3    look at them.  All three, please.

4    A.   Okay.

5    Q.   Do you recognize at least as Ashley's portion -- or

6    Ms. Grayson's portion of the messages that she sent to you

7    kind of describing the things that we just talked about,

8    repairing your credit and the success she had from your

9    posts?

10   A.   Yes.

11   Q.   Okay.

12            MR. OLDHAM:  Your Honor, I move to make this

13   three-page document the next numbered exhibit to this

14   hearing.

15            THE COURT:  Marked and received as 3 without

16   objection.

17              (Exhibit 3 marked and received.)

18            MR. OLDHAM:  May I publish, Your Honor?

19            THE COURT:  You may.

20   BY MR. OLDHAM:

21   Q.   On page 1 of Exhibit 3, what are y'all talking about

22   here?  You don't have to read it, just tell us what you're

23   talking about.

24   A.   The file that she started on with my credit, I guess.

25   I don't really remember most of this stuff because it's from

UNREDACTED TRANSCRIPT

1    2017.  I ain't looked back at -- well, I don't have this page

2    anymore.  So I'm just telling you what it's about because I'm

3    reading it.  I don't remember it.

4        Q.   But it is to you; is that correct?

5        A.   Uh-huh.

6        Q.   Yes or no?

7        A.   Yes.

8        Q.   And you do recall needing to turn over documents to

9    help -- have her help you with your credit; is that correct?

10       A.   Yes.

11       Q.   Okay.  Page 2, who is this message from?

12       A.   Ashley Grayson.

13       Q.   And would you read that one, please.  And remember --

14       A.   Slow.

15       Q.   Yeah.

16       A.   "Hey, Hun, you don't have to post my credit posts on

17   your page anymore.  I had so many clients from Memphis sign

18   up and they want to get started.  It took up over ten spots

19   on my scheduling page."  I still work -- "I'll still work on

20   your credit for free.  I appreciate you for sticking to your

21   word, though, and posting it.  I was trying to see if it

22   would be worth it to do a class in Memphis, but I don't think

23   it would be.  They're not as serious about this."

24       Q.   Okay.  And then page 3, more discussion between the

25   two of you.  And I want you to focus here on the middle.

UNREDACTED TRANSCRIPT

1  What does that say?

2   A.   "I sent you something in the mail.  I wanted to make

3  sure you got it.  I put Johnson on it."

4   Q.   Okay.  And this is more discussion about y'all's going

5  back and forth about your credit repair; is that correct?

6   A.   Correct.

7   Q.   Okay.  But at this point, this is the kind of

8  communication y'all had; is that correct?

9   A.   Correct.

10   Q.   After y'all met online, did y'all get to know each

11  other better?

12   A.   Not really.  Not in 2017.

13   Q.   Okay.  When did you think that y'all -- did you ever

14  get to know her better?

15   A.   No.

16   Q.   Okay.  Did you communicate with Ms. Grayson ever?

17   A.   Yes.

18   Q.   Okay.  And how would y'all communicate?

19   A.   Through text messages.

20   Q.   Okay.  At some point, did she send you anything as a

21  thank you for you sharing her posts and her success in

22  Memphis?

23   A.   Yes.

24   Q.   And what was that?

25   A.   A $1,000 cashier's check.

UNREDACTED TRANSCRIPT

1      MR. OLDHAM:  May I approach, Your Honor?

2      THE COURT:  You may.

3   BY MR. OLDHAM:

4    Q.   Can you tell me what that picture is?

5    A.   Yeah.  It's the $1,000 cashier's check and a photo of

6   me, three photos of me.

7      MR. OLDHAM:  Your Honor, I move to make this the

8   next numbered exhibit to this hearing.

9      MR. LEVINE:  No objection.

10      THE COURT:  Without objection, marked and

11   received as 4.

12        (Exhibit 4 marked and received.)

13      MR. OLDHAM:  May I publish, Your Honor?

14      THE COURT:  You may.

15   BY MR. OLDHAM:

16    Q.   And what is this we're looking at?

17    A.   The $1,000 check that I received from Ashley.

18    Q.   Okay.  And what's the name at the top of that check?

19    A.   Ashley K. Massengill.  Are you talking about Chase?

20    Q.   No.  The Ashley K. Massengill.

21    A.   Okay.

22    Q.   And who is Ashley K. Massengill?

23    A.   Ashley Grayson.

24    Q.   Okay.  And is that how you originally met her with

25   that name?

UNREDACTED TRANSCRIPT

1    A.    Yes.

2    Q.    Okay.  And this would have been what year?  Can you

3  tell us?

4    A.    2018.

5    Q.    Okay.  Who made this post?

6    A.    Ashley Grayson.

7    Q.    Okay.  Is that something that you posted and she

8  reposted?

9    A.    No.  She posted it.

10    Q.    Okay.  Is it something that you knew that was going to

11  be posted?

12    A.    No.

13    Q.    Okay.  Earlier, you said that y'all spoke via text

14  message mostly; is that correct?

15    A.    Correct.

16    Q.    Okay.  Earlier, have we shown you messages from those

17  text messages and spoken about those?

18    A.    Yes.

19    Q.    Okay.

20          MR. LEVINE:  No objection.

21          MR. OLDHAM:  May I approach the witness, Your

22  Honor?

23          THE COURT:  You may approach.

24  BY MR. OLDHAM:

25    Q.    You don't have to read all of these, but would you

UNREDACTED TRANSCRIPT

1    look at these --

2      A.   Scan through it?

3      Q.   Yes.

4           -- and kind of stop at some pages and tell us

5    after you read them what this is.

6      A.   These are messages between me and Ashley.

7      Q.   Okay.  And what year does this start?

8      A.   2021.

9      Q.   And let's flip to the end.  What year do -- does this

10   group stop?

11     A.   2022.

12     Q.   Okay.

13          MR. OLDHAM:  Your Honor, I move to make this

14   106-page document the next numbered exhibit to this hearing.

15          THE COURT:  Marked and received as 5.  Again,

16   without objection, it will be referred to as Collective

17   Exhibit 5.

18          MR. OLDHAM:  Thank you, Your Honor.

19           (Exhibit 5 marked and received. )

20          MR. OLDHAM:  May I publish, Your Honor?

21          THE COURT:  You may.

22   BY MR. OLDHAM:

23     Q.   Ms. Johnson, what are we looking at here?

24     A.   A message from Ashley.

25     Q.   And what is that message talking about?

UNREDACTED TRANSCRIPT

1    A.    She's at a restaurant in Memphis, and she's asking me

2   how far do I live from the restaurant.

3    Q.    Okay.  Did you know she was visiting?

4    A.    No.

5    Q.    Did y'all end up seeing each other that night?

6    A.    She stopped by for a brief moment.

7    Q.    Okay.  I'm going to scan ahead to page No. 5.  Here at

8   the bottom of page No. 5, do you recognize that blue bubble?

9    A.    Yes.

10   Q.    On these text messages, who is blue?

11   A.    Ashley.

12   Q.    Ashley?

13   A.    Grayson.

14   Q.    And who is green?

15   A.    Me, Olivia.

16   Q.    Okay.  And what is the date of this blue bubble right

17  here (indicating) on page 5 of Exhibit No. 5?

18   A.    May 5th, 2022.

19   Q.    And what does it say?

20   A.    "I want to do a give-away in Memphis, but I don't know

21  how to find a person who really deserves it and needs it that

22  I can help for Mother's Day."

23   Q.    On page 6, how do you respond?

24   A.    "Fashooo."

25   Q.    Spell that for the court reporter.

UNREDACTED TRANSCRIPT

1    A.    F-A-S-H-O-O-O.

2    Q.    Okay.  And then your next one?

3    A.    "I wouldn't dare let nobody get over.  You contacted

4    the right person."

5    Q.    And what do you mean by "get over"?

6    A.    Well, you know, like, telling a story about, like,

7    their situation or something just to get something, just to

8    get a gift.

9    Q.    So what are you trying to communicate to her in that

10   text?

11   A.    That I was going to help her find somebody that really

12   deserved the house.

13   Q.    Okay.  The next page, page 7, how does she respond?

14   A.    "I just want to pick one single mom or family that

15   needs help.  I want to buy them a house."

16   Q.    And down here at the last message on page 7, what do

17   you offer to do?

18   A.    Give her three candidates, three good candidates to

19   help her with her decision.

20   Q.    Okay.  Page 8, how do you respond?

21   A.    "That's so amazing, Ashley" --

22   Q.    Let's just read what it says.  Okay?

23   A.    Okay.

24   Q.    That's okay.

25   A.    "That's so fucking amazing, Ashley.  You just don't

UNREDACTED TRANSCRIPT

 1   know, girl.  You're really out here changing lives, girl.  I

 2   salute you."

 3       Q.   And how would you describe yourself at this point?

 4       A.   Happy.

 5       Q.   Okay.  And then y'all love and like things.  And here,

 6   what is -- what are you responding to right here?

 7       A.   The -- the -- I had sent her some notes of -- I --

 8       Q.   Okay.  Let's go back.  I'm sorry.  Page 8, what does

 9   she say?

10       A.   "Yeah, that will work.  With a little background on

11   them so I can choose easier."

12       Q.   Okay.  And who were the three people that you

13   recommended?

14       A.   Brandie Thomas, that's my sister-in-law.

15       Q.   Okay.

16       A.   Tanisha Ambrose, that's a girl from my neighborhood.

17   And my mama, my mother.

18       Q.   And why did you recommend the first person you say?

19   Who was that?

20       A.   My sister-in-law.

21       Q.   And what's her name?

22       A.   Brandie Thomas.

23       Q.   Do you know how she spells Brandie?

24       A.   B-R-A-N-D-I-E.

25       Q.   And why did you recommend her?

UNREDACTED TRANSCRIPT

1    A.    She's a good mom.

2    Q.    Okay.  And then who is the second person you

3  nominated?

4    A.    Tanisha Ambrose.

5    Q.    And why did you recommend her?

6    A.    She was living in a hotel for a long period of time.

7  I put that in the notes that I sent her.  And she just been

8  having it rough.  Her dad died.  Her mother not there, so she

9  just by herself.  And that's why.

10    Q.    And who was the final person that you recommended?

11    A.    My mom.

12    Q.    And why did you recommend her?

13    A.    It's -- her house was getting shot up a lot --

14    Q.    Okay.

15    A.    -- and it was just a lot, so . . .

16    Q.    I've turned ahead to page 12.

17          Is this the section where you sent those

18  nominations?

19    A.    Yes.

20          MR. OLDHAM:  May I approach, Your Honor?

21          THE COURT:  You may.

22          MR. OLDHAM:  Thank you.

23  BY MR. OLDHAM:

24    Q.    Can you tell me what this is, please?

25    A.    That's the one I sent to her about my mom.

UNREDACTED TRANSCRIPT

```
 1    Q.   Okay.  And this is one of the three little squares
 2  that's reflected there on the page from the Exhibit 5; is
 3  that correct?
 4    A.   Correct.
 5           MR. OLDHAM:  Your Honor, I move to make this the
 6  next numbered exhibit to the hearing.
 7           THE COURT:  Marked and received as 6 without
 8  objection.
 9            (Exhibit 6 marked and received.)
10           MR. OLDHAM:  Thank you, Judge.
11           May I publish?
12           THE COURT:  You may.
13  BY MR. OLDHAM:
14    Q.   And so Exhibit No. 6 is one of these little squares
15  from page No. 12 in Exhibit 5; is that correct?
16    A.   Correct.
17    Q.   And what -- if you'll tell the ladies and gentlemen of
18  the jury if you'll read what you wrote about your mom?
19    A.   Okay.  "My mother, who is a single mom, her kids are
20  adults, but she cares for her grandkids and any family or
21  friends that's in need of somewhere to stay for a while.  I
22  would love to be able to do this for her myself, but it will
23  still bring me the same amount of joy if it happens this way.
24           "My mother resides in South Memphis.  That's where
25  we're from.  And that's also where the majority of the chaos
```

UNREDACTED TRANSCRIPT

1  happens.  My momma's home have been shot up at least seven

2  times.  Most of the times it's something that came from

3  someone hanging at our house or the fact that she's been

4  living in the same house/area our whole life.  It just makes

5  it so easy to get to."

6        Okay.  Yeah.

7        "The thought of her life not being at risk and what

8  makes me happy as hell, the last shooting where my nephew was

9  shot, me and my sisters begged her to move.  She insisted on

10  staying.  Stubborn.  She always say that you can't dodge

11  death and God got her.  She also say the same thing can

12  happen no matter where she lives.  I feel like it's

13  something" -- "I feel like if it's something like this that's

14  presented to her, something that she can call hers, then

15  she'll be jumping for joy."

16  Q.   And that's what you submitted as one of the options;

17  is that correct?

18  A.   Correct.

19  Q.   Okay.  And on page 13 of Exhibit 5, what do you tell

20  her there at the bottom?

21  A.   "Don't think you got to choose Momma 'cause of me

22  either.  I want you to really look into it and choose from

23  your heart."

24  Q.   And is that what you -- did you say what you meant

25  there?

```
 1      A.   Yeah.  Yes, I mean.

 2      Q.   All right.  And here, reactions to your messages here;

 3  is that correct, on page 14?

 4      A.   Yes.

 5      Q.   Okay.  Over to page 15, how does Ashley respond here

 6  at the top?

 7      A.   "I'm going to pick the momma, my Godmomma.  This house

 8  going to make it to your family one way or another, LOL."

 9      Q.   And then next?

10      A.   "Don't tell her yet, though.  LOL."

11      Q.   And then next?

12      A.   "You got to help me surprise her."

13      Q.   And is that what y'all did?

14      A.   Yes.

15      Q.   Did y'all begin to plan a way to surprise your mother

16  with this house giveaway?

17      A.   Yes.

18      Q.   Eventually, did you receive from Ashley some posts or

19  notes about the house?

20      A.   Yes.

21      Q.   And on page 21, what are we looking at here?

22      A.   The house --

23      Q.   Okay.

24      A.   -- photos of the house.

25           MR. OLDHAM:  May I approach, Your Honor, please?
```

UNREDACTED TRANSCRIPT

23

```
 1              THE COURT:  You may.
 2   BY MR. OLDHAM:
 3     Q.   Can you tell me what you're looking at there?
 4     A.   Photos of the house.
 5     Q.   And this is just a bigger version of page 21 in
 6   Exhibit 5; is that correct?
 7     A.   Correct.
 8              MR. OLDHAM:  Your Honor, I move to make this the
 9   next numbered exhibit to this hearing.
10              THE COURT:  Marked and received as 7.
11               (Exhibit 7 marked and received. )
12              MR. OLDHAM:  Thank you.
13              May I publish, Your Honor?
14              THE COURT:  You may.
15   BY MR. OLDHAM:
16     Q.   Ms. Johnson, once you see this, how do you react?
17     A.   I was excited.
18     Q.   And did you let her know that?
19     A.   Yes.
20     Q.   Okay.  And did you look at all of these images and
21   kind of go in and look at the whole house?
22     A.   Yes.
23     Q.   Okay.  And did y'all plan a day to have the giveaway
24   ultimately happen?
25     A.   Yes.
```

1    Q.   And who did you discuss that with?

2    A.   Ashley.

3    Q.   Okay.  Page 23, can you tell the jury some of the text

4    messages that you sent showing your reaction to what she sent

5    you about the house.

6    A.   "Oh, my God."

7    Q.   So what does it really say?

8    A.   Okay.  "Oh, my God.  Girl, this MF beautiful.  Where

9    is it, Girl?"

10   Q.   Okay.  And for "Oh, my God," you were saying what the

11   slang actually means; is that correct?

12   A.   OMG, uh-huh.

13   Q.   Okay.  And this is an especially exuberant OMG with

14   all those Gs; is that correct?

15   A.   Yes.

16   Q.   And you asked where it is.  And what does she tell you

17   here on page 24 at the top?

18   A.   Cordova, Tennessee.

19   Q.   And then what did she say?

20   A.   "I made sure I only chose houses in good areas."

21   Q.   And then y'all discuss how the money is going to get

22   there and things like that; is that correct?

23   A.   Correct.

24   Q.   Okay.  And then were you present when the plan finally

25   happened and your mom found out?

UNREDACTED TRANSCRIPT

1    A.   Yes.

2    Q.   Okay.  And have you seen -- prior to today, have you

3    seen a video of the day that your mom found out about the

4    house?

5    A.   Yes.

6              MR. OLDHAM:  Your Honor, if I could approach,

7    please.

8              THE COURT:  You may.

9    BY MR. OLDHAM:

10   Q.   What is that?  Have you seen this before today?

11   A.   Yes.

12   Q.   And the contents of this disk, have you looked at it?

13   A.   Yes.

14   Q.   And whose initials are those?

15   A.   My initials.

16   Q.   And what date is that?

17   A.   March 25, 2024.

18   Q.   Is that when you watched it?

19   A.   Yes.

20   Q.   And does it fairly and accurately represent the video

21   of the house when you got -- that you've seen before?

22   A.   Yes.

23             MR. OLDHAM:  Your Honor, I move to make this the

24   next numbered exhibit to this hearing, Your Honor.

25             THE COURT:  Marked and received as 8 without

UNREDACTED TRANSCRIPT

1    objection.

2                   (Exhibit 8 marked and received.)

3    BY MR. OLDHAM:

4      Q.   What date did you look at it and sign it?

5      A.   March 25, 2024.

6      Q.   So yesterday; is that correct?

7      A.   Yes.

8      Q.   Okay.

9               THE COURT:  I think that's fine.  Thank you.

10   That's helpful.

11              I'm asking for the date of the video.

12              MR. OLDHAM:  Oh.

13   BY MR. OLDHAM:

14     Q.   Do you recall what date your mom received the house?

15     A.   I think it was like June 6.

16     Q.   Okay.  Of what year?

17     A.   2022.

18     Q.   Okay.

19              MR. OLDHAM:  Sorry, Your Honor.

20              THE COURT:  No, that's fine.  That's fine.

21              THE WITNESS:  Oh, I think it was '21.  Was it --

22   I don't know.  I don't remember.

23   BY MR. OLDHAM:

24     Q.   Well, let me ask you.  Y'all are talking about it

25   in -- if I can publish, again, what's Exhibit No. 5, page 26.

UNREDACTED TRANSCRIPT

1    A.    Yeah, I see it.

2    Q.    What year was that?

3    A.    2022.

4    Q.    Okay.  And what day are y'all talking about the banks

5    and the money and things like that?

6    A.    June 5, 2022.

7    Q.    Okay.  And so that leads you to June 6; is that

8    correct?

9    A.    Correct.

10   Q.    Okay.

11          MR. OLDHAM:  Your Honor, may we publish Exhibit

12   No. 8 at this time?

13          THE COURT:  You may.

14          MR. OLDHAM:  Thank you.

15   BY MR. OLDHAM:

16   Q.    Ms. Johnson, who is the lady on the left?

17   A.    To my right --

18   Q.    In the video --

19   A.    My mom.

20   Q.    Okay.  To your left -- when you're looking at the

21   screen --

22   A.    Okay.  To my left.  Okay.

23   Q.    Stage left.  I apologize.

24   A.    That's me.

25   Q.    Okay.  With the hat on?

1    A.    Yes.

2    Q.    Who is the lady in the middle?

3    A.    Ashley Grayson.

4    Q.    And who is the lady with the red hair?

5    A.    My mom.

6    Q.    Okay.  And is this the video we were just talking

7  about?

8    A.    Yes.

9    Q.    Okay.

10                     (Video was played.)

11  BY MR. OLDHAM:

12    Q.    Ms. Johnson, that's the video that was made from that

13  day; is that correct?

14    A.    Correct.

15    Q.    Okay.  And you're upset, correct?

16    A.    Correct.

17    Q.    And do you need a couple of minutes?

18    A.    (Moving head up and down.)

19               MR. OLDHAM:  Your Honor, may we approach real

20  quick?

21               THE COURT:  Sure.  Sure.

22                  (At side-bar on the record.)

23               MR. OLDHAM:  There's a deceased family member, so

24  when she sees that, it upsets her.

25               THE COURT:  Sure.  I understand.

                    UNREDACTED TRANSCRIPT

1            MR. OLDHAM:  Wasn't any way around it.  I don't

2    think she knew how much it was going to affect her.

3            THE COURT:  No, that's certainly understandable.

4    We don't usually take a short, short break, but you want a

5    five-minute break?  Is that what you're thinking?

6            MR. OLDHAM:  I think she's going to be okay.  We

7    usually do that just out of thoughtfulness.

8            THE COURT:  So we'll take a short, short break.

9            Apparently, we're going to take a 15-minute

10   break.

11            (End of discussion at side-bar.)

12            THE COURT:  We are going to take a break at this

13   time.

14            Now, I want you to be aware that we will start

15   promptly back in 15 minutes.  So don't discuss the case among

16   yourselves.  Don't let anybody talk with you about it and

17   continue to keep an open mind.  We're going to see you in

18   15 minutes.  We'll let you be excused, and then we're going

19   to take a short break here.

20            (Jury out at 4:07 p.m.)

21            THE COURT:  All right.  Be back at 24 minutes

22   after the hour.  We'll restart at that time.  Don't discuss

23   the case among yourselves.  Of course, if you're part of the

24   audience, you're certainly welcome to stay where you are, if

25   you would like.

                        UNREDACTED TRANSCRIPT

```
 1          (A recess was taken from 4:09 p.m. to 4:27 p.m.)

 2               THE COURT:  I think we're ready for the panel,

 3   and we've got our new screen in place.

 4               MR. OLDHAM:  Thank you, Judge, for letting us do

 5   that.  Appreciate it.

 6               THE COURT:  I understand.  We like it being

 7   there.  That's a good place for it.  So thank you very much.

 8               We're ready for the panel.

 9               MR. OLDHAM:  Do you want the witness seated, Your

10   Honor?

11               THE COURT:  Oh, yes, yes.  The witness can come

12   up and take her seat.

13               Are you okay?

14               THE WITNESS:  Yeah, I'm okay.

15               THE COURT:  All right.  We're ready to bring the

16   panel in.

17               MR. LEVINE:  We need to clarify.  You're going to

18   clear it up with --

19               MR. OLDHAM:  Yes, sir.

20               MR. LEVINE:  Thank you, sir.  I appreciate it.

21               THE COURT:  Sure.

22               THE REPORTER:  I'm sorry.  I didn't hear that.

23               MR. LEVINE:  I'm sorry.  He's going to clear it

24   up.

25               THE COURT:  Whatever it is.  Yes, sir.
```

UNREDACTED TRANSCRIPT

1          MR. LEVINE:  Yes.

2                    (Jury in at 4:28 p.m.)

3          THE COURT:  All right.  Everyone can be seated.

4          There had been a request that you have a closer

5   screen for some of you.  So it took us a minute, but we got

6   you a closer screen.  Is that okay?  All right.

7          I will also tell you my normal schedule on a

8   regular day is that we will stop somewhere between 5:00 and

9   5:05 or something like that or sort of a natural break point,

10  when we find one, we will stop then.  We will start

11  tomorrow -- typically, I'm going to ask you to come in no

12  later than -- truly, I mean that -- 8:30.

13         And we will start in here as soon as we've got

14  everybody together, but it usually is about 20 till or 10

15  till or 15 till because we give you a chance to have a

16  restroom break, and we give you a chance to pick up a cup of

17  coffee or anything else that you want.  So it may vary a

18  little bit because we're mindful that that might not be a bad

19  idea to give you a short chance to get some water or whatever

20  else you need.

21         All right.  I think we're squared away.  They

22  asked me for a little guidance on our normal schedule.  That

23  is our normal schedule.  Yes, sir.

24         MR. OLDHAM:  Thank you, Your Honor.  May I

25  continue my inquiry?

                      UNREDACTED TRANSCRIPT

1          THE COURT:  Absolutely.

2          MR. OLDHAM:  Thank you.

3    BY MR. OLDHAM:

4     Q.   Good afternoon.

5     A.   Good afternoon.

6     Q.   When we stopped, we had just watched Exhibit No. 8,

7    which was the video of your family receiving a house; is that

8    correct?

9     A.   Correct.

10    Q.   And who received the house?

11    A.   My mother.

12    Q.   Okay.  And you were upset during that video.  And can

13   you tell the ladies and gentlemen why you were upset?

14    A.   My auntie was on the video, and she passed away.

15    Q.   Okay.  And so seeing her drummed up those emotions; is

16   that correct?

17    A.   Correct.  Plus she was so happy, and everything wasn't

18   even genuine, so . . .

19    Q.   Okay.  That was the reason you were upset; is that

20   correct?

21    A.   Correct.

22    Q.   Did y'all -- did your family produce the video?

23    A.   No.  Ashley produced the video.

24    Q.   Okay.  And did anybody talk about the house in

25   Memphis?

UNREDACTED TRANSCRIPT

1    A.    Yes.

2    Q.    And what did you see or hear about the house?

3    A.    There was a lot of people posting saying that Ashley's

4    name was still on the house.

5    Q.    No.  I'm talking about when it was first given, was

6    there, like, positive stories about it?

7    A.    Oh, yeah, positive --

8    Q.    Okay.

9    A.    -- uh-huh.

10   Q.    All right.  And at the end of the video, the house

11   that was shown at the end, whose house was that?

12   A.    The house that was shown at the -- oh, that's my

13   mother's old house, the house that she was living in before

14   she moved.

15   Q.    Okay.  And what neighborhood was that?

16   A.    South Memphis.

17   Q.    Is that where you grew up?

18   A.    Yes.

19   Q.    Okay.  You have had some run-ins with the law; is that

20   correct?

21   A.    Correct.

22   Q.    In 2019, can you tell the ladies and gentlemen of the

23   jury what sort of charges you had?

24   A.    I had four aggravated assault, four counts of

25   aggravated assault.

UNREDACTED TRANSCRIPT

1    Q.   It was alleged that you did what?

2    A.   That I shot four people.

3    Q.   Okay.

4              MR. OLDHAM:  Your Honor, if I could approach with

5    a disc.

6              THE COURT:  You may be interested, they're

7    required to consult before they show the witness or you or me

8    one of the documents.  So that's routinely, but they're also

9    supposed to do it in a way so that we can't hear them.

10             Okay, Counsel, you may proceed.

11             MR. OLDHAM:  Thank you, Your Honor.

12             May I approach, Your Honor?

13             THE COURT:  You may.

14             MR. OLDHAM:  Thank you.

15   BY MR. OLDHAM:

16   Q.   And before today, before you were in here, did you

17   watch this video?

18   A.   Yes.

19   Q.   Okay.  And whose initials are these?

20   A.   My initials.

21   Q.   And the date, what is that?

22   A.   March 25th, 2024.

23   Q.   Okay.  And the thing on here, does that reflect the

24   charge that you just talked about?

25   A.   Okay, yes.

UNREDACTED TRANSCRIPT

1    Q.    Okay.

2              MR. OLDHAM:  Your Honor, I move to make the video

3    of the article and her charges the next numbered exhibit to

4    this hearing.

5              THE COURT:  Sure.  Without objection, it's marked

6    as 9 and received.

7                   (Exhibit 9 marked and received.)

8              MR. OLDHAM:  And may we publish, Your Honor?

9              THE COURT:  You may.

10   BY MR. OLDHAM:

11   Q.    Is that a news article that's available on the

12   Internet about those charges?

13   A.    Yes.

14   Q.    Is that correct?

15   A.    Yes.

16   Q.    And what happened with those charges?

17   A.    They were dismissed and expunged.

18   Q.    Okay.

19   A.    Are you saying like what happened like what --

20   Q.    No, just --

21   A.    Okay.

22   Q.    Are they on your record?

23   A.    No.

24   Q.    Okay.  The article still remains, though; is that

25   correct?

UNREDACTED TRANSCRIPT

1    A.   Correct.

2    Q.   In 20- -- later, after the events that took place in

3  this case, were there more charges levied against you?

4    A.   No.

5    Q.   Do you have anything pending now?

6    A.   Yes.

7    Q.   From a different event?

8    A.   Yes.

9    Q.   Okay.  Was it before all this stuff happened or after

10  all this stuff happened?

11          THE COURT:  Well, let's get the "all this stuff"

12  down.

13          MR. OLDHAM:  I'm sorry.  I apologize.  That's --

14  BY MR. OLDHAM:

15    Q.   Did these come before September of 2022 or after

16  September of 2022?

17    A.   Before.

18    Q.   Okay.  And where were those charges alleged to have

19  occurred?

20    A.   On Beale Street.

21    Q.   Okay.  And those are still pending; is that correct?

22    A.   Correct.

23    Q.   What courtroom or courthouse are those pending in?

24    A.   Shelby County.

25    Q.   Okay.  And that's over at 201 Poplar; is that correct?

UNREDACTED TRANSCRIPT

1  A.   Correct.

2  Q.   Okay.  Have you and I ever discussed those charges?

3  A.   Not that I recall.

4  Q.   Okay.

5  A.   Not that I recall.

6  Q.   And have I promised you anything in exchange for your

7  testimony because you have pending charges with the State of

8  Tennessee?

9  A.   No.

10  Q.   Okay.  Have you asked me to do anything with those

11  pending charges?

12  A.   No.

13  Q.   Are you hoping your testimony here today helps you

14  with those pending charges?

15  A.   No.

16  Q.   Those charges are similar to the other charges that

17  were dismissed but two different events; is that correct?

18  A.   Correct.

19  Q.   Okay.  After your mother got the house, was there

20  anything that you and your family discovered about the house

21  that caused you pause or alarm?

22  A.   Yes.

23  Q.   And what was that that you found out?

24  A.   That Ashley's name was still on the house as the

25  owner.

UNREDACTED TRANSCRIPT

1    Q.    How did you find that out?

2    A.    Online.  My sister found out online.  She looked it

3    up.

4    Q.    Looked it up?

5    A.    Uh-huh.

6    Q.    Okay.  And why did y'all look that up?  What happened

7    to make y'all do that?

8    A.    It was mail coming to the house under Ashley

9    Massengill.

10    Q.    Okay.

11    A.    A lot of mail.

12    Q.    And your understanding in July of 2022, who owned the

13    house?

14    A.    Ashley.

15    Q.    Okay.  Did your mom, to your understanding, own it as

16    well?

17    A.    Yes.

18    Q.    Okay.  Did this bother you?

19    A.    Yes.

20    Q.    And what -- why were you upset about the name, Ashley

21    Massengill Grayson's name, still being on that house?

22    A.    Because she told me that the house was going to be my

23    mother's house 100 percent, like 100 percent her house.  So

24    if we had discussed that prior to, then it wouldn't have been

25    a problem.

UNREDACTED TRANSCRIPT

1    Q.   Okay.  Later, in August, did you and Ms. Grayson

2    discuss a trip to Texas?

3    A.   Yes.

4    Q.   And what was your understanding as to why you were

5    going to go to Texas?

6    A.   I was thinking I was going to Texas so she can discuss

7    her taking her name off the house or probably a potential

8    business investment or something like that.

9    Q.   And did y'all discuss the reason for your trip to

10   Texas beforehand?

11   A.   No.

12   Q.   How did you get the money to go or fly to Texas?

13   A.   Ashley sent it to me through Cash App, sent me $1,600.

14   Q.   Okay.  Were you going to perform any of your duties as

15   a hairdresser with Ashley in Texas?

16   A.   No.

17   Q.   Did you ever perform any hairdressing duties with

18   Ms. Grayson in Dallas, Texas?

19   A.   No.

20   Q.   Did you ever perform any hair duties with Ms. Grayson

21   here in Memphis, Tennessee?

22   A.   No.

23   Q.   Okay.

24            MR. OLDHAM:  May I approach, Your Honor, please?

25            THE COURT:  You may.

UNREDACTED TRANSCRIPT

1          MR. OLDHAM:  Thank you.

2   BY MR. OLDHAM:

3     Q.   What is that?

4     A.   That's the $1,600 Cash App that she sent for the

5   flight.

6     Q.   Okay.

7          MR. OLDHAM:  Your Honor, move to make this the

8   next numbered exhibit to this hearing.

9          THE COURT:  Marked and received as 10 without

10  objection.

11         MR. OLDHAM:  Thank you, Your Honor.

12          (Exhibit 10 marked and received.)

13         MR. OLDHAM:  May I publish?

14         THE COURT:  You may.

15         MR. OLDHAM:  Thank you, Judge.

16  BY MR. OLDHAM:

17    Q.   All right.  And what is this?

18    A.   That's the money she sent for the flight.

19    Q.   Okay.  And why did you -- well, did y'all ever discuss

20  why you were going there?

21    A.   No.

22    Q.   Okay.  Here on Exhibit 5, the chat that we've been

23  talking about on page 28, what question do you ask?  Sorry.

24    A.   "Do you want me to do First Class?  Girl, this is

25  going to be my first time on a plane, so I'm slick lost."

UNREDACTED TRANSCRIPT

```
 1    Q.   Okay.  So never been on a plane before?

 2    A.   No.

 3    Q.   Okay.  And you're trying to navigate how to purchase

 4  tickets; is that correct?

 5    A.   Correct.

 6    Q.   Okay.  And how does she respond here at the bottom of

 7  page 28?

 8    A.   "That's fine."

 9    Q.   And then what do you send her?

10    A.   My Cash App name, oliviaoslay.

11    Q.   Okay.  And then you come down here and what do you

12  say?

13    A.   "Girl, WTF."

14    Q.   Okay.  And do you know why you said that --

15    A.   No.

16    Q.   -- on the bottom of page 29 of the Exhibit 5?

17    A.   I don't remember why.

18    Q.   Okay.  And then here at the top on page 30, what do

19  you say?

20    A.   "I think I get it.  Want me to do a roundtrip?  What

21  day we going back?"

22    Q.   And then how does she respond?

23    A.   "On Monday."

24    Q.   And then how do you respond?

25    A.   "Okay, okay.  Got you."
```

UNREDACTED TRANSCRIPT

1    Q.   Okay.  Over to page 31 on August 26 here at the top,

2    what does she ask?

3    A.   "Did you get the flights already?"

4    Q.   Okay.  And then you say what?

5    A.   "Mane, I'm on here so lost.

6    Q.   And Mane would be the traditional Memphis spelling; is

7    that correct?

8    A.   Correct.

9    Q.   And how is that spelled?

10   A.   M-A-N-E.

11   Q.   Okay.  And then at the bottom of page 31, what does

12   she tell you?

13   A.   "Don't get it yet."

14   Q.   Okay.  And then page 32?

15   A.   "Just hold the money for right now."

16   Q.   And how do you respond?

17   A.   "Okay."

18   Q.   And then what does she ask?

19   A.   "When y'all free again?"

20   Q.   All right.  And then on August 30th over here, how do

21   you respond?

22   A.   "We coming this weekend.  We just had to get

23   everything together first."

24   Q.   Okay.  And how does she respond?

25   A.   She loved the message.

UNREDACTED TRANSCRIPT

1    Q.    Okay.  And then what do you say?

2    A.    "Brandon cousin told him about an art gallery, so that

3    will be something for all of us to do."

4    Q.    And you say, "all four of us to do"?

5    A.    Yeah, "for all four of us to do."

6    Q.    Okay.  Was the plan always for Brandon to go with you?

7    A.    Yes.

8    Q.    When you had discussed it with Ms. Grayson before, was

9    that the plan, or did you just add Brandon in?

10   A.    No, that was the plan.  She said it on the phone.

11   Q.    Okay.  Over to page 34, you're still talking about the

12   museum.  And what do you say?

13   A.    "Exhibit or some."

14   Q.    Say it again.

15   A.    "Exhibit or some."

16   Q.    Okay.  And at the bottom of 34, what does she ask you?

17   A.    "What day y'all coming?"

18   Q.    And this is on August 30th.  What do you say?

19   A.    "Sunday.  Y'all must was finna leave."

20   Q.    Okay.  Would you say "Sunday.  Y'all was" --

21   A.    Finna.  It's like fixing to but like finna.

22   Q.    And how do you spell it?

23   A.    F-I-N-N-A.

24   Q.    Okay.  And then how does she respond?

25   A.    "Nah, I wanted y'all to come sooner."

UNREDACTED TRANSCRIPT

1    Q.   And then at the bottom of 36.

2    A.   "I was only going to wait because I started booking

3    for Friday.  But I'll move my appointments up."

4    Q.   And what are you talking about, "booking"?

5    A.   Hair appointments.

6    Q.   Okay.  And then on 36.

7    A.   "When you want us to come, Friday?"

8    Q.   And then how does she respond at the bottom of 36?

9    A.   "Tonight."

10   Q.   And then over here, on 37.

11   A.   "Nah, Friday cool, LOL."

12   Q.   Okay.  And then you laughed down here at "tonight"; is

13   that correct?

14   A.   Correct.

15   Q.   And then right here in the middle of 38, what do you

16   say on September 1, 2022?

17   A.   "Don't be mad at me, sis.  We coming Saturday.  We

18   having a sleepover at momma house tomorrow, leaving Saturday

19   morning though.  See y'all later.  Guess I'll call you when

20   we get there because you take forever to answer messages."

21   Q.   And what are you referring to there?

22   A.   She just take a long time to respond to messages.

23   Q.   Text messages?

24   A.   Text messages.

25   Q.   Okay.  And down here, how does she respond?

UNREDACTED TRANSCRIPT

1    A.   "I was on a Zoom call and okay.  We'll see y'all
2  Saturday."
3    Q.   Over on page 39, at the top.
4    A.   "Hey, O.  It's cool.  Y'all don't have to come."
5    Q.   And what day was that?
6    A.   Where's the date?
7    Q.   At the bottom of the bubble there.
8    A.   August 30, 2022.
9    Q.   What day?
10    A.   Does it say August?  Oh, September, my bad.
11  September 30, 2022.
12    Q.   And then how do you respond?
13    A.   "Girl, please.  We'll be arriving at 2:30 p.m. on the
14  dot tomorrow.  Byeee, Ms. Attitude."
15    Q.   How did you say bye?
16    A.   "Byeee, Ms. Attitude."
17    Q.   And that's B-Y with several Es; is that correct?
18    A.   Yes.
19    Q.   Okay.  And why did you say that?
20    A.   Because, like, she'll always catch little attitudes.
21    Q.   Okay.  And here, were you being mean or were you
22  trying to be funny?
23    A.   Being funny.
24    Q.   Okay.  And you're no stranger to attitudes; is that
25  correct?

UNREDACTED TRANSCRIPT

1    A.   Yes.

2    Q.   Okay.  Over on page 40, you say what?

3    A.   "Here now."

4    Q.   Okay.  And what are you telling her?

5    A.   That we are in Dallas.

6    Q.   And this is the flight we've been talking about; is

7  that correct?

8    A.   Correct.

9    Q.   First time on an airplane?

10   A.   Yes.

11   Q.   And you got to sit first class?

12   A.   No.

13   Q.   Okay.  But you -- nevertheless, bought and paid for by

14 Ms. Grayson; is that correct?

15   A.   Correct.

16   Q.   Okay.  And then how does she respond once you tell her

17 you're there?

18   A.   "We came to my house.  I had to get the people to fix

19 my air.  They're here now.  I'm like 40 minutes from the

20 airport."

21   Q.   And then here.

22   A.   "It's hailing bad.  Josh just left out to get some

23 food.  He ended up coming back because the weather was too

24 bad.  Y'all should be able to get an Uber here.  We were in

25 the city yesterday at his house."

47

1    Q.   Okay.  And then over here, she gives you her address;
2  is that correct?

3    A.   Correct.

4    Q.   Okay.  And then what does she ask?

5    A.   "Y'all want to get a room until the storm blows over?"

6    Q.   And how do you respond?

7    A.   "We're going to get a room right quick.  You know when
8  you'll be back?"

9    Q.   Here at the top.

10   A.   "We just going to go to the hotel so Brandon can
11 shower, then we're going to head to your house."

12   Q.   And here.

13   A.   "We almost there."

14   Q.   And then how does she respond at the bottom of page
15 42?

16   A.   "The air wasn't fixed today.  They left.  It's not
17 getting fixed until Tuesday.  It's 90 degrees in here.  I
18 thought y'all was coming yesterday or Friday while we were at
19 Josh's house, that's why I was" staying don't worry about
20 it -- I mean, "that's why I was saying don't worry about it
21 yesterday."

22   Q.   Okay.  And then what does she say at the top there?

23   A.   "We're here, though."

24   Q.   Page 43.  What does she say?  I'm sorry.

25   A.   That's me.  "We're here, though."

UNREDACTED TRANSCRIPT

```
 1    Q.   And then you're over here?

 2    A.   Oh, no, no.  That's her.  That's her.  Okay.

 3    Q.   Okay.  So let's back up.

 4         When you say "her," who is that?

 5    A.   Ashley.

 6    Q.   Ashley?

 7    A.   Uh-huh.

 8    Q.   Ashley who?

 9    A.   Ashley Grayson.

10    Q.   Okay.  And at the top, what does it say?

11    A.   "We are here, though," like we're here, though.

12    Q.   And how do you respond?

13    A.   "Damn, I didn't know we outside."

14    Q.   And what is that referring to?

15    A.   Like, we outside the house.

16    Q.   Okay.

17    A.   Okay.

18    Q.   And then is that -- when you say "the house," where do

19 you go?

20    A.   Ashley house.  I was saying "Damn," I didn't know,

21 like, the air was messed up.

22    Q.   Okay.  But did you eventually go to see Ms. Grayson

23 that night?

24    A.   Yes.

25    Q.   Who was with you?
```

UNREDACTED TRANSCRIPT

1    A.    Brandon.

2    Q.    And where did you go to see her?

3    A.    At her house.

4    Q.    Did y'all eventually leave there?

5    A.    Yes.

6    Q.    Where did y'all go?

7    A.    To Josh's house.

8    Q.    And about how long was that drive?

9    A.    Probably around 40 minutes.

10   Q.    Okay.  And where did Josh live?

11   A.    He live in Dallas.

12   Q.    And was it -- in what kind of place?

13   A.    A high-rise, I think.

14   Q.    Okay.  During the ride, did you talk to Ashley Grayson

15   about anything?

16   A.    Yes.

17   Q.    And what did y'all talk about?

18   A.    We talked about the house.  We talked about Derricka,

19   Sherrell, and Patrick.

20   Q.    Let's take those in order.

21         What did y'all talk about the house?

22   A.    She was saying that she could just take her name --

23   she could just pay $20 to take her name off the house and put

24   my name on there, and it won't take no time.

25   Q.    Is that what you wanted to have happen?

UNREDACTED TRANSCRIPT

1    A.    Yes.

2    Q.    Did you want it in your name?

3    A.    Well, I just wanted her name off of it.  I didn't care

4    if it was in my name, my sister name, I didn't care.  But she

5    said my name, so I was good with it.

6    Q.    Okay.  And then who was the next person you said y'all

7    talked about?

8    A.    Derricka or -- I don't know.  I don't know the order.

9    Q.    Okay.  Well, let's just take them one at a time.

10    Who is Sherrell?  Do you know her whole name?

11    A.    Sherrell Hodge.  I think that's her whole name.

12    Q.    Okay.  And what did y'all talk about with Sherrell?

13    A.    Her TikTok.  Her TikTok page.  Like, she had made a

14    video about Ashley being a scammer, so that's what we were

15    talking about.

16    Q.    Whose TikTok page?

17    A.    Sherrell's TikTok page.

18    Q.    Had you seen that before?

19    A.    Yes.

20    Q.    And did you talk to Ashley about that that night?

21    A.    Yes.

22    Q.    And what was the nature of the post that was

23    offensive?

24    A.    Well, I guess the whole post was offensive because she

25    was talking about both Ashley and Josh in the post.  So . . .

UNREDACTED TRANSCRIPT

1    Q.   And what was it about?

2    A.   Her credit, she was saying that -- I don't remember.

3              MR. LEVINE:  Your Honor --

4              THE WITNESS:  I don't remember, like, detail to

5    detail.

6    BY MR. OLDHAM:

7    Q.   Stop.  Stop.

8              THE COURT:  Hold on.  One at a time.

9              MR. OLDHAM:  Thank you.

10             THE COURT:  Sure.

11             MR. LEVINE:  Your Honor, may we approach briefly?

12             THE COURT:  Sure.  Sure.

13             MR. LEVINE:  Thank you.

14                  (At side-bar on the record.)

15             MR. LEVINE:  Thank you.  Judge, I believe he's

16   going to get into some manner of extraneous, in regards to

17   this TikTok video, it's going to be hearsay as well in terms

18   of what was in the TikTok video.  She didn't produce the

19   TikTok video, and it's obviously going to be nothing good

20   about the defendant.

21             THE COURT:  What about that?  You're getting

22   ready to do this extraneous thing.

23             MR. OLDHAM:  Your Honor, what I'm asking her is

24   what Ms. Grayson saw in the video and talked to her about,

25   why Ms. Grayson was upset.

1              THE COURT:  Right, and that's what I understand.

2  Your point is it needs to be carefully confined.

3              MR. LEVINE:  I believe so.  I don't know that we

4  got notice of it.  As an extraneous, it's not being offered

5  for that necessarily, but that's --

6              MR. OLDHAM:  It's being offered for why

7  Ms. Grayson was upset.  Ms. Grayson is about -- as I

8  understand, is about to ask her to kill her, and this is

9  laying the reason --

10             THE COURT:  Well, not to kill Ms. Grayson but to

11  kill --

12             MR. OLDHAM:  I'm sorry.  You're right, Your

13  Honor.  Ms. Hodge.

14             THE COURT:  -- Ms. Hodge.

15             MR. OLDHAM:  And this lays out the reason why she

16  is going to make that request to her.

17             THE COURT:  Okay.  That's an admission.  That's

18  not a problem.  That's under the rules.

19             MR. LEVINE:  I think it could be made, Your

20  Honor -- I think it should be made respectfully narrowly.  I

21  don't think it really is contingent upon the amount of motive

22  she had based on the TikTok video.

23             MR. PALMER:  Additionally, Your Honor, we asked

24  before for the information; never got it.

25             THE REPORTER:  Sorry.  Speak up.  Speak up,

UNREDACTED TRANSCRIPT

 1   Mr. Palmer.

 2            THE COURT:  Well, there is a rule about one side

 3   speaking.  I'm going to let you speak, Mr. Palmer, but we

 4   need to remember that.  Because otherwise, I end up with --

 5            MR. PALMER:  I can have him do it.

 6            THE COURT:  -- a lot of people.  However you want

 7   to do it.

 8            Mr. Palmer, we would love to hear from you.

 9            MR. PALMER:  Thank you, Your Honor.

10            October 2nd or 3rd, Mr. Ballin sent a discovery

11   letter --

12            THE COURT:  He did.

13            MR. PALMER:  -- speaking -- asking for 404(b).

14   We received a response on November 3rd with no 404(b).  We

15   never received a 404(b) from the Government.

16            THE COURT:  What about that?

17            MR. OLDHAM:  I don't see this as any past bad

18   acts from Ms. Grayson.  This is part of the case that they

19   are well aware of in this conversation.  They know that she

20   asked for three people.  They have gotten her statement where

21   she's talked about she asked that three people be killed, and

22   so this is part of what they have from what we have turned

23   over, Your Honor.

24            THE COURT:  It's part of -- essentially, *res*

25   *gestae*-type information.

UNREDACTED TRANSCRIPT

1          MR. OLDHAM:  Yes, Your Honor.

2          THE COURT:  In order to understand the whole

3    context, this is appropriate to be received.

4          MR. OLDHAM:  Okay.  And that's been our --

5          THE COURT:  But if this was the only thing

6    submitted, the Government would acknowledge that it wouldn't

7    be sufficient to prove Count 1.

8          MR. OLDHAM:  Oh, not at all, Your Honor.

9          THE COURT:  And so I think with everybody's

10   understanding that -- and do I need to say anything about

11   there's not a charge here as to that offense.  I don't think

12   that helps.  I think it's better not to say that, but I

13   always listen to Counsel on that part.

14         MR. LEVINE:  Yes, Your Honor.  I think I would

15   like to know the substance or summary at least of what she's

16   going to say so we don't have to hear it for the first time.

17         MR. OLDHAM:  She is going to say that she was

18   upset about a video.  And I think it's going to be that the

19   business wasn't a good business, and I think something about

20   the house.  And then is that the reason she's upset with her,

21   yes, and what did she ask you to do.

22         MR. LEVINE:  Okay.

23         MR. OLDHAM:  I'm not trying to --

24         THE COURT:  Why don't we go ahead.  I think we've

25   got that straightened out.  So that does take care of that,

UNREDACTED TRANSCRIPT

1   but I don't want to leave out the second defendant.

2            MR. SCHOLL:  I appreciate that, Judge.  I have

3   nothing to add.

4            THE COURT:  That's fine.

5            We are going to stop really close to five because

6   the jury came in a little earlier.

7            MR. OLDHAM:  Yes, Your Honor.

8            THE COURT:  I'm going to let them come in only by

9   8:30 tomorrow.  So a little more time.  But we will start in

10  here as everybody -- because it's so much better for all of

11  you guys.  We will start on time.

12           MR. OLDHAM:  I'm sorry.

13           THE COURT:  No, no, no.  You're fine.

14           MR. OLDHAM:  Right now, we're all riding in the

15  car with them.

16           THE COURT:  Right.  Well, I mean, we're hearing

17  them.

18           MR. OLDHAM:  Yes, Your Honor.  There are two more

19  conversations -- the end of this conversation --

20           THE COURT:  There's more than one conversation?

21           MR. OLDHAM:  Yes, Your Honor.

22           May we finish the car ride?  And I think that

23  will take us to about five, 5:05.

24           THE COURT:  Well, if you can do that, that's

25  fine.  It's better to get it all in.

UNREDACTED TRANSCRIPT

1        MR. SCHOLL:  While we're here, that's not going

2  to involve her talking about what Brandon told her, Brandon

3  Thomas told her?

4        THE COURT:  Right.  Well, no, that would be

5  hearsay.

6        MR. SCHOLL:  That will.  That's why I'm -- I

7  don't want her to also jump out and say what Brandon --

8        THE COURT:  No, no, no.  We can't do that.  I

9  think we're okay.

10              (End of discussion at side-bar.)

11        THE COURT:  Okay.  Our goal is to finish this

12  segment through the time in the car, but then to go home

13  because I will ask you to come back at 8:30, and we will stay

14  on a pretty tough -- a very regular schedule.  Very regular

15  schedule.

16  BY MR. OLDHAM:

17  Q.   Did Ms. Grayson, during the car ride, tell you why she

18  was mad at Sherrell Hodge?

19  A.   Yes.

20  Q.   Why was she mad at Sherrell Hodge?

21  A.   Because of the stuff Sherrell was saying on TikTok

22  about her.

23  Q.   Okay.  And what did she ask you to do as it pertained

24  to Sherrell Hodge?

25  A.   She wanted me to kill her.

UNREDACTED TRANSCRIPT

 1    Q.   Did she talk to you about any other people during that
 2    ride?
 3    A.   Derricka and Patrick.
 4    Q.   All right.  Patrick who?
 5    A.   Patrick Tate.
 6    Q.   And did Ms. Grayson tell you what her relationship was
 7    with Patrick Tate?
 8    A.   Yes.
 9    Q.   Did she tell you -- and what was her relationship with
10    him?
11    A.   That was her ex, her ex-boyfriend.
12    Q.   And was she having any conflict with him that she told
13    you about?
14    A.   Yes.
15    Q.   And what did she tell you the conflict was?
16    A.   That he had something in her phone -- he had something
17    in his phone of her like a video that he was using to
18    antagonize her.
19    Q.   What did she ask you to do about Patrick Tate?
20    A.   To kill him too.
21    Q.   Was she offering anything in exchange for that?
22    A.   She was offering money.
23    Q.   And who was the last person she talked to you about?
24    A.   Derricka Harwell, I think that's her last name.
25    Derricka Harwell.

1    Q.    And did she describe to you any reason she had for

2    animosity with Derricka Harwell?

3    A.    Yes.

4    Q.    And what did she tell you the reason that was?

5    A.    She said Derricka created a fake account and talked

6    about her on it and released her address to a lot of people

7    online.

8    Q.    And what did she ask you to do as it pertains to

9    Derricka Harwell?

10    A.    Kill her.

11    Q.    And during the car ride, were amounts of money

12    discussed?

13    A.    Yes.  Well, not, like, specific amounts in the car

14    ride.

15    Q.    Okay.

16    A.    But she did tell me that she had cash on-hand ready

17    to, you know, make a deposit.

18    Q.    Okay.  And when you finished the car ride, where were

19    y'all?

20    A.    At Josh's house.

21    Q.    And where was your husband -- what's his name?

22    A.    Brandon.

23    Q.    Where was he during this car ride?

24    A.    In the car with Josh.

25    Q.    Okay.  Did all four of y'all arrive at the apartment?

1    A.    Yes.

2    Q.    And did y'all go up and hang out for a little while?

3    A.    Yes.

4            MR. OLDHAM:  Okay.  Your Honor, I believe that

5    ends this part of it.

6            THE COURT:  I think that's a transition point.

7            Now, ladies and gentlemen, remember, we have not

8    heard the rest of the story.  You cannot draw any conclusions

9    at all from where we are right now.  We just know we have

10   some testimony.  I'm not telling you what to do one way or

11   the other, but you have to do what?  Keep an open mind until

12   you have all of the evidence in the case.  So as long as you

13   know that, I think we'll be fine.

14           We're going to ask you to come back at 8:30

15   tomorrow -- if everybody is back on the dot at 8:30 or little

16   before the dot on 8:30.  Then we will start in here probably

17   at 20 till or at least by 15 till because sometimes we have a

18   few things to discuss each morning, so that's not unusual.

19           You should have filled out, or will tomorrow

20   morning, if you haven't already -- have you already filled

21   out your lunches for tomorrow?  Good.  I just wanted to be

22   sure you already filled those out.

23           So there are seven things to remember.  You know

24   we make it shorter now.  Don't discuss the case among

25   yourselves.  Don't discuss it with anybody else.  Don't let

UNREDACTED TRANSCRIPT

1    anybody discuss it with you.  Of course, if they try to, you

2    need to report it promptly to the Court through my security

3    officers, my staff, or myself.

4              And, of course, do not speak to the witnesses,

5    lawyers, or parties.  They cannot speak to you.  And you know

6    what will happen.  They'll just look down and look

7    embarrassed.  So don't feel offended.  They are not supposed

8    to talk to you.

9              Don't do any research or make any inquiry.

10   Absolutely.  Don't go to see if you can get on TikTok, if you

11   understand what I'm saying.  I'm really serious about that.

12   Don't do any of those things that would give you any

13   information because you could not use it.  You cannot use it,

14   if you did, in the resolution of the case.  So it would be

15   totally forbidden.  No research, no inquiry of any kind.  We

16   talked about that.

17             Avoid anything in the media that might be about

18   it.  We know the media is a big tempt nowadays.  And that

19   means if somebody tried to send you something on Facebook, I

20   need to know about it and I'm not kidding.  I need to know

21   about it, and you send that to me so I would be aware of it.

22   Or anything, any other medium that they might use to send

23   something to you.  Hopefully, that won't happen.

24             And then, of course, the last thing is, as we

25   said, keep an open mind.

 1          Now, again, we've only begun in the case, so do
 2  not -- do not, in any way, make up your mind.  We've got a
 3  ways to go.
 4          I'm going to let y'all be excused, and then I'm
 5  going to talk to the witness for just a witness.  Witnesses
 6  actually can't talk to anybody.  The nice thing about it,
 7  about being a witness, you can't talk to anybody overnight.
 8  They can't talk to you about the case.  So you just get a
 9  nice evening rest.  But be sure what?
10          THE WITNESS:  8:30.
11          THE COURT:  You're here on time.
12          Well, no, 8:30 is a little late for the witness.
13          THE WITNESS:  Eight o'clock.
14          THE COURT:  Well, 8:15.  We'll go for that.
15          Ladies and gentlemen, thank you-all very much.
16  We're going to let you be excused and we'll let our witness
17  step down.
18               (Jury out at 5:01 p.m.)
19          THE COURT:  The first thing I need to check on is
20  how much longer does the Government think that the exam will
21  be?  I assume we're talking about 30 minutes, but I don't
22  know.
23          MR. OLDHAM:  I believe it will be longer, Your
24  Honor, probably 45 minutes to an hour.  There are a couple of
25  other exhibits that we've all talked about that defense is

UNREDACTED TRANSCRIPT

1    aware of that we are going to offer.  Some of those are

2    videos.  Each of those is brief, but they will require some

3    sort of explanation on those.

4            And the Government thinks the text messages are

5    very important, especially after this trip we're talking

6    about.  We will spend some time going through those, and

7    that's kind of some dense material, Your Honor.

8            THE COURT:  That's perfectly fine.  I think the

9    main thing is planning for everybody so that Mr. Palmer is

10   aware.  I think Mr. Palmer is going to do the cross.  Oh,

11   okay.  Well, I was totally wrong.  Mr. Levine is going to do

12   the cross here.

13           I'm sorry, Mr. Levine, I wasn't trying to leave

14   you out.  He keeps -- I don't know.  I thought he was lead

15   counsel.  That's what's confusing me.

16           MR. PALMER:  I am.

17           THE COURT:  Okay.  And then, Mr. Scholl, I know

18   y'all can't tell how long and I know that's not reasonable to

19   expect.  I think, though, based on what I'm hearing, that we

20   would finish this witness before lunch.

21           Is that what Counsel is thinking?

22           I mean, because we've got an hour, we start at,

23   you know, at 8:45, or maybe even a little earlier.  That's

24   9:45.  That's a fair amount of time.  What do you think?

25           MR. LEVINE:  Yes, Your Honor, I think that's very

UNREDACTED TRANSCRIPT

```
 1   reasonable.
 2             THE COURT:  Okay.  Mr. Scholl, is it?
 3             MR. SCHOLL:  I guess I just -- I will --
 4             THE COURT:  I know it's a little hard.
 5             MR. SCHOLL:  That's a good plan, but I'll have to
 6   see what develops.
 7             THE COURT:  You know, the best thing a lawyer can
 8   do for his client is what --
 9             MR. SCHOOL:  Sometimes --
10             THE COURT:  -- listen.
11             MR. SCHOLL:  -- listen, Judge.
12             THE COURT:  Listen.  The second best thing is --
13             MR. SCHOLL:  Or not saying anything.
14             THE COURT:  Absolutely.  Not a problem.  But I
15   think we've got a shot at doing that.  The reason I'm asking
16   that is then I'm going to ask our next witnesses in sequence,
17   if you can give them, because Counsel need to be ready.
18             MR. OLDHAM:  Yes, Your Honor.  It will either be
19   Mr. Thomas and Leslie Jones from the ATF.  One of those two.
20   And I'll let everybody know closer to time.  The last two
21   will be Special Agent Hosafros, who is the State's
22   representative.  And the final will be Ms. Harwell, Your
23   Honor.
24             THE COURT:  All right.  I think that's very
25   helpful, and that's what we always do, as you know.  Of
```

UNREDACTED TRANSCRIPT

1    course, they know if they do put on witnesses, I will ask

2    them in advance just as much as I can.  Sometimes I can't

3    because it doesn't work that way.  But as much as I can so

4    that nobody is surprised.  Everybody knows the sequence.  I

5    think that's it.

6         I was here early, and I think all of you were

7    here pretty early this morning.  So I will be out here no

8    later -- absolutely no later than 8:30.  And if you have

9    anything else you need to bring up, you will need to bring it

10   up at that time.

11        I make one inquiry or comment or trying to figure

12   out how we're doing this, and that is there -- in some of the

13   opening and -- it's not a criticism.  I just understand that

14   some of the things that were said would probably not be

15   evidence in the case and not receivable as evidence in the

16   case.  And I'm not quite sure about how we're going to be

17   navigating that.

18        This is not a chance to tell everybody's life

19   story.  And it's not a chance to -- although, Ms. Johnson has

20   told us quite a bit, we don't go through, like, where did you

21   go to high school?  What were your disadvantages?  Did you

22   grow up in Baltimore?  Was it a bad life?  Or did you grow up

23   in South Memphis?  That's simply not where the case is, and

24   those are not probative on issues in the case and they tend

25   to be things that are really of no use to the jury.  They're

UNREDACTED TRANSCRIPT

1   not relevant.

2          And the second thing is that sometimes -- and I

3   don't know that anybody here would attempt to do this, there

4   is some effort to evoke a sympathy.  And, you know, that just

5   has no place here.  And so I just want to make sure everybody

6   understands because I don't want anybody caught by surprise.

7          So, Mr. Oldham, you're not going to go back

8   through her high school degree and all that?  You're not

9   going to go about childhood?  You're not going to do all

10  that?

11         MR. OLDHAM:  I will not, Your Honor.

12         THE COURT:  It just doesn't seem appropriate to

13  me.

14         MR. OLDHAM:  I will curtail it, Your Honor.

15         THE COURT:  Okay.  Because, you know, it's a

16  sympathy issue.  It's how did you grow up.  You know what I'm

17  saying.

18         MR. OLDHAM:  Yes, sir.

19         THE COURT:  There's some issues there they aren't

20  relevant in the case, so we just don't want to go there.

21         And, Mr. Palmer, the same thing, of course,

22  Mr. Levine, we don't want that either because sympathy can go

23  either way, and we don't want sympathy in the case.

24         Mr. Scholl never does that anyway.  I'm sort of

25  smiling when I say that, Mr. Scholl.

UNREDACTED TRANSCRIPT

1              MR. SCHOLL:  Everybody feels sorry enough for me,

2    Judge.

3              THE COURT:  We understand what we cannot do.

4    Maybe I was mishearing some things in open, but there was

5    some things that I think we probably won't be hearing about

6    unless somebody can demonstrate that they have something you

7    do with an issue in the case.

8              MR. OLDHAM:  Yes, Your Honor.

9              THE COURT:  That covers that.  Anything else?  I

10   think I've determined how we're going to start tomorrow.

11             See everybody then in here no later than 8:30.

12   Obviously, you want to get here before then.  Thank you all

13   very much.

14             (Adjournment.)

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

**C E R T I F I C A T E**

        I, TINA DuBOSE GIBSON, do hereby certify that the
foregoing 66 pages are, to the best of my knowledge, skill
and abilities, a true and accurate transcript from my
stenotype notes of the trial held on the 26th day of
March, 2024, in the matter of:


UNITED STATES OF AMERICA
vs.
ASHLEY GRAYSON AND JOSHUA GRAYSON



Dated this 26th day of March, 2024.




                    s/Tina DuBose Gibson
                    _____
                    TINA DuBOSE GIBSON, RPR, RCR
                    Official Court Reporter
                    United States District Court
                    Western District of Tennessee