1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____
                                    |
UNITED STATES OF AMERICA,           |
                                    |
            Plaintiff,              |
                                    |
vs.                                 |   NO. 23-CR-20121
                                    |
ASHLEY GRAYSON AND                  |
JOSHUA GRAYSON,                     |
                                    |
            Defendants.             |
_____




TRANSCRIPT OF THE TRIAL

BEFORE THE

HONORABLE JON P. MCCALLA




MONDAY

MARCH 25, 2024




TINA DuBOSE GIBSON, RPR, RCR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

UNREDACTED TRANSCRIPT

1              A P P E A R A N C E S

2

3        Appearing on behalf of the Government:

4             PATRICK NEAL OLDHAM
               BRYCE PHILLIPS
5             United States Attorney's Office
               167 N. Main Street, Suite 800
6             Memphis, Tennessee 38103
               (901) 544-4231
7             neal.oldham@usdoj.gov
               bryce.phillips@usdoj.gov
8

9        Appearing on behalf of the Defendant Ashley Grayson:

10            SCOTT H. PALMER
               MICHAEL LEVINE
11            Scott H. Palmer, PC
               15455 Dallas Parkway
12            Suite 540
               Dallas, Texas  75001
13            (214) 987-4100
               scott@palmerperlstein.com
14            michael.levine@palmerperlstein.com

15

               LESLIE I. BALLIN
16            Ballin, Ballin & Fishman, PC
               200 Jefferson Avenue
17            Suite 1250
               Memphis, Tennessee 38103-2007
18            (901) 525-6278
               lballin@bbfpc.com
19

20

         Appearing on behalf of the Defendant Joshua Grayson:
21
               MICHAEL E. SCHOLL
22            The Scholl Law Firm
               200 Jefferson Avenue
23            Suite 1500
               Memphis, Tennessee 38103
24            (901) 529-8500
               mike@scholl-law-firm.com
25

                    UNREDACTED TRANSCRIPT

```
1                         MONDAY

2                     MARCH 25, 2024

3                 ----------------------

4

5          THE COURT:  I have received and reviewed the

6   motion by the United States in this matter on the evidence

7   that the defendants propose to possibly use as alleged

8   impeachment, and it appears that the Government's motion is

9   correct.

10          I will look at it a little more, but I've looked

11   at it.  I read it all, reviewed it yesterday, and it looked

12   like the Government was correct on that.  So if you have

13   anything in your PowerPoints or anything else that you intend

14   to use that might -- and I had trouble printing the

15   defendant's PowerPoint, but we're printing it downstairs

16   again.  Then you will need to remove that.  And on the

17   PowerPoints, I was a little concerned.

18          The PowerPoints are just what they are.  And

19   opening statements are limited, and so it looks like

20   everybody is trying to make a closing argument.  Is that what

21   you're doing?

22          MR. OLDHAM:  No, Your Honor.  I'm just trying to

23   lay out a timeline.  There won't be any argument.  Defense

24   counsel has had it.  I don't know if they think --

25          THE COURT:  No, I looked at it.  I looked at it.
```

UNREDACTED TRANSCRIPT

1    Yours looked okay, but I was a little concerned about the

2    potential for improper use of either side.  I have to be, you

3    know, even to everybody, and I want to remind everybody that

4    you can't argue.  Also I want to make sure we've got a clear

5    limit on the time.

6              This is a case where, typically, opening

7    statements by the parties would be pretty short, and I think

8    we probably -- we'll talk about it usually in every case.  We

9    weren't going to talk about it much here.

10             So I'm going to ask the Government how long your

11   opening statement would be.  I'm thinking you're thinking 15

12   to 18 minutes?

13             MR. OLDHAM:  Your Honor, I believe we timed it,

14   and it was a little over 20.

15             THE COURT:  Twenty.  It looked about 20.  I mean,

16   I couldn't quite tell because you can't tell what you're

17   going to say --

18             MR. OLDHAM:  Yes, Your Honor.

19             THE COURT:  -- in addition.  So that's sort of

20   typical, and that's not a problem.

21             So the Government is looking at about 20.

22             Now, we've got two defendants, obviously, and

23   we're always going to start, as I understand it, with

24   Ms. Grayson.  That's listed on the indictment.  That's how

25   we're going to do that.

                    UNREDACTED TRANSCRIPT

1          About how long do we think we're going to take on

2    the open on that?

3          MR. PALMER:  I would say at least -- I have mine

4    timed about 20 to 25 minutes, Your Honor.  There's a lot to

5    unpack.

6          THE COURT:  It's actually not very much.  I hear

7    you saying it's a lot, but I'm trying to caution everybody

8    we're going to stay within the rules.  We're not going to

9    stay within vast universe.

10         MR. PALMER:  Twenty minutes is fine.

11         THE COURT:  Twenty minutes is about right.  And

12   so just be mindful of that.  I mean, I know you're used to

13   doing this all the time.  So just be mindful if we started

14   going past 20, let's say you got to 22, 23 minutes, I would

15   probably say, well, that's about the amount of time we

16   allocated for opening statement.  And that just means one

17   last sentence and sit down or not even one last sentence,

18   but, you know, just go ahead.  That shouldn't be a problem.

19   I mean, it's pretty direct -- that's how I'm looking at it.

20   Maybe there's something more complicated than I think.

21         All right.  Mr. Ballin, are you doing opening

22   here?

23         MR. BALLIN:  No, sir.

24         THE COURT:  I know you're not.  So let's hear

25   from -- yes, sir?

```
 1            MR. BALLIN:  Matter of fact, if there was a seat

 2   in the hallway for me, that's where I would be.

 3            THE COURT:  Oh, no, you're stuck here.  You can't

 4   go anywhere.  We got you.  We can't let you go anywhere.

 5            Okay.  And so let's check with counsel for the

 6   co-defendant?

 7            MR. SCHOLL:  That's me, Your Honor.  I had to

 8   find a place to sit amongst everybody because it's just me.

 9            THE COURT:  I know, you managed to nail down a

10   good spot, though.

11            MR. SCHOLL:  I did manage to find a good spot,

12   Your Honor.  I do not have co-counsel in this, so everything

13   is going to come from me.

14            THE COURT:  I was trying to figure out how we're

15   doing the seating.  I was -- you could tell what I was doing

16   because you stuck Mr. Ballin over there, and I'm confused.

17            MR. SCHOLL:  We're sort of mixed in here, Your

18   Honor.  I represent Mr. Grayson.

19            THE COURT:  Right.  Exactly.

20            MR. SCHOLL:  No one else is with me, and --

21            THE COURT:  Right.  So how do you want to sit?

22   You tell me how you want -- we tried -- do you remember

23   the --

24            MR. BALLIN:  I can sit behind Mr. Palmer.  I

25   don't mind.  I don't need to be at the table.
```

UNREDACTED TRANSCRIPT

1              THE COURT:  I think I need to ask you to do that.

2    You know I hate to do that, but I think that's what I need to

3    do.  And I need to then let people switch a little bit.  Is

4    that okay?  Normally -- you remember that, we had a very

5    somewhat famous case in one of the Danny Owens cases, Blake

6    Owens.  Do you remember that?

7              MR. SCHOLL:  (Moving head up and down.)

8              THE COURT:  And counsel was very careful to

9    always sit at an appropriate distance from the co-defendant.

10   Now, I'm -- they probably want to sit right next to each

11   other, but you don't recall that.

12             MR. SCHOLL:  I know -- I do recall that, Your

13   Honor.

14             THE COURT:  Well, it's always fair to say that

15   there should be, if possible, a sort of visible distance, not

16   a lot, just a little bit, so that we're not being -- so that

17   everyone is individually determined versus some sort of group

18   mentality.  We're not doing that.  It's everybody is

19   individually charged.

20             MR. SCHOLL:  I am -- it's not going to be a group

21   effort, Judge.  We have a different defense than Ms. Grayson.

22             THE COURT:  Right.  How do you -- tell me what

23   you want to do.

24             MR. SCHOLL:  I can sit wherever.  I just need

25   enough area to work.

UNREDACTED TRANSCRIPT

1          THE COURT:  Tell me what you want to do.  I'm

2   thinking about putting you down over --

3          MR. SCHOLL:  That's fine.  I may have --

4   sometimes need to ask for someone to speak up a little bit

5   because of my hearing.

6          THE COURT:  Oh, I understand.

7          MR. SCHOLL:  But I'm not shy.

8          THE COURT:  I'm going to actually -- if it's okay

9   with you, it seems to me that visually and for an

10  understanding as to the separateness -- and you have a

11  different approach, right?

12         MR. SCHOLL:  I do, Your Honor.  So how about

13  myself and Mr. Grayson, Mr. Grayson can sit on the end.  I'll

14  sit right here next to Mr. Grayson, if that's all right?

15         THE COURT:  I think so.

16         MR. SCHOLL:  And I know Your Honor was asking

17  questions about opening statements.

18         THE COURT:  I am, and I'm coming back to that.

19         MR. SCHOLL:  Okay.

20         THE COURT:  I want to make sure we're seated in a

21  way that you're comfortable.  That both defendants are

22  comfortable.  They feel like it's the appropriate visual.

23         MR. SCHOLL:  I'll sit and get annoyed by

24  Mr. Ballin.

25         MR. BALLIN:  Judge, may I sit here?

UNREDACTED TRANSCRIPT

```
1              THE COURT:  Absolutely.  Sure.

2              MR. SCHOLL:  I almost objected to that, Your

3    Honor, because he's --

4              THE COURT:  Well, he's got a different haircut

5    and different glasses, and it's really confusing.

6              MR. BALLIN:  I'm still a hippie at heart.

7              THE COURT:  I know.  I know.

8              MR. SCHOLL:  At least everyone knows I'm better

9    looking.

10             THE COURT:  I might remember that, yeah.

11             Mr. Scholl, I think that's a little better, with

12   all due respect.

13             MR. SCHOLL:  I prefer that, Your Honor, actually

14   I just --

15             THE COURT:  Well, we all try to get along.  We

16   all try to get along.

17             Now, where is our paralegal that's keeping track

18   of stuff?  because I want to make sure we have --

19             Yes, sir?

20             MR. PALMER:  We have Mr. Chris Faulk, who is our

21   trial tech coordinator.  He's not a paralegal, but he is

22   going to be handling our exhibits.

23             THE COURT:  I'm going to ask him to spell his

24   name so I've got it right.

25             TRIAL TECH:  Christopher Faulk, F-A-U-L-K.
```

UNREDACTED TRANSCRIPT

1          THE COURT:  Mr. Faulk, okay.  Tell me your

2    official job.

3          TRIAL TECH:  Trial tech.  I'll be presenting the

4    evidence for -- on behalf of the defendant, Ashley Grayson.

5          THE COURT:  Thanks.  Appreciate it.

6          Now, what we do say in every case -- and I'm

7    going to get back to Mr. Scholl in just a second -- is that

8    if a party -- let's say that Mr. Scholl wants to display

9    something that, Mr. Faulk, you displayed.  He's entitled to

10   call on you because that's just the way to do it.  It's

11   just --

12         TRIAL TECH:  Yes, sir.

13         THE COURT:  -- the proper courtroom etiquette.

14   Same thing for the Government, and vice versa.  So we don't

15   want anybody saying, well, it's not my stuff, he's got to get

16   his own.

17         I haven't really run into lawyers who try to do

18   that.  That's pretty routine.  So is that okay?

19         TRIAL TECH:  Yes, sir.

20         THE COURT:  Good deal.  Thank you.

21         Okay.  Mr. Scholl, we were getting back to you on

22   timing.

23         MR. SCHOLL:  Yes, Your Honor.  I have no

24   PowerPoint Your Honor.  I'm, in fact, an old school.  I would

25   mess up the technology if I did it.  So I'm estimating --

1   because I think everybody is going to cover most of the main

2   timelines before I get up and speak.  I'm estimating maybe

3   10, 15 minutes at the most.

4           THE COURT:  That sounds about right, actually.

5           MR. SCHOLL:  I'm just pinpointing stuff that's

6   just relevant to Mr. Grayson for the jurors to look out for,

7   and then I will be sitting down.

8           THE COURT:  Sure.  That's fine.  I think we're

9   squared away.

10          Yes, sir, Mr. Palmer?

11          MR. PALMER:  Your Honor, I want to introduce a

12  couple of other folks that are on our team.  This is Amanda

13  Fields.  She is one of our expert witnesses we've designated

14  back in November.

15          THE COURT:  Okay.  Yes.  Do you?

16          MR. PALMER:  We also have Emily McDonald.  She's

17  a consultant who helps pick juries.

18          THE COURT:  That's fine.  The use of improper

19  factors in selection of a jury is strictly illegal.  I will

20  enforce that rule.  And so if there's a use or an attempt to

21  use characterizations, bias, prejudice, assumptions, that is

22  problematic.  It should be problematic.  You shouldn't do it.

23  And I don't think we'll probably have a problem there.  But I

24  will go through the jury selection process, which starts with

25  those questions.

UNREDACTED TRANSCRIPT

1          Now, I want to remind everybody that you will not
2     stand up when the panel comes in.  They are not jurors yet.
3     And they will all have numbers.  The number -- and we'll --
4     we can refer to them by their number or by their seat number.
5     But you will not address them in any other way.
6          I may ask some questions that may provide some
7     personal data.  Not a lot, but some, if need to because I
8     need to know a little bit about perhaps their social media
9     habits a little bit.
10         But, first, we start off with, as you know, the
11    first question, which is:  What's the most important
12    characteristic for a juror?
13         And everybody will answer those questions.  Now,
14    you've got very experienced attorneys that are local
15    attorneys, and they're used to doing this all the time, so
16    that's not a problem.
17         And that has several purposes.  One, is to make
18    sure that we understand what the most important
19    characteristics are.  It's also an abstract question so that
20    we can help assess the jurors' ability to deal with abstract
21    concepts, which is important because they have to apply the
22    law, and the law is abstract, typically.  So we want to hear
23    that.
24         And then, of course, once they've answered those
25    questions, we'll ask them the next question -- that question,

UNREDACTED TRANSCRIPT

1   and then we'll ask them the next question.

2          Now, y'all are familiar with that.  Of course,

3   the next one is:  What's an example of bias or prejudice?

4          And as you all know, we will got lots of

5   examples, and so we will see what they say.  And then, of

6   course, we will ask them can they make a decision in the case

7   without being influenced by any unconstitutional factors,

8   biases or prejudices?

9          Well, anyway, you've all had a chance to go

10  through the material.  You know what we ask.  It's not a

11  mystery.  I am just going to ask just to be sure, that

12  counsel from Texas doesn't have some question about it.

13         There are no objections during that portion.

14  There's no standing up and saying, Your Honor, I object, may

15  we approach the bench?

16         Because those questions will lead up to the

17  question of picking out the party -- the lawyers in the case.

18         And as you know, we'll ask them:  Who do you

19  think is in the juror seats 1, 2, 3, and 4?  First one is:

20  Who do you think is the lawyer for the party bringing the

21  claim?

22         And we'll say it might be a big truck case.  It

23  might be whatever it is.  It might be a criminal case,

24  whatever it is, who do you think it is and we'll see what

25  they say.  Interesting.

UNREDACTED TRANSCRIPT

1          And then we'll ask the second one:  Who do you
2    think is the lawyer for the party defending the case?
3          By the way, will somebody be sitting with the
4    Government on this one, case agent?
5          MR. OLDHAM:  The case agent will be in and out.
6    She is also handling some duties with witnesses when they do
7    arrive, Your Honor.
8          THE COURT:  The case agent should be sitting
9    right there in Seat 3.  I assume they will be; is that right?
10         MR. OLDHAM:  Yes, Your Honor.
11         THE COURT:  Okay.  I'm looking for my case agent.
12   Where is the case agent?
13         MR. OLDHAM:  She is -- witnesses who were not
14   here on time, she is preparing them, Your Honor.
15         THE COURT:  She needs to be sitting right there.
16         MR. OLDHAM:  Yes, Your Honor.
17         THE COURT:  You know that.  We do that every
18   case.  The case agent is always here.
19         MR. OLDHAM:  Yes, Your Honor.
20         THE COURT:  Right?  The case agent is always
21   here.  So where -- they're on their way, right?  They're
22   going to be here shortly?
23         MR. OLDHAM:  Shortly, Your Honor.
24         THE COURT:  How soon?  Maybe better get them here
25   because -- are they in the building?

UNREDACTED TRANSCRIPT

1          MR. OLDHAM:  Yes, Your Honor, on the eighth

2   floor.

3          THE COURT:  Okay.  You've got to have them come

4   on up because, otherwise, it's not going to work quite right,

5   as you know.  As you know that.  And then if they need to be

6   excused later on, we'll do that.  That's not a problem.

7   We'll take care of it.  But we do need them here for this

8   portion because the jury is going to see that person sitting

9   there, and, you know, they'll need to know who they are and

10  so forth.

11         MR. OLDHAM:  Yes, Your Honor.

12         THE COURT:  All right.  Mr. Palmer, you'll be

13  introducing your side at the appropriate time.  That's not

14  going to happen for a while.  And then there's somebody I

15  haven't really seen before, but he's sitting next to you.

16         MR. PALMER:  I'm going to introduce you to

17  Mr. Levine.

18         MR. LEVINE:  Good morning, Your Honor.

19         THE COURT:  Mr. Levine, they left you out.  He

20  didn't tell me who you were, but I figured that must be who

21  it was.

22         MR. LEVINE:  Thank you, Your Honor.  It is.  Nice

23  to meet you.

24         THE COURT:  Good to see you.  Absolutely.

25  Absolutely.

UNREDACTED TRANSCRIPT

1            Okay.  We've got the team there.  We've got

2   everybody.

3            Okay.  How are we doing in terms of jurors?  I

4   don't need it right now, but I just --

5            All right.  Anything else that anybody needs to

6   know?

7            Yes, sir, Mr. Ballin, are you going to be here

8   the whole time?

9            MR. BALLIN:  Yes, sir.

10           THE COURT:  Okay.

11           MR. BALLIN:  What are your plans as far as

12   statements, proof today?  And the reason I ask you that, Dave

13   Brown and I are close friends, and he called me this morning

14   about the bad weather that's coming in.  And I say that

15   seriously.

16           THE COURT:  No, right, right.

17           MR. BALLIN:  Four o'clock or so, we should be

18   getting some heavy rain and dangerous winds and just

19   certainly not -- certainly for us but the jurors getting

20   home.

21           THE COURT:  We always stay until five unless

22   there's a reason to take a break earlier.  That's a good

23   question, though.  Great question.  We'll explain that to

24   everybody.

25           Normally, in the trial, today, the jury will

UNREDACTED TRANSCRIPT

1    probably -- prospective jurors will probably be brought up

2    about ten after nine or 9:15.  One reason they're coming up a

3    little early is that there's a second case.  Judge Fowlkes

4    has a case that starts today.

5              CASE MANAGER:  Yes, sir.

6              THE COURT:  And so they'll come up and they'll

7    bring our jury up.  And then they'll have to have a little

8    time, and then they'll bring his juror to the ninth floor.

9    And so that's the schedule.

10             Now, we normally stay until right at -- right at

11   five or 5:10, something like that.  I agree that weather is

12   always a factor, and so if we have a tornado, we will do

13   something else.  But other than -- heavy rain is not going to

14   have any effect on us, unless they tell us we've got to

15   vacate the building.

16             And so our normal schedule is we'll start in here

17   every day very close to nine o'clock, probably a little

18   before or right at nine.  The jury will come in, hopefully,

19   at nine.

20             Now, I'll be out here about 8:35, something like

21   that, 8:40.  And, of course, that gives you a chance, you get

22   here and you get all set up.  We will take a morning break.

23   Because we have a large number of panelists at this point,

24   the breaks have to be longer.  So the break in the morning

25   will be at least 20 minutes.  It may have to be a little

UNREDACTED TRANSCRIPT

1 longer because we have a lot of panelists, potential jurors,

2 and then we'll take a lunch break.

3              I believe that this panel, Mr. Sample, has

4 actually lunch for them?

5              CASE MANAGER:  That's correct.  In 227, second

6 floor.

7              THE COURT:  And they will be in 227, second

8 floor.

9              CASE MANAGER:  They'll have it in by noon.

10              THE COURT:  So that will be at noon.  That

11 normally -- that break is usually -- once we're in trial,

12 usually about 50 minutes.  It will probably be because of

13 that number of people, probably be an hour, at least an hour,

14 enough time for them to all have lunch.  Of course, they will

15 leave and come back and so forth.

16              We will then have an afternoon break halfway

17 through.  If people on the panel say they have to have a

18 break earlier, you know, we take a break earlier because

19 that's the deal.

20              The chance of getting a jury today is, you know,

21 maybe 50/50, and we'll get the jury today.  Of starting the

22 case today is maybe 50/50.  We will do really well if we get

23 through preliminary instructions and opening statements.

24 There's a remote possibility that we might get to the first

25 witness.

UNREDACTED TRANSCRIPT

1          Who is our first witness going to be?  I've got
2  your list.
3          MR. OLDHAM:  Yes, Your Honor.  It's Olivia
4  Johnson.
5          THE COURT:  Sure.
6          MR. OLDHAM:  And she is here and ready to
7  testify.
8          THE COURT:  Okay.  Well, and so, you know, you
9  can tell her that it would be unusual for us to get to her
10  before four o'clock and probably will be early tomorrow.
11          MR. OLDHAM:  Yes, Your Honor.
12          THE COURT:  And so you probably already told her,
13  I hope, right?
14          MR. OLDHAM:  Your Honor, she's here, and we need
15  her here.
16          THE COURT:  Right, right, right.  That's fine.
17  We just want to make sure that people are not -- I'm going
18  to -- you know, I've been waiting here forever to testify.
19  The answer is, no, you're not waiting to testify.  You know,
20  you won't be testifying until --
21          MR. OLDHAM:  We're trying to avoid that as much
22  as we can, Your Honor --
23          THE COURT:  -- the latter part of the afternoon.
24          MR. OLDHAM:  -- where they arrive at the right
25  time, but the Court is not delayed.

UNREDACTED TRANSCRIPT

1              THE COURT:  Right, exactly.  Exactly.  And they

2    can come relax in the building.  They just have to be

3    stressed out by having to be worried about that.

4              MR. OLDHAM:  Yes, Your Honor.

5              THE COURT:  Now, who is your case agent there?

6              MR. OLDHAM:  This is Janell Hosafros, Your Honor.

7              AGENT HOSAFROS:  Good morning, Judge.

8              THE COURT:  Good morning.  How are you doing?

9              AGENT HOSAFROS:  Good.  How are you?

10             THE COURT:  They just asked me to have you spell

11   your first and last names.

12             AGENT HOSAFROS:  Yes, sir.  J-A-N-E-L-L-E.  Last

13   name is H-O-S-A-F-R-O-S.

14             THE COURT:  Okay.  And where are you from?

15             AGENT HOSAFROS:  I'm based in Memphis, Tennessee.

16             THE COURT:  Okay.  I just wanted to recheck that.

17   Absolutely.

18             AGENT HOSAFROS:  Yes, sir.

19             THE COURT:  Well, now, you didn't hear

20   everything, so we don't stand up when the panel comes in.

21   You don't say anything.  Nobody acts like a -- that they can

22   approach the bench or anything like that.  You wouldn't do

23   that anyway because that's not your job.

24             AGENT HOSAFROS:  No, sir.

25             THE COURT:  But, you know, just make sure that if

UNREDACTED TRANSCRIPT

1  you're not sure what to do, ask the person sitting next to

2  you, and if they don't know what to do, he'll ask the person

3  sitting next to him.

4          AGENT HOSAFROS:  Yes, sir.  Thank you.

5          THE COURT:  Good deal.  Thank you.  Okay.  I

6  think we're good.

7          All right.  That's it.  If we're lucky, we will

8  get the jury fairly quickly, so I cannot tell you one way or

9  the other.  I have no idea.  And since there's only really

10  one count, now the verdict form will be divided.

11          And I know that Mr. Scholl would have insisted on

12  this.  There will be two separate sheets.  They're not going

13  to be on the same sheet because -- is that consistent with

14  how you're approaching the case?

15          MR. SCHOLL:  Yes, Your Honor.

16          THE COURT:  That's what I understood, and that's

17  what everybody understood, I believe.  So that takes care of

18  that.

19          All right.  Government all relaxed, ready, all

20  that sort of thing?

21          MR. OLDHAM:  Your Honor, I can't speak to

22  relaxed, but we are ready, I think.

23          THE COURT:  Yes, sir.

24          Yes, sir, Mr. Scholl?

25          MR. SCHOLL:  Judge, we've, obviously, got ten

UNREDACTED TRANSCRIPT

1   strikes.  Is that going to be combined with both parties?  Or

2   do we get ten a piece?

3            THE COURT:  Normally, it is.  Normally, it is.

4   So you have 10 -- oh, yes, we don't get -- you get 20.

5   Otherwise, we will never get out of here.

6            MR. SCHOLL:  I think that would be great, Judge.

7            THE COURT:  Well, we want to get out of here at

8   some point in our lives.

9            MR. SCHOLL:  I want to get out of here, but I

10   would like my 20 strikes.

11           THE COURT:  And you'll have a chance if you need

12   to consult some, or you can divide them half and half if you

13   want to.  However you want to do that.  In the -- you should

14   have strike sheets in front of you, do you?

15           MR. SCHOLL:  We do.

16           THE COURT:  Hopefully, you do.  And so we will

17   take the -- it's a little more complicated when you have --

18   will this be one strike sheet being handed up or two?  How

19   are you going to do that?

20           MR. SCHOLL:  Judge, I think because we've got

21   everybody split up, I think we should do two strike sheets.

22           THE COURT:  Okay.

23           MR. SCHOLL:  One for each party, unless Your

24   Honor wishes us to put them all on the same one.  That's

25   fine.  I don't have a problem with that.

UNREDACTED TRANSCRIPT

1            THE COURT:  You know, it makes a difference in

2   terms of how you get to them sequentially.  Because let's say

3   that -- let's say that Mr. Palmer had Juror No. and Seat No.

4   4, and then you had juror in Seat No. 4, we would -- and then

5   the Government had the juror in Seat No. 8.  It doesn't

6   matter.  You know, you have to remember that we've got to

7   keep them straight.

8            MR. SCHOLL:  Judge, how about I'll consult with

9   Mr. Palmer?

10           THE COURT:  Yeah.

11           MR. SCHOLL:  If we have a difference on who we

12   want to strike --

13           THE COURT:  You probably want to do that.

14           MR. SCHOLL:  If we have a difference, then I will

15   submit my own.  I just think --

16           THE COURT:  Okay.

17           MR. SCHOLL:  -- I will consult with Mr. Palmer

18   and see.

19           THE COURT:  Are you thinking you can submit a

20   consolidated strike sheet, or what do you want to do?

21           MR. SCHOLL:  The only thing -- I think we'll be

22   able to, Your Honor, but my only concern is if we have --

23           THE COURT:  I don't want to put you lumped

24   together.  That's what I'm worried about.

25           MR. SCHOLL:  And my thing is that if we don't

                        UNREDACTED TRANSCRIPT

1    agree on a juror that they want and we want them struck off,

2    then I'm obviously not going to consolidate onto Mr. Palmer's

3    sheet.

4              THE COURT:  Right.

5              MR. SCHOLL:  For purposes of if down the road,

6    there needs to be an appeal with regards to anything.

7              THE COURT:  Okay.

8              MR. SCHOLL:  I just think it's a cleaner

9    record-wise if we have our separate sheet, but I will consult

10   with Mr. Palmer so we're not repeating --

11             THE COURT:  Sure.  Let's talk about a way to do

12   that.  The first thing I would do is take the first defense

13   strike.  Now, I could take Mr. Palmer's first strike.  Then I

14   could take the Government's first strike.  Then I could take

15   your first strike.  Then I -- in that sequence.  And then we

16   would start over.  And then I would take the Government's

17   second strike.

18             So that's the way to do that, so that you could

19   actually submit a separate sheet if you're going to use five.

20   I just don't know -- a lot of times people do consult, as you

21   know.

22             MR. SCHOLL:  And I believe we will.  And so --

23             THE COURT:  If I'm getting one sheet, it's very

24   straightforward.  I will take the defense first strike, then

25   the Government's first strike; the defense second strike and

UNREDACTED TRANSCRIPT

1    the Government's second strike.  And if there's an overlap,

2    and, of course, it's in that sequence, it's charged against

3    the party whose number came up first.  And that's pretty

4    simple.

5                    MR. SCHOLL:  We can do that, Judge.

6                    THE COURT:  That might be a little bit --

7                    Mr. Palmer, what do you think?

8                    MR. PALMER:  I agree.  We'll work together on

9    that.

10                   MR. SCHOLL:  We'll talk about it.  We've been

11   speaking, obviously, all through the case.

12                   THE COURT:  Right.  I would expect you've been

13   talking to each other.

14                   MR. SCHOLL:  We can work well together, Your

15   Honor.

16                   THE COURT:  Okay.  Are there any inconsistencies

17   in the defense in this case that might be a problem?

18                   MR. SCHOLL:  There are some -- well, not

19   inconsistencies on what happened, Your Honor, inconsistencies

20   on -- well, no.  My client's role as far as what we're

21   alleging my client's involvement in anything as far as

22   different than what -- I think it's going to be --

23                   THE COURT:  You know what I'm thinking about is

24   we are able to stay together in the case in the trial.

25                   MR. SCHOLL:  I'm sorry, Judge?

                          UNREDACTED TRANSCRIPT

1              THE COURT:  We're able to be tried together.

2              MR. SCHOLL:  Yes, yes, we are, Judge.

3              THE COURT:  And there's no question about that.

4              Is that correct, Mr. Palmer?

5              MR. PALMER:  Yes.  I don't have a motion to

6    sever, Your Honor.

7              THE COURT:  I just want to know right now,

8    because I -- you know, if it comes up during -- it's pretty

9    messy if it comes up later on.  Nobody has filed a

10   preliminary motion.  No one has asserted that there's a

11   problem.  The Government has said that they -- has not said

12   that they need to try them separately, so I don't have any

13   indication of that.  I want to be sure.

14             MR. SCHOLL:  I understand.

15             MR. PALMER:  I understand the question, and I

16   don't see -- our position requiring Mr. Grayson to be tried

17   separately, there's no issue from our perspective.  If

18   Mr. Scholl sees it differently, then we --

19             THE COURT:  Mr. Levine knows exactly what I'm

20   concerned about, right, Mr. Levine?

21             MR. LEVINE:  Yes, Your Honor.

22             THE COURT:  Okay.

23             MR. LEVINE:  I do.

24             THE COURT:  We're okay on this?

25             MR. LEVINE:  I do believe we're okay, Your Honor.

                      UNREDACTED TRANSCRIPT

1          THE COURT:  And, Mr. Scholl, obviously, you've

2    done this many times.  Not a problem?

3          MR. SCHOLL:  Not a problem, Judge.  It's not

4    going to be something where separate trials are needed.

5          THE COURT:  Okay.  And you -- I'm just going to

6    ask the obvious question, that is:  That's been thoroughly

7    discussed with your client then, is that right, Mr. Grayson?

8          MR. GRAYSON:  Yes, Your Honor.

9          THE COURT:  Okay.

10         And, Ms. Grayson, it's been thoroughly discussed

11   with you?

12         MS. GRAYSON:  Yes, Your Honor.

13         THE COURT:  Because we always have to make sure

14   that there's not an issue that would require a mandate that

15   there be separate trials, and you're well aware that that's

16   an issue the Court would address and would resolve it if we

17   needed to.

18         MS. GRAYSON:  Yes, Your Honor.

19         THE COURT:  Good deal.  How are you feeling

20   today?  Are you doing okay?

21         MS. GRAYSON:  Yes.

22         THE COURT:  All right.  Good.  Have you rested a

23   little bit?

24         MS. GRAYSON:  Yes, as rested as I could get.

25         THE COURT:  I know.  I understand.  We'll try to

UNREDACTED TRANSCRIPT

1    move forward efficiently.  It's better to do it that way.

2    Good deal.  Thank you.

3              Yes, sir?

4              MR. BALLIN:  May I?  I'm not asking you to

5    revisit what you've told us about a total of ten strikes, but

6    if we could put on the record, Ms. Grayson's request that

7    each defendant get ten, because the defenses are separate.  I

8    just wanted to note on the record --

9              THE COURT:  No, I understand.

10             MR. BALLIN:  -- my humble position.

11             THE COURT:  I understand.

12             Well, let's hear from the Government on that.  Do

13   you want to give them 20 strikes all together?

14             MR. OLDHAM:  The Government would like to have

15   the total strike number, Your Honor, of ten divided, however

16   the Court sees fit, between the defendants.

17             THE COURT:  I think what they're going to do, as

18   I understand it, is Mr. Scholl and Mr. Palmer are going to --

19   or I'm not leaving out Mr. Levine or Mr. Ballin -- are going

20   to consult and see if they can't submit a consolidated strike

21   sheet.  Now, I won't know when they do that, which one uses

22   which strike, so there won't be a way for me to untie that

23   knot, but that's what their plan is.  If they can't do that,

24   then they will have five strikes each, and then we would sort

25   them out the way that I've indicated.  But I understand that

UNREDACTED TRANSCRIPT

1  we'll have one strike sheet submitted.  I think that's what

2  they have agreed to.

3          MR. OLDHAM:  Yes, Your Honor.

4          THE COURT:  Okay.  And you're right.  We should

5  only have the number that we have.  Of course, everybody gets

6  unlimited strikes for cause, and that's not a problem.

7          All right.  My goodness, it's getting late.

8  Okay.  Where are we?

9          Yes, sir?

10          MR. SCHOLL:  Judge, I -- just for the record, I

11  would join in.  I think I was clear I would join in with

12  Mr. Ballin's objection that Your Honor has already ruled, but

13  I just would join in for the record.

14          THE COURT:  Sure.  Exactly.  Exactly.  Well,

15  that's fine.  That's no problem at all.

16          Okay.  We get a break until -- we're having --

17  we're resolving an issue on the second floor, and that may

18  take a few minutes because, apparently, we have one to

19  resolve.  Nothing to do with the case, but we have, I think,

20  maybe we need to make sure we have everybody in place.  And

21  everybody who is going to be here is here, so we have a

22  little bit of checking to do there.  That may take a little

23  longer than I thought.

24          Okay.  I think we're ready to almost get started.

25  Anything else from anybody else?

UNREDACTED TRANSCRIPT

1          Ms. Grayson, are these people doing okay for you?

2     Are you unhappy with them?  Do you want Mr. Ballin to move

3     somewhere else?

4          MS. GRAYSON:  Yes, sir.

5          THE COURT:  They're okay?  The reason I check, it

6     does matter.  You know, Ms. Grayson and Mr. Grayson, you are

7     the most important people in the courtroom in this matter,

8     and we have to -- well, I know it's -- they act like it's the

9     judge, but it's really not because this is not about me.

10    This is about your case, and I really am concerned if there

11    is a problem.  I would count on you letting your counsel

12    know, and then they would let me know if there was a problem.

13    And if necessary, you would let me know directly.

14          That's pretty unusual.  We really probably

15    wouldn't do that.

16          Mr. Grayson, are you doing okay?

17          MR. GRAYSON:  Yes, Your Honor.

18          THE COURT:  Okay.  I think everybody is good.

19          Yes, sir?  Was going to take that -- I have to

20    take a break until I get final word that everybody is ready

21    to come up.

22          MR. OLDHAM:  Yes, Your Honor.

23          THE COURT:  Good deal.  All right.  We'll take a

24    break at this time.

25       (A recess was taken from 9:07 a.m. to 9:34 a.m.)

UNREDACTED TRANSCRIPT

1          THE COURT:  The panel should be up fairly soon,

2    and we had an individual who had taken some medication and

3    just had a fainting spell, I think.  So I think they're okay.

4    But they're also probably -- we would let you know if they

5    were going to be called.  I think, probably, they will not be

6    able to -- may not be able to serve.

7          Okay.  In connection with the PowerPoint from the

8    defense, there are two things, and I'm sure you've already

9    figured this out.  And that is buying and selling food

10   stamps --

11         MR. PALMER:  That's all out.

12         THE COURT:  -- that's out.

13         And then where is the original video?  That's

14   really argument.  You may be able to say some of that, and --

15   but the Government has no objection, but that sounds -- just

16   sounds like an argument.

17         MR. PALMER:  I can -- I'll rework that.

18         THE COURT:  Probably just need to -- you know,

19   you can make that argument at the closing argument.

20         Now, the second thing is when I went over these

21   originally, I thought these are -- United States, for

22   example, you've timed it, you can get through all this stuff

23   that fast?

24         MR. OLDHAM:  Yes, Your Honor.

25         THE COURT:  Okay.  Just wanted to ask because

UNREDACTED TRANSCRIPT

1   it's a lot of material.  I will hold everybody to a timeline.

2   You know, there's just a lot of material.  Okay.  And same

3   thing for the defense.

4           All right.  We'll just be at ease for a moment,

5   but I've got to sort of get situated.

6           MR. BALLIN:  Ask a couple of questions?

7           THE COURT:  Always.  Sure.

8           MR. BALLIN:  Are we allowed to back strike?

9           THE COURT:  No, no, no, no, no.

10          MR. BALLIN:  Please?

11          THE COURT:  No, never.

12          MR. BALLIN:  Okay.

13          THE COURT:  Do they let them do that in state

14  court now?

15          MR. BALLIN:  Depends on which court you're in.

16          THE COURT:  Well, back strikes are inappropriate,

17  generally, because that juror has been accepted as a member

18  of the jury.  And there are rare occasions when something

19  comes up after the fact that nobody knew, and no one had the

20  opportunity to inquire about.  And that sometimes results in

21  a cause strike, but it's not a back strike, so that would

22  be -- that would be very different.  So we really don't have

23  back strikes.

24          MR. BALLIN:  Yes, sir.

25          THE COURT:  Good deal.

UNREDACTED TRANSCRIPT

1          MR. BALLIN:  What are your plans about

2    alternates?

3          THE COURT:  We'll seat two alternates.  Good

4    question.  I think we disclosed that to everybody earlier.

5    At least two, but it's a short trial, so two should be

6    plenty.

7          The alternates will sit in the jury room as they

8    deliberate but will be told not to deliberate.  They're just

9    going to be sitting there, and then if someone has to be

10   excused, that will allow us to use the alternate to place the

11   alternate on the panel, unless somebody has a problem with

12   that.

13         The issue about having an alternate and not doing

14   it that way is that you have a juror who has a sudden health

15   issue, you have a juror who, for some reason, must leave,

16   then you have not been able to complete your trial.  So it

17   will be unusual for us to have to, at that point, have an

18   alternate sit in, but I think that's a way to make that work

19   if we had to.

20         Any problem with the Government in that --

21   handling it that way?

22         MR. OLDHAM:  No, Your Honor.

23         THE COURT:  They will just be told they can't

24   deliberate.  They're just sitting there.  So that if they do

25   have to deliberate, they're prepared to do so.

UNREDACTED TRANSCRIPT

1          MR. BALLIN:  And will we each get one strike per

2   alternate each?  Will the defense get one strike per

3   alternate?

4          THE COURT:  Not typically.  I have not been doing

5   that, but I can do that.  If you both want one strike, both

6   sides -- both sides want one strike per alternate, that's

7   okay.  It'll just make it a little longer.

8          MR. BALLIN:  We would ask for that one strike per

9   alternate consistent with the Court's earlier ruling that the

10  defense doesn't get to double up.  Our request would be that

11  each defendant get one strike per alternate.  But I

12  understand your ruling.

13         THE COURT:  I think we've already dealt with

14  that.

15         MR. BALLIN:  Yes.

16         THE COURT:  But we will let you have one strike

17  at that time when we get to the alternates, and the

18  Government one also, and it should be -- that's usually very

19  quick.  Usually, it's not very complicated on the alternates,

20  but we'll see if they could deliberate.

21         All right.  Do we have -- what's our situation?

22  Are we about ready?

23         CASE MANAGER:  Just waiting for them.  Yes, sir,

24  waiting.

25         THE COURT:  Okay.  Remember, what are you going

UNREDACTED TRANSCRIPT

1    to do when the jury comes in?  Nothing.  You're going to stay

2    seated.  You're not going to get up.

3              Are you going to come and ask me questions or say

4    can we approach?  Absolutely not.  We'll get through that

5    whole first 45 minutes to a half hour -- to an hour, 45

6    minutes to an hour before we do that.

7              That does not mean you cannot raise objections at

8    an appropriate time.  It just means that's not an appropriate

9    time.  We can handle them either earlier or later, but we

10   won't be doing it right then.  I think everybody understands

11   how that works.

12             MR. OLDHAM:  Yes, Your Honor.

13             THE COURT:  All right.  Are you going to let your

14   sidekick do anything in this case?

15             MR. OLDHAM:  Your Honor, he's done most of

16   everything already, so now it's just time for us to try to

17   figure out how to split things up, Judge.

18             THE COURT:  Okay.

19             MR. PALMER:  Your Honor, may I ask one question?

20   I would like to see if Amanda Fields can be excused from the

21   rules since she's our expert witness so she can sit during

22   the trial.

23             THE COURT:  Sure, sure.  Not a problem.

24             MR. BALLIN:  And, Judge, we would ask for the

25   rule of sequestration.

UNREDACTED TRANSCRIPT

1           MR. SCHOLL:  Yes.

2           THE COURT:  Well, expert witnesses normally do

3   not sit there.  They normally sit in the gallery, but we're

4   not there yet.  We're not there yet, and I know you know that

5   too, so, sure.

6           MR. SCHOLL:  Judge, if I may ask --

7           THE COURT:  Sure.

8           MR. SCHOLL:  -- Mr. Sample, are we already on

9   mike-wise?

10           THE COURT:  I think your mike might not be on.

11   We'll check the battery.  We are going to have everybody --

12           MR. SCHOLL:  Hello.

13           THE COURT:  That one may not be working.  Also

14   there's a little slide button on there, and just check yours

15   and make sure they're working.

16           MR. SCHOLL:  Mine is not coming on, Judge.

17           THE COURT:  Yeah, that means we've got a dead

18   battery.

19           MR. BALLIN:  I seem to have broken mine as well.

20           THE COURT:  We'll get them all taken care of by

21   the time you have an opportunity to say anything.

22           MR. OLDHAM:  Your Honor, I taught him how to turn

23   it on, and so the sound is working.

24           THE COURT:  Does it work now?

25           MR. OLDHAM:  Yes, Your Honor.

UNREDACTED TRANSCRIPT

1              THE COURT:  That's amazing.

2              MR. OLDHAM:  You need to turn it on, Judge.

3              THE COURT:  If you don't turn it on, it won't

4    work.  It's like plugging in something.

5              MR. SCHOLL:  Everything has changed, Judge.  I

6    don't dial one for long distance anymore.

7              So it's just, Madam Court Reporter, can you hear

8    me okay?

9              THE REPORTER:  Yes, sir, I can.

10             MR. SCHOLL:  Great.  Thank you.

11             We're not on the record, so I won't comment to

12   Mr. Oldham.

13             (A recess was taken from 9:41 a.m. to 9:49 a.m.)

14             THE COURT:  All right.  We're ready to bring our

15   panel in.  And, of course, everybody will remain seated, and

16   we'll go through this process.

17                  (Prospective jury panel in.)

18             THE COURT:  Welcome, everybody, to the United

19   States District Court for the Western District of Tennessee.

20   I'm Judge McCalla.  As a point of interest, that's me right

21   up there.  If I don't look like that, it's not my fault.  We

22   don't worry about that.

23             We're going to be selecting a jury today, and I

24   will be asking a series of questions in that process.  You're

25   an anonymous jury, that's not unusual.  That just means that

1    you have the benefit of not having to be identified by

2    anybody.  We do have information about you, but that's not

3    anything to be concerned about.  But it does mean that you

4    have to know your number, right?  Everything got their

5    number?  Everybody is good on that?

6             And so you'll be called by number.  The first

7    person whose number is called will sit in Seat No. 1.  Now,

8    it doesn't have a 1 on it, but it's the seat closest to me on

9    the first row, all the way down to Seat 7, which is the seat

10   closest to you on the first row.  And then the eighth person

11   will sit in the first seat on the second row, all the way

12   down to Seat 14.

13            The fact that your name is not initially called

14   has really very little bearing on whether or not you'll be on

15   the jury, but we do ask the first 14 individuals a series of

16   questions.  You need to listen carefully to the questions

17   that are asked and the answers that are given because this is

18   a process, and we build on that process in order to know how

19   to answer the questions that are posed to you.  When you're

20   called as a potential juror, you need to know what has been

21   previously said, generally.  You need to understand what's

22   been previously said.  And I may ask a couple of questions to

23   help you along in that regard.

24            So we're going to start in just a minute, but we

25   can't do anything until we swear you in.  So if you'll stand

UNREDACTED TRANSCRIPT

```
 1    and raise your right hand, you'll be sworn in as the

 2    potential jury in this case.

 3                (Prospective jury panel sworn.)

 4                THE COURT:  All right.  You may be seated.

 5    Again, we're going to call you by number, and I think we're

 6    now ready to proceed in that regard.

 7                CASE MANAGER:  Juror No. 0008, Juror No. 0010,

 8    Juror No. 0058, Juror No. 0070, Juror No. 0009, Juror No.

 9    0042, Juror No. 0011, Juror No. 0053, Juror No. 0001, Juror

10    No. 0028, Juror No. 0051, Juror No. 0051, 51, Juror No. 0066,

11    Juror No. 0018, Juror No. 0029.

12                THE COURT:  All right.  I can assure you that to

13    us, you're not just a number.  You're a real person.  The

14    purpose of anonymous jurors is something that's handled in

15    many places.  It's most common in Kentucky where it's done in

16    some places, literally, all the time.  It's so that you feel

17    free to exercise the function of a juror, not for any other

18    purpose.  So we don't want to show any disrespect by not

19    using your names.  It's just for that purpose, so that no one

20    feels, in any way, that they need to do anything other than

21    what jurors need to do.

22                Now, we're going to start with that voir dire

23    question and the advantage is you've had that question up

24    there forever, so you know what it is.

25                What do you think we're going to ask everybody in
```

UNREDACTED TRANSCRIPT

1    this 14 group?  That question.

2              But everybody out there needs to listen to the

3    answers.  It's a building process.

4              So we're going to go through the process of

5    building a series of responses that help us be jurors as the

6    Constitution requires.

7              What do you think is the most important

8    characteristic for a person who is going to serve on a jury?

9              And, you know, I hate to do this, but it's kind

10   of like, okay, juror in Seat No. 1:  What do you think is the

11   most important characteristic for somebody?

12             PROSPECTIVE JUROR:  No pressure going first.

13   Having critical-thinking skills.

14             THE COURT:  Having critical-thinking skills.

15   Very good.  I'm going to -- okay.

16             All right.  And juror in Seat No. 2?

17             PROSPECTIVE JUROR:  I think to understand and

18   retain the information -- evidence presented and be able to

19   critically think on that as well.

20             THE COURT:  Okay.  And that is understand the

21   evidence presented.

22             PROSPECTIVE JUROR:  Yes, sir.

23             THE COURT:  So I'm just going to make it short

24   there.

25             PROSPECTIVE JUROR:  Sure.

UNREDACTED TRANSCRIPT

41

1             THE COURT:  Okay.  Juror in Seat 3?

2             PROSPECTIVE JUROR:  Being nonjudgmental.

3             THE COURT:  That's an interesting idea.

4    Nonjudgmental.

5             PROSPECTIVE JUROR:  Based upon kind of how they

6    look or --

7             THE COURT:  Okay.  Not being influenced by an

8    inappropriate factor.  Can we say it that way?

9             PROSPECTIVE JUROR:  Sure.

10            THE COURT:  Because, obviously, jurors have to

11   make decisions, but -- but --

12            PROSPECTIVE JUROR:  Yes, not judging based upon

13   looks or anything like that, without the facts.

14            THE COURT:  Not judging based on -- you just --

15   I'm going to put down, based on appearance.  Okay.

16            All right.  Juror in Seat 4, what is the most

17   important characteristic for somebody that's going to serve

18   on a jury?

19            There are a lot of things that can go on this

20   list.

21            PROSPECTIVE JUROR:  Being able to make good

22   decisions.  I guess that's kind of like what the first person

23   said.

24            THE COURT:  That's true.  That's true.  Being --

25   and that's -- and you're saying being able to make a

UNREDACTED TRANSCRIPT

1  decision, good decision, obviously, one.  So that's

2  important.

3              All right.  Juror in Seat 5?

4              PROSPECTIVE JUROR:  Attentiveness.

5              THE COURT:  Absolutely.  Attentiveness,

6  absolutely.  I like these short ones.  They're easier.

7              All right.  Juror in Seat 6?

8              PROSPECTIVE JUROR:  Being open minded.

9              THE COURT:  Being open minded, absolutely.

10             Juror in Seat 7?

11             PROSPECTIVE JUROR:  That's the same thing I was

12  going to say.  The exactly same thing, open minded.

13             THE COURT:  Well, everybody has to think of

14  something new, so -- and there are lots of things that we

15  want.  For example, you had to wait a little while

16  downstairs.  We were waiting up here.  So you need to be

17  what?  If you have to wait, you need to be patient?  How is

18  that going to work?  Patient.  Is that okay?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Because that's really important.  I

21  mean, that sounds like an odd thing to say, but patience is a

22  virtue in this circumstance.  I'm going to put down, patient.

23             Okay.  Now, we're going to go down to Seat 8.

24  It's Juror 053.  Boy, that sounds pretty tough there, 053.

25  It's probably somebody's number on their basketball jersey.

UNREDACTED TRANSCRIPT

1   I don't know.

2              PROSPECTIVE JUROR:  I think you should be able

3   to -- or should I say not be able to judge a book by their

4   cover.

5              THE COURT:  Well, that's true.  Let's see.  Well,

6   that's true.  You should not do that.  That's sort of a

7   negative characteristic, but we don't want to do that.

8   Absolutely.  Not judge something by his cover.  Okay.  I'm

9   getting the feeling some of you have been to my website.  I'm

10  getting nervous here.

11             Okay.  All right.  Juror in Seat 9?

12             PROSPECTIVE JUROR:  I'm going to say staying calm

13  and keeping your emotions in check in intense situations.

14             THE COURT:  Okay.  Stay calm.  That's always a

15  good idea.  And I suppose it's -- keep emotions in check.

16  That's an interesting one.  It's always a good idea.  You

17  have the longest set of answers of anybody that I've had in a

18  while, so this is interesting.

19             Juror in Seat 10?  What do you think is the most

20  important characteristic for a person who is going to serve

21  on a jury?

22             We've still got some we've got to get on that

23  list.

24             PROSPECTIVE JUROR:  I'll keep my short.

25  Listening skills.

UNREDACTED TRANSCRIPT

1          THE COURT:  Well, you have to have good listening

2    skills, absolutely.

3          And juror in Seat 11?

4          PROSPECTIVE JUROR:  I would say to be impartial.

5          THE COURT:  We'll go with that.  Impartial.

6          Okay.  And juror in Seat 12, that's 066.  I don't

7    know, people might pay not to have that number.  It's a

8    pretty good number, though.

9          PROSPECTIVE JUROR:  I'm okay.  Being able to

10   listen and weigh out all the evidence.

11         THE COURT:  Okay.  And we kind of got a couple of

12   listening ones, and I'm down to my last three, so I have to

13   make sure we've covered the last couple of things.  What else

14   would you add to that?  Absolutely.  Have to be able to

15   listen, have to be able to pay close attention.  Very

16   important.  What else?  We want a jury to be --

17         PROSPECTIVE JUROR:  To be -- to be honest.

18         THE COURT:  Honest, honest.  That's number one on

19   my list over here.  Honest.  Honest, absolutely.

20         And juror in Seat 13?

21         PROSPECTIVE JUROR:  It's a long answer kind of.

22   But, basically, independent thought, work well with the team,

23   but also not be swayed by what everybody else --

24         THE COURT:  Okay.  To think independently.

25   Nothing wrong with that at all.  Decide a matter for

1    yourself, and then think as it applies to everybody.

2              Okay.  Juror in Seat 14, I have a bunch we didn't

3    necessarily get.

4              PROSPECTIVE JUROR:  Why don't you just tell me?

5              THE COURT:  Oh, no.  No, no, no, no, no.  There

6    are lots of good characteristics.  There really are.  We want

7    jurors to be a lot of things.  You know, I want them to be on

8    time.  That's one.  That's, you know, mindful of how time

9    affects everybody else.  We want -- patience is the one we

10   talked about.  That's a big one.

11             But what would you add to that?  What

12   characteristic would you want on -- in a juror in any case?

13   It could be lots of things.

14             PROSPECTIVE JUROR:  The phrase that came to me

15   was to overall use common sense.

16             THE COURT:  Okay.  And willing to use their

17   common sense.  Now, we know you have to follow the law, but

18   we also know that that also includes using common sense.

19             Okay.  Well, that's a good list, and there are

20   always things we could add.  You know, but one of the things

21   that was mentioned here was that in Seat 11, it said

22   impartial.  Now, all these are important, but the

23   Constitution requires that a jury be impartial, not biased or

24   prejudiced.  We need to be all the other things.  Nothing

25   wrong with that, but you have to be impartial.  The Bill of

UNREDACTED TRANSCRIPT

1   Rights and the Constitution are going to require that.

2           So now we're going to ask another set of

3   questions, handing it back, of course, to Seat 1, which is a

4   great thing to be in Seat 1 until you get a little further

5   along.  Let's make sure we're on here.  It helps if you push

6   that little button.

7           Okay.  A jury is required to be impartial, not

8   biased or prejudiced.  What is an example of a characteristic

9   as to which people sometimes have a bias or prejudice?

10          Now, we're, again, going to build a list, and

11  this needs to be -- I think y'all know that there are

12  probably lots of things that fall in this category.  Seat 1

13  always gets to answer the question, typically, first.

14          So what is an example of a characteristic as to

15  which people sometimes have a bias or prejudice?

16          PROSPECTIVE JUROR:  Something that's outside of

17  the norms of their religious beliefs.

18          THE COURT:  Okay.  That's a great point.  I need

19  to figure out a way to say that in less than that many words.

20  Outside -- okay.  Outside the norms of somebody's religious

21  beliefs.

22          So if your religion -- your religious belief says

23  this, what if it's different?  What if the response is

24  different?  And I might be so predisposed that I couldn't get

25  past that.  So no predisposition in connection with religion.

UNREDACTED TRANSCRIPT

47

1    I'm going to make -- I'm going to shorten it a little bit to

2    that.

3              Okay.  Juror in Seat 2?  Well, what about that?

4              PROSPECTIVE JUROR:  I would say economically,

5    whether income level for an individual or perhaps how much

6    money a corporation makes or anything like that, so . . .

7              THE COURT:  Okay.  So economics, people are

8    biased and prejudiced by economics.  And that can work -- can

9    that work both ways?  I mean, you know, we can say they've

10   got a whole lot of money, or they don't have any money.  I

11   mean, that could be a bias or prejudice.  That's just simply

12   not a factor in a case, typically, in a case.  So, economics.

13   May I call that socio economic?

14             PROSPECTIVE JUROR:  Sure.  Absolutely.

15             THE COURT:  Okay.

16             All right.  Juror in Seat 3?

17             PROSPECTIVE JUROR:  I would --

18             THE COURT:  Things as to which people sometimes

19   have a bias or prejudice?

20             PROSPECTIVE JUROR:  I would just say past

21   situations, past things that have happened.

22             THE COURT:  Okay.  Now, tell me what you mean by

23   that because I think what you're saying is a personal -- of

24   the person who is making the decision, their past

25   experiences.  So I'm going to shorten it to past experiences.

UNREDACTED TRANSCRIPT

48

1          PROSPECTIVE JUROR:  Okay.

2          THE COURT:  Okay.  In fact, that may be one of

3  the most frequent things that influences us.

4          All right.  Juror in Seat 4, things as to which

5  people may have a bias or prejudice?

6          PROSPECTIVE JUROR:  The first thing that came to

7  mind for me was stupidity.

8          THE COURT:  I don't know how you -- that's an

9  interesting one.

10          PROSPECTIVE JUROR:  It just -- that's a --

11          THE COURT:  Do people wear a sign and say I'm

12  whatever?  I don't know.  I think there's a way to say --

13  let's see, bias or prejudice based on -- may I say it this

14  way, intellectual level?  Is that okay?  It sounds a little

15  kinder.

16          Okay.  And we -- that's a great point, though,

17  because have y'all seen the advertisements in which they have

18  someone who has -- I want to be very respectful, Down

19  Syndrome?  And there -- you know, we have to remember that

20  everybody is human, and so we don't want to make a judgment

21  based on any of those characteristics, and we really want to

22  be mindful of that.

23          So I'm going to call it intellectual disability.

24  There may be many ways to say that.  I'm going to write down

25  what you said because that's interesting.  Okay.

UNREDACTED TRANSCRIPT

1          All right.  Juror in Seat 6, things as to

2   which -- characteristics as to which people sometimes have a

3   bias or prejudice?  There are a lot of these, and we need to

4   get a -- I've got a whole list over here.

5          PROSPECTIVE JUROR:  Political beliefs.

6          THE COURT:  Well, yes, and that's true.  Although

7   in court, and certainly in federal court, we kind of don't

8   talk about it because of our -- what we do.  But exactly

9   right.  So if someone says -- let's put it somebody says

10  they're a conservative or liberal, that's nonparty

11  identified, or socialist or whatever?  And that could cause

12  us to have an image in our mind that could be inaccurate as

13  to that individual.  So I've got that one down.

14          And Juror in Seat 7?

15          PROSPECTIVE JUROR:  Race or ethnicity.

16          THE COURT:  Absolutely.  And I missed there

17  because it was actually juror in Seat 6.  So I've got you

18  there.  I'm sorry, say again, please.

19          PROSPECTIVE JUROR:  Race.

20          THE COURT:  Race or ethnicity, absolutely.  You

21  covered two, and somebody is going to regret that when we get

22  to juror in Seat 14.  He's going to say, I was going to say

23  that.

24          Give an example of ethnicity, juror in Seat 6.

25          PROSPECTIVE JUROR:  Indian or African American.

UNREDACTED TRANSCRIPT

1          THE COURT:  And we think of it probably more as a

2     cultural thing often.  So let's say somebody is from Mumbai,

3     which is in the north -- is it in the north?  Kind of the

4     northwest part of India, and they have particular traditions,

5     religions, et cetera, and so we might -- if someone is

6     wearing a saree, we might respond negatively, but we

7     shouldn't, right?  Is that okay?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  It seems like a decent one, and we

10    want to think about.

11         Okay.  Juror in Seat 7?  So I may have skipped

12    one, here and there, so, yes.

13         PROSPECTIVE JUROR:  Age or gender.

14         THE COURT:  Right.  And I tell you, juror in Seat

15    14 is already about ready to come over, hey, you keep taking

16    everything up.  That's two at a time.

17         But, certainly, give an example of how gender is

18    sometimes -- there's a situation for bias and prejudice as to

19    gender.

20         I always ask the question:  How many -- how many

21    female basketball coaches will be coaching in the final four

22    of the men's tournament?  I think we can get that answer.

23    The answer is, right now, it doesn't look like any.  Does

24    that mean they couldn't use a female coach?  They probably

25    could, but there's a -- sometimes perhaps a predisposition

1    there to not have a female coach, no matter how qualified.

2              So we've got a whole list of -- and that's a case

3    where -- then we can go through a lot of things.  Is that

4    right?  I mean, the gender bias is something we don't want to

5    have, right?

6              PROSPECTIVE JUROR:  Right.

7              THE COURT:  Absolutely.  Absolutely.

8              Let's go to Seat No. 8.  Characteristics as to

9    which people sometimes have a bias or prejudice?  They keep

10   using up multiple ones so we're going to -- yes, sir.

11             PROSPECTIVE JUROR:  Sexual orientation.

12             THE COURT:  Sexual orientation.  That's an easy

13   one.  That's absolutely.  Okay.  And there's -- there can be

14   a lot of bias and prejudice there.  Absolutely.

15             And then juror in Seat No. 9.  Characteristics as

16   to which people may have a bias or a prejudice.

17             PROSPECTIVE JUROR:  He just took exactly what I

18   was thinking.

19             THE COURT:  You what I'm saying, it's just

20   amazing.

21             PROSPECTIVE JUROR:  Your presentation as far as

22   your clothing, the way you're wearing your stuff.

23             THE COURT:  Okay.  That's a great point there.

24   And that is what you wear.  And how does that influence us?

25   I always say think about the movie -- y'all are too young to

UNREDACTED TRANSCRIPT

 1    know this.  *Pretty Woman,* remember?  Some of you remember
 2    that.  Okay.  Right.  What does she do when she goes into the
 3    expensive shop?  Remember what happens?  You're too young to
 4    remember that, right?  What happens when she goes -- I'm just
 5    kidding you.
 6                When she goes into that shop, and she's dressed
 7    in a particular way, how is she treated?  Very, very -- not
 8    very well.  Not very well.  You can't afford this, you need
 9    to leave.  And yet she comes back later with somebody with a
10    big checkbook and things sort of change.  Absolutely.  What
11    you wear.
12                Okay.  But it can be a source of a lot of
13    predisposition bias and prejudice.
14                All right.  Juror in Seat 10?
15                PROSPECTIVE JUROR:  They took my answers.
16                THE COURT:  You know, it happens a lot around
17    here.  Let's talk about things that really can cause some
18    really serious bias and prejudice, and that is -- that was a
19    good one on what we wear.
20                What's another thing that may appear -- that may
21    cause us to have a preconceived notion about that person that
22    might relate to an individual's appearance choices?
23                PROSPECTIVE JUROR:  Just -- I mean, your body,
24    your -- I'm trying to think of the word and I can't because I
25    didn't think about it earlier.

                        UNREDACTED TRANSCRIPT

1          THE COURT:  Pull the mike a little closer.  We're

2    really enjoying this.

3          PROSPECTIVE JUROR:  Like *The Elephant Man,* the

4    appearance of their body, the deformation, the physical look.

5          THE COURT:  Appearance of somebody's body,

6    absolutely.  And what you're talking about is that famous

7    movie that's *The Elephant Man*, which was an individual, who

8    actually had a very serious medical condition, and it caused

9    him to look very different, very different, facially.

10          And prob- -- I don't -- that was the main thing

11   we noticed there.  So it's the physical appearance of one's

12   face because we know facial identification is part of human

13   activity.  So it's a little uncomfortable to have to talk

14   about that, but it's absolutely something we need to know.

15          All right.  Juror in Seat 11?

16          PROSPECTIVE JUROR:  Language or manner of

17   speaking.

18          THE COURT:  Language, manner of speaking.  Give

19   an example there.

20          PROSPECTIVE JUROR:  Well, I mean, someone's

21   dialect or accent could cause someone to have a preconceived

22   notion.

23          THE COURT:  Absolutely.  Absolutely.  And so when

24   you watch *My Cousin Vinny,* you've never seen that, have you?

25          PROSPECTIVE JUROR:  (Moving head up and down.)

UNREDACTED TRANSCRIPT

1              THE COURT:  You've seen it?  What's noticeable

2    about his accent?  He has a Brooklyn accent, remember?  And

3    is he treated initially differently?  He is because he's got

4    this strong accent.  How important -- that can really affect

5    what we think.  Should that affect how we evaluate somebody's

6    evidence?

7              PROSPECTIVE JUROR:  No.

8              THE COURT:  No, but we have to be very mindful.

9    What's another -- I mean, there are other examples, many

10   examples where we have -- people have different accents, and

11   we just need to be very mindful of that.

12             Okay.  Good.  Well, juror in Seat 12.  It's

13   always fun to be in the last three seats, isn't it?

14             PROSPECTIVE JUROR:  Yes.  The way they wear their

15   hair.

16             THE COURT:  Great point.  Well, that's not fair.

17             PROSPECTIVE JUROR:  Your hair looks great.

18             THE COURT:  But that's a great point.  I

19   didn't -- yeah, the way a person wears their hair.  Okay.

20   Absolutely.

21             Well, juror in Seat 12?

22             PROSPECTIVE JUROR:  Tattoos and piercings.

23             THE COURT:  Tattoos and piercings.  You're

24   absolutely 100 percent right there.

25             PROSPECTIVE JUROR:  Piercings is actually his

UNREDACTED TRANSCRIPT

1    answer.

2             THE COURT:  Well, he gets -- he has to clean up.

3    He's got to come up with a new one.

4             All right.  Juror in Seat 14, things as to which

5    people that I have a bias or prejudice?  They did a really

6    good job of using a bunch of them up.  I realize that.

7             PROSPECTIVE JUROR:  I was thinking maybe personal

8    quirks like stuttering or something like that.

9             THE COURT:  Absolutely.  Fantastic.  And what's

10   the best example of that one that's so important?  It's a

11   wonderful movie?

12            And do you remember *The King's Speech?*  And

13   that's one in which, oh my goodness, I'm going to get it

14   wrong, George the VI?  George the VI had a real impediment,

15   and his brother, who was his brother?  His brother was the

16   king at the time.  But with all due respect, fortunately not

17   the king when the war started.  He could speak very well, so

18   he had to really work to overcome that.  Great, great point.

19   And great, great movie, wonderful movie.

20            All right.  Well, we've got a whole lot of things

21   that are -- things as to which a person might have a bias or

22   prejudice.  Preconceived notions, things that cause us to

23   form an opinion or conclusion that is not based on fact.

24   Just simply based on something we should not use.

25            Well, the next question is always pretty much the

UNREDACTED TRANSCRIPT

```
 1   same one.  We've got everything working here.  Oh, my
 2   goodness.  Can you decide the case without being influenced
 3   by any of these illegal, unconstitutional factors that have
 4   just been listed?
 5              And, of course, there can be more added to that
 6   list, but can you do that?  Now, we have to think about that.
 7   That's not just a fun question to ask because we have to
 8   think about it.  Can I do that?  Can I decide a case without
 9   being influenced by any bias or prejudice or preconceived
10   notion?
11              Well, juror in Seat No. 1 always gets to start
12   out on this.  Do you think you can do that?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  All right.  Juror in Seat No. 2?
15              PROSPECTIVE JUROR:  Yes.
16              THE COURT:  Okay.  Juror in Seat No. 3?
17              PROSPECTIVE JUROR:  Yes.
18              THE COURT:  Okay.  Juror in Seat No. 4?
19              PROSPECTIVE JUROR:  Yeah.
20              THE COURT:  Juror in Seat No. 5?
21              PROSPECTIVE JUROR:  Yes.
22              THE COURT:  Juror in Seat No. 6?
23              PROSPECTIVE JUROR:  Yes.
24              THE COURT:  Okay.  Jury in Seat No. 7?
25              PROSPECTIVE JUROR:  Yes.
```

UNREDACTED TRANSCRIPT

```
 1              THE COURT:  Okay.  Very enthusiastic group here.
 2         Juror in Seat No. 8?
 3              PROSPECTIVE JUROR:  Yes.
 4              THE COURT:  Okay.  Juror in Seat No. 9?
 5              PROSPECTIVE JUROR:  Yes.
 6              THE COURT:  No. 10?
 7              PROSPECTIVE JUROR:  Yes.
 8              THE COURT:  No. 11?  Don't hesitate to say, I'm
 9    not sure.  It's okay.
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  Okay.  All right.  Seat No. 12?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  Okay.  Seat 13?
14              PROSPECTIVE JUROR:  Yes.
15              THE COURT:  Seat 14?
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  All right.  Now, everybody says that
18    they can do that, so let's go to the next process.
19              And that is we'll start in Seat 1.  We have got a
20    lot of people sitting over there at the table.  We've got 1,
21    2, 3, 4, 5, 6, 7, 8, 9.  We've got nine people sitting over
22    there at the table.  I'm going to ask you to look out there
23    and tell me who you think is the lawyer for the party
24    bringing the claim?
25              Now, could be a massive insurance case or it
```

UNREDACTED TRANSCRIPT

1  could be a not so big insurance case.  It could be a big

2  truck case where somebody was seriously injured.  It could be

3  a criminal case.  It could be any kind of case, but who do

4  you think is the attorney for the -- for the -- who is

5  bringing the claim, the lawyer for the party bringing the

6  claim?

7             Is it No. 1, No. 2 -- now, they have similar

8  haircuts -- 3, 4, 5, 6, 7, 8, 9, the attorney for the party

9  bringing the claim?  It can be anybody out there.  You've

10 got, again, 1, 2, 3, 4, 5, 6, 7, 8, 9.

11            I hope I got them in a sequence that's capable of

12 being followed.  The gentleman with the beard over there is

13 No. 9.  The gentleman with the haircut very similar to mine

14 is No. 1.  So who is the attorney for the party bringing the

15 claim?

16            PROSPECTIVE JUROR:  This is based off of looks?

17 I mean, just --

18            THE COURT:  That looks like what we're doing.

19            PROSPECTIVE JUROR:  Okay.  I'm going to say No.

20 1.

21            THE COURT:  No. 1.  No. 1.  Attorney for the

22 party bringing the claim.  Okay.

23            Now, hand that over to juror in Seat No. 2.

24            Okay.  Well, who is the attorney for the party

25 defending the claim?  Is it 9, 8, 7, 6, 5, 4, 3, 2, 1, the

UNREDACTED TRANSCRIPT

```
1    attorney defending the claim?  The attorney -- and this is a
2    little complicated question, but the attorney defending the
3    claim?
4                 PROSPECTIVE JUROR:  It would be hard to judge
5    based on what's the case as to who the plaintiff is and who
6    is the defendant.
7                 THE COURT:  It is too.
8                 PROSPECTIVE JUROR:  It's -- if it's the -- you
9    know, like U.S. Government is the plaintiff, maybe down
10   there.  So it's a -- maybe civil defense, somewhere over
11   there, maybe No. 2.
12                THE COURT:  Okay.  So this is -- we've got --
13   you're picking out No. 2?
14                PROSPECTIVE JUROR:  Well, I was just saying it
15   depends on what the case is, if we're going by prejudice.
16                THE COURT:  I'm not going to tell you.
17                PROSPECTIVE JUROR:  Okay.  Well, that's my
18   answer.
19                THE COURT:  You're going to go with No. 2?
20                PROSPECTIVE JUROR:  If it's like a criminal
21   defense, I think, or maybe, like, some kind of defense,
22   prosecution maybe for the state would be down that way.
23                THE COURT:  I'm just going with any answer here.
24                PROSPECTIVE JUROR:  Okay.  Sure.  We'll go with
25   2.
```

UNREDACTED TRANSCRIPT

1      THE COURT:  We're going with No. 2.  No. 2.

2  Okay.  Jury doesn't -- no one -- they want to see who you're

3  talking about over there.  Okay.  No. 2 is the attorney

4  defending claim.

5      Okay.  Okay.  Now, I'm going to tell you what

6  kind of case it is.  I'm going to ask you to pick out who you

7  think is a defendant in the case.

8      This happens to be a criminal case brought by the

9  United States Government.  I want you to pick out the person

10  that you think is a defendant in the case.  It can be No. 9,

11  8, 7, 6, 5, 4, 3, 2, 1, but the defendant in the case, who do

12  you say that might be?

13      PROSPECTIVE JUROR:  Number 3.

14      THE COURT:  No. 3.  No. 3.

15      All right.  And now, I'm going to go to our juror

16  in Seat 4 and say, well, who do you think is the

17  representative of the United States who is not an attorney,

18  not a lawyer?  Not a lawyer, representative of the United

19  States, can be anybody, 1, 2, 3, 4, 5, 6, 7, 8, 9, the one

20  who is not a lawyer?

21      PROSPECTIVE JUROR:  Seven, maybe.

22      THE COURT:  No. 7.  No. 7.

23      All right.  Well, let's see how we did.  But

24  before we have them tell us who they are, I'm going to go to

25  juror in Seat 5 and ask you -- and they did exactly what I

UNREDACTED TRANSCRIPT

1  asked them to do, right?  They were good sports.  What did we

2  do that was an incorrect method, an unreliable method?

3            PROSPECTIVE JUROR:  Asked people to judge based

4  on appearance.

5            THE COURT:  They had to make judgments based on

6  appearance.  Do you think that's a good way to do something?

7            PROSPECTIVE JUROR:  No.

8            THE COURT:  No, it's not.  But they were good

9  sports, and they did that.  So now, we're going to have the

10  attorney for the United States, the lead counsel introduce

11  himself and those who are with him.

12            MR. OLDHAM:  Thank you, Your Honor.

13            Good morning.  My name is Neal Oldham.  I'm an

14  Assistant United States Attorney.  With me is co-counsel,

15  Bryce Phillips, who is also an Assistant United States

16  Attorney, and our representative of the Government, Special

17  Agent Janelle Hosafros from the Federal Bureau of

18  Investigation.

19            THE COURT:  Okay.

20            MR. OLDHAM:  Thank you, Judge.

21            THE COURT:  Sure.  Absolutely.  I see y'all did

22  pretty well on guessing, but we'll see how this turns out.

23            All right.  Well, I'm going to have lead counsel

24  for the first defendant introduce himself and those who are

25  with him.

UNREDACTED TRANSCRIPT

62

1           MR. PALMER:  Good morning.  My name is Scott

2   Palmer, along with Michael Levine and Leslie Ballin.  We

3   represent Ashley Grayson.

4           THE COURT:  Ms. Grayson is here, and Ms. Grayson

5   happens to be a defendant in the case.

6           Thank you, Ms. Grayson.

7           Thank you, all.

8           And then, Mr. Scholl, I'm going to let you

9   introduce yourself and those who are with -- and the

10  individual who is with you.

11          MR. SCHOLL:  Good morning, everyone.  My name is

12  Michael Scholl.  I'm by myself, so I don't have anyone else

13  to introduce.  This is my -- stand up.  This is Joshua

14  Grayson.

15          THE COURT:  And that's Mr. Grayson.  Okay.

16          Now, on the first one, we had that one wrong.

17  And then the attorney for the defendant, well, they didn't

18  get the lead counsel right, so they get half credit for that.

19  Lead counsel is Mr. Palmer, but -- so you get -- it's a half

20  credit, so you get half that right.

21          And then for -- for the defendant, they guessed

22  right.  I'm a little concerned there.  We'll talk about that.

23  So that was a correct.  But there are two defendants, so they

24  only got one.

25          And then as to who was the representative, they

UNREDACTED TRANSCRIPT

```
 1    got that right.  So we've got basically one wrong.  One-half
 2    right.  I gave them credit on that.  And then we got two
 3    correct.  So that's about a 65, something like that.
 4              Now, is that the kind of reliability that we
 5    would be comfortable with in putting the bolts in a Boeing
 6    airplane?  I'm going to go back to Juror 5 because she's got
 7    an answer on this.
 8              PROSPECTIVE JUROR:  No.
 9              THE COURT:  In fact, that would be terrible if
10    you're putting the bolts in the door on the plane because
11    it's got to be what?
12              PROSPECTIVE JUROR:  A hundred percent.
13              THE COURT:  It's got to be a hundred percent.  I
14    mean, if it's not, what happens to the door or the window?
15              PROSPECTIVE JUROR:  It flies off.
16              THE COURT:  Flies off.  Not good.  Not good
17    result.
18              In this case, I'm also going to ask in Juror No.
19    6, well, we picked out people through the exercise, what is
20    the lesson from the exercise?  What's the lesson from the
21    exercise?  We do this on -- very much on purpose, and we do
22    it with real people because it's really important to make
23    sure we ferret out certain things.
24              PROSPECTIVE JUROR:  I feel like we've just judged
25    a book by its cover.
```

UNREDACTED TRANSCRIPT

1          THE COURT:  Right.  Right.  You don't -- and if

2    you want to know what's in the book, what have you got to do?

3          PROSPECTIVE JUROR:  Take it and read it.

4          THE COURT:  You have to read the book.  And we

5    don't want to make an error, you know, at all, so we have to

6    read the book.  How do we -- and how do we assure -- and it

7    turned out, that in this case, Ms. Grayson was picked out as

8    the defendant.  Now, how do you think she feels right now?

9    How would you feel if you got picked out as a defendant?

10          Now, Mr. Grayson is probably down there saying,

11   oh, this is okay.  But how do you feel?  How do you feel

12   about that?  How would she feel?  Would you agree you'd

13   rather not be picked out?

14          PROSPECTIVE JUROR:  Oh, yes, most definitely.

15          THE COURT:  You would rather not be picked out.

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  So what do we do as a jury to

18   reassure any person who is a defendant in any case?  What do

19   we do?  What do we tell that person, not directly, because

20   you're not going to be speaking to each other, but what do we

21   do?  What do we say?  How do we deal with this?

22          PROSPECTIVE JUROR:  Just that I think we need to

23   know all the details of things before we make a decision.

24          THE COURT:  Okay.  I'm not going to make a

25   decision until I know what all the evidence is.  I just

UNREDACTED TRANSCRIPT

1    rephrased it slightly, but that's what you're telling me; is

2    that right?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.  And what do we also say about

5    in the case if the Government fails to present evidence

6    that's -- to meet its burden of proof, which is beyond a

7    reasonable doubt?  What do we say we're going to do if the

8    Government fails to meet its burden?

9              PROSPECTIVE JUROR:  Find her not guilty.

10             THE COURT:  We're going to find not guilty.  Now,

11   what do we -- I'll tell Mr. Grayson too.  We don't want to

12   leave anybody out here because they get separate -- they get

13   considered separately from every case.  Does that apply to

14   everybody?

15             PROSPECTIVE JUROR:  Yes, it should.

16             THE COURT:  Can you do that in this case?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Okay.

19             Now, let's go to juror in Seat No. 7 and say,

20   okay, when -- did it make sense why we asked four jurors to

21   pick out people as part of an example of what we were doing?

22   Does that make sense?  because we picked out real people in a

23   real case.  We didn't pick out some theoretical thing.  We

24   were asking about real folks.  Does that make sense to you?

25             PROSPECTIVE JUROR:  Well, you're just doing an

UNREDACTED TRANSCRIPT

1    example, I guess, or whatever.  We didn't know what the case

2    was about.  They were just asked who would they pick.  So it

3    was just an exercise.

4              THE COURT:  You didn't know what the case was

5    about.  Exactly.  And we use -- we use -- we want things to

6    be contextually understandable.  In other words, it's not

7    abstract, it's real.  And we have to think about it in terms

8    of real context.  Does that make sense?  That's what I'm

9    hearing here.  It's not just an exercise, it's a process of

10   how the jurors are going to need to think, right?

11             And if, again, the Government fails to prove its

12   case as to any defendant, either defendant, then as to that

13   defendant, what verdict would we have to return?

14             PROSPECTIVE JUROR:  Not guilty.

15             THE COURT:  Not guilty.  Would you even hesitate

16   if that's the case?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  On the other hand, if the Government

19   does prove its case beyond a reasonable doubt as to a -- the

20   defendant that you're considering, and you consider them

21   separately, what verdict would you have to return?  If the

22   Government proves beyond a reasonable doubt the facts

23   necessary to support its theory in the case, what verdict

24   would you have to return?

25             PROSPECTIVE JUROR:  Guilty.

                    UNREDACTED TRANSCRIPT

1           THE COURT:  And would you even hesitate in that

2   regard or would you do what is required?

3           PROSPECTIVE JUROR:  No.

4           THE COURT:  Okay.  Exactly.  Exactly.

5           Now, let's hand that back to juror in Seat No. 8.

6   So how do we decide a case?

7           We've asked this already a little indirectly:

8   How do we decide a case without being influenced by any

9   illegal factor?  How do we do that?  How does the jury do

10  that?  because we really have to think about that.  That's

11  really important.  How do we decide a case without being

12  influenced by any illegal factor?  Illegal or

13  unconstitutional.

14          PROSPECTIVE JUROR:  I think we should decide the

15  case strictly by the facts that are presented to us.  We

16  should weigh the pros and cons and be able to decipher what's

17  true and what's not true.

18          THE COURT:  Decide the case strictly, as you

19  said, strictly on the facts, on the evidence.

20          PROSPECTIVE JUROR:  The facts that are presented.

21          THE COURT:  Strictly on the -- and in accordance

22  with the law, of course.

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Now, can you do that in this case?

25          PROSPECTIVE JUROR:  Yes.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.

2          Let's go to our juror in Seat No. 9.  In everyday

3   life, people make quick decisions about many things, whether

4   it's going to the grocery store, whether it's getting cut off

5   in traffic, we make lots of decisions every day.  That's an

6   individual decision.

7          Well, what makes a jury different in order to

8   achieve the objective that we all have here, which is to

9   decide the case solely on the evidence and the law?  What

10  makes a jury able to do that when in everyday life, it's

11  probably harder?  Maybe harder maybe not, but it's certainly

12  different.  What makes a jury different?

13         And I'm going to ask jurors in your seat,

14  probably in three or four seats, a single factor that makes a

15  jury different, that makes a jury a reliable mechanism to

16  make the decision free from any bias and prejudice and based

17  solely on the evidence in the case?  What enables a jury to

18  do that?

19         And if you don't mind, we're going to list maybe

20  one at a time because, otherwise, juror in Seat 12 is going

21  to be sitting there thinking, these people are not giving me

22  a chance.  So we're not going to do that.

23         What makes a jury different and able to perform

24  its constitutional duty?

25         PROSPECTIVE JUROR:  Am I able to say that it's

                    UNREDACTED TRANSCRIPT

1  because we are different?

2          THE COURT:  Okay.  Okay.  First one, absolutely,

3  yeah, the jury is diverse.

4          PROSPECTIVE JUROR:  Yes, diverse.

5          THE COURT:  Okay.  And that helps.  Okay.

6          And we're going to get the next one, okay, juries

7  are diverse.

8          And then juror in Seat 10, something else that

9  makes a jury able to perform it's duty.

10          PROSPECTIVE JUROR:  Getting the facts from both

11  sides.

12          THE COURT:  That's true.  That's not exact --

13  that's true.  You're going to make a decision based on

14  evidence and not on any first impression or anything else.

15  That's great.  I think that's good.  You're making a decision

16  based solely on the evidence.

17          All right.  We've still got a couple of really

18  important things.  What makes a jury different and enables

19  the jury to perform its constitutional duty, frankly, with

20  great regularity, if we think about it?

21          PROSPECTIVE JUROR:  I would say because we're

22  given specific instructions to do that, and then that is our

23  duty.

24          THE COURT:  Okay.  There's instructions -- your

25  instructions under the law.  And we're not required to do

UNREDACTED TRANSCRIPT

1  that if we're going to the grocery store.

2          I may have to add a couple of more

3  characteristics here because I've got a couple we haven't

4  gotten to.

5          Well, juror in Seat 12, what makes a jury

6  different?

7          PROSPECTIVE JUROR:  After listening to the

8  evidence, we're able to give an honest and sincere judgment.

9          THE COURT:  Okay.  And that's true, Absolutely.

10  I'm going to ask a little bit because I've kind of got --

11  okay.

12          Absolutely.  You're going to rely on the

13  evidence, and you're not going to decide until the evidence

14  is all presented as opposed to the very beginning.  So you're

15  going to wait, the jury has to wait and then decide -- and

16  I'm going to say, after deliberation with fellow jurors.

17  Okay.

18          Okay.  Well, actually, we still have a few things

19  we didn't cover there, so what else makes a jury different?

20  And there are at least two more.

21          So, juror in Seat 13?

22          PROSPECTIVE JUROR:  They're diverse, they're

23  peers.

24          THE COURT:  Well, that's true, and we covered

25  that one, so you've got to come up with another one.

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Okay.  I was already thinking

2   of the deliberation.

3          THE COURT:  What does the jury have to do that

4   you don't do when you're at the grocery store?  You took a --

5          PROSPECTIVE JUROR:  Well, they -- they stay away

6   from news, and they don't go looking for more information --

7          THE COURT:  Right.  That's actually a great

8   point.  I mean, you decide the case based solely on the

9   evidence presented.  That's a very good point.

10         Okay.  Yes, you don't go on TV and check it out.

11  You don't go on your computer and check it out.  That would

12  be really bad.  You know, you don't go on websites.  You

13  don't go to blogs.  That's all out of the window.  We can't

14  do that.  Great point.

15         Well, they left you a whole bunch of things,

16  juror in Seat 14.  What makes a jury different?  Two big

17  things that we haven't talked about.

18         PROSPECTIVE JUROR:  The one thing I can think of

19  was it comes from a randomly selected pool of people.

20         THE COURT:  And that's the diverse question.  But

21  what else is the juror going to have to do?  You're going to

22  have to be sworn in.  You're not sworn in at the grocery

23  store.  Maybe you should be, but you're not.  So you're going

24  to be sworn, so it's under oath.  And it has -- the jury

25  verdict has to be what?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Unanimous.

2          THE COURT:  Unanimous.  Unanimous.  Y'all came up

3     with a great list there.  That was longer than most of them.

4     Absolutely.

5          Now, well, those are all important things.  You

6     know, it's tough being in Seats 1, 2, 3, and 4, so I'm going

7     to ask you, all right, we're coming back to 1, 2, 3, and 4.

8     Usually, 1, 2, 3, and 4 want to tell us how they picked out

9     the people they picked out, and we have to ask:  How do you

10    feel having heard people talk about the duty of a jury as to

11    the ability of the jury to carry out its function?

12         But then we'll go over that.  So having heard all

13    of these things, tell us, though, you picked out No. 1 as the

14    attorney for the party bringing the claim.  How did you do

15    that?

16         PROSPECTIVE JUROR:  I actually thought it was the

17    one with the beard, but I thought that was also too obvious,

18    so I went with my second choice.  It was one of the ones on

19    the end of the table.

20         THE COURT:  Okay.  I may have numbered those

21    wrong.  Did they get that right on that one?

22         CASE MANAGER:  I think so.

23         THE COURT:  Oh, my goodness, they got a lot of

24    them right on this one.

25         PROSPECTIVE JUROR:  No, I meant this one, but I

UNREDACTED TRANSCRIPT

1  thought that that was the obvious choice.

2          THE COURT:  You thought it was No. 9?

3          PROSPECTIVE JUROR:  Yeah.

4          THE COURT:  But you went with the guy who looked

5  most like the judge, right?  We appreciate that.  We

6  appreciate that.

7          Okay.  But did you feel uncomfortable when you

8  were asked to do that?

9          PROSPECTIVE JUROR:  Very much so.

10          THE COURT:  And I'm going to ask you why?

11          PROSPECTIVE JUROR:  Because it's not a reliable

12  thing to -- I mean, it involves misogyny.  It involves race.

13  It involves age.

14          THE COURT:  It involves all those things that we

15  know we shouldn't do.  And I know that I've asked jurors in

16  Seats 1, 2, 3, and 4 many, many times to do this.  It's

17  right.  It's an uncomfortable spot to be in.

18          In this case, can you decide the case now --

19  after hearing all this, do you feel more comfortable that you

20  can decide the case without being influenced by any

21  inappropriate factor:  gender, race, nationality, anything at

22  all?

23          PROSPECTIVE JUROR:  Yes.

24          THE COURT:  Okay.  All right.  Now, I'm going to

25  ask juror in -- and I've got another set of questions, but

UNREDACTED TRANSCRIPT

74

1   I'm going to ask juror in Seat No. 2, you got a half right --
2   you really kind of -- you know, you got a half right on
3   defense counsel because of shared haircut but not much.  You
4   know, a little different there.
5          How did -- how do you pick out juror in seat --
6   in the seat in which you did -- I mean, the -- at the number
7   in terms of who was defense counsel?  How did you do that?
8          PROSPECTIVE JUROR:  I used to work for a law
9   firm, so I've had to deliver things up here.  And I know
10  federal is usually over here, and over here, there's a lot of
11  people, defendants, and I recognized Mr. Ballin from the
12  news.
13         THE COURT:  Oh, dear, we're in trouble already.
14         PROSPECTIVE JUROR:  I didn't want to cheat with
15  that, so I went down here.
16         THE COURT:  Well, is the fact that you recognized
17  some people over there going to influence you in --
18         PROSPECTIVE JUROR:  No, sir --
19         THE COURT:  -- in any decision you might make?
20         PROSPECTIVE JUROR:  -- Your Honor.
21         THE COURT:  I am going to ask what you did for
22  the law firm because that might matter.
23         PROSPECTIVE JUROR:  I was just a runner, and I
24  did some IT work for them.
25         THE COURT:  Okay.  And I am going to secondly

UNREDACTED TRANSCRIPT

1   ask:  Did you go to court very much?

2           PROSPECTIVE JUROR:  Well, I mean, to drop off

3   boxes in the morning for trials.  This was 20 years ago

4   before there was a lot of electronic stuff, so bankers boxes,

5   I brought them up in the court.

6           THE COURT:  Sure.  That's when they used to bring

7   in all the boxes and stack them around the courtroom, and it

8   was --

9           PROSPECTIVE JUROR:  Yes, sir.  The more boxes,

10  the more impressive it was.

11          THE COURT:  Oh, it was dependent on your point of

12  view, I suppose.  Absolutely.  You know, you can't use any of

13  that experience in deciding this case.  I know you used it a

14  little bit in sorting things out here, but you can't do that.

15  Is that okay?

16          PROSPECTIVE JUROR:  Yes, sir, Your Honor.

17          THE COURT:  And if you bring up something like

18  that with your fellow jurors, what should they tell you?

19  Say, well, I was over in state court, and I heard the judge

20  say this, that, and the other, and that's really important.

21  If you said something like that, what should they say to you?

22          PROSPECTIVE JUROR:  That's not relevant.

23          THE COURT:  Not relevant.  It's not from the

24  evidence in the case.  We can't consider it at all.  So you

25  wouldn't feel offended if they did that?

UNREDACTED TRANSCRIPT

 1          PROSPECTIVE JUROR:  No.  And I wouldn't say

 2   anything like that to begin with.

 3          THE COURT:  Okay.  I am going to ask you what you

 4   do now.

 5          PROSPECTIVE JUROR:  That's a loaded question.  I

 6   was -- I'm a software developer, but I'm transitioning

 7   positions, so I've taken some time off.

 8          THE COURT:  You're doing what everybody would

 9   like to do, take a little break and --

10          PROSPECTIVE JUROR:  Yes, sir, Your Honor, I'm

11   taking a sabbatical right now.  I was overworked and

12   underpaid, so . . .

13          THE COURT:  So that's exciting, a new transition

14   in life.  Something new.  Absolutely.

15          PROSPECTIVE JUROR:  I lost 20 pounds.

16          THE COURT:  Congratulations.

17          PROSPECTIVE JUROR:  Thank you, Your Honor.

18          THE COURT:  Exactly.

19          Now, we're going to hand it to juror in Seat No.

20   3.  It's always tough to be in Seat No. 3 because we always

21   ask:  Who do you think is the defendant in the case?

22          And in this case, you pick out somebody and how

23   did you that and how did you feel about it?  First of all,

24   how did you -- did you feel uncomfortable?  How did you feel?

25          PROSPECTIVE JUROR:  Yeah, I thought that was a

UNREDACTED TRANSCRIPT

1    terrible thing to ask me.

2            THE COURT:  It is a tough one.  We know Seat No.

3    3 is a tough one.

4            PROSPECTIVE JUROR:  Yeah.  I didn't -- I mean, I

5    guessed upon what was in front of her, and there's not really

6    anything in front of her.  And the rest of them were all --

7    there's either big notebooks.  They were writing.  There's

8    computers.  I can't see the guy that's to the left.  I can't

9    see what's in front of him, but there is a big screen in

10   front of him.  I didn't know if that was him or what that had

11   to do with.  So -- yeah.

12           So it really had to do that all she had was a

13   yellow pad, and she hasn't written anything down, and she

14   hasn't been taking notes where the rest of them have all been

15   taking notes, writing things.  Even the defendant down at the

16   end, he's got a lot of notebooks in front of him, so I

17   assumed he was -- I thought they were all her team.

18           THE COURT:  Oh, I see.  You thought it was the

19   whole team.

20           PROSPECTIVE JUROR:  I thought she had five people

21   representing her because he has so much stuff in front of

22   him, and he's busily writing.

23           THE COURT:  You went on the little piece of

24   information you had, which is how much do they have in front

25   of them, and who looks like that they're participating versus

UNREDACTED TRANSCRIPT

1    observing.

2              PROSPECTIVE JUROR:  Yes.  And the rest of them

3    look like, honestly, they're judging me.  They're looking at

4    all of us, and they're writing notes, and they're judging,

5    and she's just sitting there.

6              THE COURT:  Okay.  Okay.  And -- but what would

7    you say to --

8              PROSPECTIVE JUROR:  That had nothing to do with

9    her looks or her race or anything else.

10             THE COURT:  I understand.

11             PROSPECTIVE JUROR:  It had to do with --

12             THE COURT:  The books and the papers and so

13   forth.

14             PROSPECTIVE JUROR:  And the lack of, yeah.

15             THE COURT:  Well, but I know that you -- what

16   would you say to Ms. Grayson about -- or anything else who

17   is -- you know, obviously, Mr. Grayson, too, since he's here.

18   But in order to assure Ms. Grayson that you can be completely

19   fair and impartial in this case, what would you tell anybody

20   in her position?  because she needs to know, hey, this person

21   is going to be fair.  They're going to be impartial.  They're

22   going to decide the case only the way in which they're

23   allowed to decide it.  What would you say?

24             PROSPECTIVE JUROR:  Yeah, I mean, I'm sorry that

25   I chose you.  Really, it's the judge made me choose you.  We

1  have to answer what he says, so I would have loved to have

2  passed the mike to her.  I said it very quickly because I

3  wanted to move on, but, again, it had nothing to do with, you

4  look very pretty, very nice, your hair looks nice, and your

5  clothing.  So it had nothing to do with that.

6          I just would say in the future, great job to you

7  having 9,000 things in front of you to look like you're a

8  lawyer, so good job on that.  And then over here, y'all, too,

9  also looked like you got a lot of stuff going on.  I can't

10  see her either, so I didn't know what was in front of her,

11  so . . .

12          THE COURT:  Okay.  And so the question always is:

13  Can you assure everyone, including Ms. Grayson, that you will

14  decide the case solely on the evidence and the law in this

15  case and on no other basis?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Okay.  Now, you want to tell them

18  what you do because this is going to be interesting to

19  everybody?

20          PROSPECTIVE JUROR:  Yes.  I'm a co-founder and

21  executive director of a nonprofit.

22          THE COURT:  Right.  And how long have you been in

23  that position?

24          PROSPECTIVE JUROR:  So we started it because my

25  son passed away.  So he passed away about 16 and a half years

UNREDACTED TRANSCRIPT

1   ago, and so we started it when he passed away.  So it's been

2   going about 16 and a half years.

3           THE COURT:  And there were many people who knew

4   about that at the time; is that a fair statement?

5           PROSPECTIVE JUROR:  Yes, lots.

6           THE COURT:  All right.  And how has it been going

7   in terms of running the nonprofit?

8           PROSPECTIVE JUROR:  Great.  I mean, it's really

9   hard to run a nonprofit but, yeah, good.  We've expanded.

10  We're all across the mid South.  We have offices in numerous

11  cities, but our home base is here in Memphis.

12          THE COURT:  Can we talk briefly at side-bar?  Is

13  that okay?  This is going to be a chance to talk very briefly

14  on one issue at side-bar.  Is that okay?  Can you come

15  around?

16          And this is an example when you come to the

17  side-bar, there's a background noise that comes on, and so

18  you -- everybody else, you won't be able to hear out there.

19  But I do need to ask a question, if that's okay.  If you

20  don't mind coming around here.

21          (At side-bar on the record.)

22          THE COURT:  That's probably fairly well known.

23  There's a lot of people.  And I am going to ask you, first of

24  all, are you doing okay?

25          PROSPECTIVE JUROR:  Yes.

UNREDACTED TRANSCRIPT

1          THE COURT:  And I hate to bring that up.

2          PROSPECTIVE JUROR:  Yeah.

3          THE COURT:  I think we probably needed to ask

4   folks.  And do you mind telling them how your son passed

5   away?

6          PROSPECTIVE JUROR:  Yeah, he got real sick at

7   birth.  Sorry, I did not know you were going to ask this.

8          THE COURT:  I'm sorry, I didn't mean to do that,

9   but I just think that they need to understand a little bit

10  about what happened because their first thought would be, was

11  this in an accident, how did it occur?  And I know that

12  that -- I mean, I'm sorry to have to bring that up.  And I

13  know you've been working really hard on this for a long time

14  and it never goes away, does it?  So we've all had some

15  things in our lives that have been really, really tough.  And

16  how long did he live?

17          PROSPECTIVE JUROR:  He lived two months.

18          THE COURT:  Okay.  Exactly.

19          PROSPECTIVE JUROR:  Well, 55 days in the

20  pediatric ICU.

21          THE COURT:  All right.  Well, they didn't know

22  what it -- well, I might have known, but they didn't know

23  what happened.  And I think there was too much speculation by

24  attorneys or parties as to what happened.  So I'm sorry I had

25  to ask you, but I had to let them know.  Now, do you now have

UNREDACTED TRANSCRIPT

1    other children?

2              PROSPECTIVE JUROR:  I do.  I've had three more.

3              THE COURT:  Okay.  And how are they doing?

4              PROSPECTIVE JUROR:  They're good.  They're 15,

5    13, and 11.

6              THE COURT:  Okay.  All right.

7              Gentlemen, I only have men up here.  I feel

8    really awkward.  I think they would have been speculating

9    about what happened, and I didn't want them to do that

10   because too much respect for you.  You want to tell them

11   the -- well, any questions?  I just knew that was going to be

12   an issue, and I didn't want it to go unresolved, so are you

13   going to be okay?

14             PROSPECTIVE JUROR:  Yeah, yeah.

15             THE COURT:  I was trying to give you a moment to

16   feel a little better.

17             PROSPECTIVE JUROR:  Yeah.

18             THE COURT:  We appreciate what you're doing.

19   That's not it at all.

20             I am going to ask the Government:  Do you have

21   any questions?  I just thought may as well tell them now as

22   opposed to having everybody start speculating about what

23   happened.  And also to say it's really a great thing you're

24   doing, so I understand that.

25             PROSPECTIVE JUROR:  Thank you.

                    UNREDACTED TRANSCRIPT

1          THE COURT:  Anything from the Government?

2          MR. SCHOLL:  Could I just ask what the nonprofit

3    is?

4          PROSPECTIVE JUROR:  It's called the Forrest

5    Spence Fund.  His name was Forrest.  And we assist with the

6    nonmedical needs of critically and chronically ill children

7    and their families throughout the mid South.  So families

8    that are struggling with winter, utilities, or can't get a

9    roof, we pay their bills.  We offer grants to families.  We

10   send families to counseling who have lost a child, and then

11   we work with nine area institutions throughout the --

12   throughout the mid South, and we provide things to those

13   hospitals.

14         THE COURT:  And I just -- and it's a fair

15   question.  I didn't -- I'm sorry to have to -- I'm trying to

16   take off the table speculation, and that's all I was trying

17   to do.  Good deal.  Well, thank you.  Thanks for what you're

18   doing.  Appreciate it.

19         PROSPECTIVE JUROR:  Yeah, thank you, yeah.  I

20   don't know if it's to you, I will say if -- I did want to say

21   too the only thing I would say is a year ago Wednesday, our

22   very best friend's child was murdered at that school shooting

23   in Nashville, and that has definitely really affected things

24   so --

25         THE COURT:  The Covenant School?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Yes.  That was -- the pastor

2    is our very best friend and roommate from college, so if that

3    takes into account anything that's going on, I can't do it.

4          THE COURT:  I understand, and that will not be

5    the nature of the case at all.

6          PROSPECTIVE JUROR:  Okay.

7          THE COURT:  And that's a very fair question and a

8    very good point to raise.

9          MR. PALMER:  It's been a year?

10         PROSPECTIVE JUROR:  It's been a year Wednesday,

11   yeah.

12         THE COURT:  Absolutely.  Life is complicated, and

13   we all understand that.

14         PROSPECTIVE JUROR:  Yeah, okay.

15         THE COURT:  So if you're set and ready to go

16   back, we're going to let you go back.

17         PROSPECTIVE JUROR:  Yeah, okay.  Thank you.

18         MR. BALLIN:  Your Honor, before she goes, would

19   you rather me ask questions of Jury No. 3 now about that

20   issue or wait until general voir dire?

21         THE COURT:  Well, sure, you should ask them now

22   because this is a private area and if you wish to ask a

23   question -- although, this case is -- I'm going to tell you

24   very soon about the nature of the case, and I don't think it

25   will have any effect on -- you have a question?

```
1              MR. BALLIN:  I do.

2              THE COURT:  Okay.  Well, remember now, once you

3   start speaking, nobody else on your side can speak.

4              MR. BALLIN:  I plan to do voir dire.

5              THE COURT:  Oh, my goodness, go ahead.

6              MR. BALLIN:  I forgot what I was going to ask.

7              THE COURT:  That would make it a lot quicker.

8              MR. BALLIN:  No, I do remember.

9          The event of a year ago, Judge told you has

10  nothing to do with this case.  If you are on the jury and you

11  deliberate, can you put that event out of your mind totally?

12             PROSPECTIVE JUROR:  Honestly, I do not think I

13  can.

14             THE COURT:  Okay.  Well, the question is:  Would

15  it influence you in the case?  We're not -- we don't ask

16  people not to have a memory because we understand that.

17         I think we're going to rephrase that a little,

18  Mr. Ballin.

19             MR. BALLIN:  How would this event affect your

20  ability to be fair and impartial in this case?

21             PROSPECTIVE JUROR:  I mean, I don't think it

22  would affect me being fair and impartial.  I think I'm just

23  struggling with -- -yeah, just in general of the heaviness of

24  this week, not being fair and impartial.

25             MR. BALLIN:  If it was another week, do you think
```

UNREDACTED TRANSCRIPT

1    that this event would be different for you as a juror?

2             PROSPECTIVE JUROR:  Yeah, I mean, I think

3    timing-wise, this is a heavy week for me, for sure.

4             MR. BALLIN:  So what I hear you saying is that

5    because it's the anniversary, because this is a criminal

6    case, probably it's not -- or is this the kind of case that

7    you're comfortable in deciding a case on solely on the

8    evidence presented from the witness stand and the law given

9    to you by the judge?

10            PROSPECTIVE JUROR:  I mean, I would -- I mean,

11   because I'm called to oath and do what I'm supposed to do, I

12   would be impartial or whatever the other words were supposed

13   to be.  Do what you've asked me to do.

14            THE COURT:  Sure.  I think -- anything else

15   because we're going to try to --

16            MR. BALLIN:  Could I have one moment?

17            THE COURT:  Sure.

18            PROSPECTIVE JUROR:  Good golly, I can't imagine

19   what everybody out there is thinking right now.

20            THE COURT:  No, no, no.  Do you see why we needed

21   to talk about it?

22            MR. BALLIN:  This is what we do.

23            THE COURT:  This is our job.  It's our job to

24   make sure.  It's not your -- well, if they know what -- they

25   can find out later on in the privacy -- what you do.  We're

                    UNREDACTED TRANSCRIPT

1   just not telling everybody in public because that's okay.

2   Yes.

3           And -- yes, sir?

4           MR. BALLIN:  Ordinarily, I would address you by

5   your name as a matter of respect, but you are Juror Number?

6           PROSPECTIVE JUROR:  Three.

7           MR. BALLIN:  Yes.

8           THE COURT:  She's Juror 58, but she's in Seat 3.

9           MR. BALLIN:  Seat 3.  Thank you.

10          If the allegations in this case involve the

11  concept of murder for hire, does that change your ability to

12  be fair and impartial based on the fact that the child was

13  lost by murder?  Do you need me to repeat that?

14          PROSPECTIVE JUROR:  No, I heard you.  So what

15  you're -- tell me what you're asking me.

16          THE COURT:  Let me suggest this.  In this case,

17  there's not an indication that anyone was actually killed, so

18  we're not going to be confronted with an actual death.  I

19  will tell everybody on the panel fairly soon that the

20  allegation in the case is that the -- each defendant is

21  charged with murder for hire.  That is an attempt to hire

22  someone to kill someone else.  And the case is going to be

23  about that.

24          We don't know how it's going to come out.  I

25  don't know how it's going to come out.  We're going to have

1   witnesses.  I -- you know, I -- I'm -- the good thing is we

2   have a jury, and I won't have to make the factual

3   determination.

4           The jury will have to decide that based on the

5   evidence presented as to whether or not the Government has

6   proven beyond a reasonable doubt the facts necessary to

7   sustain the charge in the case.  And I'll give you the

8   elements of the charge and so forth at the time.

9           So it is -- it does involve that charge, but it

10  does not involve someone's demise.  So the question is:  Can

11  you decide the case solely on the evidence and the law and

12  not on any emotional response or preconceived notion for any

13  of the reasons that we talked about, the time of the year,

14  the events that have happened a year ago and so forth.  Can

15  you do that?

16          PROSPECTIVE JUROR:  I just say no.

17          THE COURT:  Okay.  It might be very difficult.

18          PROSPECTIVE JUROR:  I think it would be very

19  difficult.

20          THE COURT:  Okay.  Okay.  Well, I tell you what,

21  any questions from either side, any more questions?  I'm

22  going to ask you to -- there should be a seat in that corner,

23  but I can't see you.  Oh, no, they moved it.  Yeah,

24  absolutely, it's supposed to be back over there.  Thank you.

25  Thank you.  So if you will have a seat just for a moment, I'm

UNREDACTED TRANSCRIPT

1    going to check with counsel.

2                MR. BALLIN:  It's our humble position that juror

3    in Seat 3, Juror 58 should be excused for cause.

4                THE COURT:  Any problem?

5                MR. PALMER:  No, Your Honor.

6                MR. OLDHAM:  No, Your Honor.

7                THE COURT:  Okay.  Well, I think we should.  This

8    is going to be a really tough time for her.  It's pretty well

9    known what they do.  You knew that already.

10               MR. BALLIN:  When I heard the name, I recognized

11   that there's a race every year.

12               MR. SCHOLL:  That's why I wanted to ask to see

13   what the name was.

14               THE COURT:  Yes.  So I think everybody knows this

15   has been a very tough time.  Okay.  We're going to let her be

16   excused.

17               And so, Juror 58, I like that tag.  That looks

18   really good.  I suppose you can keep it afterwards.  We're

19   going to let you be excused in this case.  Thanks for being

20   here, and thanks for sharing that.  That's really, really

21   important.  And everybody wants to make sure that you know

22   that they're very supportive, everything that you're doing.

23               PROSPECTIVE JUROR:  Thank you.

24               THE COURT:  So thank you so much.  Good luck.

25   Thank you.

                        UNREDACTED TRANSCRIPT

1        PROSPECTIVE JUROR:  Thank you so much.  Just let

2   me get my bag and leave?

3        THE COURT:  Oh, absolutely.

4        MR. OLDHAM:  Your Honor, are you going to call

5   someone else or are you going to do that in the next round of

6   jurors?

7        THE COURT:  No, I'll do it right now.

8        MR. OLDHAM:  Okay.

9        (End of discussion at side-bar.)

10       THE COURT:  All right.  Well, we're going to let

11  our juror be excused, and thank you so much.  And we're going

12  to call someone to take that place.  Then we're going to take

13  a break, but I have to tell you seven things before we take

14  that break.  So that's the way that works.

15       Well, for all of you who have been waiting and

16  hoping that you would be the first one called after that,

17  we're going to call the next number.

18       CASE MANAGER:  Your Honor, that number is 0039.

19       THE COURT:  All right.  I'll ask one question

20  when our juror gets in place.

21       Did you hear everything we asked about earlier.

22       PROSPECTIVE JUROR:  Yes.

23       THE COURT:  You got all the answers down.

24       PROSPECTIVE JUROR:  I don't know about that.

25       THE COURT:  Okay.  I understand.  I'll come back

UNREDACTED TRANSCRIPT

1    after our break, and we're going to ask a few questions.  I

2    am going to ask, though:  What's the most important

3    characteristic for someone who is going to serve on a jury?

4                    It's a test.  The most important characteristic

5    for someone who is going to serve on a jury?

6                    PROSPECTIVE JUROR:  Be honest.

7                    THE COURT:  Okay.  Be honest, but also be

8    impartial.  Impartial.  And it's kind of a -- see, you got to

9    be an example for all the rest.  They're going to be ready

10   for it.  I appreciate that.

11                   Now, what we're going to do is because there are

12   this many of us, and if somebody doesn't need a restroom

13   break by now, I'm going to be concerned about you.  So we're

14   going to take that.  I have to tell you seven things before

15   we take a break.

16                   And the first thing is that you cannot discuss

17   the case among yourselves.  You don't really know anything

18   about it, and when you come back, we're going to tell you a

19   little bit -- a preview about what the charges are, what the

20   charge is in this case, and we'll ask you some more questions

21   about that.

22                   So do not discuss anything about the case at all.

23   Don't even talk about what we're doing here because once you

24   start down that road, you start the process of making up your

25   mind, and we don't want you to do that.  We want you to keep

1  an open mind.

2         The second thing is that you cannot speak to any

3  of the witnesses, parties, or attorneys in this case.  Now,

4  there are a bunch of them.  They will avoid you.  They have

5  to.  If you're seen speaking with someone who is a part of

6  the case, then it would appear that they were trying to

7  influence you, and that would be very inappropriate.  That's

8  actually jury tampering, and Jimmy Hoffa went to prison for

9  that.  So we're not going to -- we're not going to -- they're

10  not going to talk to you.  They're not going to talk to you

11  about that.

12         By the way, he got tried in Chattanooga when he

13  went to prison, and he got -- he tampered with the jury in

14  Nashville.  It wasn't here.  Isn't that great?  That makes me

15  feel better already.  So do not speak to the witnesses,

16  lawyers, or parties at all.

17         The next thing is that if someone attempts to

18  speak with you, that you should immediately report that to a

19  court security officer, the gentlemen with the badges on here

20  and the blue jackets.  You can speak to a member of my staff

21  or directly to me, but you should tell me very promptly in

22  some way that someone has attempted to talk with you about

23  the case.

24         Now, the other thing is -- the fourth thing is,

25  well, you can't speak among yourselves about the case, but

UNREDACTED TRANSCRIPT

1    your question is, what about somebody else?  What about

2    somebody at home, somebody at the office, can I tell them?

3    The only thing that you can tell someone is that I am a

4    prospective juror in a criminal case in federal district

5    court, and I cannot tell you anything else.  And, of course,

6    they're going to say, well, tell me what it's about, tell me

7    what it's about.  And the answer is, I can't tell you.

8           Now, right now, you don't really know, but you

9    will soon and, therefore, you cannot tell them anything

10   except, I'm a prospective juror in a criminal case in federal

11   district court, and the case is expected to be concluded this

12   week and it's highly likely.  So three, four days, and I

13   think we're here also on Friday, even though that is Good

14   Friday, we would be here as necessary.

15          The fifth thing is that you cannot do any

16   research or make any inquiry at all.  Now, right now, you've

17   heard some names and you cannot look up anybody on Google,

18   you cannot go to any platform, you can't -- absolute

19   prohibition.  Absolute.  I cannot be clearer about that.  You

20   cannot go to any media source.  You cannot do anything like

21   that at all.  No research at all, so no electronic research

22   or any other kind of research.

23          So you can't go back and look up something for a

24   term that you're not quite sure about.  And while I don't

25   mind if you look at the Constitution, I'm not going to

UNREDACTED TRANSCRIPT

94

1    encourage you to go try to look at the Constitution on terms

2    of bias and prejudice because that's my job to tell you about

3    that.  So no research at all, period, absolute prohibition.

4    I want to be very, very clear on that.

5            The next thing is that if there is something in

6    the media about this case, it's always possible.  Then if you

7    see something about this case or it's something you think is

8    about this case, you should report that promptly the next

9    opportunity we are together.  You should say, I saw something

10   on whatever it was.  I didn't know at the time, but this is

11   what I saw.  I need to tell you about it.

12           The key is to be transparent to tell us what you

13   saw, and more than likely, it is not a problem, but you must

14   be mindful of that.  You must tell us if you do see something

15   in the media, any kind of media.  And media is a big tent

16   nowadays.  It's not TV.  It's not the print media.  It's

17   everything on your computer.

18           If anybody in any way attempts to contact you

19   through a media methodology or through a computer

20   methodology, you must tell us about it, and you will not have

21   done anything wrong, but you need to tell us.

22           The last thing is that you must keep an open

23   mind.  You must keep an open mind until you've heard all of

24   the evidence in the case, the final arguments of counsel, and

25   the final instructions on the law.  And then you would go to

UNREDACTED TRANSCRIPT

1  the jury room at the end of the case, let's say on, say,

2  Thursday morning.  I don't know when it will be, but maybe

3  Thursday morning.  And you would then discuss the case among

4  yourselves, which is called your deliberation, and then, and

5  only then, would you attempt to make up your mind as to what

6  the verdict should be, and then would you attempt to reach a

7  verdict as a jury.  So that's a ways away.  That's how we

8  will proceed.

9            I have to tell you those seven things before we

10  take our first break.  I have to repeat them in a couple

11  times, and then I'll refer to them in a shortcut way.

12            Now, I'm going to -- since there are a lot of

13  you, I need to know how we're going to handle this.  There

14  are restrooms on this floor.

15            CASE MANAGER:  They may have to go down to 9.

16  They may have to go down to 2.

17            THE COURT:  Okay.  There are restrooms on this

18  floor.  There are restrooms on 2.  Well, there are restrooms

19  on every floor, but restrooms on 9 and restrooms on 2.  So

20  because of the number of people here and the time, my

21  goodness, what time is it?  I know, it's 11:15.

22            We're actually going to take a 25-minute break.

23  What's your -- any floor is fine, but we need to have you

24  back in 25 minutes.  After we get the jury, these breaks will

25  be compressed.  They won't need to be nearly as long, so

UNREDACTED TRANSCRIPT

1    that's how we'll handle that, 25 minutes from now.  So it's

2    15 after.  That should make it 20 till the hour.  Is that

3    right?  We got that right.

4              Okay.  Everybody good on that?  Okay.  You now

5    understand what you need to do.  We're going to hold

6    everybody here while you go out through the double doors.  I

7    cannot bring you back in until that time period, so I will

8    not see you for another 25 minutes.

9              We're going to let everybody be excused.  This is

10   your morning break.  And there will be a lunch prepared for

11   you and provided for you on the second floor when we get to

12   lunchtime, so don't worry about that.  We'll let everybody be

13   excused at this time, and we'll see you in 25, 24 minutes

14   now.  Thank you.

15         (Prospective jury panel out at 11:15 a.m.)

16             PROSPECTIVE JUROR:  I'm wanting to be excused.

17             CASE MANAGER:  What is your number, ma'am?

18             PROSPECTIVE JUROR:  18.

19             THE COURT:  We're going to have you stay.  In

20   fact, I'll have counsel come around to side-bar.  We have one

21   individual we need to speak with.

22               (At side-bar on the record.)

23             THE COURT:  Yes, ma'am.

24             PROSPECTIVE JUROR:  So, first of all, and let me

25   say, I would love to serve, okay?  What has happened since

UNREDACTED TRANSCRIPT

1    the time that I filled out the form, my mother is 91 years

2    old, and she was diagnosed with COVID pneumonia the 14th and

3    spent about eight days in the hospital in isolation, and I

4    stayed with her the whole time.  She was discharged to rehab

5    last Thursday, and I've still been staying with her at night

6    and per- -- you know, going to see her during the day because

7    she has Parkinson's dementia, so the isolation on top of that

8    has left her way confused or intermittently confused.

9            I'm her only person here, and she was sending me

10   texts this morning before we started, and she's, you know,

11   agitated, you know.  She's someplace where we can get on the

12   call light if she will get on the call light.  So, basically,

13   I'm wanting to be excused so that I can take care of her.

14           THE COURT:  You're the sole caregiver of your

15   mom, and that is normally something that we all respect, and

16   we understand that.  I don't see any issue here.  That's a --

17   that's a -- there are only a limited number of bases to

18   excuse someone, but one is sole caregiver of an individual

19   who needs you and your immediate attention.

20           So is there any objection by the Government?

21           MR. OLDHAM:  No, Your Honor.

22           THE COURT:  Any objection by the defendant, first

23   defendant?

24           MR. BALLIN:  No, Your Honor.

25           THE COURT:  Any objection by second defendant?

UNREDACTED TRANSCRIPT

1          MR. SCHOLL:  No, Your Honor.

2          THE COURT:  All right.  Well, look, let me let

3     you go.  You go take care of her, and don't worry about it.

4          PROSPECTIVE JUROR:  Okay.  Thank you so much.

5          THE COURT:  Thank you so much.

6          (End of discussion at side-bar.)

7          THE COURT:  All right.  We're going to take one

8     minute to speak to everybody, and then we're going to take

9     our break.  We're going to unlock the door to the jury room.

10    That has a men's restroom and a women's restroom, but there's

11    a limited number of women, so they may be willing to share.

12    I don't know.  But they're going to unlock that door.

13         Also if you -- there are other restrooms, but

14    that gives you the assurance that you won't run into anyone

15    and probably a little better way to handle that.  Other than

16    that, I think -- anything else?

17         Yes, sir?

18         MR. SCHOLL:  Judge, if I may, I don't know if

19    tech can come up and add one more computer screen or not or

20    if it somehow -- we can't see the computer screens back here.

21         THE COURT:  Sure, sure.

22         MR. SCHOLL:  I know when this case gets going --

23    I'm not worried about it right now since we're turning around

24    doing this, but when the case gets going --

25         THE COURT:  No, that's fine.  We'll see if we can

UNREDACTED TRANSCRIPT

1   get somebody from IT up and see if we can.  I think we

2   probably can.  We just need to get the tech up.  Let's try to

3   do that.  Anything else?

4                   MR. SCHOLL:  No.  Thank you, Judge.  I appreciate

5   that.

6                   THE COURT:  Okay.  Anything else from the

7   Government?

8                   MR. OLDHAM:  No, Your Honor.

9                   THE COURT:  Anything else from defense?

10                  MR. PALMER:  No, sir.

11                  THE COURT:  Okay.  Now, our schedule is that the

12  lunch is actually supposed to be here at 12 noon, so there

13  may be a short period of time that they're here.  I will

14  caution everybody just to remember that I will allow you to

15  ask a few questions.  I'm not -- I kind of emphasize the word

16  "few."  If you need me to ask a question, you need to tell me

17  about it, and I will.  Or I may, depending on what the

18  question is.

19                  The questions that attempt to suggest to a jury

20  that they need to commit to a position if such and such

21  events occur are inappropriate because they seek to

22  precondition the jury, and they are just plain not

23  constitutional, although in Texas, they're probably allowed.

24  They're allowed also in state court in Tennessee to some

25  degree.  They don't do that anymore, do they, over there,

UNREDACTED TRANSCRIPT

1    Mr. Scholl?

2                  MR. SCHOOL:  No, sir.

3                  THE COURT:  They've given that up completely.

4                  MR. BALLIN:  Yes, sir.

5                  THE COURT:  Really, they have?  I feel better.  I

6    feel better.  When I was practicing, I'm not sure they gave

7    it up, but, okay.  So I just want to remind everybody.

8                  Usually, it's a very straightforward -- and

9    you're not required to ask any questions at all.  And

10   sometimes the best course of action is not to ask much.

11                 Okay.  I think that's it.  We need to take that

12   short break at this -- well, not so short -- that break right

13   now, and I'll see everybody at 20 till.  And anything else?

14                 MR. OLDHAM:  No, Your Honor.  Thank you.

15                 THE COURT:  Okay.  I think we're good.  Thank you

16   all very much.

17       (A recess was taken from 11:21 a.m. to 11:41 a.m.)

18                 THE COURT:  I think we're on time, and we're

19   ready to bring the panel in.  So ready to bring the panel in.

20                 MR. PALMER:  Your Honor, I need to report a

21   contact.

22                 THE COURT:  Okay.

23                 MR. PALMER:  It was -- I was taking Ms. Grayson

24   downstairs to the restroom.

25                 THE COURT:  Okay.  Well, I mean, we have a

UNREDACTED TRANSCRIPT

1  restroom up here.  But if you want to go downstairs, you want

2  to go downstairs, but that's a risk.

3          MR. PALMER:  It will not happen again.  I was

4  taking her down, and there was contact.

5          THE COURT:  Okay.  Well, did anybody say anything

6  to you or they just ran into them?

7          MR. PALMER:  No.

8          THE COURT:  I think we're okay.

9          MR. PALMER:  It was nothing.

10          THE COURT:  Okay.  All right.  You can be seated

11  as you come in.  Of course, they're going to be seated.  And

12  we're going to let our jurors get up here.  And we're going

13  to see how far we can get before lunch.

14                  (Jury in at 11:43 a.m.)

15          THE COURT:  We have to call one more juror as

16  you're coming in.  We have to call a juror to take Seat No.

17  13.

18          CASE MANAGER:  Your Honor, that juror is 0012.

19          THE COURT:  Yes, sir, Seat 13.

20          All right.  I think we have everybody.

21          Well, Juror No. 3.  You're our new Juror No. 3.

22  How are you?

23          PROSPECTIVE JUROR:  Good.

24          THE COURT:  Yeah.  Which part of the county are

25  you from?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Shelby County.

2          THE COURT:  Okay.  All right.  Absolutely.  And

3     did you hear all those questions I asked earlier?

4          Let me start over:  What do you think is the most

5     important characteristic and so forth?

6          PROSPECTIVE JUROR:  Yes, I heard all of them,

7     yeah.

8          THE COURT:  Okay.  And what is the second

9     question, which is:  A juror is required to be impartial;

10    what is an example of something as to -- a characteristic as

11    to which people sometimes are biased or prejudiced?

12         PROSPECTIVE JUROR:  How they look.

13         THE COURT:  Okay.  And appearance -- it's

14    interesting.  Appearance is probably the most important thing

15    in terms of analytically.  So appearance is a big deal.

16         Now, does that mean that we should be more kindly

17    disposed toward people who are really good looking or people

18    who are less good looking?  What about that?

19         PROSPECTIVE JUROR:  We should judge everybody

20    equal but . . .

21         THE COURT:  Judge everybody equal.  And I always

22    ask:  Do you think that Robert Redford, when he was young,

23    got the best table in the restaurant when he went in

24    and asked for a table?

25         PROSPECTIVE JUROR:  I'm sure he did.

UNREDACTED TRANSCRIPT

1        THE COURT:  He did because he was a handsome guy,

2    and he also was a celebrity, so that was one of those things.

3    But does that apply here?

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  No, it doesn't.  None of that applies

6    here.

7        Okay.  Well, let's get back to our juror in Seat

8    13.  That's Juror 0012.  How are you doing today?

9        PROSPECTIVE JUROR:  Pretty good.

10        THE COURT:  All right.  Absolutely.  Do you want

11    to tell them what part of the city or county or district

12    you're from?  We've got four counties in this --

13        PROSPECTIVE JUROR:  Shelby.

14        THE COURT:  You're in Shelby, okay.  Absolutely.

15    And, of course, we also cover -- who -- I got somebody out

16    there from Lauderdale?  Who have I got somebody out there

17    from Lauderdale?  I should.  Absolutely.  Right there.

18    Lauderdale.

19        Anybody from Tipton out there?  We should have

20    people from Tipton.  Yes.

21        Fayette County?  Fayette County, my goodness, I

22    have all you guys.  Absolutely.  We remind everybody that

23    we're not just one place.

24        And the Western District of Tennessee actually

25    goes to the Tennessee River with one county crossing the

UNREDACTED TRANSCRIPT

1  Tennessee River.  So I think that's -- Mr. Oldham ought to

2  know.  Is it Perry County, Mr. Oldham?  Is that right?

3            MR. OLDHAM:  I think it is Perry County.

4            THE COURT:  It is Perry?  Got that right?  Okay.

5  So we cover a big area.

6            All right.  Well, our juror in Seat 13, why did I

7  go through the -- one, did you follow that exercise we went

8  through, you know, where I ask everybody, oh, you know --

9            PROSPECTIVE JUROR:  I did.

10            THE COURT:  -- Seats 1, 2, 3, and 4?  What did

11  you think about that?

12            PROSPECTIVE JUROR:  It's procedure.

13            THE COURT:  Okay.  It's a procedure.  That's

14  true.  Why do we go through that exercise with every jury?

15  We ask them to look out there and pick out people.  You know,

16  that sounds kind of dangerous.  I mean, you wouldn't want to

17  pick out people.  Why do we do that?  What's the point of

18  going through that exercise?

19            PROSPECTIVE JUROR:  To try to see what everyone's

20  mindset is.

21            THE COURT:  Okay.  We want to see what their

22  mindset is, but we also want to treat it like a vaccination.

23  You know, like a vaccination.  Once I've gone through that

24  exercise, I'm never going to use those characteristics again,

25  right?  I don't ever want to -- does that make --

UNREDACTED TRANSCRIPT

1    uncomfortable.

2              Is it uncomfortable when you ask a question like

3    that, pick out somebody you think is the lawyer for the party

4    bringing the claim?  Pick out the defendant.  That's a tough

5    one.  Pick out the party representing the Government.  Why is

6    that important that we look at people and make the -- draw

7    the conclusions that we really should draw?

8              PROSPECTIVE JUROR:  To eliminate prejudice.

9              THE COURT:  Eliminate prejudice, absolutely.

10   Absolutely.  And make sure that we're not going to do

11   something that is inappropriate, absolutely.

12             Tell them what you do, if you don't mind, and I'm

13   not going to get very specific because we're an anonymous

14   jury, but tell them what you do.

15             PROSPECTIVE JUROR:  I'm a retired truck driver.

16             THE COURT:  Okay.  I always like to ask that one

17   for this reason.  Do you ever find that people have

18   preconceived notions about truck drivers?

19             PROSPECTIVE JUROR:  All the time.

20             THE COURT:  All the time, absolutely.

21             And how important is it to have truck drivers in

22   the United States?

23             PROSPECTIVE JUROR:  It's very important.

24             THE COURT:  Very important.  And is there a

25   shortage of truck drivers now?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  There's not?  Oh, I didn't know that.

3    Okay.  That's -- I feel better already.  Absolutely.

4          Can you tell us the longest trip you ever had to

5    make?

6          PROSPECTIVE JUROR:  Five hundred miles.

7          THE COURT:  Okay.  Were you a regional driver or

8    across the road --

9          PROSPECTIVE JUROR:  I was local in my last years.

10         THE COURT:  Local?  Okay.  Absolutely.

11   Absolutely.

12         What is the thing that a truck driver worries

13   most about happening when you're driving a truck?

14         PROSPECTIVE JUROR:  Other drivers not

15   appreciating what we're doing.

16         THE COURT:  Absolutely.  Absolutely.  And so how

17   long have you been retired?

18         PROSPECTIVE JUROR:  Six months.

19         THE COURT:  Six months.  Do you miss it?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Okay.  All right.  Absolutely.

22         What makes the jury different?  You know, I

23   ask that question -- I'm not going to ask every person who

24   comes up later every question probably, but what does make a

25   jury different so that a jury can do what it would be harder

UNREDACTED TRANSCRIPT

1  to do as an individual?

2         Why is a jury different?  How does a jury -- how

3  is a jury structured so that a jury can make a decision in

4  conformance with the constitutional requirements whereas an

5  individual might struggle with that?  What are the things

6  that make a jury different?  There are about six, but I'll

7  settle for one or two.

8         PROSPECTIVE JUROR:  Well, a juror -- a jury has

9  the job of making a decision that could change someone else's

10  life, and we don't know these people.  So we have to -- we

11  have to judge based on the information that we receive.

12         THE COURT:  Okay.  Now, but a jury -- what makes

13  a jury different?  I mean, a jury actually decides a limited

14  question.  The jury decides whether or not the elements of

15  the crime have been proven by the Government beyond a

16  reasonable doubt, and they return a verdict.  What are your

17  two choices in returning a verdict?  I mean, they're

18  either --

19         PROSPECTIVE JUROR:  Guilty or not guilty.

20         THE COURT:  Guilty or not guilty, absolutely.

21  And we don't know the answer.  We don't know the answer on

22  that one.  I don't certainly at this time.

23         But the jury is different from individuals

24  because of what?  You can name any of the ones we talked

25  about or one that you think is -- that we've not talked

UNREDACTED TRANSCRIPT

1   about.  Why is a jury able to do that because a jury doesn't

2   decide the issue -- and I will tell you this, never decides

3   the issue of punishment.  They don't decide that.  That's not

4   for the jury to decide, and that's a good thing.  That means

5   you don't have that burden of deciding that.  That's not one

6   that anybody welcomes.  It really isn't.  What makes a jury

7   different?

8           And I'm going to come back to your colleague in

9   Seat 3.  What makes a jury different?

10          PROSPECTIVE JUROR:  What makes a jury different?

11  Well, we all from different backgrounds.

12          THE COURT:  It's diverse.  That's -- absolutely.

13  The jury is from different backgrounds, and that's important.

14          And I'm going to pass it down to juror in Seat 3.

15  Okay.  He's going to add to that list.  What makes a jury

16  different?

17          PROSPECTIVE JUROR:  We're all diverse.  We all

18  have different backgrounds.

19          THE COURT:  Right.  But that's not the only

20  thing.  I mean, what makes a jury verdict reliable versus

21  individual judgment perhaps not as reliable?  This is a test.

22          Y'all are -- all you guys want to raise your hand

23  out there and say, I've got three or four of those, right?

24  No.  I'm just checking.  So there were about five things we

25  mentioned that makes a jury different.

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Well, for one thing, every

2     has to agree.

3          THE COURT:  It has to be unanimous.  Okay.  And

4     you are, what --

5          PROSPECTIVE JUROR:  Yes, sworn in.

6          THE COURT:  Sworn in, which is very different

7     than everyday life.

8          Okay.  And you have what basis to make a

9     decision?

10          PROSPECTIVE JUROR:  On the facts.

11          THE COURT:  On the facts and the evidence.  Those

12     are -- that's a good summary of -- there are a couple of

13     other things, but those -- it's a good summary of what makes

14     a jury different.

15          Okay.  Now, would it help for all of you to know

16     the nature of the case in order to know if you can really sit

17     on the jury and be fair and impartial?  because you don't

18     know the nature of the case right now.  You don't know it.

19     And that's sort of the next component that we have to get to,

20     is what's the nature of the case?  Let's see what's going to

21     happen here.

22          What I'm going to do first before I get to that

23     is I'm going to ask you:  If someone brings up something that

24     is outside the record and something you should not consider,

25     they bring up somebody's gender, they bring up somebody's

UNREDACTED TRANSCRIPT

1  ethnicity, or they have an accent, and we say, well, I don't

2  like their accent, or they say something -- I'm going to put

3  it very directly, I didn't like the way that the witness or

4  anybody else looked.  And they really mean it.  You know, I

5  didn't like the way they looked.  And they're using that as a

6  basis to make a decision.

7          Of course, we all look different.  Do you think

8  you ought to say something if someone says something like

9  that in the jury room?  I just don't like the way he looks.

10 And you say, oh, you don't really mean that, you don't really

11 mean that.  Yeah, I really mean that.  I just didn't like the

12 way they looked and, therefore, I'm not going to believe him

13 or her because I just didn't like the way they looked.  You

14 know, maybe they've got a tattoo.  Maybe they've got a

15 piercing.  You know, that's all sorts of things.

16         Do you think you ought to say something if

17 somebody brings up an unconstitutional factor that really

18 means appearance or it means gender, race, national origin,

19 or something else, all these many things that are not

20 allowed?  Do you think you ought to say something?

21         PROSPECTIVE JUROR:  Yes, you should.

22         THE COURT:  You should.  Right.  We all have to

23 think about that.

24         So what would you say if somebody brings up a

25 factor like that?

UNREDACTED TRANSCRIPT

1        PROSPECTIVE JUROR:  It's going to end up being a

2    mistrial or something if we don't agree, if all 12 of us

3    don't agree.

4        THE COURT:  Well, but the first thing, we're in a

5    discussion, and so the person that brings it up, sometimes

6    people say things you find out maybe they didn't exactly

7    mean.  Is there something that might be appropriate to say,

8    would be appropriate to say, if somebody says something that

9    is bringing in an unconstitutional factor?  What might the

10   jury say -- a juror say?  Would you be willing to speak up?

11       PROSPECTIVE JUROR:  I guess I would.

12       THE COURT:  Okay.

13       PROSPECTIVE JUROR:  I don't know if I would or

14   not.

15       THE COURT:  Okay.  Well, think about it.

16       PROSPECTIVE JUROR:  I would hope I would.

17       THE COURT:  Well, hand it over to your young

18   colleague right next to you.  He's the youngest one on the --

19   how old are you?

20       PROSPECTIVE JUROR:  I'm 44.

21       THE COURT:  Oh, my goodness, he's got my

22   completely fooled.  Okay.  Who is under 44 on the panel?  Oh,

23   youngsters down there.  Okay.  How old is our juror in Seat

24   No. 4?

25       PROSPECTIVE JUROR:  Thirty-eight.

UNREDACTED TRANSCRIPT

1          THE COURT:  Everybody wants to be younger.  How

2     old is our juror in Seat No. 7?

3          PROSPECTIVE JUROR:  He's not supposed to -- oh,

4     62.

5          THE COURT:  Do I have no one under 30 in this

6     group?  How many are under 30 out there?  All right.  My

7     gosh, we've got a -- congratulations is all I can say.

8          All right.  Well, what would be appropriate -- in

9     Juror Seat No. 2, what would be something appropriate to say

10    if someone brings up an unconstitutional factor.  They say --

11    they genuinely mean they don't like the way somebody looks,

12    but it can be all those factors we talked about.  You know, I

13    didn't like X or Y or Z, and the answer -- and, therefore,

14    I'm not going to believe that person.  What do we do?

15         PROSPECTIVE JUROR:  We say that's irrelevant.

16         THE COURT:  Okay.  We say it's not relevant.  And

17    they say -- and why is it not relevant?

18         PROSPECTIVE JUROR:  Because it doesn't pertain to

19    the evidence in the case.

20         THE COURT:  It doesn't pertain to anything that

21    we can consider in the case.  It's an unconstitutional

22    factor.

23         Would you be willing to say that and speak up if

24    somebody brings up an unconstitutional factor?

25         PROSPECTIVE JUROR:  Absolutely.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  We have to think about -- all

2     of us have to think about that.  So we're going to pass that

3     all the way down to juror in Seat No. 6 and 7, and what might

4     you say?

5          PROSPECTIVE JUROR:  That that's not considering

6     what the facts would be, and you can't judge by whatever that

7     person looks like or what they've said because that could

8     hinder, you know, them as a -- as a key witness or something.

9     They -- you know, they may be stating something and if I've

10    decided, well, I just don't like that person, I'm not going

11    to believe them, you just can't do that.

12         THE COURT:  Right.  We do listen to the evidence

13    as it comes in.  So we can listen obviously and want to

14    listen attentively as to what each witness has to say, but we

15    don't look at that person and say, well, they didn't wear

16    clothes I like today.  You know, I didn't think they were

17    appropriately dressed for court.

18          That's not the issue.  If somebody comes in and

19    they've got a tank top on and tattoos on their arms, and they

20    start -- are you going to say, well, I can't believe them.

21    Are you just going to say you have to wait and listen?

22          PROSPECTIVE JUROR:  No, I have to wait and

23    listen.

24         THE COURT:  You have to wait and listen.  And,

25    you know, we just can't -- that's just not how it's done.  We

UNREDACTED TRANSCRIPT

1    don't -- we wait and listen to each witness with respect, and

2    we listen to see what they have to say, and we make our

3    judgments based on the evidence and not on physical

4    appearance.  I don't know if anybody is going to have a tank

5    top and tattoos, but it can be many things that cause us to

6    have -- you know, somebody said hair.

7              I think we got back there juror in Seat No. 12.

8    Hair, right?  I don't like their hair.  We don't go there.

9    We're not going there.  We're not going there, absolutely.

10   And so you would speak up and say in a couple of words what

11   might you say to the person who brings up an unconstitutional

12   factor or something outside the record?

13             PROSPECTIVE JUROR:  Basically, that's giving a

14   biased opinion or that you can't do that.  You've just got to

15   listen to the facts that they have presented.

16             THE COURT:  Right.  Let's say we can only decide

17   based on the evidence presented in the case.  We have to

18   really think about what we're going to say, right?  All of

19   you are thinking about it now.  I could really say it and

20   start a fire in the jury room.  We don't want to do that.

21             We want to -- I'm going to hand it back to our

22   juror in Seat 12.  Do you see what I'm getting at?  It does

23   matter how you think about this and what you have to say.  If

24   somebody brings up an unconstitutional factor and you feel --

25   would you -- one, would you be willing to speak up?

UNREDACTED TRANSCRIPT

1      PROSPECTIVE JUROR:  Definitely because we want

2  them to focus on the facts and realize why we're here, and as

3  you said, we have taken an oath to do that, and it's very

4  important.  So based on that, we shouldn't be here on these

5  little mediocre facts, but just stick to the facts so we can

6  make an honest decision and a bias decision.

7      THE COURT:  Stick to the evidence.  We can only

8  decide the case on the evidence and the law.  And we can't

9  decide it on some unconstitutional factor.  But we have to

10  think about what we're going to say because if we don't do

11  that -- the jury right next to you wants to say something, so

12  I'm going to go to the jury in Seat 11.  Right?  She's right

13  there.  What do you think?  Don't you think we ought to think

14  about this ahead of time?

15      PROSPECTIVE JUROR:  Yes.  I agree with what

16  everybody has already said.  We -- you know, I would just say

17  we're not judging on what they look like.  We're judging on

18  the facts and the evidence of the case.

19      THE COURT:  Okay.  But we really do have to think

20  about it because if we say something inflammatory, it might

21  not be a positively received -- we just need to bring us back

22  to the focus on the evidence and the law.  So we want to

23  thoughtfully do that.  Tell them what you do.

24      PROSPECTIVE JUROR:  What I do?  I work in

25  financial services.

UNREDACTED TRANSCRIPT

1          THE COURT:  Right.  Now, if you make a decision

2   in financial services that's not based on the facts, just on

3   a whim, what could happen?

4          PROSPECTIVE JUROR:  Bad, bad.  It would be bad.

5          THE COURT:  It would be bad, to say the least,

6   and this is -- this is at least as important if not more

7   important than that; is that fair?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Okay.  And I'm going to ask your

10  colleague in Seat 12.  Tell us what you do.

11         PROSPECTIVE JUROR:  I'm retired happily for the

12  last three years.  I retired from FedEx.  I worked for a

13  vendor in food service.  I was blessed to feed a lot of

14  wonderful people, even Fred Smith.

15         THE COURT:  That's amazing.  That's amazing.

16  Absolutely.  Absolutely.  Well, glad -- congratulations on

17  being retired.

18         PROSPECTIVE JUROR:  Thank you.

19         THE COURT:  And so that -- but we all have

20  different perspectives.  We're going to see things that are

21  very important for everybody else to hear.  That's very

22  important.

23         Okay.  Now, I'm going to hand that back down to

24  Seat No. 8.  I don't want to leave anybody out here.  Would

25  you like to know the nature of the case so we know whether we

UNREDACTED TRANSCRIPT

1  can really be fair and impartial?  Would you say there's some

2  kind of cases that would be harder to sit on than others?

3          PROSPECTIVE JUROR:  I personally don't need to

4  know the nature of the case to be fair and impartial.  I

5  mean, I'm going to make my decision on the facts that are

6  presented to me.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  Also what the case may be.

9          THE COURT:  I understand that.  This is not a

10  case -- and I'm going to give you an example.  This is not a

11  case, for example, about child sex trafficking.  So,

12  obviously, not at all.  I'm using that just as an example.

13  It's not that.

14          But we usually tell people things like that so

15  that they can think about whether they can sit on the jury.

16  This doesn't have anything to do with that.  This doesn't

17  have anything to do with that.

18          But the reason I'm mentioning that is I think the

19  nature of the case can affect sometimes our ability to sit on

20  the jury and be fair and impartial.  So is it okay if I tell

21  you the nature of the case?

22          PROSPECTIVE JUROR:  It's okay if you tell me the

23  nature of the case.

24          THE COURT:  What I'm going to do is I'm going to

25  get out a copy of the indictment.  That's the charge in this

UNREDACTED TRANSCRIPT

1    case, and we're going to kind of watch our time.  They're

2    going to tell me when lunch is there.  But this is what the

3    indictment in this case says.  And so you'll all know the

4    nature of the case, and I can then ask you:  Knowing the

5    nature of the case, does that in any way affect your ability

6    to sit on the case and be fair and impartial.  This is a one

7    count case.  Does the number of counts make any difference?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  It doesn't make any difference.  By

10   the way, tell them -- I'm going to make sure I've got this

11   down.  Tell them what you do again.

12             PROSPECTIVE JUROR:  I'm an electronic engineer.

13             THE COURT:  Okay.  And that's pretty amazing

14   stuff.  How long have you been doing that?

15             PROSPECTIVE JUROR:  For 33 years now.

16             THE COURT:  Okay.  Have you been fascinated by

17   the electronics and all the things that have been going on in

18   some of the stories that have been in the news lately?

19             PROSPECTIVE JUROR:  Well, yes, and then it

20   changes almost daily.

21             THE COURT:  Absolutely.  Absolutely.

22             Now, this is what the case is about.  It is just

23   an indictment.  It is not evidence in the case, and you

24   cannot consider it as evidence at all.  The fact that there

25   is an indictment is not evidence of anything.  You can never

UNREDACTED TRANSCRIPT

1   regard it as that.  But it is a way to tell you and me and

2   the defendants what the charges are because, otherwise, we

3   wouldn't know what they are.  So we have to know the nature

4   of the charges.

5              This is a one count case.  Again, that is not --

6   it doesn't matter how many there are.  The question is

7   whether or not the Government can prove beyond a reasonable

8   doubt the facts necessary to sustain the charges in the

9   indictment.

10             This is what it says:

11             Count 1, from on or about August 26th of 2022,

12  and continuing until on or about September 11, 2022, in the

13  Western District of Tennessee and elsewhere, the defendants,

14  Ashley Grayson, that's Ms. Grayson, and Joshua Grayson,

15  that's Mr. Grayson, together with others unknown -- known and

16  unknown to the grand jury, did knowingly and intentionally

17  conspire to use and cause another to use a facility of

18  interstate commerce to wit, a cellular telephone with the

19  intent that the murder of DH, that's the initials, DH, a

20  person, a real person known to the grand jury, be committed

21  in violation of the law of the State of Mississippi and as

22  consideration for the receipt of and promise and agreement to

23  pay money and other items of pecuniary value all in violation

24  of Title 18 United States Code Section 1958.

25             And that's the charge in this case.  Sometimes

UNREDACTED TRANSCRIPT

120

1    it's referred to as a murder for hire charge.  I don't know

2    what happened in this case, but I tell you what the charges

3    are because each of you has to think about does that, in any

4    way, affect my ability to sit on the jury and be fair and

5    impartial?  And let me give you an example.

6         If you had a first cousin, who last year was

7    killed or seriously injured, wounded in some type of criminal

8    conduct, you would need to tell me that, and you would need

9    to tell the parties that because this might be a difficult

10   case for you to sit on.  I don't know that.  I don't know

11   that.  But it might be.

12        And, understandably, it might be difficult for

13   you to disassociate what has happened in your experience, in

14   your family, in deciding the case, and it's not appropriate

15   to consider that.  You have to decide whether the Government

16   has proven beyond a reasonable doubt each of the elements

17   necessary to sustain the charges in this indictment.

18        So I tell you that because if you have personally

19   been a victim of a crime, if you have had someone who

20   threatened you with physical harm, or if you were falsely

21   accused of that, then it might be really hard to sit on this

22   jury and be fair and impartial.

23        Now, I'm going to have to check with each of you.

24   I'm kind of watching my time because in a moment, they're

25   going to tell me that lunches have arrived on the second

UNREDACTED TRANSCRIPT

1    floor.

2                    CASE MANAGER:  12:15 is the ETA.

3                    THE COURT:  So they've got another few minutes

4    before lunch gets here.

5                    I'll tell you the nature of the charges because I

6    believe each of you has told me -- and I didn't go back and

7    ask jurors in 13 and 3, but they said, I think I can be fair

8    and impartial.  And I think -- and juror in Seat 3, I

9    understand that that would be your thought before you heard

10   what I said, right?

11                   PROSPECTIVE JUROR:  (Moving head up and down.)

12                   THE COURT:  And juror in Seat 13, I mean, you'd

13   say, I think I can be fair and impartial; is that right?

14                   PROSPECTIVE JUROR:  Yes.

15                   THE COURT:  Okay.  But now that you know the

16   nature of the charge, think about anything in your life that

17   may affect your ability to sit on the jury and be fair and

18   impartial.

19                   If you're a small business owner and somebody

20   came in and injured or shot or harmed one of your employees

21   and it was-- particularly if it was recent, that might be

22   hard.  Think about it.

23                   So let me go back to the juror in Seat 12.  Does

24   knowing -- I'm sorry, not 12.  I'm sorry, 8.  I'm trying to

25   keep you.  I'm trying to hold on to you.  Is there anything

                      UNREDACTED TRANSCRIPT

1    about the nature of the charges that might in any way affect

2    your ability to sit on the jury and be fair and impartial?

3              PROSPECTIVE JUROR:  No, there's not.

4              THE COURT:  Have you had any occasion in which

5    someone in the family has been threatened with physical harm,

6    and it was a point of concern to you.

7              PROSPECTIVE JUROR:  No, not to my knowledge.

8              THE COURT:  Okay.  And I am going to ask in what

9    you do in your -- by the way, day-to-day work for you would

10   involve what?

11             PROSPECTIVE JUROR:  I work at the prison, so I do

12   all the electronics at the prison.

13             THE COURT:  Right.  And there's more than one

14   prison, so I'm going to ask which one?

15             PROSPECTIVE JUROR:  Shelby County penal farm.

16             THE COURT:  Shelby County penal farm.  I'm going

17   to put that down as a side-bar for us, if that's okay,

18   because I will need to ask you some questions.  I need not

19   ask in front of everybody else.

20             Okay.  By the way, how long have you been there.

21             PROSPECTIVE JUROR:  I've been out there for going

22   on eight years now.

23             THE COURT:  Okay.  And do you have a rank or is

24   it -- are you a contract employee, a regular employee, or do

25   you have a rank?

UNREDACTED TRANSCRIPT

123

1    PROSPECTIVE JUROR:  No, I don't have a rank.  I'm

2    just a regular employee.

3    THE COURT:  That's what I understood, but I want

4    to make sure I understand.  We're going to put that down as a

5    side-bar, and we'll get that at the appropriate time.

6    Okay.  Let's go to the juror next to you in Seat

7    9.  Does knowing the nature of the charges in any way affect

8    your ability to decide the case solely on the evidence?

9    PROSPECTIVE JUROR:  No, it does not.

10    THE COURT:  Anybody, friend, family who has ever

11    been threatened with serious bodily harm?

12    PROSPECTIVE JUROR:  No.  I have never had anyone

13    close to me involved with anything like that.

14    THE COURT:  Okay.  Let's go to juror in Seat No.

15    10.  Anything about the nature of the charges that would in

16    any way affect your ability to sit on the jury and be fair

17    and impartial?  Now, let me talk about that just a second.

18    Nature of the charges means I heard the charges,

19    and now I think having heard the charges that I think that I

20    either can't be fair, or I think I know what happened.  So

21    anything about -- and, of course, you shouldn't, but it could

22    happen.  Anything about the nature of the charges that might

23    in any way affect your ability to sit on the jury and be fair

24    and impartial?

25    PROSPECTIVE JUROR:  No, Ii don't think so, so.

UNREDACTED TRANSCRIPT

124

1          THE COURT:  Okay.  Anyone in the family, close

2     friend, so forth who has ever been threatened with serious

3     bodily injury, serious injury, probably better way to say

4     that.

5          PROSPECTIVE JUROR:  I'd have to say our company

6     was.  A gentleman tried to hit our building, killed a couple

7     of people, came in, jumped off the second floor, tried to

8     commit suicide.  And now we have to have armed guards at our

9     doors.

10          THE COURT:  I'm actually going to put that down

11     as a side-bar, and we'll talk about it a little bit more at

12     the side-bar.  Did that in any way -- I am going to ask you:

13     Were you in any way harmed in that process?

14          PROSPECTIVE JUROR:  No, sir, not at all.

15          THE COURT:  Okay.

16          Juror in Seat 11, anything about the nature of

17     the charges that might in any way affect your ability to sit

18     on the jury and be fair and impartial?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  Anybody in the family who -- or

21     friends, close friends, relatives, someone you know well, who

22     has ever been threatened with serious bodily injury?

23          PROSPECTIVE JUROR:  Fortunately, no.

24          THE COURT:  Okay.  And let's go to juror in Seat

25     12.  Does knowing the nature of the charges in any way affect

UNREDACTED TRANSCRIPT

1    your ability to sit on the jury and be fair and impartial?

2                  PROSPECTIVE JUROR:  No.

3                  THE COURT:  Anybody in the family, close friends,

4    someone who is close to you, who has been threatened with

5    serious bodily injury?

6                  PROSPECTIVE JUROR:  Yes.

7                  THE COURT:  I'm going to put that down as a

8    side-bar.  Okay.

9                  Juror in Seat 13, anything about the nature of

10   the charges that might in any way affect your ability to

11   decide the case solely on the evidence?

12                 PROSPECTIVE JUROR:  No.

13                 THE COURT:  Have you on anybody in the family or

14   close friends, someone you know well ever been threatened

15   with serious bodily injury?

16                 PROSPECTIVE JUROR:  No.

17                 THE COURT:  And I am interested in your

18   profession.  Is -- did you feel that you needed to -- you

19   were a local driver?

20                 PROSPECTIVE JUROR:  Right.

21                 THE COURT:  Were there any extra precautions you

22   ever took in order to be protected?

23                 PROSPECTIVE JUROR:  Always.

24                 THE COURT:  Okay.  All right.

25                 And then let's go to juror in Seat 14.  Anything

UNREDACTED TRANSCRIPT

1   about the nature of the allegations in the case, anything

2   about the nature of the case that would in any way affect

3   your ability to sit on the jury and be fair and impartial?

4             PROSPECTIVE JUROR:  No.

5             THE COURT:  Anybody in the family or good friend

6   who has ever been -- or someone you know very well who has

7   ever been threatened with serious bodily injury?

8             PROSPECTIVE JUROR:  Yes.

9             THE COURT:  I'm going to put that as a side-bar

10  also.  I'm watching downstairs.  They'll tell me as soon as

11  lunch is here.  We've probably got a minute.  Let me see if I

12  can get through -- I'll tell you what.  I'm going to leave

13  the first row, we'll come back and ask all of you.  Think

14  about this.  This is serious.  You know, if somebody

15  threatened you or, you know, if something happened, I need to

16  know about it.  Or if you were falsely accused, I will say

17  that also of that, then I will need to -- I must know about

18  that.  You must tell me about it.  Same way with everybody

19  else out there.  We want to know our situation.

20            Well, lunch has arrived.  I'm actually going to

21  try to keep -- we're going to take at least -- is one hour

22  enough?  They asked me to take a little more time, an hour

23  and 15, at least an hour and 15.  Okay.

24            Lunch has arrived.  We're going to take an hour

25  and 15 minutes.  I'm going to ask my four individuals on the

UNREDACTED TRANSCRIPT

1   back row.  That's 8, 10, 12 and 14 to wait with me at least a

2   few minutes to see if we can go through our discussions at

3   side-bar to save everybody else a little time.

4           Now, there are seven things that you have to

5   remember at all times.  Do not discuss the case among

6   yourselves, period.  Now you actually know something to say

7   to somebody, right?  Don't do it.  It's a temptation.  You

8   know, just don't talk about it.  I know you have to

9   internalize that, but please do not talk about the nature of

10  the case or what we're doing in this process until we've

11  completed this whole process.

12          The second thing is don't speak to any of the

13  witnesses, lawyers, or parties here.  And if they

14  inadvertently see you -- they actually quickly told me I

15  think I may have run into somebody, but it was of no

16  consequence.  But they will come tell me because they

17  understand the critical nature of not speaking to you, and

18  they won't do it.  So if you see one and you say, hello, they

19  are not going to say hello.  They're going to look down and

20  look embarrassed.  So do not speak to them.

21          I know in the American South, there's a great

22  tendency to speak to everybody we think we know.  Do not do

23  that.

24          The third thing is that if anybody tries to speak

25  to you about the case, you should immediately report that to

UNREDACTED TRANSCRIPT

1    the court security officer, a member of my staff, or me.

2    That would be very important.  And we will take the

3    appropriate steps.  We will handle it appropriately.  We

4    won't overreact, but we do need to know that.  So please,

5    please tell us if that occurs.

6            Now, you also -- I'm going to skip one or two

7    things, but don't do any research or make any inquiry.  Do

8    not go on Google or go look it up in a book or try to go to

9    the library and look up the statute under which the

10   defendants are charged.  Don't make any inquiry.  That is not

11   your job.  And it will create a significant problem if you

12   were to attempt to do so.

13           Don't do any research at all.  Don't go back and

14   see if you can find out any background.  That is not your

15   responsibility.  That will be the responsibility of the

16   parties to present all the evidence in the case.  And the

17   Court will give you the instructions on the law.  So,

18   absolutely, do not make any inquiry at all.

19           Of course, also avoid things from the media that

20   might be about this case.  I will tell you, there could be

21   something in the media about this case.  There could be

22   something online.  There could be something that definitely

23   could come up.  It probably won't, but if you inadvertently

24   see something or potentially see something, you must tell me

25   about it, and it will be okay.  You're not going to get in

UNREDACTED TRANSCRIPT

129

1   trouble.  You just need to be very transparent.  So if you

2   see something about this case, you need to tell us about it

3   immediately.

4              And, of course, continue to keep an open mind.

5   Now, I'm sort -- I'm sort of abbreviating things because you

6   heard my full discussion earlier.

7              We're going to let you have lunch -- oh, my

8   goodness, it's going to bring us back at what time,

9   Mr. Sample?

10             CASE MANAGER:  Seventy-five minutes.

11             THE COURT:  Seventy-five minutes from now.  My

12   goodness, I'm showing at one -- I've got 11:22, something

13   like that.

14             CASE MANAGER:  Yes, sir, 12:22.

15             THE COURT:  An hour and 15 minutes from now, so

16   we're going to talk about -- I'm sorry, obviously, 12:22, so

17   we're talking about 1:22 plus 15, so that ought to do 1:37.

18   Let's make that about 1:35.

19             Okay.  So enjoy your lunch.  There are plenty of

20   things to talk about.  You can talk about NCAA basketball if

21   you can stand talking about it anymore.  You can talk about

22   the Grizzlies and who they need to draft and that sort of

23   thing.

24             You can talk about also -- my point of saying is

25   there are many things to talk about.  You can talk about the

                    UNREDACTED TRANSCRIPT

1   new museum that's going to be downtown.  It will be the new

2   Brooks museum.  It'll be renamed.  It's going to be a really

3   wonderful thing.

4           But do not discuss the case.  For all of you, I'm

5   going to let you be excused for this time, except for my four

6   jurors I'm holding on to for a few moments.  I'll try to get

7   them free as soon as possible.

8                   (Jury out at 12:22 p.m.)

9           THE COURT:  I'm going to have juror in Seat 8

10  come around the side-bar.  We can start a little early, and

11  we will, of course, put the background on.

12                  (At side-bar on the record.)

13          THE COURT:  All right.  You have a lot of

14  experience.  These people want to know about it.  Tell us

15  about it.  What's your job involve, but also where you work.

16  And you've been there eight years, and what your job was

17  before.  And, you know, we've got a lot of knowledge.

18          PROSPECTIVE JUROR:  I was a maintenance mechanic

19  for Shelby County.  I still work at Shelby County.  I did the

20  building maintenance on -- actually, the building that's

21  across the street, 201, 157, and 150.  I did the maintenance

22  on those buildings before I became an electronic technician.

23  Prior to that, I worked the election commission.

24          THE COURT:  The election commission?

25          PROSPECTIVE JUROR:  Yes.

UNREDACTED TRANSCRIPT

1          THE COURT:  And that was across the street here?

2          PROSPECTIVE JUROR:  Yes.  I programmed the voting

3   machines there.

4          THE COURT:  Okay.

5          PROSPECTIVE JUROR:  I've been -- prior to that, I

6   was in the Air Force.  I did electronics on the fighter jets.

7          THE COURT:  And how long were you in the Air

8   Force?

9          PROSPECTIVE JUROR:  I was in the Air Force for

10  four years.

11         THE COURT:  Okay.  Well, thank you.  I was in the

12  Army, but it was a different time.

13         PROSPECTIVE JUROR:  I've been at the prison now

14  going on eight years.

15         THE COURT:  Okay.

16         PROSPECTIVE JUROR:  And my job entails there, I

17  do security cameras.  I do the -- some of the doors have

18  electronic locks on them --

19         THE COURT:  Yeah.

20         PROSPECTIVE JUROR:  -- and I work on those.  I

21  don't have any contacts with the inmates.

22         THE COURT:  That's what I was going to ask about.

23  I mean, I don't know how you avoid any contact.

24         PROSPECTIVE JUROR:  Well, because of the nature

25  of my job, when I have to go in and work on a lock, they have

UNREDACTED TRANSCRIPT

132

1  to clear the inmates so they don't see what I'm doing.

2          THE COURT:  Okay.  Because you don't want them to

3  be watching you.

4          PROSPECTIVE JUROR:  They can't watch me and

5  figure out how to get out.

6          THE COURT:  Right.  Exactly.

7          PROSPECTIVE JUROR:  And so when I go to work on

8  the locks, the inmates have to be -- they usually move them

9  to a different cell, or they have to get to the back of their

10  pod, or stay, whatever the case may be.

11          THE COURT:  You have heard every possible story

12  as it relates to criminal conduct probably in your

13  experience.  Not that you interact with inmates, but you do

14  work in a security environment.

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  And would it be fair to say that on

17  occasion, there are difficulties in which inmates are

18  involved, that is, altercations?

19          PROSPECTIVE JUROR:  There are, but it really

20  doesn't affect me.  I'm on the maintenance side.

21          THE COURT:  Right.

22          PROSPECTIVE JUROR:  The correctional officers --

23          THE COURT:  Right.

24          PROSPECTIVE JUROR:  -- have more experience with

25  that.  But as I said, I don't have much interactions with the

UNREDACTED TRANSCRIPT

1  inmates at all.

2      THE COURT:  Do you have interaction with the
3  correctional officers?

4      PROSPECTIVE JUROR:  I have interaction with the
5  correctional officers.

6      THE COURT:  Do they tell you things about their
7  experiences?

8      PROSPECTIVE JUROR:  Vaguely.  Vaguely.

9      THE COURT:  Okay.

10     PROSPECTIVE JUROR:  They don't go into details
11 about what happened because of the nature of the, as they
12 say, where we work at.

13     THE COURT:  Absolutely.  Do you think that this
14 is a case that you should be sitting on?  I don't know.  Can
15 you do this job?

16     PROSPECTIVE JUROR:  I feel that I can do this job
17 because, like I say, I will base my decision on solely the
18 evidence that was presented before me.  I don't have any
19 preconceived notions whether the parties involved are
20 innocent or guilty.

21     THE COURT:  The inmate population at Shelby
22 County correction Center varies a good bit, but should
23 typically be lower security level personnel.  That's not
24 always true anymore.  Used to be; is that right?  Now it can
25 be anybody with any type of crime; is that right?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Well, they've -- in the last

2    couple of years, the population has changed.  Like, we now

3    house federal inmates.

4          THE COURT:  Yes, you do.

5          PROSPECTIVE JUROR:  So it has changed since I've

6    been out there.

7          THE COURT:  Okay.

8          PROSPECTIVE JUROR:  Federal inmates are kept

9    separate from the state -- well, not the state, the county

10   inmates.

11         THE COURT:  Okay.  I'm going to let them ask you

12   some questions.  I mean, if you -- any questions from the

13   United States?

14         MR. OLDHAM:  No, Your Honor.  Thank you.

15         THE COURT:  Any questions from the first

16   defendant?

17         MR. BALLIN:  No, Your Honor.

18         THE COURT:  Any questions from second defendant?

19         MR. SCHOLL:  No, Your Honor.

20         THE COURT:  All right.  Well, we're going to keep

21   you for a while.  So if you think of something, you let me

22   know, okay?

23         PROSPECTIVE JUROR:  Okay.

24         THE COURT:  Enjoy your lunch.

25         PROSPECTIVE JUROR:  Thank you.

UNREDACTED TRANSCRIPT

```
1              THE COURT:  Absolutely.

2              PROSPECTIVE JUROR:  What floor is that?

3              THE COURT:  It's on the second floor.

4              PROSPECTIVE JUROR:  Second floor.

5              THE COURT:  Second floor.

6              PROSPECTIVE JUROR:  Thank you.

7              THE COURT:  Juror in Seat 10.

8              CASE MANAGER:  Juror 28.

9              THE COURT:  That's Juror 28.

10             Yes, ma'am.  You had an occasion where there was

11   a threat at your company.

12             PROSPECTIVE JUROR:  Uh-huh.

13             THE COURT:  How long ago was that?

14             PROSPECTIVE JUROR:  It hasn't gone to jury yet, I

15   don't think.

16             THE COURT:  I'm sorry?

17             PROSPECTIVE JUROR:  It's an active --

18             THE COURT:  Active case?

19             PROSPECTIVE JUROR:  Active case right now.

20             THE COURT:  Are you a witness in connection with

21   that case?

22             PROSPECTIVE JUROR:  No.  We have multiple

23   witnesses.

24             THE COURT:  I probably -- nobody can use this

25   information to look up anything on the Internet, but I am
```

UNREDACTED TRANSCRIPT

136

1  going to need to ask which company this is.

2              PROSPECTIVE JUROR:  It's REI Nation on Exeter

3  Road.

4              THE COURT:  Okay.  I am going to ask how many

5  employees are at that location, just to get a better feel for

6  what's going on there, what went on?

7              PROSPECTIVE JUROR:  We have about 110.  No, I'm

8  sorry, that's Dallas, Texas.  I would say 75 and then another

9  150, total.  We own the building.

10             THE COURT:  Right.

11             PROSPECTIVE JUROR:  And there's another company

12 that rents from us and then a doctor's office.

13             THE COURT:  Okay.

14             PROSPECTIVE JUROR:  So . . .

15             THE COURT:  Now, tell us what happened in

16 connection with this threat situation.

17             PROSPECTIVE JUROR:  Okay.  So the employee was

18 fired, a disgruntled employee.  He was escorted out to his

19 car.  He got in his vehicle, turned it around, and we have a

20 curved driveway.  He came through when the two employees were

21 out there, which is the human resource person and another

22 lady, two ladies.

23             The gentleman came around the curb to hit the

24 building to kill them, attempted murder.  Went through our

25 building.  Then the gentleman was in the car for a while.  I

UNREDACTED TRANSCRIPT

1  can't believe he even lived through that.  He runs through

2  our office.  At this time, all the employees were starting to

3  run out because we didn't know what was going on.

4           We have a second floor.  He came up to the second

5  floor.  He got in the elevator and when he did, we have a

6  glass awning that goes down to the eighth floor that we have,

7  like, desks or tables.  He jumped from that second floor on

8  to the other one.  He fell on top of the table and then

9  started -- I'm getting into gory details.

10           He tried to stab himself in his eyes with keys.

11  He was very -- we were all watching this from the second

12  floor because he was in the car for a long period of time.

13  He got out and went to the elevator, so I don't know if he

14  was knocked out.  We don't know.  But he had gone through our

15  building, so now we have security guards -- armed guards at

16  the doors.

17           THE COURT:  How long ago was this event?  Was it

18  six months, eight months?

19           PROSPECTIVE JUROR:  Six months ago, maybe six

20  months ago.  It could have been a little longer than that.

21           THE COURT:  Did you know the person?

22           PROSPECTIVE JUROR:  I just knew of him walking

23  through the building.

24           THE COURT:  You did not know him personally?

25           PROSPECTIVE JUROR:  No, he did not work for our

UNREDACTED TRANSCRIPT

1  company.  He worked for the other company, but he was running

2  the halls constantly.

3         THE COURT:  Now, we need to know because that's

4  pretty traumatic.  Would that in any way affect your ability

5  to sit on this jury and be fair and impartial?

6         PROSPECTIVE JUROR:  I'm going to be honest.  You

7  just asked me that question if we had been threatened or

8  something that's going on --

9         THE COURT:  Sure, sure.

10         PROSPECTIVE JUROR:  -- and that's just something

11  that's been very hard to deal with --

12         THE COURT:  Sure.

13         PROSPECTIVE JUROR:  -- especially when we have to

14  go to work now with armed guard.

15         THE COURT:  Sure.

16         PROSPECTIVE:  You have to be checked before you

17  come in.  Honestly, I'm not going to be -- I didn't hear the

18  exact reason for the case.  I mean, to know if I could answer

19  that correctly.  Does that make sense?  I mean, I don't -- I

20  mean, I listened to what you said, but then all I could

21  remember is cell phones, two people, date September --

22         THE COURT:  Sure.

23         PROSPECTIVE JUROR:  That's what I remember --

24         THE COURT:  Sure.

25         PROSPECTIVE JUROR:  -- of what you said at that

UNREDACTED TRANSCRIPT

1  time.

2         THE COURT:  Right.  It's -- and I'm not saying

3  what happened to them because I don't know.  Sometimes it's

4  referred to as a murder for hire case in which by use of a

5  cell phone, individuals, it's asserted, were contacted for

6  the purpose of carrying out the murder of an individual who

7  is identified as DH, and who will actually end up testifying

8  in this case.  So it's not driving the car into a building.

9  It's not running on an elevator.

10        It's very different in nature, but also it

11  involves threats of violence.  So you have to tell me that

12  you would be able to decide the case solely on the evidence

13  and the law, if you can, or -- I'm not sure I can because I

14  had this recent experience and it's hard to put out of my

15  mind, and I'm afraid I will be affected by it.  I do not know

16  the answer to that.

17        PROSPECTIVE JUROR:  I don't know if I would have

18  the answer to that.  I just -- I mean, I don't feel like I

19  would be impartial or partial.  This is a different case,

20  yes.  It sticks with us every day when we have to go in the

21  office.  But it's nothing that -- I can't answer that.

22        THE COURT:  Nobody humanly, who is honest, can

23  say with absolute certainty something will never affect me,

24  but people can say, I believe I can do it.  I'll make every

25  effort to do it.  I intend to do it.  And if I start to do

UNREDACTED TRANSCRIPT

1    it, I'm going to -- you know, I will tell you, which you

2    can -- a person can say that.  They can say, you know, Judge,

3    it turned out it wasn't something I can do.

4              So we let people -- we recognize humans are

5    humans.  We don't expect people to be anything other than

6    human.  But you have to tell me right now -- I mean, soon,

7    maybe not this minute, you know, do I think I can decide this

8    case solely on the evidence and the law and return the

9    verdict that the evidence and the law requires irrespective

10   of how the case comes out?  In other words, I can -- can you

11   decide for the defendant or defendants?  Can you decide for

12   Ms. Grayson if you decide, well, the Government didn't prove

13   it beyond a reasonable doubt?

14             PROSPECTIVE JUROR:  Yes, I can.

15             THE COURT:  Can you decide for Mr. Grayson if it

16   turns out the Government didn't prove what was necessary

17   beyond a reasonable doubt, what verdict would you return for

18   him?  If the Government fails to prove its case beyond a

19   reasonable doubt, what verdict would you return for him?

20             If the Government fails to prove beyond a

21   reasonable doubt the facts necessary, your verdict would have

22   to be what?  If they fail to prove beyond a reasonable doubt

23   the facts necessary to establish the crime charged, what

24   verdict would you have to return?

25             PROSPECTIVE JUROR:  For the defendant or for

                        UNREDACTED TRANSCRIPT

1    the --

2                    THE COURT:  There's only -- the -- it's either

3    guilty or not guilty.  And if the Government fails to prove

4    beyond a reasonable doubt --

5                    PROSPECTIVE JUROR:  Then he's not guilty.

6                    THE COURT:  -- the facts necessary to establish

7    the crime charged, what verdict would you have to return?

8                    PROSPECTIVE JUROR:  Not guilty.

9                    THE COURT:  Would you even hesitate if that's the

10   case?

11                   PROSPECTIVE JUROR:  If you don't have enough

12   evidence, I mean, the evidence doesn't prove a hundred

13   percent, then, no.

14                   THE COURT:  Well, I'll tell you that's not the

15   standard exactly, but if it's not proven beyond a reasonable

16   doubt.

17                   PROSPECTIVE JUROR:  Yes.

18                   THE COURT:  Okay.  All right.  Now, of course, if

19   the Government does prove as to a defendant the facts

20   necessary to establish the facts necessary to establish the

21   crime charged, if the Government does prove that as to a

22   defendant, as to that defendant, what verdict would you have

23   to return?  If the Government does prove it?

24                   PROSPECTIVE JUROR:  Then he's guilty.

25                   THE COURT:  Okay.  The question is:  Can you do

UNREDACTED TRANSCRIPT

```
 1   that in this case without being influenced by these events

 2   that happened at your place of employment?

 3              PROSPECTIVE JUROR:  I feel very strongly that I

 4   could.  Yes.

 5              THE COURT:  Okay.  Now, any questions by the

 6   Government?

 7              MR. OLDHAM:  No, Your Honor.

 8              THE COURT:  Any questions by Defendant 1?

 9              MR. BALLIN:  Can I have one moment?

10              THE COURT:  Sure.

11              MR. BALLIN:  This event that occurred six months

12   or so ago, you witnessed -- you personally witnessed it?

13              PROSPECTIVE JUROR:  When he jumped -- when we

14   were coming out of our offices, when he jumped and was on the

15   ground.

16              THE COURT:  You have to come up closer to the

17   mike because the court reporter is having trouble hearing

18   you.

19              PROSPECTIVE JUROR:  When he hit the building, no,

20   it was not outside.

21              MR. BALLIN:  What part did you see?

22              PROSPECTIVE JUROR:  What part did we see, when

23   he --

24              MR. BALLIN:  What did you see?

25              PROSPECTIVE JUROR:  Him on the table on the
```

UNREDACTED TRANSCRIPT

1   ground.

2              THE COURT:  And how did that make you feel?

3              PROSPECTIVE JUROR:  Scared, but we were

4   running -- I mean, it was scared, I was very nervous, didn't

5   know what was happening, why did he do it.

6              MR. BALLIN:  Did this guy have any mental health

7   issues that --

8              PROSPECTIVE JUROR:  From what we found out later,

9   yes, he did.  He was very unique, and he would always walk

10  around the office and everybody would just kind of go --

11  because he wouldn't say anything to anybody.  So you can't

12  judge a book by its cover.

13             MR. BALLIN:  I hear you.

14             PROSPECTIVE JUROR:  But you see him in the hall

15  and, yes, I mean, he was very unique and a lot of people

16  would discuss him.

17             MR. BALLIN:  Are you saying that you were scared?

18             PROSPECTIVE JUROR:  Yes, I was scared.

19             MR. BALLIN:  Are you going to have any feelings

20  in jury deliberations about this event?  Are you going to

21  think about this event while you're deliberating on this

22  case?

23             PROSPECTIVE JUROR:  Not to the same thing, am I?

24  I don't know if they're the exact same -- I think they're two

25  completely opposite issues.

UNREDACTED TRANSCRIPT

144

1          MR. BALLIN:  Okay.  So you agree, no sympathy, no

2   prejudice, only evidence from the witness stand and the law

3   that the judge gives you, that's what you're going to use?

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  This event that happened six months

6   or so ago, it's at your office, has nothing to do with this,

7   does it?

8          PROSPECTIVE JUROR:  No, nothing at all.

9          THE COURT:  Yes, sir?

10          MR. SCHOLL:  Judge, it's a question not about

11   that but since we have her here, could I just ask her, what

12   do you do in client services?

13          THE COURT:  Oh, fair.

14          PROSPECTIVE JUROR:  Investors.  We have -- we buy

15   homes from 11 different cities, 7,700 properties.  We manage

16   all 11 cities, so I take care of the investors.  I talk to

17   investors all day long on their properties, whether I'm doing

18   evictions or not paying rent.

19          MR. SCHOLL:  You're like the liaison between your

20   company and the investors.

21          PROSPECTIVE JUROR:  And, actually their parties,

22   I take care of them.  I call them.  I'm their eyes and ears

23   for their investments, and we have investors all the way from

24   Japan, Saudi Arabia, all over the place, all over.

25          MR. SCHOLL:  Thank you.

                        UNREDACTED TRANSCRIPT

1              THE COURT:  Yes, sir.  Last question.

2              MR. BALLIN:  Thank you.  The initials DH is

3    alleged to be a victim in this case, this person, the

4    initials DH.  Based on what you personally witnessed, do you

5    think that that person, as we stand now, do you think that

6    person is a victim?

7              PROSPECTIVE JUROR:  Not at this time, no.  I

8    mean, I don't know anything about them.  I mean --

9              MR. BALLIN:  Based on your experience, will you

10   be able to decide this case without any sympathy for anybody,

11   including Ms. Grayson?

12             PROSPECTIVE JUROR:  I have a big heart.  I'm

13   going to be honest, I mean, I feel for people.  I mean, you

14   want me to be honest right now, yes, I feel -- I have a heart

15   for a lot of things and a lot of people, but --

16             MR. BALLIN:  If the judge tells you that sympathy

17   nor prejudice can enter into your deliberations, can you

18   follow that law?

19             PROSPECTIVE JUROR:  Yes.  He's the judge.

20             THE COURT:  Okay.  We need to let you get some

21   lunch.

22             PROSPECTIVE JUROR:  Do you think I'm getting too

23   skinny because you hear my stomach roaring?  I'll stop

24   talking, when you dismiss me.

25             THE COURT:  No, we're going to keep you.  We're

UNREDACTED TRANSCRIPT

1    going to keep you on the panel.

2              PROSPECTIVE JUROR:  No, I'm saying dismiss me to

3    go eat lunch.

4              THE COURT:  Go eat lunch.  Go eat lunch.

5    Absolutely.  Thank you.  No problem.  No problem.

6              Juror in Seat 12, how are you doing?

7              PROSPECTIVE JUROR:  Good.  How are you?

8              THE COURT:  I'm good.

9              PROSPECTIVE JUROR:  Good.

10             THE COURT:  We talked about threats because

11   that's a way to think about things here.  Tell me about your

12   situation.  I'm going to let you speak up just a little.

13             PROSPECTIVE JUROR:  Okay.  When you first

14   mentioned, you said, within a year, but then you said --

15             THE COURT:  Well, it could really be any time.

16             PROSPECTIVE JUROR:  Yes, and I said, maybe I

17   better say something.  But it's been 14 years, and my nephew

18   was murdered by his wife's brother in Cordova, and he passed

19   away.  And so the brother was incarcerated, and he passed

20   away while he was incarcerated.  He didn't even serve out all

21   of his time.  So there was some evidence of his wife getting

22   his brother to do the crime.

23             At first, he said she didn't, wasn't involved,

24   but his attorney let him know that if he was coerced and it

25   wasn't his idea, he wouldn't get as much time.  But after he

UNREDACTED TRANSCRIPT

1    kept saying she did it, then they didn't believe him, so --

2    but she ended up, there was a mistrial, and she ended up

3    going back to trial, and she took the plea bargain and got

4    less time, so --

5               THE COURT:  I'm going to ask the obvious

6    question, which was:  What was the name of the individual who

7    was murdered?

8               PROSPECTIVE JUROR:  Fredrick Matting.

9               MR. OLDHAM:  Your Honor, can we have a second

10   without the juror, please?

11              THE COURT:  Sure.  That's what I'm concerned

12   about.

13              Yes, ma'am.  I tell you what --

14              I'm sorry?

15              MR. OLDHAM:  That's my case, Your Honor.  I tried

16   Ms. Patricia Matting --

17              THE COURT:  Right.

18              MR. OLDHAM:  -- who was the wife of Fredrick

19   Matting.  Her brother was the person that actually killed

20   him.  He took a plea deal and --

21              THE COURT:  Right.

22              MR. OLDHAM:  -- testified against her, so I don't

23   know if she remembers that or not.  I don't even know if I

24   need to bring it up, but I just wanted to let the Court now.

25              THE COURT:  I thought it might be important.

                    UNREDACTED TRANSCRIPT

148

```
 1              MR. OLDHAM:  And it's been on -- there was a TV
 2   show about it too.
 3              THE COURT:  There was a TV show about it.
 4   Congratulations.
 5              MR. OLDHAM:  I was just trying to let you know.
 6              THE COURT:  No, no, I'm not disagreeing at all.
 7   I think, though, she may well be able to be a juror in the
 8   case, but I think it might be a little complicated, so let me
 9   ask her one or two more questions unless you all want to let
10   her be excused at this time.
11              MR. BALLIN:  I'm concerned that when Mr. Oldham
12   starts talking --
13              THE COURT:  When he starts talking.
14              MR. BALLIN:  -- she may remember.
15              THE COURT:  When he starts talking, yes.
16              MR. SCHOLL:  And then also, it's a little bit --
17   it's not exactly like this case, but very similar.
18              THE COURT:  It's got some similarities.  I don't
19   have a problem with that.  Is there a motion or not?
20              MR. BALLIN:  Yes.
21              MR. SCHOLL:  I move to excuse.
22              THE COURT:  Otherwise, I'd ask a couple more
23   questions.  Both defense counsel move?
24              MR. OLDHAM:  I have no objection to her being
25   dismissed.
```

UNREDACTED TRANSCRIPT

149

1          THE COURT:  I'm going to let her come back

2    around.

3          Yes, ma'am.  You know, I really am going to

4    regret having to let you be excused in this case.  That's a

5    little too close, don't you think?  Maybe we need to let you

6    be excused.  You have been a wonderful juror.

7          PROSPECTIVE JUROR:  Thank you.

8          THE COURT:  I'm going to miss you.

9          PROSPECTIVE JUROR:  I wanted to tell the truth,

10   though.

11         THE COURT:  You did exactly the right thing to

12   let me know about it and let them all know about it.  We

13   really appreciate you being here, and also I really

14   appreciate your very thoughtful comments from the jury box.

15         PROSPECTIVE JUROR:  Thank you.

16         THE COURT:  You still get to have a free lunch,

17   but then tell them when you get down there that you are being

18   excused in the case, so you won't have to come back up.

19         PROSPECTIVE JUROR:  Okay.  And where am I going?

20         THE COURT:  You're going to the second floor.

21         PROSPECTIVE JUROR:  Second floor, okay.

22         MR. BALLIN:  Tell the jurors if they ask why

23   she's being excused, Your Honor?

24         THE COURT:  No, no, no, you just say -- don't

25   ever tell them anything.  It's just that, you know, I had a

UNREDACTED TRANSCRIPT

1   side-bar, and I'm excused.  That's it.  They won't ask.

2   Don't add more information.

3               PROSPECTIVE JUROR:  Okay.  Thank you so much.

4               CASE MANAGER:  This is Juror No. 14, Judge.

5               THE COURT:  Yes, sir?  How are you doing?

6               PROSPECTIVE JUROR:  I'm fine.  How about you?

7               THE COURT:  I'm doing okay.  I don't know about

8   the rest of these folks, but you and I are okay.

9               You need to see us at side-bar about -- go ahead.

10  Tell us about your situation.

11              PROSPECTIVE JUROR:  Eliza Fletcher.

12              THE COURT:  Right.  Exactly.  And I kind of

13  thought that's what you were going to say, but I think that

14  not everybody here has the same background as you or I or the

15  local -- or others.

16              PROSPECTIVE JUROR:  Family is long-time friends

17  of our family.  Her uncle, Mike Keeney, is next door to me

18  office-wise.

19              THE COURT:  Oh, okay.

20              PROSPECTIVE JUROR:  So, I'm -- yeah.

21              THE COURT:  Are you going to be able to sit on

22  this case and be fair and impartial?

23              PROSPECTIVE JUROR:  I brought that up just -- I

24  don't think that's a problem for me, no.

25              THE COURT:  Okay.  Now, you and I both know that

1  this is a tragic, tragic event that happens on Central Avenue

2  near -- I can't remember -- University of Memphis, and

3  absolutely terrible.  And, of course, eventually, the -- a

4  defendant was apprehended and so forth.  When these events

5  occurred, how closely did you follow the activity as to

6  Ms. Fletcher?

7          PROSPECTIVE JUROR:  Pretty closely.

8          THE COURT:  Okay.  That was not the same type of

9  facts as are asserted in this case.  It's really quite

10  different.  But would that be on your mind if you were

11  deliberating in this case?

12          PROSPECTIVE JUROR:  No.  I mean, I don't -- in

13  the way you're asking the question, I don't think so, no.

14          THE COURT:  Right.  And what we really mean is

15  will it affect in any way your ability to decide the case

16  fairly and impartially?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Okay.  Now, in the event that as to a

19  defendant or both defendants, the Government fails to prove

20  its case beyond a reasonable doubt, what verdict would you

21  have to return if they fail to prove their case?

22          PROSPECTIVE JUROR:  Not guilty.

23          THE COURT:  Would you have any hesitancy about

24  doing that if that's what the facts require?

25          PROSPECTIVE JUROR:  No.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  On the other hand, I do have

2     to ask the flip side of that.  If the Government does prove

3     its case beyond a reasonable doubt as to a defendant, as to

4     that defendant, what verdict would you have to return?

5          PROSPECTIVE JUROR:  Guilty.

6          THE COURT:  Okay.  Would you be embarrassed or

7     anything about how the verdict that you return might affect

8     others that you know, including friends that you know, if you

9     decided that the case was one in which a not guilty verdict

10    was required?

11         PROSPECTIVE JUROR:  That's a good question.  I

12    haven't even thought about that.

13         THE COURT:  We always have to think about will we

14    feel like, I've got to go back and somebody is going to say

15    something to me and my friend, who sits near me, is going to

16    say, why in the world did you do that?  Now, I'm not saying

17    that would happen at all.  But you have to think about it,

18    and say, I can make a decision based only on the evidence and

19    the law and will not be affected by my concern about what

20    anybody else might think about that.

21         PROSPECTIVE JUROR:  No.  That wouldn't be a

22    problem.

23         THE COURT:  Okay.  Questions?

24         MR. OLDHAM:  No, Your Honor.  Thank you.

25         MR. BALLIN:  That includes Mr. Keeney's

UNREDACTED TRANSCRIPT

1  brothers-in-law?

2              PROSPECTIVE JUROR:  Yes.

3              MR. SCHOLL:  Do you work with her uncle?

4              PROSPECTIVE JUROR:  No.

5              MR. SCHOLL:  Where do you work?

6              PROSPECTIVE JUROR:  I run the investment

7  business.

8              MR. SCHOLL:  Investment business?

9              PROSPECTIVE JUROR:  Yes.  They actually work at

10  the headquarters.

11             MR. SCHOLL:  He stays there at that office, but

12  he does some stuff --okay.  So you do investment business?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Okay.  Anything else?

15             PROSPECTIVE JUROR:  I don't know if I'm supposed

16  to bring this up or not.

17             THE COURT:  It won't hurt.  Nothing you can say

18  is inappropriate.

19             PROSPECTIVE JUROR:  My firm does business with

20  Mr. Ballin's firm.

21             THE COURT:  Well, the main question is do they

22  pay their bills?  No, I'm saying that in light of this, do

23  you think that would affect you in any way in deciding this

24  case?

25             PROSPECTIVE JUROR:  No, but I thought I should

UNREDACTED TRANSCRIPT

1   bring it up.

2           THE COURT:  Oh, you should absolutely tell us

3   about it.  And I think I know what kind of business, but tell

4   me what kind of business you do with the Ballin firm.

5           PROSPECTIVE JUROR:  I'm in the money management

6   business, and we manage money for Mr. Ballin.

7           THE COURT:  Okay.  Are you going to feel like

8   you've got to decide for Mr. Ballin and his client because

9   you have a business relationship with Mr. Ballin?

10          PROSPECTIVE JUROR:  No, it doesn't -- I don't see

11  that as a problem, no.  I just thought I should bring it up.

12          THE COURT:  Okay.  Government questions?

13          MR. OLDHAM:  Is that your only client?

14          PROSPECTIVE JUROR:  Thank goodness, no.

15          THE COURT:  That's a fair question, though,

16  because if it was Berkshire Hathaway, and that was your only

17  client, you know, that would really put you in a difficult

18  situation.

19          I think the question -- I'm going to just add one

20  thing there, and I don't want to put you in a bad light here,

21  but I assume that Mr. Ballin's representation, while

22  important, is less than 10 percent of the portfolio that you

23  oversee?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Okay.  And you can ask a follow-up if

UNREDACTED TRANSCRIPT

1    you'd like.

2             MR. OLDHAM:  That was the nature of the question,

3    Your Honor, and that was going to be a similar follow-up,

4    that what impact it would have to know how it weighed on his

5    decision-making, if it weighed on his decision-making at all,

6    which I trust him when he says it does not.

7             THE COURT:  Okay.  Yes, sir.

8             MR. BALLIN:  Do you understand that we're not

9    going to pull our business from you regardless of what your

10   decision is?

11            PROSPECTIVE JUROR:  Yes.

12            THE COURT:  Okay.  Well, I think that -- I think

13   it's important.

14            MR. BALLIN:  That's a very fair question.

15            THE COURT:  That's a very fair question and

16   certainly appropriate to say that.

17            Yes, sir?

18            MR. SCHOLL:  I don't have any questions, Judge.

19            THE COURT:  All right.  We need to let you try to

20   get your lunch.  We have to try to get our lunches, and we

21   have to work very hard to get back on schedule.  So thank you

22   very much.

23            Okay.  Now, anything else that we need to do?  I

24   think, you know, we're going through this process.  This will

25   take a little bit of time.  We'll get through the first row,

1    and we'll be getting fairly close to preliminary or initial

2    strikes.  If there's a cause strike, I want to make sure

3    everybody understands this, cause strikes have to be raised

4    as they occur.  They are not raised -- and they've been --

5    that's what we've been doing.  But they are not then raised

6    at the last minute.  They are raised as they occur, so we can

7    fill the panel.  Okay.  That's it.

8                    MR. SCHOLL:  Can we talk for just one second,

9    Judge?

10                   THE COURT:  Sure.  I'm going to actually go back

11   on the regular part of the record.

12                      (End of discussion at side-bar.)

13                   THE COURT:  We don't have anybody else here, so

14   we can do it from the regular mikes, and you can come around

15   to the big podium if you want.

16                   MR. SCHOLL:  Judge, if I may, on the last juror

17   that we had, No. 29 seated in Seat 15 -- I'm sorry.

18                   Judge, I'm asking with regards to Juror No. 29

19   seated in Seat 14, you know, we had a sort of similar

20   situation with Mr. Oldham trying the case that was involving

21   the lady whose, I guess it was her nephew was a victim.  I

22   just think the relationship with Mr. Ballin and this juror is

23   just way too close.  Not to say that anything improper would

24   go with Mr. Ballin.  I know that would never happen.  But as

25   far as making this a clean record, we've got a room full of

UNREDACTED TRANSCRIPT

```
 1   jurors that don't have financial and business relationships
 2   with lawyers here.  And I just think that, when --
 3              THE COURT:  This is a motion by Defendant 2 by
 4   Mr. Grayson.
 5              MR. SCHOLL:  Mr. Grayson.
 6              THE COURT:  To excuse Juror No. 29 in Seat 14.
 7              MR. SCHOLL:  Yes, sir, motion to strike for
 8   cause, Your Honor, based on that close relationship.  I just
 9   don't think -- one, I just don't think --
10              THE COURT:  Let's see what the Government says.
11   They may not disagree.
12              MR. OLDHAM:  I believe Mr. Scholl is right.
13   That's the reason why we have so many people, and I think
14   that he -- he said a couple of things that might make it hard
15   for him.  And when we do have other people who would have no
16   relationships, that makes sense that the Government has no
17   objection.
18              THE COURT:  Without objection, I'm going to make
19   sure there's nothing from Ms. Grayson's counsel that counters
20   that, but that sounds like that might be a good idea.
21              MR. BALLIN:  Nothing to add, Your Honor.  And no
22   objection to what Mr. Scholl and Mr. Oldham have requested.
23              THE COURT:  Good idea.  We'll just go ahead and
24   excuse juror in Seat 14.  That's No. 029, and he is excused
25   in the matter.
```

UNREDACTED TRANSCRIPT

1          When we come back, we will need to fill Seats 12

2   and 14, and then, of course, we have a series of questions

3   for the front row.  Okay.

4          We need to let everybody be excused because we're

5   going to be tight on lunch for all of you.  And I think

6   everybody understood that we do have to keep moving.

7          Anything else, then?  Without anything else,

8   we're going to take our break at this time.

9          MR. BALLIN:  Your Honor, what time do you want us

10  back?

11         THE COURT:  We said we would come back at -- what

12  time, Mr. Sample?

13         CASE MANAGER:  1:35, Your Honor.

14         THE COURT:  1:35.  We'll see you at 1:35.

15         MR. BALLIN:  We have lunch at my office, which is

16  on Jefferson.

17         THE COURT:  May need to bring lunch over, if they

18  can.  That would be much preferred.  And if you need to, they

19  can -- you can eat in the witness room.  I don't think

20  there's anybody in there.  Well, I don't know who is in there

21  now or not.  And that might be a lot more efficient.  Do you

22  think it'll be more efficient?

23         MR. BALLIN:  I'll ask somebody to bring it over.

24         THE COURT:  If they bring it over real quickly,

25  that would help you out.  We'll help you out in that regard.

UNREDACTED TRANSCRIPT

1          Anything else?

2          MR. OLDHAM:  No, Your Honor.

3          THE COURT:  Okay.  Thank you.

4          Mr. Scholl, are they going to bring lunch for you

5   or they left you out?

6          MR. SCHOLL:  They offered, Your Honor.  I packed

7   my own lunch today.

8          THE COURT:  Good idea.  Thank you.

9          We'll let everybody be excused.

10       (A recess was taken from 12:56 p.m. to 1:37 p.m.)

11          MR. OLDHAM:  United States wanted to report

12   something to the Court.  We didn't see it; however, there are

13   two witnesses who were here today who had an interaction or

14   involvement with a third party.  The third party is known to

15   defense and United States alike.  Her name is Sherrell Hodge.

16   She was in the parking lot filming telling whoever was

17   watching her social media, their car is here, and then

18   interacted with our witnesses when they were on their way to

19   lunch and had an interaction, and then posted that on social

20   media.

21          I don't think it rises to witness tampering;

22   however, she was then sitting out in front of the courtroom

23   with potential jurors.  We have asked -- she's not a witness

24   in our case.  She's not a victim in our case.  However, we

25   did ask our witness coordinator to bring her around to the

UNREDACTED TRANSCRIPT

1    jury room so that we can tell her, even though she's not

2    our -- like our said, our witness or our victim, how her

3    interactions could affect the trial and/or the jury pool and

4    warn her or admonish her that her behavior in that regard

5    should cease.

6              We just got this information.  We haven't been

7    able to pass along that message and, frankly, wanted to make

8    defense counsel aware and the Court aware before we took any

9    action.

10             THE COURT:  All right.  Any thoughts from counsel

11   opposite?

12             MR. PALMER:  Your Honor, thank you for bringing

13   that to our attention.  As we were walking out to go

14   downstairs to get something to drink, she immediately started

15   calling out to Ms. Grayson and Mr. Grayson.  I didn't know

16   who she was until they alerted me, and she sounded like she

17   was trying to cause trouble, was waving.

18             There was a juror sitting next to her, and there

19   was a younger female to her right, and I didn't realize -- I

20   did tell the CSO that was out there that this woman looked

21   like she was here to cause trouble and that he needs to keep

22   an eye on her.  He kind of understood she's whispering.  But

23   she is -- it looks like she's here to disrupt the process.

24             While I appreciate the United States cautioning

25   her as to her behavior, it seems like this is going to get

UNREDACTED TRANSCRIPT

161

1   worse before it gets better.  I don't know if that

2   conversation is going to have any effect on this woman.  She

3   lives two miles from my office.  She's from Texas.  She is --

4   she touches in concern of that case, the original

5   investigation, so she is -- she is a witness in the case, but

6   not into the case that's going to be presented in this

7   courtroom.

8              But the investigation, this woman is part of the

9   case in that regard.  I don't want to go into too much

10  detail, Your Honor, but she's here, I believe to be as much

11  trouble as she can make without getting arrested.  But

12  anything the Court can do -- we don't know at this point how

13  much damage has been done.  There was a juror who -- I didn't

14  get her number.  Does anybody else --

15             MR. LEVINE:  Juror No. 55, Your Honor.

16             MR. PALMER:  Was sitting next to her when she was

17  calling out Ashley and Josh's name and waving at pretty much

18  our team, and we did our best to ignore her and then went

19  down the elevator.

20             MR. LEVINE:  If I may clarify very briefly.  I

21  saw Juror 55 when we came back up, so I don't know if that

22  was the same juror that she was sitting next to.  I remember

23  that she was seen next to her when we went down, so it could

24  be more than one juror, Your Honor.

25             THE COURT:  Okay.  First of all, what we can do,

UNREDACTED TRANSCRIPT

1   one, we may not get that person, but I do need to ask if

2   any -- I will ask if anyone has attempted to speak with you

3   and if they have, you will need to tell me even if you're in

4   the gallery.  I don't want to spend forever on that sort of

5   subject because it can delay us and, frankly, might not be

6   productive.  But we'll check on that.

7            Also, in order to limit the ability -- the

8   necessity of defendants going to any other floor, what we

9   will check on -- and, Jeff, we need to check on this right

10  now -- is putting you in the judge's conference room on this

11  floor, and just don't go anywhere else.  Just go -- just have

12  lunch there.  There's a restroom there.  You know, it's a

13  nice room, pretty nice room.

14           And so, therefore, you won't be going on the

15  elevators because we need to keep you away from people who

16  are, one, bothering you, and, secondly, people who might

17  cause a problem in the trial itself.  So that's something

18  we're checking on right now and see if we can't move to that

19  situation.

20           I think we must have everybody here.  Hopefully,

21  we do.  I think we must.  Just checking back there.  Is that

22  Mr. Pirtle back there?  He's so far away.  How did he get so

23  far away?

24           Yes, sir?

25           MR. SCHOLL:  Judge, I didn't want to speak on

UNREDACTED TRANSCRIPT

1    that just yet, but --

2              THE COURT:  She wants you on the mike because if

3    you don't get on the mike, you're going to have a really

4    funny looking record.  It's going to say, Mr. Scholl was

5    attempting to speak.

6              MR. SCHOLL:  I was trying to speak, Judge.  I

7    didn't get an option to just a second ago.  But this is the

8    thing I was warning about when we addressed about the court

9    the first time.  I'm concerned with what this lady may have

10   gotten or has she gotten to the jurors in the parking lot or

11   anything before we came in and if that has caused any damage

12   or irreparable damage to our jurors as we have it now.  That

13   was my biggest concern.  I did run into Juror Number --

14   sitting in Seat 2 on the elevator, but I got off on the

15   floor -- I think on Floor 5 when I saw them and took another

16   elevator.

17             THE COURT:  Sure.

18             MR. SCHOLL:  We didn't speak.

19             THE COURT:  I think that what we were hearing

20   from Mr. Palmer at the very -- at one point was that he had

21   had sort of an innocuous exposure to somebody but no

22   substantive contact.

23             MR. PALMER:  That's correct, Your Honor.  The

24   juror would be Juror No. 14 -- I'm sorry, Seat No. 14.

25             THE COURT:  Sure.  So I think we're doing what we

UNREDACTED TRANSCRIPT

1   should do.  I think we just need to bring the panel in.

2   We'll go ahead and replace Jurors 12 -- in Seat 12 and 14,

3   which are Jurors, I think, 66 and 29, and they will be

4   replaced.  And then ask a few questions there, and then we'll

5   come back to Jurors 1 through 7 and Seats 1 through 7.  And

6   then we'll move as fast as we can.  Thank you.

7           We're ready to bring the panel in.  We'll let

8   everybody get to their seats.  Wilt Gibbons is here.  I don't

9   think he could possibly be seated in this case.  Is there any

10  reason not to excuse him?

11          MR. SCHOLL:  No, Your Honor.

12          THE COURT:  Any reason not to excuse him?

13          MR. BALLIN:  Mr. Gibbons?

14          THE COURT:  Yes.

15          MR. BALLIN:  It's Junior.

16          THE COURT:  Yes.

17          MR. BALLIN:  Let me tell him who he is.

18          THE COURT:  Sure, okay.  Fine.

19          MR. BALLIN:  Your Honor, may we approach briefly?

20          THE COURT:  Sure.

21              (At side-bar on the record.)

22          MR. BALLIN:  We have no objection to letting

23  Mr. Gibbons be excused.

24          THE COURT:  Sure.  We ought to let him be

25  excused.  I mean, if you can't see it, but I can see it that

UNREDACTED TRANSCRIPT

1     he would be unlikely to be called anyway.  And, you know, a

2     lawyer can sit here for a little while, but there's no real

3     possibility that he's going to be on the jury since his

4     mother is on the Court of Appeals, and district trial -- he

5     now works for the City in the City Attorney's Office.

6             MR. OLDHAM:  When he was with the City's

7     Attorney's Office, he was assigned to the gang unit with the

8     D.A.'s Office, and he and I worked closely together.

9             THE COURT:  Ane we, absolutely -- it just

10    wouldn't be possible for him to sit on the panel.  By

11    unanimous agreement, we're just going to let him be excused

12    at this time.  Okay.  Thank you.

13             (End of discussion at side-bar.)

14            THE COURT:  All right.  Well, during the period,

15    we did excuse at least one juror, and we're actually going to

16    let our Juror 29 be excused in the case.  That's juror in

17    Seat 14, so we appreciate you being here very much.  Thank

18    you so much.

19            In connection with Mr. Gibbons, who is here, we

20    chit-chatted about that at side-bar, and we should actually

21    let you be excused in the case.  So we appreciate you being

22    here.  There may be somebody else on the panel that we need

23    to be -- let them be excused at this time.

24            I need to caution all of you that you need to

25    avoid people you don't know and not sit next to anybody who

UNREDACTED TRANSCRIPT

1   is attempting to have any interaction with any party in the

2   case.  That is a problem.  If that has occurred and you are

3   called as a potential juror, you are to tell me about that

4   very promptly, and we will discuss that.

5           I'm not saying you've done anything wrong.  I'm

6   saying that we don't want anybody exposed to individuals that

7   you should not be exposed to.  So there may be at least one

8   or two people that might have had that experience.

9           Now, you all made it through lunch.  We're going

10  to call someone to take Seat 12 and Seat 14 at this time.

11          CASE MANAGER:  Your Honor, that's 0023.

12          THE COURT:  That would be Seat 12.

13          CASE MANAGER:  And 0050, No. 50.

14          THE COURT:  Now, if we call somebody and they

15  know they already need to see me at side-bar, then you need

16  to tell me so.  So our juror in Seat 12, new juror in Seat

17  12, and we've got at least one in Seat 14.

18          And, Seat 12, do we need to see you at side-bar?

19  Are we okay?  Or are you okay?

20          I know in Seat -- I'm going to let juror in Seat

21  14, that's Juror 50, come around to the side-bar.

22              (At side-bar on the record.)

23          THE COURT:  All right.  How are you doing?

24          PROSPECTIVE JUROR:  I'm okay.

25          THE COURT:  You're going to have to -- you can

UNREDACTED TRANSCRIPT

1    speak up pretty well.  That's good.

2              PROSPECTIVE JUROR:  I won't be able to be fair

3    because my brother got murdered last year.  And the guy that

4    killed him, he hasn't even been to trial.  This will be too

5    much for me.  I know I'm not going to be able to deal with

6    that, to be fair.

7              THE COURT:  Okay.  Well, that's terrible.  And

8    was that here in the city of Memphis?

9              PROSPECTIVE JUROR:  Yes, sir.

10             THE COURT:  Okay.  I am going to ask:  Was he

11   your younger brother?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  How old was he at the time?

14             PROSPECTIVE JUROR:  Thirty-eight.

15             THE COURT:  Okay.  Was anybody apprehended in

16   connection with his killing?

17             PROSPECTIVE JUROR:  Yeah, they got him.  He in

18   jail now, but he hasn't been to trial yet.

19             THE COURT:  It's in state court, of course.

20   Well, under those circumstances, do you feel that because

21   this is -- of course, this is different, but it's a -- the

22   charge is murder for hire.  We're not saying anybody got

23   killed.  Do you think it would be difficult if not impossible

24   for you to sit on a jury and be fair and impartial?

25             PROSPECTIVE JUROR:  It's going to be difficult.

UNREDACTED TRANSCRIPT

```
 1    I'm going to be honest.
 2                 THE COURT:  Okay.
 3                 PROSPECTIVE JUROR:  It's going to be very
 4    difficult for me.
 5                 THE COURT:  We understand that.
 6                 I'm going to just ask:  Any problem in allowing
 7    Juror 50 to be excused?  We're so sorry about that.
 8                 MR. OLDHAM:  No.
 9                 MR. BALLIN:  No problem.
10                 PROSPECTIVE JUROR:  I'm just being honest.
11                 THE COURT:  No.  Thank you so much.  I'm so sorry
12    about that.
13                 PROSPECTIVE JUROR:  Okay.  Thank you.
14                 THE COURT:  You take care.
15                 PROSPECTIVE JUROR:  Okay.  Thank you.
16                 THE COURT:  And juror in Seat 12.  I saw you out
17    there earlier.  Yes, ma'am?
18                 PROSPECTIVE JUROR:  Yes, I feel like I might be
19    really bias because I've had tragedy in my family before.
20                 MR. OLDHAM:  I'm sorry.
21                 THE COURT:  I'm sorry, go ahead.  You might be
22    bias because you've had tragedy in the family before.
23                 PROSPECTIVE JUROR:  I don't know how I might
24    react.
25                 THE COURT:  Let me ask this:  Tell me what you
```

UNREDACTED TRANSCRIPT

1    mean by events in the family, and I think we understand
2    but tell me what you mean.
3                    PROSPECTIVE JUROR:  Someone murdered before.  And
4    then they never found who did it, you know.
5                    THE COURT:  How long ago was that?
6                    PROSPECTIVE JUROR:  It's been a while.  It's been
7    over ten years, but, you know, by it being unresolved, you
8    know, it's just -- I have a -- I'm kind of emotional like.
9    I'm an emotional person.
10                   THE COURT:  I always tell people, it's not my job
11   to make jurors cry, and I'm not going to do that.  I
12   understand.  I am going to ask:  Was this a younger brother
13   or older brother?
14                   PROSPECTIVE JUROR:  It was actually a cousin.
15                   THE COURT:  A cousin.  Okay.  I'm sorry, a
16   cousin.  And I am going to ask:  Were you satisfied or
17   dissatisfied with the police work on that case?
18                   PROSPECTIVE JUROR:  Dissatisfied.
19                   THE COURT:  Okay.  You were close to your cousin.
20                   PROSPECTIVE JUROR:  Yes, very close.
21                   THE COURT:  How would that affect your -- you in
22   this case?  Would it cause you to be thinking about what
23   happened to your cousin as you were trying to make a
24   decision?
25                   PROSPECTIVE JUROR:  I do.  I really do because

UNREDACTED TRANSCRIPT

170

1    I'm a sensitive person.  I'm pretty sensitive, and being at

2    the same time, I could lean either way to be honest with you,

3    you know.  I have empathy on both ends, you know.  And I

4    think that would lead me to be indecisive, you know, not

5    knowing --

6              THE COURT:  You would be conflicted by the fact

7    that --

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  -- your cousin had been murdered --

10             PROSPECTIVE JUROR:  Yes.  And then --

11             THE COURT:  -- and that would make it very hard

12   to make a decision in this case.

13             PROSPECTIVE JUROR:  Yes.  And then at the same

14   time, I have compassion from the other end, you know, just --

15   I don't even know how to say it.  I'm a people person, but I

16   love people.  And I just -- I have empathy on both sides.

17   You know, it doesn't make any sense.

18             THE COURT:  Do you think you should be excused?

19             PROSPECTIVE JUROR:  I do because I'm not sure --

20   I don't want to be a hold out on, you know, like --

21             THE COURT:  It would be hard for you to

22   deliberate, is that it?  I mean, would it be hard for you

23   to -- would this event with your cousin be some much on your

24   mind that you would find it hard to function as a juror?

25             PROSPECTIVE JUROR:  Yeah, I do.  I do.

UNREDACTED TRANSCRIPT

1              THE COURT:  Questions from the Government?

2              MR. OLDHAM:  No questions, Your Honor.

3              MR. BALLIN:  If I could, Your Honor?

4              THE COURT:  Sure.

5              MR. BALLIN:  This is a trial, and you understand

6    there is no easy button that anybody can push?

7              PROSPECTIVE JUROR:  Yes.

8              MR. BALLIN:  And you take your position as a

9    potential juror as a hard job?

10             PROSPECTIVE JUROR:  Yes.

11             MR. BALLIN:  Do you agree that the way our system

12   works that an accused is entitled to a jury of his or her

13   peers?

14             PROSPECTIVE JUROR:  I do.

15             THE COURT:  That means a cross-section of

16   everybody in the community.

17             PROSPECTIVE JUROR:  I do.

18             MR. BALLIN:  You'd agree, people like you, people

19   dissimilar to you?

20             PROSPECTIVE JUROR:  Right.  I do.

21             MR. BALLIN:  If the judge instructs you that

22   sympathy nor prejudice should enter into your decision-making

23   process, can you follow that law?

24             PROSPECTIVE JUROR:  I want to say I could, yeah.

25   I think I could.

                    UNREDACTED TRANSCRIPT

1           MR. BALLIN:  If the judge --

2           THE COURT:  What else were you going to say?

3           PROSPECTIVE JUROR:  That's what I was going to

4    say.  I think that I could, but I'm so emotional, I don't

5    know if I -- I will do it, but it might be a rough road.

6           MR. BALLIN:  We appreciate that.  If the judge

7    instructs you that Ms. Grayson is entitled to a presumption

8    of innocence, can you follow that law?

9           PROSPECTIVE JUROR:  Yeah, I can.

10          THE COURT:  If the judge tells you that the

11   burden of proof is on the Government to prove otherwise, that

12   is, to prove her guilt beyond a reasonable doubt, can you

13   follow that law?

14          PROSPECTIVE JUROR:  Yeah.

15          MR. BALLIN:  Even though I hear you saying that

16   your job will be hard, are you willing to do it?

17          PROSPECTIVE JUROR:  I don't know.  I don't know.

18   It's tough.  I can do it, but I don't know if I could do it

19   without emotion.

20          MR. BALLIN:  That's okay.  You can use your

21   common sense.

22          PROSPECTIVE JUROR:  I know.  I know.

23          MR. BALLIN:  You can use the evidence.  And you

24   can decide this case based on what you think the decision

25   would be.  Can you do that?

                    UNREDACTED TRANSCRIPT

173

1          PROSPECTIVE JUROR:  I could, yes.

2          THE COURT:  And in your deliberation, do you

3     understand that the decision of the jury has to be a

4     unanimous decision?

5          PROSPECTIVE JUROR:  That's where I have a --

6          MR. BALLIN:  That's not a problem.  That's a good

7     thing.  That's a good thing.  Okay.  And you're entitled to

8     your decision even if you're in the minority.  Do you

9     understand that?

10          PROSPECTIVE JUROR:  Yes.

11          MR. BALLIN:  Okay.  That's a good thing.  Don't

12     feel bad about it.

13          THE COURT:  Yes, sir?

14          MR. SCHOLL:  No questions from me, Your Honor.

15          THE COURT:  Questions by the Government?

16          MR. OLDHAM:  You keep -- when we talk about

17     deliberations, is that where you're thinking ahead and having

18     an issue?

19          PROSPECTIVE JUROR:  Yeah.  And then as well as

20     listening to potential testimonies and stuff that may

21     trigger.

22          MR. OLDHAM:  Let's break those down.

23          First, the testimony may trigger what?

24          PROSPECTIVE JUROR:  Say that again.

25          MR. OLDHAM:  The testimony, what might it

UNREDACTED TRANSCRIPT

174

1  trigger?  You say it may trigger what?

2            PROSPECTIVE JUROR:  Feelings and emotions from

3  the past.

4            MR. OLDHAM:  Is that because of your experience

5  from your family or just, in general, having feelings and

6  emotions about the things you hear?

7            PROSPECTIVE JUROR:  Both.

8            THE COURT:  Okay.  Now, would you agree that

9  everybody has feelings and emotions they have to deal with

10 every day?

11           PROSPECTIVE JUROR:  Yeah, I do.

12           MR. OLDHAM:  Okay.  So let's just focus on your

13 family situation and your cousin.  What do you think will

14 happen if, during this testimony when you say you're going to

15 be triggered, what do you think is going to happen?

16           PROSPECTIVE JUROR:  I might shed a tear or two,

17 you know, something like that.  That's what I mean by that.

18           MR. OLDHAM:  Okay.  Now --

19           PROSPECTIVE JUROR:  But I'm -- you know, I'm

20 stable as far as -- you know, I --

21           MR. OLDHAM:  When you go back to deliberate, and

22 all the jurors have to say -- they have to talk about the

23 case, they have to listen to each other, will you be able to

24 participate in that process, speak with other people, listen

25 and express your opinion?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Yes, but sometimes, I am kind
2     of loud.  I talk loud.  I'm talking low now the best I can,
3     but I kind of talk loud because I'm country.  But that's how
4     I was raised up, you know.  We didn't have no phones and all.
5     We hollered across the road, so I'm kind of loud.
6          MR. OLDHAM:  Well, we're bringing different
7     people in for different reasons, okay?  So you being loud,
8     that's just you, right?
9          PROSPECTIVE JUROR:  Yes.
10         MR. OLDHAM:  What about your cousin's death and
11    nobody ever getting caught?  What do you think that's going
12    to do to you when you go back to that jury room to talk to
13    the other jurors about this case?
14         PROSPECTIVE JUROR:  Again, just emotional, but I
15    understand whatever.  You know, I understand.  It just would
16    bring back --
17         MR. OLDHAM:  Emotional where you cannot talk and
18    make a decision or emotional where this will be hard, but I
19    can get through it?  because that's the nature of it.  Can
20    you get through those emotions, or will you become so
21    emotional, you won't be able to decide what happened in this
22    case?
23         PROSPECTIVE JUROR:  Honestly -- I could -- I
24    just -- to be honest with you, I don't know how I would
25    react, but I do know that I can -- I'm stronger than I seem,

UNREDACTED TRANSCRIPT

1    but it's just emotional.

2              THE COURT:  Let me ask you a question:  Tell them

3    what you do for a living.

4              PROSPECTIVE JUROR:  Right now?

5              THE COURT:  Yeah.

6              PROSPECTIVE JUROR:  Right now, I am -- I work for

7    Sam's Club at the moment.  Mostly entrance and exit greeting

8    people and all of that nature, so I see a lot of stuff.  You

9    meet a lot of people.

10             THE COURT:  So if I went to a Sam's Club, would

11   you be the greeter?

12             PROSPECTIVE JUROR:  It's possible.

13             THE COURT:  Might be.  Okay.

14             All right.  Do you like that?

15             PROSPECTIVE JUROR:  I do.  I do.  I like it for

16   the most part.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  The job itself, I like.  I

19   just don't like when it's time to get off work.

20             THE COURT:  Okay.

21             PROSPECTIVE JUROR:  They leave you at the door.

22             THE COURT:  I understand.  I understand.

23             PROSPECTIVE JUROR:  But other than that, I do

24   like it.

25             THE COURT:  What I'm going to do is this, I'm

                        UNREDACTED TRANSCRIPT

1   going to talk to the lawyers, but I'm going to let you go

2   back to your seat over there.  Think about it.  You know, it

3   is not good for either side if somebody determines that they

4   will simply not be able to decide anything because sometimes

5   that happens.  We've had jurors that that's just too hard,

6   and they just couldn't do it.  At the same time, if you say,

7   you know, I may be a little emotional, but I'll be able to

8   listen to the evidence and decide the case solely on the law.

9   Will you think about that?

10              PROSPECTIVE JUROR:  Uh-huh.

11              THE COURT:  I'm going to ask you this:  If, as to

12  Ms. Grayson, the Government proves its case beyond a

13  reasonable doubt, what verdict would you have to return?

14              PROSPECTIVE JUROR:  If they prove their case,

15  guilty.

16              THE COURT:  And if they fail to do that, then

17  what verdict would you have to return?

18              PROSPECTIVE JUROR:  Not guilty.

19              THE COURT:  And the same thing as to Mr. Grayson,

20  if the Government proves its case, beyond a reasonable doubt,

21  what verdict would you have to return?

22              PROSPECTIVE JUROR:  Guilty.

23              THE COURT:  And if they fail to do that, what

24  verdict would you have to return?

25              PROSPECTIVE JUROR:  Not guilty.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  I understand.  If people

2     raising their hand and saying they wanted to be on the jury,

3     I would be worried about it.  You understand what I'm saying?

4     So we want jurors who can listen and then decide the case

5     solely on the evidence and the law.

6          So I think we're okay.  There may be some other

7     questions I need to ask you, but for right now, I'm going to

8     let you go back to your seat.  Right now, I'm going to check

9     with the lawyers about it, okay?

10          PROSPECTIVE JUROR:  Okay.

11          THE COURT:  Okay.  Thank you.

12          All right.  I think we need to talk about this

13     for a moment.  And the main thing that you can't see or can't

14     hear on the record is her expression and the way in which she

15     is responding, which is, at times, takes her a while to

16     respond as she should, very thoughtfully, and somewhat

17     emotionally.  So they can't see that on the record.  You all

18     have to think about it.  Would she be able to sit on the jury

19     and be fair and impartial?

20          Now, we do not want to try this case and get to

21     the end of the day and not have a -- have a juror who says, I

22     can't do it, I can't do it.

23          Now, we will keep two alternates and, of course,

24     we could replace the juror at that time if we had.  We may

25     find out a little more later.

UNREDACTED TRANSCRIPT

1          Anyway, anything from the Government at this

2   time?

3          MR. OLDHAM:  The Government would like that she

4   be stricken for cause because of her reluctance to commit to

5   saying it wasn't, I guess I can do it.  It was always several

6   qualifying statements before she would get to that, and feel

7   that with the venire we have, we should be allowed to have

8   somebody else who can give a more definite answer to that

9   very critical question.

10          MR. BALLIN:  Your Honor, I humbly would like to

11   address the pause in some of her answers.  But when I say

12   pause between the question and the answer, I submit to you

13   it's more of her thinking about her answer.

14          THE COURT:  I think the Court gets to make a

15   decision about what we observed, and I hear what you're

16   saying.  A little reluctant responses.  I think

17   characterization is not entirely incorrect, but it's also not

18   entirely correct.

19          MR. BALLIN:  And then also she did say she could

20   follow the law.  I can.  I can.

21          THE COURT:  I'm going to keep her on the panel

22   for right now.

23          Yes, sir?

24          MR. SCHOLL:  I would object to striking her,

25   Judge.

UNREDACTED TRANSCRIPT

1          THE COURT:  I'm going to keep her on the panel

2     for right now.  She's got some time to think about it, and

3     then it may turn out that we need to let her be excused.

4     Right now, I'm going to deny the motion.  Of course, I'm

5     aware that we might have an issue.

6          (End of discussion at side-bar.)

7          THE COURT:  All right.  We have another seat to

8     fill, which is Seat No. 14.  Let's call somebody for that

9     seat.

10          CASE MANAGER:  0072.

11          THE COURT:  All right.  Do you need to see me at

12     side-bar or are you okay over there?

13          PROSPECTIVE JUROR:  No, I'm okay.

14          THE COURT:  All right.  We have a couple of new

15     jurors.  I'm going to ask a couple of fairly quick questions.

16          First of all, Juror 72 in Seat 14, I am going to

17     ask what you do, what's your regular work?  We're not trying

18     to get real specific, but we need some idea.

19          PROSPECTIVE JUROR:  I sell commercial food

20     service equipment.  I do bid work and -- for correctional

21     facilities, hospitals, schools, things like that.

22          THE COURT:  Okay.  All right.  May I ask for whom

23     you work or is it your proprietorship?

24          PROSPECTIVE JUROR:  No.  I work for Hotel &

25     Restaurant Supply.

UNREDACTED TRANSCRIPT

1          THE COURT:  And if somebody wants to start a

2    restaurant, you're the people they call up, right?

3          PROSPECTIVE JUROR:  Technically, not me.  If you

4    want a piece of equipment to bid on for school, things like

5    that, but I don't design, no.

6          THE COURT:  Okay.  All right.  But your --

7    actually, the business that you're in and the company you're

8    with has a very substantial business here in town with all

9    sorts of supplies?

10          PROSPECTIVE JUROR:  Correct.  Yes, sir.

11          THE COURT:  Absolutely.  I'm going to ask you

12    what is the best below counter refrigerator three-door in --

13    that you've got available?

14          PROSPECTIVE JUROR:  Probably True.

15          THE COURT:  Okay.  It's T-R-U-E.

16          PROSPECTIVE JUROR:  T-R-U-E.

17          THE COURT:  That's a really good one, absolutely.

18    And it's popular with a lot of places because they can use

19    that top counter space.

20          PROSPECTIVE JUROR:  Correct.

21          THE COURT:  Absolutely.  How long have you been

22    doing that?

23          PROSPECTIVE JUROR:  Going on 15 years.

24          THE COURT:  Okay.  How many?

25          PROSPECTIVE JUROR:  Fifteen.

UNREDACTED TRANSCRIPT

1          THE COURT:  Fifteen years, my goodness.  Okay.
2   Absolutely.
3          Well, what's the most important characteristic
4   for somebody who is going to serve on a jury?
5          PROSPECTIVE JUROR:  Impartial.
6          THE COURT:  Be impartial, absolutely.  I thought
7   you were going to say be patient, right?  Impartial.
8          PROSPECTIVE JUROR:  Yes.
9          THE COURT:  Okay.  Absolutely.  You've heard all
10  the questions that have been asked.  Do you feel better about
11  the ability of the jury to perform its duty after hearing the
12  way in which we go through jury selection?
13         PROSPECTIVE JUROR:  Yes.
14         THE COURT:  I'm going to ask you, why?  Why do
15  you feel better about it?
16         PROSPECTIVE JUROR:  I don't know.  I mean, it's
17  the process, I guess.
18         THE COURT:  Okay.  It's a process that helps us
19  understand what we're supposed to do and what we cannot do.
20         PROSPECTIVE JUROR:  Yes.
21         THE COURT:  Absolutely.  Absolutely.
22         Well, we're going to go back to juror in Seat 12,
23  and I'm going to ask her, and she's going to tell me:  What's
24  the most important characteristic for somebody who is going
25  to serve on a jury?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  To be honest and fair.

2          THE COURT:  Be honest and fair, absolutely.  I

3    know we had a fairly long conversation and thanks for that

4    information.  That's very helpful.  And I'm going to ask you

5    again so that the jury knows what you currently do.  I think

6    it's very interesting.

7          PROSPECTIVE JUROR:  Mostly, I'm a greeter.

8    Sometimes cashier for Sam's Club.

9          THE COURT:  Okay.  I asked you to tell us that

10   because when they go into the Sam's Club and they see you, I

11   want them to say hello, okay?

12         PROSPECTIVE JUROR:  Okay.

13         THE COURT:  Absolutely.  I'm going to ask you

14   this, though, should I ask when I go into the Sam's Club and

15   I can't find what I'm looking for, should I come back and ask

16   you where it is?

17         PROSPECTIVE JUROR:  Well, you can do that, or ask

18   any of the associates.

19         THE COURT:  Okay.

20         PROSPECTIVE JUROR:  Or go to the service desk.

21         THE COURT:  Okay.  I always --

22         PROSPECTIVE JUROR:  -- member services.

23         THE COURT:  I always wanted to have an app where

24   I could put it in and it would tell me exactly.  Maybe there

25   is one.

UNREDACTED TRANSCRIPT

1            PROSPECTIVE JUROR:  There is.

2            THE COURT:  Good.

3            PROSPECTIVE JUROR:  Yes, you can download the

4    Sam's app.

5            THE COURT:  Absolutely.

6            PROSPECTIVE JUROR:  And you can find a lot of

7    things on there.

8            THE COURT:  Absolutely.

9            In every case, we not only know that you have to

10   be impartial, but you also have to be aware of what biases

11   and prejudices might be.  What's an example as to which

12   people sometimes have a bias or prejudice?

13           PROSPECTIVE JUROR:  I would say something that

14   they possibly have experienced in their life.

15           THE COURT:  Experiences in their -- absolutely.

16   That tends to affect us, and it tends to affect how we look

17   at things, absolutely.

18           If someone in the panel were to bring up a factor

19   that we cannot consider, and I'm not -- everybody needs to

20   think about this.  For example, they said, I had a relative

21   who had something really bad happen to them and they were

22   killed and, therefore, I feel very strongly about how this

23   case should be resolved one way or the other, would that be

24   appropriate for them to tell us that?

25           PROSPECTIVE JUROR:  No, it wouldn't.

UNREDACTED TRANSCRIPT

185

1          THE COURT:  It would not be.  And would you be

2    willing to speak up and say something to them about that?

3    Would you be willing to speak up and then what might you say

4    to them?

5          PROSPECTIVE JUROR:  Oh --

6          THE COURT:  You said you weren't -- didn't mind

7    being outspoken.

8          PROSPECTIVE JUROR:  I know and that's what I'm

9    trying not to do.  I said, no, no, no, you can't do that,

10   that's not right.  No, we ain't going there.

11         THE COURT:  It's all right.  It's all right.  We

12   all have to have an understanding that it's appropriate to

13   speak up if something is brought up.  We can't use our past

14   experience to decide any of disputed facts in this case.  Is

15   that okay?

16         PROSPECTIVE JUROR:  It's okay.  It's just

17   sometimes when I speak up, it's misunderstood.

18         THE COURT:  Well, you said that you were -- have

19   an authoritative voice.

20         PROSPECTIVE JUROR:  Yeah.

21         THE COURT:  When you speak up and you tell those

22   people, you can't come in this door, you got to go to the

23   next door, or go get your basket, you expect them to go do

24   it, right?

25         PROSPECTIVE JUROR:  No, I don't be telling them

UNREDACTED TRANSCRIPT

1   like that.  I be telling them with a smile.  I say, help me

2   out, help me out, help me keep my little job.  Go on and

3   do -- no, no.

4          THE COURT:  Okay.  Okay.  We want to make sure

5   we've got the right tone here.  Okay.

6          PROSPECTIVE JUROR:  Oh, yeah.

7          THE COURT:  The reason I'm asking is we don't

8   want anybody to feel like that they can't speak up and

9   sometimes -- is anybody on the jury a little hard of hearing?

10  You don't have to raise your hand, but sometimes people

11  appreciate that.  So that's okay.  Is that all right?

12         PROSPECTIVE JUROR:  Yes, I think that's one of my

13  problems, maybe one -- another one of my problems is the

14  reason why I'm so loud.

15         THE COURT:  You have a little difficulty in

16  hearing?

17         PROSPECTIVE JUROR:  My husband thinks so.

18         THE COURT:  Well, that's not a diagnosis, but you

19  bring up a great point to all of you, and that is, if you're

20  having difficulty hearing, and you're a little concerned

21  about missing things, we actually have hearing assistance

22  devices.  And we can actually give you -- it kind of fits

23  over you.  It's kind of like a -- looks like a necklace a

24  little bit and fits in your ears, and we can help you out.

25  So don't hesitate if you're having trouble hearing.  Is that

UNREDACTED TRANSCRIPT

1   okay?

2                   PROSPECTIVE JUROR:  Yes.

3                   THE COURT:  Now, I'm not going to -- we're going

4   to go back to our jurors in Seats 1, 2, 3, 4, 5, 6, and 7.  I

5   think -- well, let me make sure.

6                   We've asked everybody about -- on the second row,

7   except maybe our juror in Seat 14, about the nature of the

8   case.  And would it in any way affect your ability to sit on

9   the case and be fair and impartial?  I want to make sure I've

10  covered that with juror in Seat 14 before I come down to Seat

11  1.

12                  PROSPECTIVE JUROR:  No.

13                  THE COURT:  Okay.  Well, that's pretty

14  straightforward.

15                  Have you had any situation where someone has

16  threatened you or a member of your family with physical harm?

17                  PROSPECTIVE JUROR:  No.

18                  THE COURT:  Okay.  All right.  Thank you.

19                  Now, we come back to Seat 1.  They've been

20  waiting on us all this time.  And that is, I do need to ask

21  all of you because we've got to that other -- now, I'm not

22  leaving out the other questions.  They're all important, but

23  we recognize that we've covered a lot of material.

24                  So does knowing the nature of the case, the

25  allegations in the case, affect in any way your ability to

                       UNREDACTED TRANSCRIPT

188

1    decide the case solely on the evidence and the law?

2              PROSPECTIVE JUROR:  No.

3              THE COURT:  Okay.  Have you had any situation

4    where you, a family member, or close friend has been

5    threatened with physical harm?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Okay.

8              I'm going to hand that to juror in Seat No. 2.

9    Anything about the nature of the case -- be sure that you all

10   think about this.  I know you are thinking about it, but we

11   really need to be mindful that it's quite important.

12             Anything about the nature of the case that would

13   in any way affect your ability to sit on the jury and be fair

14   and impartial, that is, to decide the case solely on the

15   evidence and the law?

16             PROSPECTIVE JUROR:  No, Your Honor.

17             THE COURT:  Any situation where you, a member of

18   your family, close friend has been threatened with serious

19   bodily harm?

20             PROSPECTIVE JUROR:  Yes.

21             THE COURT:  Okay.  Now, I'm going to put that

22   down as a side-bar because that's what we do on those.  Okay.

23             All right.  Juror in Seat No. 3, of course, we

24   haven't got to talk to you as much, a little bit, but not too

25   much.  Remind me again exactly what you do.  You told me, but

UNREDACTED TRANSCRIPT

1    I want to remember what your job is.

2                    PROSPECTIVE JUROR:  Now I work at Pfizer.

3                    THE COURT:  Right.  Exactly.

4                    And anything about the nature of the case that

5    might in any way affect your ability to sit on the jury and

6    be fair and impartial?

7                    PROSPECTIVE JUROR:  No.

8                    Anybody in the family, good friend, yourself has

9    been threatened with serious bodily harm by anybody?

10                   PROSPECTIVE JUROR:  Yes.

11                   THE COURT:  I'm going to do that on side-bar.

12   It's better to do it that way.

13                   Okay.  And, No. 4, Seat 4, how are you doing

14   today?

15                   PROSPECTIVE JUROR:  I'm all right.

16                   THE COURT:  You want to be here, or do you want

17   to be somewhere else?

18                   PROSPECTIVE JUROR:  I always want to be somewhere

19   else no matter where I'm at, so . . .

20                   THE COURT:  I understand.  I understand.

21                   Anything about the nature of the case that might

22   in any way affect your ability to decide the case solely on

23   the evidence and the law, anything at all?

24                   PROSPECTIVE JUROR:  Honestly, I'm not 100 percent

25   sure.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  And I'm actually going to do a

2     side-bar on that because I think we probably need to.  Would

3     you think we probably ought to talk about it?

4          PROSPECTIVE JUROR:  (Moving head up and down.)

5          THE COURT:  I think we need to, so we will take

6     care of that.  I know we're going to have a bunch of

7     side-bars, but it's more fair to everybody.

8          All right.  Juror in Seat No. 5, anything about

9     the nature of the case that might in any way affect your

10    ability to decide the case solely on the evidence and the

11    law?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Anybody -- you're including yourself,

14    family, friends, and so forth who has been threatened by

15    anybody with serious bodily harm?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Okay.  Let's go to No. 6, juror in

18    Seat 6.  Anything about the nature of the case that might in

19    any way affect your ability to sit on the jury and be fair

20    and impartial?

21         PROSPECTIVE JUROR:  No.

22         THE COURT:  Anybody in the family or yourself or

23    close friend, who has been threatened by anyone with serious

24    bodily harm?

25         PROSPECTIVE JUROR:  No.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  And in Seat No. 7, anything

2    about the nature of the case that might in any way affect

3    your ability to sit on the jury and be fair and impartial,

4    that is, to decide the case solely on the evidence and the

5    law?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  And anyone in -- have you or any

8    member of your family, close friend, who has been threatened

9    by anyone with serious bodily harm?

10         PROSPECTIVE JUROR:  No.

11         THE COURT:  Okay.  All right.

12         All right.  We've got some side-bars.  We're

13   going to take juror in Seat No. 2 first on this one.

14              (At side-bar on the record.)

15         THE COURT:  Okay.  Yes, sir.  What happened?

16         PROSPECTIVE JUROR:  Well, I've been robbed at

17   gunpoint, so that implies --

18         THE COURT:  That's pretty threatening.

19         PROSPECTIVE JUROR:  Yes, sir.  And I also had a

20   friend that was murdered about 20 years ago.

21         THE COURT:  Twenty years ago?

22         PROSPECTIVE JUROR:  Yes, sir.

23         THE COURT:  Okay.  How long ago was the robbery?

24         PROSPECTIVE JUROR:  About 15.  Fifteen or so.

25         THE COURT:  As to the friend who was killed, how

                    UNREDACTED TRANSCRIPT

1  long -- I'm sorry, was that person a relative or close

2  friend?

3            PROSPECTIVE JUROR:  He was a friend.  You may

4  have heard about it.  He was the pizza delivery guy in

5  Cooper-Young that got killed, John Stambaugh.

6            THE COURT:  He was a pizza delivery guy, exactly.

7            PROSPECTIVE JUROR:  Yes.  Yes, sir.

8            THE COURT:  That was a terrible event.  Does that

9  in any way affect your ability to sit on this jury and be

10  fair and impartial?

11            PROSPECTIVE JUROR:  No, sir.  I understand the

12  material conditions are probably involved in both of those

13  incidents, and it doesn't really affect --

14            THE COURT:  Okay.

15            PROSPECTIVE JUROR:  -- this case or anything

16  else.  That's unfortunate, but crime happens.

17            THE COURT:  Let's go to the situation where you

18  were robbed.  Where did that occur?

19            PROSPECTIVE JUROR:  Half a block from the house.

20            THE COURT:  And what part of the city was that

21  in?

22            PROSPECTIVE JUROR:  That was on Jackson Avenue.

23            THE COURT:  Okay.  Was anybody apprehended in

24  connection with that robbery?

25            PROSPECTIVE JUROR:  I doubt it.

UNREDACTED TRANSCRIPT

1          THE COURT:  Did you notify the police when it

2    occurred?

3          PROSPECTIVE JUROR:  I called them after I got

4    home.

5          THE COURT:  Okay.  How much money was taken?

6          PROSPECTIVE JUROR:  Couple of bucks, couple of

7    tallboys of beer, and a sack of potato chips.

8          THE COURT:  Okay.  That's not too bad.

9          PROSPECTIVE JUROR:  Not too bad.

10          THE COURT:  Which intersection on Jackson?

11          PROSPECTIVE JUROR:  Jackson and Belvedere.

12          THE COURT:  Okay.  Now, being robbed is something

13    that is pretty traumatic.  How traumatic was it for you?  You

14    seem to have done pretty well with it, but I can't tell.

15          PROSPECTIVE JUROR:  Yeah, it's -- I mean, if you

16    live long enough in Memphis, it's going to happen eventually.

17          THE COURT:  Okay.  Do either of those predispose

18    you in any way as to how you should decide this case?

19          PROSPECTIVE JUROR:  No, Your Honor.

20          THE COURT:  If the Government fails to prove its

21    case beyond a reasonable doubt as to a defendant, what

22    verdict would you have to return as to that defendant?

23          PROSPECTIVE JUROR:  Fail to prove, not guilty.

24          THE COURT:  Okay.  If they do prove the case

25    beyond a reasonable doubt as to a defendant, as to that

UNREDACTED TRANSCRIPT

1   defendant, what verdict would you have to return?

2            PROSPECTIVE JUROR:  It would have to be guilty.

3            THE COURT:  Okay.  Can you keep an open mind

4   until the very end of this?

5            PROSPECTIVE JUROR:  Absolutely.

6            THE COURT:  You told me you were in your -- how

7   old are you?

8            PROSPECTIVE JUROR:  I'm 44.

9            THE COURT:  I made a note about that, and I

10  thought, well, that's -- you still look young, so that's a

11  good thing.

12           PROSPECTIVE JUROR:  I appreciate that.

13           THE COURT:  Absolutely.  Absolutely.  Anything

14  else you need to tell us about?  I think that covers it.

15           PROSPECTIVE JUROR:  I don't think so.  Other than

16  I think I've met your daughter before, but that's about it.

17           THE COURT:  Which one?

18           PROSPECTIVE JUROR:  Kate.

19           THE COURT:  Sure.

20           PROSPECTIVE JUROR:  My best friend is Zack Payne,

21  I think he's -- Brian was friends with her.

22           THE COURT:  Is he a doctor now?

23           PROSPECTIVE JUROR:  He's a doctor down in

24  Pensacola.

25           THE COURT:  Do you ever see him?

UNREDACTED TRANSCRIPT

195

1          PROSPECTIVE JUROR:  Every once in a while.

2          THE COURT:  Exactly.  Exactly.  I want to make

3    sure you were not one of those kids who came over to my house

4    when I was asleep.

5          PROSPECTIVE JUROR:  I don't think so.

6          THE COURT:  Okay.  I used to have kids come over

7    way past my bedtime.

8          Okay.  Was that going to influence you at all in

9    this case?

10          PROSPECTIVE JUROR:  I don't believe so.

11          THE COURT:  Tell them how long ago that was.  It

12    actually was quite a while ago.

13          PROSPECTIVE JUROR:  About 20 years ago.

14          THE COURT:  It would be about 20 years ago.  It

15    would be a long time ago, absolutely.

16          All right.  Any questions from the Government?

17          MR. OLDHAM:  No, Your Honor.

18          THE COURT:  Any questions from defense?

19          MR. BALLIN:  My daughter played basketball

20    against Judge McCalla's daughter years ago.

21          Do you know my daughter, Jana.

22          PROSPECTIVE JUROR:  I don't --

23          MR. BALLIN:  Jana Ballin?

24          PROSPECTIVE JUROR:  I don't know.  If I do, it's

25    just in passing.  There's a chance we were at the same party.

UNREDACTED TRANSCRIPT

196

1          THE COURT:  Probably.

2          MR. BALLIN:  Where did you go to high school?

3          PROSPECTIVE JUROR:  I went to Bolton.  I didn't

4   meet that group until I was in -- went to CBU, so I met Zack

5   there and his, brother, his younger brother, and that's how I

6   met them.

7          THE COURT:  You didn't take the agricultural

8   course at Bolton High School, did you?

9          PROSPECTIVE JUROR:  No.  It was an agriculture

10  high school, but I did not.

11         THE COURT:  But you did not?

12         PROSPECTIVE JUROR:  No.  I was a skate boarder,

13  not a rodeo guy.

14         THE COURT:  No problem.  Rodeo is actually a

15  really big deal.

16         PROSPECTIVE JUROR:  It is.

17         THE COURT:  It's a big deal.

18         MR. SCHOLL:  I don't have any questions about any

19  of my kids, so you're done.

20         THE COURT:  We appreciate you coming up.  Thanks

21  very much.

22         Seat No. 3.  Yes, sir?

23         PROSPECTIVE JUROR:  My stepdaughter was involved

24  in a shooting.  Her ex-boyfriend broke into the house and

25  broke into it again.  She shot him.  She didn't kill him.  It

UNREDACTED TRANSCRIPT

1   might be better if she would have.  But the lawyer we had was

2   Mr. Ballin here, so I would probably pick him over anybody

3   else.  I would probably take his side.  I would probably be

4   bias because I would take him because he helped my family and

5   got her taken care of, so --

6               THE COURT:  That sounds pretty clear to me.  How

7   did he do in the case?

8               PROSPECTIVE JUROR:  She was let go of jail and

9   all charges dropped.

10              THE COURT:  That sounds like a favorable

11  determination.

12              Well, Mr. Ballin, any objection to letting --

13              MR. BALLIN:  No, sir.

14              THE COURT:  Anything from the Government?

15              MR. OLDHAM:  No.

16              THE COURT:  That's what I needed to know,

17  exactly.

18              MR. SCHOLL:  We'll keep him, Judge.

19              THE COURT:  You know when you have that close

20  relationship and how important it was to the family, and it

21  was very important to the family at the time.

22              PROSPECTIVE JUROR:  For sure, it was.

23              THE COURT:  She was probably initially charged

24  with at least manslaughter.

25              PROSPECTIVE JUROR:  Yes.  But she didn't -- she

                         UNREDACTED TRANSCRIPT

1    shot him -- well, she went outside and shot him.  She

2    didn't -- because he ran around the back and got in his car.

3    She went in front of him and shot him.  She was not where she

4    was supposed to be.

5              THE COURT:  Exactly.

6              PROSPECTIVE JUROR:  And she got all the charges

7    taken off, so . . .

8              THE COURT:  Okay.  Well, it helps us to have that

9    context, and so you feel an obligation.

10             PROSPECTIVE JUROR:  Right.

11             THE COURT:  We need to let you be excused.

12   There's no objection by anybody and thanks for being here.

13             PROSPECTIVE JUROR:  Sorry about that.

14             THE COURT:  Absolutely.  No problem.  Thank you.

15             PROSPECTIVE JUROR:  Thank you.

16             MR. OLDHAM:  Thank you for letting us know.

17             THE COURT:  I'm not going to ask how you got --

18   that's a pretty good result.  I know.

19             MR. BALLIN:  I don't remember.

20             THE COURT:  I understand.  You know, he remembers

21   you, and that's a big deal.  Maybe Blake handled part of it.

22             MR. BALLIN:  Good result, he probably did.

23             THE COURT:  Probably did.

24             Juror in Seat 4.  Juror in Seat 4.

25             By the way, she's having some type of emotional

UNREDACTED TRANSCRIPT

1   issue, so I need to be very kind, but I will need to ask

2   about that.  So I'll ask her about it.

3                MR. BALLIN:  Also the drive.

4                THE COURT:  Yeah, she does have a long drive.

5                MR. SCHOLL:  I'll sit here and be quiet.  That's

6   been my role.

7                THE COURT:  How are you doing?  I've been

8   watching you.  You've been real upset.  I know you're crying

9   a little bit.  Do we need to --

10               PROSPECTIVE JUROR:  This is reminding me of when

11  my son messed up.

12               THE COURT:  Okay.

13               PROSPECTIVE JUROR:  And I don't know if I can

14  really listen to all the evidence when I've got that going on

15  in my head.

16               THE COURT:  Sure.  I'm going to ask you just one

17  or two questions.  What happened in your son's case?

18               PROSPECTIVE JUROR:  He got rape charges for

19  messing with his little cousin, and he has to go do the --

20  he's on a registry now.

21               THE COURT:  Sure.

22               PROSPECTIVE JUROR:  And it's just I never got no

23  therapy for it or nothing, and I know I probably need to, but

24  I've been doing a pretty good job of pushing it down and

25  avoiding courtrooms until now.

                        UNREDACTED TRANSCRIPT

1          THE COURT:  Let me ask this because --

2          PROSPECTIVE JUROR:  I just had to stay at home

3     constantly for the past two years.

4          THE COURT:  You've been staying home really for

5     the whole time?

6          PROSPECTIVE JUROR:  Just about, except sometimes

7     I go to my daddy's house.

8          THE COURT:  Sure.  You've had a really terrible

9     situation, and it stays with you all the time; is that right?

10         PROSPECTIVE JUROR:  It really does.

11         THE COURT:  Do you need to be excused in this

12    case?  Is this simply impractical and impossible for you to

13    sit in the case?  Is it that hard?

14         PROSPECTIVE JUROR:  It's going to be really hard

15    for me to concentrate on what's going on and really focus the

16    way that I should, the way that the defendants probably

17    deserve somebody to.

18         THE COURT:  I understand.  You live in Lauderdale

19    County?

20         PROSPECTIVE JUROR: (Moving head up and down.)

21         THE COURT:  Where in Lauderdale?

22         PROSPECTIVE JUROR:  Almost to Halls.

23         THE COURT:  Almost to Halls.  Okay.  I think the

24    lawyers are fine with understanding your situation, but I'm

25    going to ask them.  So I'm going to ask you to sit in that

UNREDACTED TRANSCRIPT

1   chair right over there.  If you'll have a seat just for a

2   moment, and we're going to check on it.

3              MR. LEVINE:  May I be excused?  I left my jury

4   list in that room.

5              THE COURT:  Sure.  That's fine.  Go ahead.

6              Obviously, she can't serve.  She's highly

7   emotional.  She's crying.  She's, you know, been at her house

8   for the last two years hardly able to come out.  Does

9   anybody -- I mean, is there a joint motion by all three of

10  you to let her be excused?

11             MR. BALLIN:  On behalf of Ms. Grayson, we move

12  that she be excused for cause.

13             MR. SCHOLL:  I would join on, on behalf of

14  Mr. Grayson.

15             MR. OLDHAM:  Government joins as well.

16             THE COURT:  We need to let her be excused.  Thank

17  you all very much.

18             We need to let you go home, and we're going to

19  let you be excused.

20             PROSPECTIVE JUROR:  Okay.

21             THE COURT:  And so never forget, though, now,

22  there are some counseling services that might be able to

23  help, so we're always -- we can't do a lot from the federal

24  side, but we can always make some suggestions because I know

25  that if that would help, we will do what we can.  You take

UNREDACTED TRANSCRIPT

1    care.  Okay.  We're going to let you go -- go down to the

2    second floor, and tell them you've been excused.

3                    PROSPECTIVE JUROR:  Okay.

4                    THE COURT:  Thank you.

5                    Juror in Seat 5, I think.  Maybe I don't need to

6    see her, but . . .

7                    CASE MANAGER:  I didn't mark anybody else.

8                    THE COURT:  I didn't mark anybody else either.

9                    Okay.  I think we're good.

10                   (End of discussion at side-bar.)

11                   THE COURT:  All right.  Well, we have two seats

12   to fill here in Seats 3 and 4.  We're going to call those

13   numbers.

14                   CASE MANAGER:  Your Honor, the next juror will be

15   0059, Juror 59.

16                   And the next number is 0005, Juror No. 5.

17                   THE COURT:  Okay.  0005 in Seat 4 and 0059 in

18   Seat 3.

19                   All right.  Well, let me start with juror in Seat

20   No. 3.  How are you doing today?

21                   PROSPECTIVE JUROR:  (Inaudible.)

22                   THE COURT:  I'm doing okay.  We'll get that mike

23   to you, though.  That's what we need to work on there.

24   Absolutely.  Absolutely.

25                   PROSPECTIVE JUROR:  Yes, sir.

                              UNREDACTED TRANSCRIPT

203

1          THE COURT:  Now, are you retired now?

2          PROSPECTIVE JUROR:  Yes, I am.

3          THE COURT:  Okay.  That's a good thing.  And tell

4   me what you did before you retired?

5          PROSPECTIVE JUROR:  Truck driver.

6          THE COURT:  Truck driver?  That's what I thought

7   was right.  Now, I'm going to ask you what it was like being

8   a truck driver when you were driving a truck?

9          PROSPECTIVE JUROR:  Peace of mind for me.

10          THE COURT:  Peace of mind, absolutely.  How long

11   did you do that?

12          PROSPECTIVE JUROR:  Fifteen years.

13          THE COURT:  And what size rig did you -- was it

14   an 18 wheeler?

15          PROSPECTIVE JUROR:  No, sir.  It was a tandem.

16   It was a dump truck.

17          THE COURT:  Okay.  And was that hauling gravel?

18          PROSPECTIVE JUROR:  Yes.

19          THE COURT:  Okay.  And was that in the north part

20   of the county?

21          PROSPECTIVE JUROR:  City of Memphis.

22          THE COURT:  City of Memphis?  Okay.  And people

23   don't realize this, but there's a pretty large gravel yard,

24   pit, et cetera, in the city of Memphis itself; is that right?

25          PROSPECTIVE JUROR:  Yes, sir.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  Do you want to tell them the

2    quality of the gravel there?

3          PROSPECTIVE JUROR:  I did it all.

4          THE COURT:  Exactly.  Now, in this case, what

5    would you say is the most important characteristic for a

6    juror, the most important characteristic?

7          PROSPECTIVE JUROR:  I really can't say right now.

8    My head ain't together on what to say.

9          THE COURT:  I tell you what, can we talk briefly

10   at side-bar about that?  Is that okay?  I want to make sure

11   you're okay.

12         PROSPECTIVE JUROR:  I'm okay.

13         THE COURT:  All right.  Come around.  I want to

14   check one thing.  I'm checking on hearing.

15         PROSPECTIVE JUROR:  Yeah.

16         THE COURT:  And that's what I need to know is how

17   well you can --

18         PROSPECTIVE JUROR:  I don't hear good out of my

19   right ear.

20         THE COURT:  Okay.  Tell me again.

21         PROSPECTIVE JUROR:  I can't hear good out of my

22   right ear.

23         THE COURT:  Okay.  Difficulty hearing out of your

24   right ear.  Did you hear me say earlier that we have a

25   hearing assistance device if we need one?

UNREDACTED TRANSCRIPT

205

1           PROSPECTIVE JUROR:  Yes, sir.

2           THE COURT:  It is very important that you be able

3    to hear everything that is said in the courtroom.  Will you

4    tell me if you would like one?

5           PROSPECTIVE JUROR:  Yes, sir, I would.

6           THE COURT:  Okay.  Because it's just not -- it's

7    the right thing to do.  It's not good to not be able to hear

8    okay.  Well, wanted to check on that.

9           Now, what would you say -- because you drove a

10   truck for a long time, what would you say is the most

11   difficult thing about driving a truck?

12          PROSPECTIVE JUROR:  The most difficult thing?

13          THE COURT:  About driving -- of course, you were

14   driving a dump truck.

15          PROSPECTIVE JUROR:  Yes, I was.

16          THE COURT:  And there's a lot -- people may not

17   realize this, there is actually quite a lot of noise usually

18   at the gravel pit area.

19          PROSPECTIVE JUROR:  At the landfill, yes, sir.

20          THE COURT:  Yes, there is, exactly.  What's the

21   most difficult thing about driving -- because it's a big

22   piece of equipment?

23          PROSPECTIVE JUROR:  It was -- to me, my difficult

24   part was the pedestrians just driving on the street with me,

25   and I have -- I be hauling a lot of debris and, like, that

UNREDACTED TRANSCRIPT

1  would be my biggest problem is trying to drive and make sure

2  they not right up on me for no debris to come off on.

3           THE COURT:  And, actually, there's a law that

4  deals with how you have to cover the dump truck.

5           PROSPECTIVE JUROR:  We have a cover, right.

6           THE COURT:  And if the cover is not on the truck,

7  what can happen?

8           PROSPECTIVE JUROR:  The debris could come off --

9           THE COURT:  Right.

10          PROSPECTIVE JUROR:  -- and hit the car.

11          THE COURT:  And that's a pretty serious thing --

12          PROSPECTIVE JUROR:  Right.

13          THE COURT:  -- actually.

14          Now, can you decide -- what would you say is an

15 example of something as to which people sometimes have a bias

16 or prejudice?  It's a charact-  -- it's No. 2, an example of

17 a characteristic as to which people sometimes have a bias or

18 prejudice?

19          PROSPECTIVE JUROR:  Right now, I can't say.  It

20 just won't come to me right now.

21          THE COURT:  Well, let me ask it this way:  Do you

22 think that sometimes people judge people on the way that they

23 appear on their looks?

24          PROSPECTIVE JUROR:  Some people do, but, no.

25          THE COURT:  Not everybody.

UNREDACTED TRANSCRIPT

207

1          PROSPECTIVE JUROR:  I don't because I focus on

2     peoples a lot due to the fact that I worked with the public a

3     lot too, so I would always focus on people's heart.  You

4     know, sometimes they will say, why you looking at me so hard?

5     I'm not looking at you hard.  I'm really focusing on you, you

6     know, your ways around me.

7          THE COURT:  If in this case, the Government fails

8     to prove its case as to a defendant beyond a reasonable

9     doubt, what verdict would you have to return?  If they fail

10    to prove the case beyond a reasonable doubt?

11         PROSPECTIVE JUROR:  You're asking for my judgment

12    of it?

13         THE COURT:  Well, and the jury too.  What verdict

14    would the jury have to return if the Government fails to

15    prove its case as to a defendant beyond a reasonable doubt?

16         PROSPECTIVE JUROR:  Well, I really -- I have to

17    think about that myself because the way I think, it may not

18    be right.

19         THE COURT:  Okay.  Well, let me hand that over to

20    your colleague right next to you.  He's in Seat No. 4.

21         And you want to tell them what do you do now?

22         PROSPECTIVE JUROR:  I am a musician.

23         THE COURT:  And do you operate out of one of

24    studios here in Memphis?

25         PROSPECTIVE JUROR:  I have my own studio, but I

UNREDACTED TRANSCRIPT

1  do for hire work with studios around town.

2          THE COURT:  I've always been surprised at how

3  much it cost to rent a studio fully equipped for an hour or a

4  day.  Do you want to tell us or is that a secret?

5          PROSPECTIVE JUROR:  Well, no, it's not a secret,

6  but I couldn't say I know everyone's rates around the nation

7  and what have you.  And I agree that it is expensive.  That's

8  why I invested in my own facility, a modest one.

9          THE COURT:  The equipment is expensive.  The

10  setup is expensive.  The acoustics are expensive.  And so

11  some people will rent the studio for an hour, occasionally.

12  Some for a day.  Ever had anybody rent it for two weeks?

13          PROSPECTIVE JUROR:  Mine is not really for hire.

14          THE COURT:  That's a long time because that's got

15  a -- that's a totally different -- that's what we're --

16  absolutely.  So what is your musical specialty?  What do you

17  play?

18          PROSPECTIVE JUROR:  I play drums, piano, and

19  bass.

20          THE COURT:  Okay.  Who is the most famous person

21  you've ever had recorded?

22          PROSPECTIVE JUROR:  I didn't get to any famous

23  people.  Oumou Sangare.

24          THE COURT:  Okay.  Did they lease it -- did they

25  rent it for a full day?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  No.  They wanted me to work

2    directly with them.

3          THE COURT:  They did?  Okay.  Are you also an

4    editor?

5          PROSPECTIVE JUROR:  Yeah.  I do recording

6    engineering, all that as well.

7          THE COURT:  It sounds -- no, is this -- you own

8    the whole studio?

9          PROSPECTIVE JUROR:  Yes.

10         THE COURT:  Okay.  Is it a secret where it is or

11   should we not tell them?  Maybe we shouldn't tell them.

12         PROSPECTIVE JUROR:  Well, it's more a privacy

13   thing.

14         THE COURT:  No, I agree.  We're not going to ask

15   too much there.  Okay.  Absolutely.  Have you been on any

16   record labels yourself?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Okay.  What do you think is the most

19   difficult task the jury has in this case?

20         PROSPECTIVE JUROR:  Which question is that?

21         THE COURT:  The most difficult task the jury has.

22   It's not up there.  I just asked another one.

23         PROSPECTIVE JUROR:  Oh, deciding whether --

24   coming to agreement, about what is presented in evidence.

25         THE COURT:  Yeah, thoughtfully deliberating and

UNREDACTED TRANSCRIPT

210

1    trying to reach a verdict, absolutely.  Absolutely.

2              In your business, what is the effect of someone

3    who is not careful about the use of the equipment?

4              PROSPECTIVE JUROR:  They can damage the

5    equipment.  They can get electrical shocks and all kind of

6    things like that.

7              THE COURT:  And will they be asked -- or will

8    they allowed to continue to rent it if they're not handling

9    it correctly?

10             PROSPECTIVE JUROR:  Well, we're not a for rent

11   facility, so we don't encounter that much.

12             THE COURT:  Okay.  You don't really rent it as a

13   facility?

14             PROSPECTIVE JUROR:  No.  It's a private facility.

15             THE COURT:  Even for an hour?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  Oh, okay.  That's what I didn't

18   understand earlier.

19             PROSPECTIVE JUROR:  Yeah, I pretty much keep it

20   full with my own projects.

21             THE COURT:  Okay.  Exactly.

22             PROSPECTIVE JUROR:  But I probably do need to

23   confer with you about past incidents.

24             THE COURT:  Will you come around please, and

25   we'll talk about it.

UNREDACTED TRANSCRIPT

```
 1                    (At side-bar on the record.)
 2              THE COURT:  Yes, sir.  Drums, piano --
 3              PROSPECTIVE JUROR:  And bass.
 4              THE COURT:  And bass.  Okay.  So you can
 5    really -- that's a lot.
 6              PROSPECTIVE JUROR:  Yeah, it took me a long time.
 7              THE COURT:  What do you need to tell me?
 8              PROSPECTIVE JUROR:  I had an incident of violence
 9    from my father pulled a gun on me when I was 15.  I tried to
10    intervene in an altercation between he and my mother.
11              THE COURT:  What happened?
12              PROSPECTIVE JUROR:  He -- I guess he just felt
13    that I was trying to intervene, and he pulled a gun and put
14    it in my face.
15              THE COURT:  Okay.  Were you able to protect your
16    mom or not?
17              PROSPECTIVE JUROR:  Not.  I was kind of frozen
18    after that.
19              THE COURT:  You were a 15-year-old.
20              PROSPECTIVE JUROR:  Fifteen, yeah.
21              THE COURT:  What happened after that?  Did your
22    dad stay around or did he --
23              PROSPECTIVE JUROR:  I think that was the final
24    straw for my mother where she was enduring things happening
25    to her, but anything happening to the children, I think that
```

UNREDACTED TRANSCRIPT

1    was the straw that broke the camel's back.

2              THE COURT:  That's important for us to know

3    about.  Did you feel like that your mother was protected by

4    the police?  Did she call them?

5              PROSPECTIVE JUROR:  She did.  My father was a

6    police officer.

7              THE COURT:  Oh, my.  Okay.

8              PROSPECTIVE JUROR:  And his brother was a

9    detective.

10             THE COURT:  Was your mother physically injured on

11   more than one occasion?

12             PROSPECTIVE JUROR:  Yes.

13             THE COURT:  Were you hurt on more than one

14   occasion?

15             PROSPECTIVE JUROR:  No.

16             THE COURT:  How many brothers and sisters did you

17   have?

18             PROSPECTIVE JUROR:  I had four brothers.

19             THE COURT:  Were you the oldest?

20             PROSPECTIVE JUROR:  I was next to the older.

21             THE COURT:  Next to the oldest.  What happened to

22   any of the children in this situation?  Anybody get hurt?

23   Anybody of the children get hurt?

24             PROSPECTIVE JUROR:  No.  I was the only one

25   present of the children.

UNREDACTED TRANSCRIPT

213

1              THE COURT:  Okay.  Do you know what kind of gun

2    it was?

3              PROSPECTIVE JUROR:  I don't know.  Maybe whatever

4    they -- a standard issue for police officers.

5              THE COURT:  Sure.

6              PROSPECTIVE JUROR:  I don't know.

7              THE COURT:  Absolutely.  Does that cause this --

8    this is going to be a case in which law enforcement personnel

9    are going to testify.  Now, I don't think there's going to be

10   any MPD presence at all, Memphis Police Department at all,

11   but there are going to be law enforcement personnel.  Is it

12   going to be hard for you to accept their testimony because of

13   what happened to your mother and you?

14             PROSPECTIVE JUROR:  I'm not sure, but I know my

15   heart was beating pretty fast just knowing that I had to kind

16   of speak about this, yes.

17             THE COURT:  Sure.  Do you think that you can sit

18   on this jury and be fair and impartial?

19             PROSPECTIVE JUROR:  I'm not sure because I never

20   really had resolution.  He never really sat down and talked

21   with me.  I notice more anger and that kind of thing, but we

22   never had any resolution.  I was kind of where I kept my

23   distance for safety.

24             THE COURT:  How emotional is this subject to you?

25             PROSPECTIVE JUROR:  You just never know until

UNREDACTED TRANSCRIPT

1    something comes right before -- right in front of your face

2    and you're faced with it.  Most of the time, I guess, you

3    don't think about it.

4              THE COURT:  Did you feel like your dad might kill

5    you at the time?

6              PROSPECTIVE JUROR:  I wasn't sure, but I was

7    completely shocked that he did that.

8              THE COURT:  Sure.

9              PROSPECTIVE JUROR:  Because that's the last

10   person you expect to do that.

11             THE COURT:  Is your dad still living?

12             PROSPECTIVE JUROR:  No.  He died in '88.

13             THE COURT:  Okay.  Is your mom still around?

14             PROSPECTIVE JUROR:  No.  She died in 2018.

15             THE COURT:  Okay.  You were very close to your

16   mother?

17             PROSPECTIVE JUROR:  Yes.  I was close to both of

18   them.

19             THE COURT:  Sure.  Absolutely.  You won't be able

20   to consider what happened to you or your mom in deciding this

21   case at all because it's not part of the record in the case

22   in terms of the evidence.  Is that okay with you?

23             PROSPECTIVE JUROR:  On the surface, I think so.

24   But you never know what internal feelings well up --

25             THE COURT:  Right.

UNREDACTED TRANSCRIPT

1            PROSPECTIVE JUROR:  -- because you get more and

2    more detail.

3            THE COURT:  Right.

4            Questions from the Government?

5            MR. OLDHAM:  I think anytime we handle situations

6    involving what's alleged in this case, which is somebody

7    tried to hire somebody, the judge read it to y'all.  Do you

8    remember that?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  That's going to cause an emotional

11   reaction.  Do you think your situation with your mom and dad

12   is going to cause you further emotional distraction where you

13   can't decide the facts or can you listen to the facts, apply

14   it to the law, and be able to make a determination?

15           PROSPECTIVE JUROR:  I hope that I can, but I

16   can't say that I know that I can.

17           MR. OLDHAM:  What are you worried -- like, when

18   you say hope, what are you worried about?

19           PROSPECTIVE JUROR:  Since I really have full

20   resolution of my own scenario, I don't know what could be

21   dredged up, and I have some kind of emotional reaction to it,

22   you know, that I don't expect myself.

23           MR. OLDHAM:  There's nothing specific, but

24   because this has lingering under the surface, you don't know

25   what could trigger that.  Is that basically what you're

UNREDACTED TRANSCRIPT

1   saying?

2              PROSPECTIVE JUROR:  Yes.

3              MR. OLDHAM:  Okay.

4              I don't have any further questions, Your Honor.

5              MR. BALLIN:  May he have a seat and I ask the

6   Court a question before I ask this gentleman something?

7              THE COURT:  Sure.  I'm going to let you have a

8   seat right other there in the green chair.

9              MR. BALLIN:  I'd like to ask who his father was.

10             THE COURT:  That's okay.

11             MR. BALLIN:  Okay.

12             THE COURT:  I think that's okay.  I mean, the

13  only thing is we're going to get more identification material

14  than we had before.  Disclosure of the name will not be

15  something that you can disclose outside of this conference,

16  outside of the side-bar.  You just can't go back and say, oh,

17  So and So's son is potentially on the jury.  We could not do

18  that.

19             MR. BALLIN:  Okay.

20             THE COURT:  But I think for some other analytical

21  reasons, we probably need to know that.

22             MR. BALLIN:  Better to ask permission than

23  forgiveness.

24             THE COURT:  I agree with that completely.

25             Yes, sir.  And I think Mr. Ballin has a

                    UNREDACTED TRANSCRIPT

217

1  question -- well, I think the question is -- I can ask it,

2  but we won't share it outside of the side-bar.

3            Who was your dad?

4            PROSPECTIVE JUROR:  His name was Gerald Lloyd

5  Heard.

6            THE COURT:  Okay.  And you spell his last name --

7            PROSPECTIVE JUROR:  H-E-A-R-D.

8            THE COURT:  Did you live with him after you were

9  15?

10            PROSPECTIVE JUROR:  No.  They separated at that

11  time.

12            THE COURT:  So after that time, they were

13  separated?

14            PROSPECTIVE JUROR:  Yes.

15            THE COURT:  Yes, sir?

16            MR. BALLIN:  Your dad retired in the 80s, is that

17  about right?

18            PROSPECTIVE JUROR:  He passed in the 80s.

19            MR. BALLIN:  Okay.  Well, he was working up until

20  the end?

21            PROSPECTIVE JUROR:  Yes.

22            MR. BALLIN:  Okay.  After this incident with you

23  with him pulling a gun on you, did he continue to work for

24  the police department?

25            PROSPECTIVE JUROR:  Yes.

UNREDACTED TRANSCRIPT

218

 1          MR. BALLIN:  Was he charged with any criminal

 2   offense?

 3          PROSPECTIVE JUROR:  Not to my knowledge.

 4          MR. BALLIN:  Okay.

 5          PROSPECTIVE JUROR:  But I didn't get to tell

 6   police what happened to me.  They only knew about what

 7   happened to my mother.

 8          MR. BALLIN:  I think the chances you had visible

 9   was not.

10          PROSPECTIVE JUROR:  She had visible injuries.

11          MR. BALLIN:  Let me ask you, sir:  All we can ask

12   of you as a person, as a juror, is to follow the law, apply

13   the evidence, and not let inappropriate things enter into

14   your decision-making process.  You got that concept?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  Okay.  So if the judge instructs you

17   on the law about what the elements of the offense are, what

18   the Government has to prove beyond a reasonable doubt, can

19   you follow the law?

20          PROSPECTIVE JUROR:  I think I can, yeah.

21          MR. BALLIN:  What about your personal situation;

22   how will your personal situation, being victimized by your

23   late dad, how would that affect, if at all, your ability to

24   follow the law?

25          PROSPECTIVE JUROR:  I'm not sure because I can't

UNREDACTED TRANSCRIPT

1  go to either of them, you know, for any wisdome or advice or

2  resolution.

3          MR. BALLIN:  You're concerned about you having

4  thoughts about what happened to you while you're

5  deliberating; is that what you're saying?

6          PROSPECTIVE JUROR:  Pretty much.  I mean, because

7  I kind of really hadn't thought about the situation until you

8  started to ask questions about whether they had had violence.

9          MR. BALLIN:  So you're concerned that, like the

10 judge was asking earlier, if somebody brings up something

11 that you shouldn't, another juror would say, you're not

12 supposed to say that, but can you talk to yourself and say,

13 I'm not supposed to decide this case on what I'm --

14         PROSPECTIVE JUROR:  I hope that I -- your

15 reasoning tells you that, but you don't know what is going to

16 happen to you emotionally.  Like, I didn't know I was going

17 to start -- my knees are going to start shaking because I

18 knew I had to talk about this.

19         THE COURT:  Right.

20         MR. BALLIN:  Do you think you would be a better

21 jury for instance on an automobile accident case?

22         PROSPECTIVE JUROR:  Yes.  There's nothing I can

23 connect directly to that.

24         MR. BALLIN:  And so you're sharing this concern

25 because of your inability to commit a hundred percent that

UNREDACTED TRANSCRIPT

220

1   this will not affect your -- I say this, your experience will

2   not affect your decision?

3               PROSPECTIVE JUROR:  That's what I can't say.

4   That's what I can't say.

5               THE COURT:  We never ask anybody to -- typically,

6   to say that they're absolutely sure that they will never be

7   affected.  What we are asking people to do is to commit that

8   they will consciously avoid being affected in a case because

9   absolutes are hard to demonstrate, whereas a commitment to

10  avoid the conflict, to avoid any preconceived notion, bias or

11  prejudice, is more attainable.

12              So the question is:  Can you consciously make

13  that effort:  I will not be influenced by any inappropriate

14  factor.  Can you make the commitment that you're going to

15  make that effort?

16              PROSPECTIVE JUROR:  Yes, I can make the effort.

17              THE COURT:  Okay.  I'm going to ask a question

18  because you have an interesting background.  Where did you go

19  to high school?

20              PROSPECTIVE JUROR:  I went to high school in

21  Chicago, Marshall Harlan.

22              THE COURT:  Okay.  And where did you go -- where

23  did you learn your additional musical?

24              PROSPECTIVE JUROR:  I played by ear.  I learned.

25  I was around a lot of musicians coming up my whole life, and

UNREDACTED TRANSCRIPT

1    I was just picking up things by ear.

2               THE COURT:  Okay.  Okay.  You went to a good

3    school that had a good music program?

4               PROSPECTIVE JUROR:  Yeah.  I went through a

5    two-year art studio, which included all kinds of art, film

6    making, photography, all kind of things like that.  That's

7    pretty much it as far as official education in music.  That's

8    just my own.

9               THE COURT:  And is the studio, you would feel the

10   studio is pretty successful?

11              PROSPECTIVE JUROR:  I mean, for one individual

12   doing it, it's not like Motown, but sustains me.

13              THE COURT:  Are you married?

14              PROSPECTIVE JUROR:  No, I'm single.

15              THE COURT:  You got plenty of time?

16              PROSPECTIVE JUROR:  Hopefully.

17              THE COURT:  To work on all of this?

18              PROSPECTIVE JUROR:  Yeah.

19              THE COURT:  It's really interesting to meet

20   somebody with that background.

21              So other questions?

22              MR. SCHOLL:  No questions, Your Honor.

23              MR. OLDHAM:  No, Your Honor.

24              THE COURT:  I'm going to let you go back to your

25   seat.  I am going to talk to the lawyers here at side-bar,

UNREDACTED TRANSCRIPT

```
 1    but I'm going to let you go back to your seat.  Thank you.

 2                PROSPECTIVE JUROR:  Okay.  Thank you.

 3                THE COURT:  Mr. Ballin, we have to be careful

 4    about asking for, you know, absolutes.  Nothing wrong with

 5    asking the question.  Somebody can say, sure.  That makes you

 6    even more nervous.  You know what I'm saying?

 7                MR. BALLIN:  Absolutely.  My concern is and

 8    position as to why this juror should be excused for cause is

 9    his answer to -- you know what, I'm going to rethink.  I have

10    nothing else to say.

11                THE COURT:  Okay.  No motion to excuse.  We're

12    going to keep him?  It's up to you.  I don't care.  I mean, I

13    care, but I want to make sure you've got a chance to say

14    whatever you want to say.

15                MR. BALLIN:  You apparently didn't see the looks

16    I got.

17                MR. PALMER:  Hold on a second.

18                THE COURT:  Why don't y'all --

19                MR. BALLIN:  We're good.  I do not challenge for

20    cause.

21                THE COURT:  He's definitely a very intelligent

22    guy and seems like he makes rational sense.

23                Anything from the Government?

24                MR. OLDHAM:  No, Your Honor.  Thank you.

25                THE COURT:  Well, Defendant No. 2, you still got
```

UNREDACTED TRANSCRIPT

223

1    a shot.

2              MR. SCHOLL:  Judge, I'm not going to challenge

3    for cause.

4              THE COURT:  Okay.  All right.  That's fine.

5                 (End of discussion at side-bar.)

6              THE COURT:  All right.  I'm going to make sure

7    I'm going to go through quickly.  I mean quickly.

8              Juror in Seat 5, anything about the nature of the

9    charges that's going to, in any way, affect your ability to

10   sit on the jury and be fair and impartial?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Okay.  And I am going to ask you:

13   When somebody brings up something they shouldn't bring up

14   that's outside the record, something they remember from their

15   past, anything like that, what are you going to say?

16             PROSPECTIVE JUROR:  That shouldn't be considered.

17             THE COURT:  Okay.  That takes care of that one.

18             And then let's go to juror in Seat No. 6.

19             All right.  Anything about the nature of the

20   charges that is in any way going to affect your ability to

21   sit on this jury and be fair and impartial?

22             PROSPECTIVE JUROR:  No.

23             THE COURT:  Okay.  And what are you going to say

24   when somebody brings up -- something happens?  What happens

25   is you're having a discussion and somebody brings up

                      UNREDACTED TRANSCRIPT

1    something that's not relevant, but we need to remind

2    everybody, will you be willing to speak up?

3                    PROSPECTIVE JUROR:  Sure.

4                    THE COURT:  Tell me again what you're going to

5    say.

6                    PROSPECTIVE JUROR:  That's irrelevant to this

7    case.  Let's stick to the basics.

8                    THE COURT:  We all think about it, and that's

9    really important.

10                   Let's get to Juror No. 7.  I've been hardly able

11   to see her, so I'm going to get her to come to side-bar

12   because she's been invisible to me over there.  Come on

13   around just for a minute.  I want to just check.

14                   (At side-bar on the record.)

15                   THE COURT:  I've had a little trouble being sure

16   that I was hearing you accurately, so I wanted to come to

17   side-bar and make sure that I could hear you okay.  Are you

18   doing okay today?

19                   PROSPECTIVE JUROR:  I am.

20                   THE COURT:  Okay.

21                   PROSPECTIVE JUROR:  Just a little tired.  I don't

22   have it now, but I had COVID, so I got a little -- I'm still

23   having some issues.

24                   THE COURT:  We're glad to keep you right where

25   you are.  And I was -- I was going to ask you, I mean, you

                        UNREDACTED TRANSCRIPT

 1   know, it's perfectly fine to wear a mask.  That's perfectly

 2   good.  But I was going to check and see if you're okay

 3   because some people wear a mask because they have been

 4   exposed and they don't want to expose anyone else.  So what's

 5   our situation?

 6                  PROSPECTIVE JUROR:  About COVID?

 7                  THE COURT:  Yeah.  Some people wear masks

 8   because --

 9                  PROSPECTIVE JUROR:  I have a lot of health

10   problems, so I have to wear a mask.

11                  THE COURT:  Tell me --

12                  PROSPECTIVE JUROR:  I just got over it, but I

13   checked myself yesterday, and it was negative.

14                  THE COURT:  Okay.  Tell me about your health

15   problems.  I just need to know so I'll understand.

16                  PROSPECTIVE JUROR:  High blood pressure, high

17   cholesterol, coronary artery disease.

18                  THE COURT:  Okay.  And do you take any

19   medications?

20                  PROSPECTIVE JUROR:  Yes.

21                  THE COURT:  I'm going to ask how many medications

22   you're currently taking on a daily basis?

23                  PROSPECTIVE JUROR:  Approximately ten.

24                  THE COURT:  Okay.  Do those in any way affect you

25   being sleepy on occasion, anything like that?

                      UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And had you taken medication today?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Okay.  Is it sometimes hard for you

5 to concentrate because of these medications which affect your

6 sleepiness?

7          PROSPECTIVE JUROR:  No.  It's just side effects

8 from the COVID now.  I have -- these headaches will just come

9 in.  Then I have these coughing spells.  I get these

10 headaches from the COVID.  This is my second time.  I got it

11 last year right before I retired, the same month, in March.

12          THE COURT:  I'm sorry, tell me again what you

13 retired from.

14          PROSPECTIVE JUROR:  Social security.

15          THE COURT:  Okay.  Which office were you?

16          PROSPECTIVE JUROR:  Monroe.

17          THE COURT:  I'm sorry?

18          PROSPECTIVE JUROR:  Monroe.

19          THE COURT:  Monroe.  And what did you do there?

20          PROSPECTIVE JUROR:  Technical expert.

21          MR. SCHOLL:  What was that, Judge?

22          PROSPECTIVE JUROR:  Technical expert.

23          THE COURT:  Technical expert.  Sure.  Absolutely.

24 Okay.

25          Have you needed to have any type of disability or

UNREDACTED TRANSCRIPT

1    anything else as a result of all these things that have

2    happened to you?  Have you made an application?

3                   PROSPECTIVE JUROR:  I am tempted to file, but I

4    really didn't want to get myself a classification being

5    disabled because I'm so smart, you know.

6                   THE COURT:  Well, you hate to file.

7                   PROSPECTIVE JUROR:  But medical problems, what

8    can I say?

9                   THE COURT:  Right.  I understand.  You were

10   reluctant to file, but you may need to.

11                  PROSPECTIVE JUROR:  And then I did take my

12   pension from civil service, and it was the most horrible,

13   horrible situation.  They gave me an amount that was much

14   higher, and they came back to say it should have been maybe a

15   fourth lower, which I retired because of the money they said

16   I was going to get was going to cover all of my bills.  But

17   when it come down to it, I don't have enough money.

18                  THE COURT:  Sure.  I understand.

19                  PROSPECTIVE JUROR:  I've got an appeal on that.

20                  THE COURT:  Okay.

21                  PROSPECTIVE JUROR:  You work all of your life,

22   you do the best you can.  I always treated people fair.  I go

23   out of my way to make sure a person have what they need, and

24   then I get treated like that.  So I've been going through --

25                  THE COURT:  You've been going through a lot.

                          UNREDACTED TRANSCRIPT

228

```
1    Okay.  I just wanted to check.  I couldn't hear a couple of
2    things real well.  I wanted to make sure it's okay to wear a
3    mask.  I'm not saying you shouldn't.  That's a good thing.
4    In fact, everybody agrees that that's a good thing for you to
5    do.  And I wanted to check on her medications, really.  I
6    wanted to check and see how you were doing.
7              Questions?
8              MR. OLDHAM:  Yes, Your Honor.  The thing that's
9    affecting you the most right now is the fact that you're
10   recovering from having COVID?
11             PROSPECTIVE JUROR:  Yes.
12             MR. OLDHAM:  How is that affecting you right now?
13             PROSPECTIVE JUROR:  I keep getting headaches, and
14   then I get these coughing spells.  Thank God, I ain't had one
15   since I've been here.
16             MR. OLDHAM:  When is the last time you had one of
17   your headaches?
18             PROSPECTIVE JUROR:  About an hour ago.
19             MR. OLDHAM:  So while you were sitting here?
20             PROSPECTIVE JUROR:  Uh-huh.
21             MR. OLDHAM:  When that happens, can you still
22   concentrate or does that kind of take over?
23             PROSPECTIVE JUROR:  It kind of gives you a -- I
24   don't know -- anyone had it?  Brain fogs.  I mean, I'm there,
25   and I'm not there sometimes.
```

UNREDACTED TRANSCRIPT

229

1          MR. OLDHAM:  And are you experiencing -- have you

2   experienced that since the judge asked you to come up there

3   and sit in the jury box?

4          PROSPECTIVE JUROR:  No, I haven't.

5          MR. OLDHAM:  Okay.  When you had your headache,

6   where were you?

7          PROSPECTIVE JUROR:  Sitting there.

8          MR. OLDHAM:  Okay.  And when that happened, were

9   you able to concentrate or were you just concentrating on

10  that headache?

11         PROSPECTIVE JUROR:  I did go out a minute.

12         MR. OLDHAM:  Okay.

13         PROSPECTIVE JUROR:  I did.  Honestly, I did.  I

14  just --

15         MR. OLDHAM:  And how long have you been over

16  COVID, but still experiencing these symptoms?

17         PROSPECTIVE JUROR:  It's been about a week now.

18         THE COURT:  Okay.  And has it consistently been

19  the same for about a week?

20         PROSPECTIVE JUROR:  Uh-huh.

21         MR. OLDHAM:  Okay.  I don't have any further

22  questions.

23         MR. BALLIN:  When you got your headache about an

24  hour ago, did it just go away by itself or did you take

25  something?

UNREDACTED TRANSCRIPT

230

```
 1              PROSPECTIVE JUROR:  It's gradually going down.  I
 2    just close my eyes a little bit.  I think I dozed off a
 3    little.  I didn't mean to, though.  I think I did.
 4              MR. BALLIN:  Having been here for the length of
 5    time you have been here, I'm surprised I haven't dozed off.
 6    But do you think that with your headache you could fight
 7    through the headache and listen to the witnesses?
 8              PROSPECTIVE JUROR:  I want to say -- I could -- I
 9    mean, it takes your concentration away.  I think, oh Lord,
10    this pain in my head.  I want it to go away.
11              MR. BALLIN:  Okay.  I have no other questions,
12    Your Honor.
13              MR. SCHOLL:  Do you get these headaches during
14    the day multiple times?
15              PROSPECTIVE JUROR:  Yes, about three times.
16              MR. SCHOLL:  That's what happened to me.  I had
17    them all day.  It just came and went.
18              No further questions, Judge.
19              THE COURT:  I'm going to ask you to have a seat
20    in the little green chair over there.  I need to check with
21    counsel.
22              Motions?
23              MR. OLDHAM:  Your Honor, I make a motion she be
24    excused for cause.  I've experienced that, and it's pretty
25    miserable.
```

UNREDACTED TRANSCRIPT

1      MR. SCHOLL:  I have too.

2      THE COURT:  Okay.

3      MR. OLDHAM:  That process after is almost as bad

4  as the process of when you have it really bad.

5      THE COURT:  Well, I think we needed to ask the

6  question, so we need to let her be excused for cause.  She

7  needs to be excused.  It's just not practical.

8      Okay.  Yes, ma'am.

9      We need to let you be excused.  It's just not

10  practical for you at this point in time to stay because we

11  know that you have a headache, it's going to have a

12  significant -- it's going to have an effect.

13      PROSPECTIVE JUROR:  It does, and then, you know,

14  I do want to be fair and do what's right, but it's something

15  going on that might inhibit that, so it's best.

16      THE COURT:  You take care.  Good luck on your

17  appeal there too.

18      PROSPECTIVE JUROR:  Thank you.

19      THE COURT:  Thank you so much.

20      I need to see counsel briefly at side-bar.  We

21  need to let one of our pending jurors be excused in this

22  matter.

23      And we're going to call another one.  No. 67, who

24  is the gentleman who had the episode on the second floor, is

25  now not well again.  He's out in the -- had to be moved to

UNREDACTED TRANSCRIPT

232

```
 1   the hall.  He's not well.  He wouldn't be called probably

 2   anyway, but we need to let him be excused.  He is medically

 3   unable to function.

 4              MR. OLDHAM:  No objection.

 5              MR. SCHOLL:  No objection.

 6              MR. BALLIN:  No objection.

 7              THE COURT:  Okay.  He's excused.

 8                (End of discussion at side-bar.)

 9              THE COURT:  We have a seat to fill, which is Seat

10   No. 7, so we'll call Seat No. 7.

11              CASE MANAGER:  Your Honor, I believe the next

12   number is going to be 0021.

13              THE COURT:  If you know you already need to see

14   me at side-bar, we'll handle that.  Otherwise, just go to

15   Seat No. 7.

16              Are you from Atoka?

17              PROSPECTIVE JUROR:  I am.

18              THE COURT:  All right.  I'm from Rosemark.

19              PROSPECTIVE JUROR:  Are you?

20              THE COURT:  Yeah.

21              PROSPECTIVE JUROR:  I know where that's at.

22              THE COURT:  Not very far away.

23              PROSPECTIVE JUROR:  No, it's not.

24              THE COURT:  Not very far away.

25              You've heard all of those questions, right?
```

UNREDACTED TRANSCRIPT

1           PROSPECTIVE JUROR:  Yes.

2           THE COURT:  Well, what makes a jury different

3    from us making individual decisions?  What makes a jury

4    different?

5           PROSPECTIVE JUROR:  We have to be very diverse.

6    We have to be able to do it without prejudice.  We have to --

7    I don't even know.

8           THE COURT:  And you're under oath?

9           PROSPECTIVE JUROR:  Yes, we are under oath.

10          THE COURT:  Do you want to tell them what you do

11   for a living?

12          PROSPECTIVE JUROR:  I am a children's director at

13   church.

14          THE COURT:  What age group?

15          PROSPECTIVE JUROR:  I have four year olds to

16   sixth grade.

17          THE COURT:  Okay.  I don't want to ask too much

18   specific, but is it a church in Tipton County?

19          PROSPECTIVE JUROR:  It is.

20          THE COURT:  Okay.  Is it near Rosemark Road?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Okay.  That tells me where you are.

23   I'm good.  I'm good.  I'm just checking on you.

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  Okay.  Exactly.  How long have you

UNREDACTED TRANSCRIPT

1  been children's director?

2              PROSPECTIVE JUROR:  For about 18 months now.

3              THE COURT:  Okay.  What did you do before that?

4              PROSPECTIVE JUROR:  I am also a sales

5   administrator.

6              THE COURT:  Okay.  For what company?

7              PROSPECTIVE JUROR:  It is Factory Motor Parts.  I

8   work for the VP.

9              THE COURT:  Okay.  What do y'all make?

10             PROSPECTIVE JUROR:  We make car parts.

11             THE COURT:  Car parts.

12             PROSPECTIVE JUROR:  Aftermarket parts, yes.

13             THE COURT:  Is that in Tipton County or is that

14  north of there?

15             PROSPECTIVE JUROR:  No, it's in Minnesota.

16             THE COURT:  It's in Minnesota?

17             PROSPECTIVE JUROR:  Yes.

18             THE COURT:  Okay.  With a warehouse?

19             PROSPECTIVE JUROR:  No.

20             THE COURT:  Okay.

21             PROSPECTIVE JUROR:  I work remote.

22             THE COURT:  Okay.  You work remote.  Okay.

23  Exactly.  Well, I kind of thought there was a back story.

24             You heard all the questions we asked earlier?

25             PROSPECTIVE JUROR:  Uh-huh.

                      UNREDACTED TRANSCRIPT

```
 1              THE COURT:  Really important to know if there's
 2    any experience in your life that might in any way affect your
 3    ability to sit on this jury and be fair and impartial.  We
 4    know that's really important.
 5              PROSPECTIVE JUROR:  I have had something happen
 6    but --
 7              THE COURT:  We're going to talk about that at
 8    side-bar.
 9                   (At side-bar on the record.)
10              THE COURT:  How are you doing?
11              PROSPECTIVE JUROR:  I'm good.  How are you?
12              THE COURT:  I'm good.  It's going a little slower
13    today.  I would like to go a little faster.
14              PROSPECTIVE JUROR:  I know.  I know.
15              I mean, it's just a neighbor, a year ago,
16    threatened my husband.  Police had to be called.  You know,
17    it's just that's the only -- I mean --
18              THE COURT:  Well, that's sort of important.
19              PROSPECTIVE JUROR:  It is.  It was very
20    important.
21              THE COURT:  And --
22              PROSPECTIVE JUROR:  He brought a gun out and was
23    going to shoot him, so . . .
24              THE COURT:  He -- the neighbor brought the gun
25    out --
```

236

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  And was going to shoot your husband?

3          PROSPECTIVE JUROR:  My husband.

4          THE COURT:  That's quite negative.  And the

5    police came?

6          PROSPECTIVE JUROR:  Yes, they did.

7          THE COURT:  Did they take him into custody?

8          PROSPECTIVE JUROR:  They told him one more time

9    because this was a second time we had called the police on

10   him, but they did not take him.

11         THE COURT:  This was the -- was it the sheriff's

12   department?

13         PROSPECTIVE JUROR:  Sheriff's department.  I live

14   in the county.

15         THE COURT:  Okay.  We have to be really

16   thoughtful.  Now, how long ago was that?

17         PROSPECTIVE JUROR:  It was back in October.

18         THE COURT:  Okay.  Is that going to be on your

19   mind as you listen to this case?  Is it going to be something

20   that you're going to be thinking about?  I mean, this is --

21         PROSPECTIVE JUROR:  I would hope not.  I would

22   hope not.  I think I could be fair, but -- I really feel like

23   I could be fair, but, I mean, it's going to be in the back of

24   your mind, of course.

25         THE COURT:  We never ask anybody to not use their

UNREDACTED TRANSCRIPT

237

1   common sense or wipe their minds of everything in the world.

2   It's just not practical, so we don't try to do that.  But we

3   have safeguards to avoid that being a factor.  And that is

4   the factors that we went on -- went through about what jurors

5   are.

6               PROSPECTIVE JUROR:  Yes.

7               THE COURT:  They have to be unanimous.  They have

8   to be diverse.  You know, jurors have to be a number of

9   things and decide the case solely on the evidence and the law

10  and not consider anything outside the record and so forth.

11  Can you do that in this case?

12              PROSPECTIVE JUROR:  I think I can.

13              THE COURT:  Okay.  All right.

14              Now, I need to ask one set of questions about

15  social media background.  Are you a social media person?

16              PROSPECTIVE JUROR:  No, not at all.

17              THE COURT:  Okay.  And I'm going to ask everybody

18  one last round on that, and then I'm about through with it.

19              Let me ask:  Do you think, in this case, that you

20  would speak up if somebody brought up an illegal factor,

21  inappropriate factor?

22              PROSPECTIVE JUROR:  Oh, absolutely.

23              THE COURT:  And I ask everybody to think about

24  what they would say because we don't want it to be a

25  surprise.

UNREDACTED TRANSCRIPT

```
1              PROSPECTIVE JUROR:  Right.

2              THE COURT:  We want it to understandable --

3              PROSPECTIVE JUROR:  Correct.

4              THE COURT:  -- and not done in such a way as to

5    be personal as much as we can avoid.

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  What might you say?

8              PROSPECTIVE JUROR:  If somebody inappropriately

9    said something?

10             THE COURT:  If they -- I always use the same

11   line --

12             PROSPECTIVE JUROR:  I would just say that's not

13   what we're here to do.  That's not what we heard in court.

14   We have to stick to the facts that we heard.

15             THE COURT:  Okay.  All right.

16             PROSPECTIVE JUROR:  This is my fourth jury.

17             THE COURT:  Have you been on a jury before?

18             PROSPECTIVE JUROR:  This will be the fourth time.

19             THE COURT:  In state court?

20             PROSPECTIVE JUROR:  I've been in -- this is my

21   second in this one.

22             THE COURT:  Federal?

23             PROSPECTIVE JUROR:  And then I've had two in

24   Tipton County.

25             THE COURT:  Which one did you have down here?
```

UNREDACTED TRANSCRIPT

1  How long ago?

2          PROSPECTIVE JUROR:  Oh, it's been about probably

3  eight or nine years ago.

4          THE COURT:  Did the jury reach a verdict in that

5  case?

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  Were you satisfied or dissatisfied in

8  the way in which it proceeded?

9          PROSPECTIVE JUROR:  No, it was good.

10          THE COURT:  Okay.  And the state court, was it in

11  Covington?

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  Were you satisfied or dissatisfied in

14  the way in which those matters proceeded?

15          PROSPECTIVE JUROR:  No, both of them were good.

16          THE COURT:  Okay.

17          MR. BALLIN:  I didn't hear that, Your Honor.

18          THE COURT:  Both of them were good.  They were

19  okay.

20          All right.  Questions?

21          MR. OLDHAM:  Your Honor, I have.

22          The years of the Tipton County juries?

23          PROSPECTIVE JUROR:  I don't remember exactly the

24  years.  One has been like probably 12 years ago.  And one

25  before that.  It's been a while since I've been on one.

UNREDACTED TRANSCRIPT

240

1          THE COURT:  You don't recognize me?

2          PROSPECTIVE JUROR:  I do recognize you.  You

3  were -- I think you were -- were you in Tipton County?  I do.

4  That's -- when I was sitting there, I was looking at him.

5  I've seen him on TV.

6          THE COURT:  You've seen both of these people.

7  Mr. Scholl is feeling really left out.

8          MR. SCHOLL:  I'm left out of everything.

9          PROSPECTIVE JUROR:  And I think you did the one

10 that I was on.  You were the attorney.

11         MR. OLDHAM:  What kind of case was it?

12         PROSPECTIVE JUROR:  It was a rape case for a

13 child.

14         MR. OLDHAM:  Okay.

15         THE COURT:  Now, it's not impossible or even

16 impractical for someone who has had a lawyer in another case

17 to hear a new case.  You see Mr. Ballin.  Of course, he's

18 virtually impossible not to see.  You know, he'll well known

19 and often seen.

20         PROSPECTIVE JUROR:  Exactly.

21         THE COURT:  Is that going to influence you at all

22 in this case, though?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Are you going to favor Government

25 counsel because he's familiar with you?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Are you going to favor Mr. Ballin

3    because he's familiar to many people?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Now, are you going to disfavor

6    Mr. Scholl because you haven't seen him before?

7          MR. BALLIN:  I feel bad for him because you don't

8    recognize him.

9          MR. SCHOLL:  I am better looking.

10          THE COURT:  Well, the reason it's so important is

11    that cases have to be decided on the facts, that is, the

12    evidence.

13          PROSPECTIVE JUROR:  Exactly.

14          THE COURT:  And not based on the personality of

15    the lawyers.

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  You know, it doesn't have anything to

18    do with it.  I know lawyers think it does.  They think that

19    their presentation is critical.  But really what is most

20    important is the evidence from the witness stand and, of

21    course, the exhibits that are received in the case, and then,

22    of course, the application of the law to the facts as the

23    jury finds them.  Is that something you can follow in this

24    case?

25          PROSPECTIVE JUROR:  Yes.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  We're going to let you go
2    back.  I am going to check with counsel on this matter, but
3    I'll let you go back to your seat.
4          PROSPECTIVE JUROR:  All right.  Thanks.
5          THE COURT:  Yes, sir?  I don't know.
6          MR. OLDHAM:  Your Honor, it's not uncommon for
7    someone in Tipton County to sit on multiple cases during --
8          THE COURT:  I know.
9          MR. OLDHAM:  -- one jury pool, so I think that --
10   the only reason I brought it up was to let everybody know.
11         THE COURT:  They need to know, and it's not
12   uncommon for somebody who is from Rosemark to know that that
13   happens.  It's just normal.
14         MR. OLDHAM:  That's what they do, but I did think
15   I should bring it up since I did practice there.
16         THE COURT:  Sure.
17         MR. OLDHAM:  But the Government has no motion at
18   this time.
19         THE COURT:  And it's not uncommon, frankly, for
20   everybody in west Tennessee to have seen Mr. Ballin, if you
21   likely know him.
22         Mr. Ballin, it's either comforting or not
23   comforting, but I think it's true, right?  I mean, you have
24   many people who have said they've seen it.
25         MR. BALLIN:  Another subject.  We have no

UNREDACTED TRANSCRIPT

1    objection.

2              THE COURT:  Okay.

3              MR. SCHOLL:  No objection, Your Honor.

4              THE COURT:  Okay.  Just to cover everybody.

5              MR. SCHOLL:  Yes, sir.

6              THE COURT:  Okay.

7              (End of discussion at side-bar.)

8              THE COURT:  All right.  Now, I have to ask all of

9    you one final set of questions, and I hope it's final.  I

10   could put some more things on the screen, but probably won't.

11             And that is, this case is going to involve social

12   media.  And it's going to involve social media that involves

13   Ms. Grayson and Mr. Grayson, and I'm going to tell you that

14   because you can't look it up.  And I have to say you cannot

15   do that, right, because we don't -- that's not appropriate.

16   But I have to know if you are, one, a person who is familiar

17   with Ms. Grayson or Mr. Grayson from social media.

18             And I have to then know if you are a big user of

19   social media.  And I know everybody in the United States

20   seems to have -- not everybody, but many people have a social

21   media presence or a social media regular participation.

22             So I'm going to start actually on the first row

23   and just ask about that, those two questions:  Are you

24   familiar with -- this does not make the case any different

25   than any other case.  We don't treat it differently.  We

UNREDACTED TRANSCRIPT

1    talked about it earlier.  Somebody might be well known.

2    Somebody might be on TV, but we can't treat it differently.

3                    Are you familiar with Mr. Grayson, Ms. Grayson,

4    or their social media presence?

5                    PROSPECTIVE JUROR:  No.

6                    THE COURT:  Are you a big consumer of social

7    media?

8                    PROSPECTIVE JUROR:  I wouldn't say a big

9    consumer.  I do run a Comms team that has social media

10   channels that we do for my work.

11                   THE COURT:  Okay.  And does that involve anything

12   to do with involving Mr. or Ms. Grayson?

13                   PROSPECTIVE JUROR:  No.

14                   THE COURT:  Okay.  Does that cause you to have

15   somehow some knowledge about social media that you would just

16   feel compelled to share with the rest of the jury if some

17   cases come up even though it's not been part of the evidence?

18   I really have to check on that.  In other words --

19                   PROSPECTIVE JUROR:  No.

20                   THE COURT:  We need you not to -- if somebody

21   asks you about how something works on social media, we can't

22   really go into that.  That's not evidence that jurors can

23   use.  Is that okay?

24                   PROSPECTIVE JUROR:  Yeah.

25                   THE COURT:  Okay.  And I think we've covered

UNREDACTED TRANSCRIPT

1    that.

2              Now, let's go to juror in Seat No. 2.  Well, are

3    you familiar with Mr. or Ms. Grayson through social media?

4              PROSPECTIVE JUROR:  I am not.

5              THE COURT:  All right.  Well, are you a big

6    consumer of social media?

7              PROSPECTIVE JUROR:  Not any longer.  I cut it off

8    a few years ago.

9              THE COURT:  Okay.  Does the fact that this case

10   is going to have some things about social media in it that's

11   going to influence you in this case?

12             PROSPECTIVE JUROR:  No, Your Honor.

13             THE COURT:  Okay.  I think we're okay on that,

14   but I want to make sure.

15             Juror in Seat No. 3, are you familiar with

16   Mr. and Ms. Grayson in connection with social media?

17             PROSPECTIVE JUROR:  No.

18             THE COURT:  Are you a big consumer of social

19   media?

20             PROSPECTIVE JUROR:  No.

21             THE COURT:  Okay.  And is the fact that this case

22   is going to have some things about social media going to

23   influence you at all?

24             PROSPECTIVE JUROR:  Oh, no.

25             THE COURT:  Okay.  Let's go to juror in Seat

UNREDACTED TRANSCRIPT

1 Number 4.  Are you familiar with Mr. and Ms. Grayson from

2 social media or through social media?

3          PROSPECTIVE JUROR:  No, I'm not.

4          THE COURT:  Okay.  You're going to make -- hurt

5 their feelings here.  I'm sorry, I'm kidding.  Also are you a

6 big consumer of social media?

7          PROSPECTIVE JUROR:  Just moderate user.

8          THE COURT:  Okay.  I know in your business, you

9 probably have to be somewhat aware of social media activity.

10          PROSPECTIVE JUROR:  Yeah, but I pretty much stay

11 on the topic of announcements kind of to do with my

12 particular field and not going everywhere and commenting on

13 everything.

14          THE COURT:  Would the fact that that case is

15 going to involve some things about social media going to

16 affect you in any way in deciding this case?

17          PROSPECTIVE JUROR:  No, I don't think so.

18          THE COURT:  Okay.  Let's go to juror in Seat 5.

19          Are you familiar with the Graysons in connection

20 with social media and their presence on social media?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Are you a big -- are you a

23 substantial consumer of social media?  And that's hard to

24 define.  I just don't know.

25          PROSPECTIVE JUROR:  I have a bad habit of

UNREDACTED TRANSCRIPT

1   scrolling through reels more than I should probably but,

2   otherwise, just use it for work and personal.

3            THE COURT:  Okay.  Is the fact that this case

4   does involve some aspects of social media going to affect

5   your judgment in any way or can you still decide the case

6   solely on the evidence and the law?

7            PROSPECTIVE JUROR:  It won't affect.

8            THE COURT:  Okay.  Hand it over to juror in Seat

9   No. 1.

10           Are you familiar with Mr. and Ms. Grayson or Ms.

11  Grayson in connection with social media?

12           PROSPECTIVE JUROR:  No, I'm not.

13           THE COURT:  Are you a consumer, a significant

14  consumer of social media?

15           PROSPECTIVE JUROR:  I wouldn't say significant.

16  I have a Facebook page, but that's it.

17           THE COURT:  Okay.  Does the fact that this is a

18  social media case to some degree, not really -- it's not

19  about social media, but there are going to be some mentions

20  of that.  Does that in any way affect your ability to sit on

21  the jury and be fair and impartial?

22           PROSPECTIVE JUROR:  No.

23           THE COURT:  All right.  Good.

24           Juror in Seat 7, well, are you familiar with

25  Mr. Grayson and Ms. Grayson or Ms. Grayson in connection with

UNREDACTED TRANSCRIPT

1    social media.

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  Are you a consumer of social media?

4            PROSPECTIVE JUROR:  No.

5            THE COURT:  Would the fact that this is going to

6    have some aspects of social media going to influence you in

7    any way at all in this case?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Okay.  Well, let's go to the juror in

10   Seat No. 8.

11           All right.  Are you familiar with Mr. Grayson and

12   Ms. Grayson or Ms. Grayson in connection with social media?

13           PROSPECTIVE JUROR:  No, I'm not.

14           THE COURT:  Are you a consumer of social media in

15   any significant way?

16           PROSPECTIVE JUROR:  I use social media to post

17   daily scriptures reads for the church.

18           THE COURT:  All right.  I don't think that has

19   anything to do with -- that's certainly commendable.  I'm

20   going to ask you what's your favorite verse?

21           PROSPECTIVE JUROR:  I don't have a favorite

22   verse, really.

23           THE COURT:  Okay.  Okay.  You know some people

24   like the shortest one in the New Testament.

25           PROSPECTIVE JUROR:  Jesus wept.

                    UNREDACTED TRANSCRIPT

249

1              THE COURT:  That's right.  That's exactly right.

2   But my point is you do that every day?

3              PROSPECTIVE JUROR:  Yes.

4              THE COURT:  Okay.  So you are a user of that

5   social media?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Other than that, any other presence

8   or use of social media?

9              PROSPECTIVE JUROR:  No.

10              THE COURT:  Okay.  Does the fact that this

11   case -- it's going to have some references to social media,

12   and we'll talk about it to some degree.  Is that going to

13   affect you in any way?

14              PROSPECTIVE JUROR:  No, it won't.

15              THE COURT:  I'm going to reinforce what I said

16   earlier and that is, if people -- if someone on the jury

17   tries to ask you or asks you about how certain aspects of

18   social media work, you understand that you cannot provide

19   evidence to the jury because, as a juror, you decide the case

20   based on the evidence presented to you and, therefore, what

21   would your answer need to be?

22              PROSPECTIVE JUROR:  My answer would be we

23   can't -- repeat the question.  Make sure I understand.

24              THE COURT:  Well, in this case, if someone was to

25   ask you how certain aspects of social media works because you

UNREDACTED TRANSCRIPT

250

1   have posting -- I know some of you -- others of you have some

2   familiarity there -- they want to know how social media

3   works.  What would you need to tell them if they're asking

4   about information on which they intend to possibly make a

5   decision?  What would you have to tell them?

6            PROSPECTIVE JUROR:  I would advise them that, you

7   know, we can't let social media influence our decision one

8   way or another.

9            THE COURT:  We also need to make sure that

10  everybody understands that all the evidence in the case has

11  to come from the witness stand and the exhibits.  And that

12  they can't -- you can't really ask a juror about facts that

13  might be a basis for a decision.  So they can't really ask

14  you that.  I mean, they can ask you that, but you have to

15  say, well, we have to decide the case solely on the evidence.

16  Is that okay?

17           PROSPECTIVE JUROR:  Yes.

18           THE COURT:  I'm trying to let everybody know that

19  this is not a chance to go back and have some long discussion

20  about a fact that is not supported by the evidence.

21  Everything that you talk about has to be based on the

22  evidence that's submitted in the case.  Is that okay?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  Good deal.

25           Juror in Seat 9, have you heard or seen the

UNREDACTED TRANSCRIPT

251

1    Graysons on social media?

2                    PROSPECTIVE JUROR:  I have not.

3                    THE COURT:  Are you active on social media?

4                    PROSPECTIVE JUROR:  I get on there to scroll just

5    to keep up with friends or see sports stuff, but --

6                    THE COURT:  Okay.

7                    PROSPECTIVE JUROR: -- I'm not on there all the

8    time as much as other people.

9                    THE COURT:  When you get your print out every

10   day, how many hours have you spent on social media?

11                   PROSPECTIVE JUROR:  For daily?  It may be an hour

12   on there or something.

13                   THE COURT:  That's pretty good.  That's not bad.

14                   Anything about the fact that there's going to be

15   some information about social media in the case, and that the

16   jury will have to make its decision based solely on the

17   evidence in this case and the instructions in the law and

18   can't use information that is not submitted in open court.

19   Is that okay?

20                   PROSPECTIVE JUROR:  Yes.

21                   THE COURT:  Okay.  Let's hand that over to the

22   juror in Seat 10.

23                   Are you familiar with Mr. Grayson or Ms. Grayson

24   or both of them in connection with their social media

25   presence?

UNREDACTED TRANSCRIPT

1              PROSPECTIVE JUROR:  No, sir.

2              THE COURT:  Are you active on social media or

3      not?

4              PROSPECTIVE JUROR:  Well, if it has to do with

5      the University of Memphis tigers or dogs, I'm on there a lot.

6      Other than that, no.

7              THE COURT:  Okay.  And the big question is:

8      Should they have a new basketball coach at the University of

9      Memphis?  I'm not going to ask that.

10             PROSPECTIVE JUROR:  No.

11             THE COURT:  I'm kidding.  I don't know the answer

12     there, but the point is that there's a lot of discussion.

13             But in this case, would you say that you're then

14     a limited consumer of social media, a limited -- that is, you

15     don't scroll and look for everything?

16             PROSPECTIVE JUROR:  I scroll and look at puppy

17     dogs, canines.  I really don't -- I'm there to -- I'm

18     scrolling.

19             THE COURT:  No problem.  This is going to have

20     some aspects about social media in the case.  Do you

21     understand that that cannot influence you in deciding the

22     case?  Now, that doesn't mean that the evidence presented

23     isn't important.  I'm not going to tell you that.  Every

24     piece of evidence is important and has the weight that the

25     jury decides to give to it after listening to all the

UNREDACTED TRANSCRIPT

253

1    evidence.

2            But the fact that it is a social media case would

3    be no different than if we said, this is a case involving a

4    person who is on television or some other thing.  Is the fact

5    that this is a case involving social media and individuals

6    who may be on social media something that would influence you

7    at all?

8            PROSPECTIVE JUROR:  No, sir.

9            THE COURT:  Okay.  That's fine.  We just need to

10   think about this.  All right.

11           Juror in the next seat over, which should be 11,

12   anything -- are you familiar with the Grayson's presence on

13   social media?

14           PROSPECTIVE JUROR:  No.

15           THE COURT:  You understand it would be really

16   problematic if somebody went back and said, I'm going to see

17   if I can find them on social media and did some research.

18   I'm sure you understand.

19           PROSPECTIVE JUROR:  I won't do that.

20           THE COURT:  And we want everybody to understand

21   that.  You cannot do that.  You know, I'm just -- it's

22   absolutely forbidden.  If you inadvertently do something, you

23   have to come tell me, but please don't even think about it.

24           Okay.  Are you a consumer of social media?

25           PROSPECTIVE JUROR:  Yes.  I would say average.

UNREDACTED TRANSCRIPT

254

1          THE COURT:  Okay.  Is the fact that this case is

2  going to have some aspects of social media mentioned in it,

3  and it will have some evidence about that, is that going to

4  influence you in terms of how you resolve the fact disputes

5  in this case?

6          PROSPECTIVE JUROR:  No.

7          THE COURT:  All right.  Well, we're going to go

8  to our juror in Seat 12, absolutely.

9          All right.  Have you ever seen Mr. and

10  Ms. Grayson or Ms. Grayson on social media?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  Are you a consumer of social media?

13          PROSPECTIVE JUROR:  I have a Facebook page.

14          THE COURT:  Okay.  Do you post pictures of

15  grandkids and that sort of thing?

16          PROSPECTIVE JUROR:  I don't post anything.  I

17  just look at pictures.

18          THE COURT:  Okay.  All right.  Anything about the

19  fact that this case will involve some aspects of social media

20  that would influence you in deciding the case?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Okay.  All right.  Well, let's hand

23  that over to your colleague to your right.

24          And are you familiar with Mr. Grayson or

25  Ms. Grayson in connection with a presence on social media?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Are you a consumer of social media?

3          PROSPECTIVE JUROR:  Sometimes.

4          THE COURT:  And is that basically Facebook, that

5  sort of thing?

6          PROSPECTIVE JUROR:  Uh-huh.

7          THE COURT:  Okay.  Does the fact that Mr. Grayson

8  or Ms. Grayson or both may have some presence on social

9  media, will that affect you in any way in deciding the case?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  And let's just go to your last

12  colleague on your right.

13          Are you familiar with Mr. Grayson or Ms. Grayson

14  or both of them in connection with the social media presence?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Okay.  Are you on -- do you consume

17  social media?

18          PROSPECTIVE JUROR:  Oh, yeah, regularly.

19          THE COURT:  And part of your job partly?

20          PROSPECTIVE JUROR:  No.  Personal.

21          THE COURT:  Personal.  Okay.  Do you look at that

22  time slot that tells you how much time you spent?

23          PROSPECTIVE JUROR:  I don't want to know that.

24          THE COURT:  Okay.  Perfectly fine.

25          Is the fact that this case is going to have some

UNREDACTED TRANSCRIPT

1    aspects of social media, it's going to -- and it's going to

2    have some reason that you will hear a little bit of -- some

3    about that, is that going to influence how you decide the

4    case, that is, will it affect how you decide the case in this

5    matter?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Okay.  All right.  I needed to ask

8    all of you that.  Now, I want to remind you that you are

9    absolutely forbidden to look up anything about -- and nobody

10   wants you to, to look anything up, anything about Mr. Grayson

11   or Ms. Grayson or this case, anything else that might be on

12   social media.

13             And if somebody approaches you or attempts to

14   approach you or somebody says there's a film on social media

15   where something has been posted on social media about this

16   case, you cannot go look at it.  Is that okay with everybody?

17   Everybody good there?

18             And what are you going to do if you do see

19   something or somebody approaches you about going on social

20   media and looking for something?  What are you going to do?

21   Tell my staff, tell me, and we will take the appropriate

22   action.

23             All right.  I think that we've covered everything

24   we're going to cover today in this.  And I will tell all of

25   you that are out there, we will move rather quickly through

UNREDACTED TRANSCRIPT

1   the rest of these matters, so be prepared if you come up here

2   to quickly tell me if you have something that would require

3   you to talk to me at side-bar, and if you have an answer that

4   you know you need to give me as a result of the discussions

5   today.

6          All right.  Let me see counsel briefly at

7   side-bar.

8          (At side-bar on the record.)

9          THE COURT:  All right.  Now, I'm not going to ask

10  any more questions.  If they don't know what they're supposed

11  to do by now, we're sunk.  There is an opportunity for

12  everyone to ask questions.  Cautionary, again, you cannot ask

13  questions to get them to commit to take a position if certain

14  things are established or proven.  You just can't do it.

15  It's inappropriate.  It's usually short factual questions,

16  and if you don't want to ask anything, don't worry about it.

17  Most of them don't want to answer any more.  Anyway, we've

18  done a lot.  We've done a lot.  It's been a little slow

19  today.  I'm not quite sure why.

20         MR. SCHOLL:  Can we ask questions about what

21  their opinion is on certainly things as long as it's not

22  specific facts of the case?

23         THE COURT:  No.  What difference does it make?

24  What opinion are you going to ask about?

25         MR. SCHOLL:  Well, Judge, I would like to know

UNREDACTED TRANSCRIPT

258

1    what they think about reasonable doubt.  Like to know what

2    they think about --

3              THE COURT:  No.  No, reasonable doubt is what I'm

4    going to tell them it is.  They don't have to ever think

5    about it.  Reasonable doubt is going to be defined for them.

6    They don't have to have a concept about it.

7              MR. SCHOLL:  So I can't voir dire them on their

8    thoughts on reasonable doubt?

9              THE COURT:  You can ask them if they will follow

10   the instructions of the Court, and if they won't, we need to

11   get them off the jury.  We don't ask people abstract concepts

12   like:  What do you think the law ought to be?  What do you

13   think the law is?  because we're going to tell them what the

14   law is and, therefore, we don't want to implant in the jury

15   the idea that they make up what the law is.  They don't.

16   They don't, and we don't want them to.  That would be a

17   disaster.  I'm sure you don't want that to happen.  You want

18   to ask them about reasonable doubt?

19             MR. SCHOLL:  Usually, we're allowed to inquire --

20             THE COURT:  Not by me.

21             MR. SCHOLL:  Okay.  Well, this is my record.

22   Inquire about what their thoughts are on reasonable doubt to

23   make sure that they understand the concept because most

24   jurors, when they're instructed, it's a very nebulous concept

25   that most attorneys don't even understand.  Also the --

UNREDACTED TRANSCRIPT

1          THE COURT:  I can ask them about it.

2          MR. SCHOLL:  -- preconceived notions that people

3    have, they want to hear both sides of the case, which is the

4    right not to testify.

5          THE COURT:  Okay.  I think that's a really

6    important one.  I'll be glad to ask that too.  I don't ask

7    them to speculate about what the law is, should be, or maybe

8    ought to be.  I just don't do that.

9          But you can always say, if the Court is going to

10   instruct you on reasonable doubt, are you going to follow the

11   Court's instructions?  That's the rule.  They're going to

12   have to.

13         MR. BALLIN:  May I ask if the jury understands

14   that beyond a reasonable doubt is the highest and heaviest

15   burden known under the law?

16         THE COURT:  No.  That's just argument.  That's

17   just argument.  I mean, at the end of the case, you can argue

18   those things.  That's fine.  That's just argument.  I mean,

19   that's just a way to pose an argument.

20         MR. SCHOLL:  May I get my notes just one second,

21   Your Honor, so I can address these things?

22         THE COURT:  Sure.  I'll cover a couple of things

23   if you want me to.

24         MR. SCHOLL:  I have a couple of things, Your

25   Honor, I want to be able to address.  One is the presumption

UNREDACTED TRANSCRIPT

260

1   of innocence, I would like to go through that concept with

2   the jury and --

3            THE COURT:  Okay.  I'll cover it.

4            MR. SCHOLL:  Okay.  I believe we also need to --

5   we've talked about burden of proof, Judge, but I think we

6   need to discuss in detail with them what their thoughts are

7   on burden of proof.

8            Mr. Ballin brings up a very good point that I

9   know some of these people sat on juries.  We don't know who

10  yet.  But at least one person has responded and said they sat

11  on a jury.  If they sat on a civil jury, that burden is way

12  lower.  I think it needs to be emphasized to our jury how

13  strong the burden of proof is and how difficult a burden it

14  is.  That's the greatest burden that we have.

15           THE COURT:  I never know how difficult it is

16  until we conclude the case.  I just don't know.  It's going

17  to be what it is.  They have to meet the definition of

18  reasonable doubt under the law.  I think that's what the rule

19  is.

20           What we don't do is we don't -- we don't -- we

21  tell -- we make sure the jury understands they must follow

22  the law.  At the end of the case, you can say, they haven't

23  met their proof -- their burden of proof.  That's fine.

24           MR. SCHOLL:  Well, my concern, Judge, is --

25           THE COURT:  Sometimes that works pretty well.

UNREDACTED TRANSCRIPT

1          MR. BALLIN:  We need to ask those types of

2    questions so we can intelligently exercise our peremptories

3    is our humble position.

4          THE COURT:  You can't -- asking a juror what they

5    think the law is or what the law ought to be is fraught with

6    problems because when you ask them what it is, they don't

7    know what it is.  I'm going to tell them what the law is.  If

8    you ask them what it ought to be, that imbeds a preconceived

9    notion as to what the law is and commits them to a position

10   that is inappropriate, so we don't want to do that.

11         There's nothing wrong with making sure that they

12   understand each of these concepts.  This is not a you pick

13   the law, you decide what the law is, and you decide.  This is

14   you follow the law as is required.

15         MR. BALLIN:  Can we counter it in terms of:  Can

16   you follow the law assuming the judge gives it to you?

17         THE COURT:  Oh, sure.  Absolutely.  We definitely

18   want everybody to do that.

19         MR. SCHOLL:  And one of my reasons for asking to

20   do those things, Judge, is because it gives me an idea of

21   what people's preconceived notions are coming into this trial

22   and whether or not there's somebody I need to leave on my

23   jury.  If it's somebody that cannot get past the fact that

24   they want to hear both sides of the case, which is often a

25   big thing, then I don't want them to be someone that's stuck

UNREDACTED TRANSCRIPT

1    on my jury.

2              THE COURT:  Well, the idea there is -- and I hear

3    what you're saying.  And so both sides of the case, they

4    don't have to hear any side of the case.  There's no

5    obligation to present any evidence at all.  And we need to

6    make that clear.

7              I will make that clear in preliminary

8    instructions, and I can make that clear now.  I'll do it.  I

9    mean, you know we're going to do this right.  We're going to

10   get it done right.  And, you know, this is going to be an

11   interesting case.  I have no idea how it's going to come out.

12   So not every case is like that.

13             MR. BALLIN:  You're not going to issue a judgment

14   of acquittal?

15             THE COURT:  I never know how a case is going to

16   come out.  Well, occasionally, we have done that.  You know

17   that.  You know that.  The Government does have a burden

18   here.  Let me ask a few more questions.  Y'all have got some

19   good points, and we'll ask those.

20             MR. OLDHAM:  Your Honor, before we break --

21             THE COURT:  We also have to take a restroom break

22   pretty soon.

23             MR. OLDHAM:  I was going to talk to the jurors

24   about their determin-  -- that one of their jobs is to

25   determine credibility.

263

1          THE COURT:  Sure.

2          MR. OLDHAM:  And that -- and then say, you do

3    this in your everyday life, what sort of things do you rely

4    on?

5          THE COURT:  It does.  You're making your closing

6    arguments and not your voir dire.

7          MR. OLDHAM:  Okay.

8          THE COURT:  I mean, you know, make your --

9    remember, you get to make a closing argument.  You get to --

10   that's fine.  And you get to make an opening statement in

11   voir dire.

12         I went to a seminar one time in Florida, and they

13   said, you can win your case on voir dire, and the answer was,

14   if you're doing that, the judge is doing it wrong.  You know

15   what I'm saying.  It's just inappropriate.  Voir dire is just

16   voir dire.  You're going to get your shot.  You'll get it.

17         MR. PALMER:  My fear is that we get our shot once

18   they're all sat, and we don't realize that they think the

19   burden of proof is actually a preponderance until they get

20   the instructions.

21         THE COURT:  We're not going to get that confused.

22   We'll take care of it.

23         MR. BALLIN:  About how far are we going to go

24   today?  Are we going to --

25         THE COURT:  We're going to try to get our jury,

UNREDACTED TRANSCRIPT

264

1   but if we don't, we're going to get it early tomorrow.

2                      (End of discussion at side-bar.)

3              THE COURT:  We're going to take a break in

4   literally just a couple of minutes.  I've got to go over a

5   couple of concepts very quickly with you.

6              And that is:  Does anybody think that the

7   defense, either defendant, Ms. Grayson or Mr. Grayson, has to

8   put on any proof at all?  What do you think about that?  This

9   is not Perry Mason.

10             Okay.  Let's go to Juror No. 4.  Do they have to

11  put on any proof at all?

12             PROSPECTIVE JUROR:  The lawyers have to provide

13  the evidence.

14             THE COURT:  The evidence comes from -- and the

15  defense never has to present any proof at all, period.  They

16  don't have to.  This is not Perry Mason.  You know, Perry

17  Mason gets them on the stand and asks the defendant a bunch

18  of questions.  That's just make believe.  That is not the

19  truth.

20             One of the principle ideas in the Constitution

21  and the Bill of Rights was that you didn't have to do that.

22  You never have to testify -- the defendant never has to

23  testify in any case.

24             Now, I'm not saying they won't testify.  It will

25  be up to them.  But they never have to, and you can never

UNREDACTED TRANSCRIPT

265

1    even talk about it if they decide not to.  You know, they

2    say, the Government didn't prove their case.  They say to

3    themselves, I'm not getting on the stand.  The Government

4    didn't prove it.  I'm not getting on there.

5            They don't have to testify.  And you can't even

6    discuss it in your deliberations that somebody didn't put on

7    any proof or testify.

8            I see a few mystery looks over there.  Is that

9    okay into my Juror No. 8?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  They never have to testify.  Juror

12   No. 1, never to have testify?

13           PROSPECTIVE JUROR:  Yes.

14           THE COURT:  Juror No. 12?  I'm watching Juror 12.

15   Never have to testify, is that okay?

16           PROSPECTIVE JUROR:  Yeah.  You said they sat down

17   at --

18           THE COURT:  They never have to testify.

19           And we're going to take a break literally in just

20   a moment.

21           This is --

22           PROSPECTIVE JUROR:  I don't know.  Didn't you

23   say -- you said they don't have to testify, right?

24           THE COURT:  They don't have to.  They have a

25   constitutional right embedded in the Constitution and the

UNREDACTED TRANSCRIPT

1  Bill of Rights not to testify at all.

2          PROSPECTIVE JUROR:  Okay.  Well, no.

3          THE COURT:  They don't have to, and that's a

4  really important guarantee that is from 18 -- sorry, 1789 and

5  1791, and so forth.  So important guarantee, you never have

6  to testify if you're a defendant.

7          Now, a person makes their own decision about

8  that.  But can you even talk about it if they decide not to

9  testify or present any evidence at all?  Can you even talk

10  about it in the jury room?

11          PROSPECTIVE JUROR:  No.

12          THE COURT:  No, absolutely not.

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  We want to make sure.

15          Okay.  Now, also, let me go to Juror -- right

16  next to you, he's right in there, No. 13, Seat 13.

17          Do they start out with -- what presumption do

18  they start out with in this case?

19          PROSPECTIVE JUROR:  Innocent.

20          THE COURT:  Innocence.  They start out innocent.

21          Who has the burden of proof at all times in this

22  case?

23          PROSPECTIVE JUROR:  Prosecutor.

24          THE COURT:  The Government in this case at all

25  times, absolutely.  It doesn't change.  Doesn't change.

UNREDACTED TRANSCRIPT

1          I want to make sure that's okay with juror in 14.

2   Is that okay with you?

3          PROSPECTIVE JUROR:  Yeah.

4          THE COURT:  Okay.  Just being sure.  Just being

5   sure.  Anybody got a problem about that because it's really

6   important?

7          Now, also, have any of you been on a civil jury?

8   My goodness.  Nobody.  Anybody out there been on a civil

9   jury?  Just a couple of people.  Okay.  Totally different

10  burden of proof, right?  That's preponderance of the

11  evidence.

12         This is beyond a reasonable doubt.  And that's --

13  that's a high standard.  That's a high standard.  And we

14  would want that and do want that in every criminal case.

15         Anybody have a problem with the fact that the

16  burden of proof is on the Government, and they have to prove

17  their case beyond a reasonable doubt?  Any problem at all

18  with that?  Jury No. 9, Seat 9?  None at all on that one.

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  All right.  Let's go to my juror in

21  Seat No. 3.

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Okay.  And have you been able to hear

24  okay?

25         PROSPECTIVE JUROR:  Yes, sir.

UNREDACTED TRANSCRIPT

1        THE COURT:  Okay.  I want to be absolutely sure.

2        PROSPECTIVE JUROR:  I hear you.

3        THE COURT:  You will tell me if you cannot.

4        PROSPECTIVE JUROR:  Yes, sir.

5        THE COURT:  Okay.  Is there anybody else who

6   might want any assistance on hearing?

7        Okay.  We know we've got to take a break here,

8   and I'm sorry we've gone -- we've taken a little longer, but

9   doing it right is better than doing it quickly.

10       Seven things to remember.  Don't discuss the case

11  among yourselves at all.  Don't discuss it with anybody else.

12  If you call home, you can say we hope to get the jury before

13  the end of the day.  We're going to work hard to do that.

14  It's going to be a little tight.

15       And then, of course, you cannot speak to the

16  witnesses, lawyers, or parties at all.  You can't speak to

17  them at all.  They cannot speak to you.  If somebody tries to

18  talk to you, you're going to tell the court security officer,

19  a member of my staff, or me.  You cannot do any research or

20  make any inquiry at all.  That means anything on electronic

21  media, anything like that.  No type of research at all,

22  books, computers, anything at all, legal books, nothing at

23  all.

24       And, of course, you cannot or you must avoid, you

25  must avoid anything in the media that might be about this

UNREDACTED TRANSCRIPT

1    case.  Media is a big tent.  It includes everything on the

2    computer.  Absolutely must avoid it.  What do you do if you

3    do see something?  You tell me about it.  You tell me about

4    it.  You'll not get in trouble, you just need to tell me

5    about it.

6            And then, of course, the last thing is keep an

7    open mind.  Well, I know we've -- we've taken a little longer

8    than we sometimes need to, but we're doing it right.  So

9    don't -- I'm going to let everybody be excused.

10           This will be a 20-minute break at the most.

11   We're going to come back, and I'm going to discuss with

12   counsel.  We're going to see how far we can get today.  We're

13   going to move as fast as we can.

14           Thank you all very much.  We're going to let you

15   be excused for this restroom break.

16           (Prospective jury panel out at 3:44 p.m.)

17           THE COURT:  All right.  Let me check with counsel

18   real quickly about one thing, which is anything else you want

19   to ask them about?  I covered at least three of the points we

20   wanted to cover.  Anything else?

21           MR. SCHOLL:  If I may have a moment, Judge?

22           THE COURT:  Nothing else from the Government.

23           Anything else, Mr. Ballin?

24           MR. BALLIN:  I'm not asking for anything else.

25   I'm asking to be allowed to ask questions during voir dire.

UNREDACTED TRANSCRIPT

270

1    I do not intend to run afoul of the Court's directions and

2    orders and intend to represent our client.

3                    THE COURT:  Okay.

4                    MR. BALLIN:  But beyond that, I don't have

5    anything to ask the Court, specifically.

6                    THE COURT:  Okay.  And how long are you going to

7    take on voir dire?  It needs to be fairly short.  I've

8    covered the waterfront.

9                    MR. BALLIN:  Thirty minutes.

10                   THE COURT:  How much shorter can you make it?

11                   MR. BALLIN:  I think that's up to you.  I'll make

12   it as short as I can, Your Honor.

13                   THE COURT:  Yeah, let's make it short because I

14   think if you've got a question, it's almost easier for me to

15   ask it than it is for you.  If you want to ask me, that's

16   fine.  I'll be glad to do it.  Let's make it short, though,

17   because anything that sounds like argument, you know, I can't

18   let you do it, so . . .

19                   MR. BALLIN:  Got it.

20                   THE COURT:  Okay.  Mr. Scholl, and what have we

21   got from -- in terms of questions?  Often you say, no

22   questions.  What's going on here?  What's going on here?

23                   MR. SCHOLL:  Well, I was hoping to get to the

24   point where I could actually say something in the trial,

25   Judge.  I'm getting there.

                        UNREDACTED TRANSCRIPT

271

1          So, Judge, I'd like to see what Mr. Ballin has to

2     say first.  Anything that I would present to the jury may be

3     very, very brief.  It may -- it won't go any longer than 30

4     minutes.

5          THE COURT:  Right.

6          MR. SCHOLL:  I think once I hear what everybody

7     has to say, Judge, I seem to be getting shoved out of the

8     way.

9          THE COURT:  Well, no, no, no.  Not at all.  In

10    fact, you know, we know that your major role is in opening

11    statement, and then your major role is in examination,

12    cross-examination, and in closing.

13         MR. SCHOLL:  I understand I'm in a different spot

14    because I'm last on the list -- or once everybody goes, a lot

15    of times everything has happened.

16         THE COURT:  Yeah, sure, sure.  Right.  I know

17    that we're all trying to push forward now, and it seems it's

18    not gone quite as quick as we'd like for it to have.

19         Okay.  Well, we'll see everybody shortly, and

20    we'll get it taken care of as much as we can.

21       (A recess was taken from 3:48 p.m. to 4:03 p.m.)

22         THE COURT:  On the food stamp fraud question,

23    there probably is a question on -- for the Government

24    witness, on that question that can be asked.  On the other

25    two, I don't think there is.  Certainly not on the marijuana

UNREDACTED TRANSCRIPT

```
1    question, that cannot be asked.  Nothing there.  And it

2    sounds like on the card cracking, I just can't tell.  It

3    doesn't sound like it's something.

4              MR. BALLIN:  Your Honor, can you -- Mr. Palmer

5    just walked in.

6              THE COURT:  We'll enter an order probably early

7    tomorrow morning.  But on the card -- on the food stamp fraud

8    question, probably a question that can be asked there.  We're

9    working on it because -- but it has to be the right question.

10   In other words, we're not going to have a mini trial.  It's

11   just a short question.  But you understand, it won't be very

12   long.  You don't have to have a lot anyway on that.  It

13   depends on what the answer is.

14             So if the witness says, yeah, I did it, you know,

15   and the Government made me do it, whatever it is.  I'm sort

16   of kidding.  But you know, I did it, it's kind of the end of

17   the road on that.  It's kind of done.  And we all know that.

18             And on the card cracking thing, I'm just not

19   clear on that.  It sounds like it's something that probably

20   is not askable just because it's probably not appropriate,

21   but I'm going to look at that a little more.  The marijuana,

22   of course, has been out all along.  So we're working on it.

23   We'll get you something final on that.  And the Government is

24   probably not surprised.  There's a little bit of an issue

25   there that probably is appropriate to come in on the
```

UNREDACTED TRANSCRIPT

1   credibility question as that particular witness.  So that's

2   one of those close calls.

3               MR. PHILLIPS:  I understand, Your Honor.  I would

4   ask could we have a jury out hearing before that witness

5   testifies with that issue?

6               THE COURT:  The normal thing to do is -- because

7   we won't -- I won't know how it sounds and how the witness is

8   responding.  I won't know any of those things until it

9   happens right then, I mean, until we've gotten to that point,

10  and then I will know what to do with it.  But you're right,

11  I'll have to listen, because, you know, maybe -- it just

12  affects the final ruling.

13              MR. PHILLIPS:  Yes, Your Honor.

14              THE COURT:  But I think the one that's the close

15  one is the food stamp fraud question, and I don't know all

16  the details on those things.  So -- but this is not going to

17  be a mini trial.  It's just going to be a short inquiry, but

18  that's what it normally is.  I know that defense counsel is

19  well aware they're usually short questions.  We all know

20  that's the best practice anyway.  You get a yes on that, and

21  you're not unhappy.

22              MR. SCHOLL:  There will be some pending charges,

23  Your Honor, with regards to those witnesses.  There will be

24  some pending charges especially with regards to Ms. Johnson.

25              THE COURT:  Well, pending charges are a little

UNREDACTED TRANSCRIPT

1    different situation, and we'll talk about that.

2              MR. SCHOLL:  We'll address that at that time.  I

3    just want to give the Court a heads-up on that.

4              THE COURT:  We'll address that at that time, but

5    we're going to have to move on today.

6              Okay.  We're ready to bring the panel in?  By the

7    way, anything else that you need me to ask?  I think we've

8    covered what -- most of what was asked anyway.

9              Yes, sir, we're ready for the panel.  We are not

10   going to stay real late.  That's always a bad idea because

11   people get tired.  We're not going to stay real late because

12   people get tired.

13             MR. LEVINE:  Yes, Your Honor, I'm sorry.

14             THE COURT:  And that's just -- we try not to do

15   that.  We will start early though because that way I know

16   you're rested.

17             (Prospective jury panel in at 4:08 p.m.)

18             THE COURT:  All right.  Everybody can be seated.

19             Ladies and gentlemen, I've concluded the

20   questions I need to ask.  If any of you think you still need

21   to speak to me at side-bar about something, please let me

22   know now.  I think we've covered everything pretty

23   thoroughly.

24             Okay.  Seeing no further response on that, the

25   Government and the defense are allowed to ask a few brief

UNREDACTED TRANSCRIPT

275

1    questions, not very long, because we've covered so -- I even

2    asked a number of questions they asked me to ask, so I pretty

3    well covered what they asked me to ask already.

4             But let me ask, Mr. Oldham, do you wish to make

5    any inquiry of the panel?

6             MR. OLDHAM:  The United States has no questions

7    at this time, Your Honor.

8             THE COURT:  All right.  Certainly, that's fine.

9             Mr. Ballin, I think that you have voir dire

10   responsibilities for Ms. Grayson, so do you have any

11   questions and, of course, we know it's going to be pretty

12   limited?

13            MR. BALLIN:  I do, and let me -- test, test.

14            THE COURT:  We'll assist with that if necessary.

15   While you're getting ready, what will happen will be we will

16   not stay real late because we start pretty early and you

17   started pretty early, so we would like to conclude a jury

18   selection today.  That's unlikely that we will do that.

19            So what we'll do is you'll be coming back in at

20   8:30 tomorrow morning.  We will start in here no later than

21   nine o'clock.  We'll start in here earlier if we get

22   everybody here, which means really important for all of you

23   to come right on in at 8:30.  We'll do a check-in and we'll

24   get everybody up.  And then we'll get the jury, and I suspect

25   we'll definitely have the jury after fairly -- it takes a

UNREDACTED TRANSCRIPT

1   little while, but we'll definitely have the jury tomorrow

2   morning.  Then all of those who are not selected will be

3   excused.

4            We'll have 12 jurors and two alternates, but the

5   alternates will stay with the case until the case is

6   essentially over.  They don't go home after the jury gets the

7   case.  They simply sit in the jury room not debating, not

8   deliberating, but listening in the event that something

9   happens to one of you, who are in the jury room deliberating,

10  so that's how we'll handle that.  That's our situation.  So

11  that means you are going to get to go home reasonably soon.

12           MR. BALLIN:  Thank you.

13           Good afternoon.  A general question to all of

14  you, and then I may have some specifics.

15           Do you understand what lawyers say is not

16  evidence?  Does everybody understand that?  That I'll speak

17  for these two gentlemen that if we, as lawyers, say something

18  different from what you hear from the witness stand, don't go

19  by what we say.  Not an intentional misrepresentation, but

20  you understand that what we say is not proof.  Everybody

21  understand that?

22           Judge has talked about an indictment.  Can you

23  follow the law that that indictment carries no weight

24  whatsoever?  It's just a starting notice of what

25  Ms. Grayson -- Ms. Grayson is accused of.  Everybody

                        UNREDACTED TRANSCRIPT

1    understand that?

2              If you look at Ms. Grayson right now, and this is

3    a question that ties in with the burden of proof and the

4    presumption of witness.

5              Juror No. 1, look at Ms. Grayson right now.

6    Guilty or not guilty?

7              PROSPECTIVE JUROR:  Right now, not guilty.  I

8    don't have any evidence to say otherwise.

9              MR. BALLIN:  No evidence contrary to the

10   presumption of what?

11             PROSPECTIVE JUROR:  Innocence.

12             MR. BALLIN:  Innocence.  Is everybody good with

13   that?  That Ms. Grayson is presumed to be?

14             PROSPECTIVE JURORS:  Innocent.

15             MR. BALLIN:  Until proven guilty by proof to

16   commit you otherwise beyond what?

17             PROSPECTIVE JURORS:  Reasonable doubt.

18             MR. BALLIN:  And do you understand when the --

19   I'll ask you if you can follow the law on reasonable doubt

20   and what that means when Judge McCalla gives it to you.

21             Just as what we say is not evidence, what we say

22   is not the law.  Do you understand the evidence comes from

23   the witness stand?  Law from the judge?  Everybody understand

24   that?

25             Juror No. 5, if a heard, I didn't get it.  I too

UNREDACTED TRANSCRIPT

1   have a spouse that says I can't hear thunder, but what do you

2   do for work?

3                    PROSPECTIVE JUROR:  I am a nonprofit arts

4   administrator.

5                    MR. BALLIN:  One more time?

6                    PROSPECTIVE JUROR:  Nonprofit arts

7   administration.

8                    MR. BALLIN:  Okay.  And how long have you been

9   doing that?

10                    PROSPECTIVE JUROR:  Going on eight years.

11                    MR. BALLIN:  Okay.

12                    And, Judge, may I ask the jurors about if they

13   have a significant other and what that person does for a

14   living?

15                    THE COURT:  Sure.  Although it is up to each

16   juror as to whether or not they want to tell you.  And the

17   reason we do that is we respect your ability to make that

18   decision but, obviously, if one of you has a spouse and that

19   spouse is working for the United States Government, we might

20   want to know that.  And so that would be really important.

21                    MR. BALLIN:  Thank you.

22                    THE COURT:  Sure.

23                    MR. BALLIN:  So do you have a significant other,

24   Juror No. 1?

25                    PROSPECTIVE JUROR:  Yes.

UNREDACTED TRANSCRIPT

279

1            MR. BALLIN:  And what does that person do for a

2    living?

3            PROSPECTIVE JUROR:  They own their own business.

4            THE COURT:  If you want to pass that mike.  I

5    don't know what's going on here, but --

6            PROSPECTIVE JUROR:  Yes.  And they own their own

7    business.

8            THE COURT:  Hold it right there.

9            MR. BALLIN:  All right.  Let's start over.

10           Do you have a significant other?

11           PROSPECTIVE JUROR:  Yes.

12           MR. BALLIN:  And what does that person do for a

13    living?

14           PROSPECTIVE JUROR:  They own their own online

15    business.

16           MR. BALLIN:  And what is that business?

17           PROSPECTIVE JUROR:  It's an Etsy site.  They sell

18    products.

19           MR. BALLIN:  Did you say exercise?

20           PROSPECTIVE JUROR:  Etsy.  It's a platform for

21    selling things online.

22           MR. BALLIN:  All right.  If you'll pass the

23    microphone down to Juror No. 2.

24           Do you have a significant other?

25           PROSPECTIVE JUROR:  I do.

UNREDACTED TRANSCRIPT

280

1           MR. BALLIN:  And what does that person do?

2           PROSPECTIVE JUROR:  She is a financial advisor.

3           MR. BALLIN:  I'm not understanding today, and it

4    may be the echo.  Tell me again, sir.  I apologize.

5           PROSPECTIVE JUROR:  She works in financial

6    advising.

7           THE COURT:  Okay.

8           And Juror No. 3, do you have a significant other?

9           PROSPECTIVE JUROR:  No, sir.  He's deceased.

10          MR. BALLIN:  And what did he do in his lifetime?

11          PROSPECTIVE JUROR:  He didn't.

12          MR. BALLIN:  Okay.  Juror No. 4?

13          PROSPECTIVE JUROR:  I'm single.

14          MR. BALLIN:  And what does that person do?

15          PROSPECTIVE JUROR:  I said I'm single.

16          THE COURT:  It's a limited question.

17          MR. BALLIN:  Oh, single.  Don't tell my wife she

18   is correct that I can't hear.

19          Ma'am, No. 5?

20          PROSPECTIVE JUROR:  Yes, I have a husband.

21          MR. BALLIN:  And what does he or she do?

22          PROSPECTIVE JUROR:  He's a visual artist.

23          MR. BALLIN:  Juror No. 6?

24          PROSPECTIVE JUROR:  I am single.

25          PROSPECTIVE JUROR:  Yes, I'm married.

UNREDACTED TRANSCRIPT

1              MR. BALLIN:  And what does your spouse do?

2              PROSPECTIVE JUROR:  He's a manufacture foreman.

3              MR. BALLIN:  And that's in Tipton County?

4              PROSPECTIVE JUROR:  In Memphis.

5              MR. BALLIN:  Judge, may she just pass the

6    microphone to 14 instead of coming all the way down?

7              THE COURT:  Okay.  We'll do that.  That's fine.

8              PROSPECTIVE JUROR:  Yes.

9              MR. BALLIN:  And?

10             PROSPECTIVE JUROR:  She works at Expeditor's

11   global freight.

12             MR. BALLIN:  Okay.

13             No. 13?

14             PROSPECTIVE JUROR:  Single.

15             MR. BALLIN:  And No. 12?

16             PROSPECTIVE JUROR:  Yes.  He's a supervisor at a

17   chemical plant.

18             MR. BALLIN:  Okay.

19             No. 11?

20             PROSPECTIVE JUROR:  Yes.  And yes, and he's an

21   investment advisor.

22             MR. BALLIN:  Okay.

23             PROSPECTIVE JUROR:  No.  I'm single, divorced.

24             MR. BALLIN:  Nine?

25             PROSPECTIVE JUROR:  Single.

1          MR. BALLIN:  Eight?

2          PROSPECTIVE JUROR:  Yes, and she's a stay-at-home

3  mom.

4          MR. BALLIN:  Okay.

5          No. 8, tell me about your social media use.  What

6  did you tell me?  Do you post stuff?  Do you get on TikTok

7  and act all crazy?

8          PROSPECTIVE JUROR:  I don't do TikTok.  I just

9  every morning I put some inspirational scripture on.

10          MR. BALLIN:  Okay.

11          PROSPECTIVE JUROR:  And that's about the gist of

12  it.

13          MR. BALLIN:  Pass it down to No. 9.

14          Tell me about social media, do you go on TikTok?

15          PROSPECTIVE JUROR:  No.  I don't even have that.

16          MR. BALLIN:  If you don't look, you don't act out

17  on TikTok either, I guess?

18          PROSPECTIVE JUROR:  No, I don't have TikTok.

19          MR. BALLIN:  Okay.

20          PROSPECTIVE JUROR:  I do, but I'm just looking at

21  dogs and football?

22          MR. BALLIN:  Do you post things?

23          PROSPECTIVE JUROR:  No, not at all.

24          MR. BALLIN:  Okay.

25          Yes, ma'am, No. 11?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  I do not have TikTok.

2          MR. BALLIN:  And what about other social media

3   platforms?

4          PROSPECTIVE JUROR:  Yeah, I have Facebook and

5   Instagram, but I just look at stuff.  I don't ever post

6   anything.

7          MR. BALLIN:  Okay.  No. 12?

8          PROSPECTIVE JUROR:  Same.  I just look at stuff.

9   I don't post anything.  I have Facebook.

10          MR. BALLIN:  What's the most bizarre thing you've

11   seen on social media?

12          THE COURT:  Let's ask that a little more nicely.

13   There's some pretty strange things on social media.

14          MR. BALLIN:  That's what I'm asking.  I agree.

15          That's what I'm asking, Judge.  What's the

16   strangest thing?  Can I ask that?

17          THE COURT:  Can we ask what would be

18   representative of what you might look at on social media?

19   We'll start there, and if we need to ask the other, we will.

20          MR. BALLIN:  I'll move on.

21          PROSPECTIVE JUROR:  Yes.

22          MR. BALLIN:  Now, let me ask you, please, ma'am:

23   Does anybody -- and this is to anybody.  Do any of you know

24   an Olivia Johnson?  Do any of you know a Brandon Thomas?

25   Derricka Harwell?  Jenny Chaney -- Chung?  Jenny Chung?  An

UNREDACTED TRANSCRIPT

284

1   ATF agent, Leslie Jones?  And Ms. Hosafros?  Do y'all know

2   any of those people?

3              Do any of you have any connections with law

4   enforcement here in your community in which you live or

5   elsewhere like a friend, relative that's law enforcement?

6              No. 7?

7              PROSPECTIVE JUROR:  My son is a Memphis police

8   officer.

9              MR. BALLIN:  And is he uniformed patrol or

10  detective?

11             PROSPECTIVE JUROR:  He's a uniformed patrol, but

12  he's at the academy.  He's an instructor right now in

13  training.

14             MR. BALLIN:  Okay.  Does he share with you his

15  job and what he does?

16             PROSPECTIVE JUROR:  No.

17             MR. BALLIN:  The fact that your son is a police

18  officer, will that affect your ability to be fair and

19  impartial?

20             PROSPECTIVE JUROR:  No.

21             MR. BALLIN:  Will it lessen the burden of proof?

22             PROSPECTIVE JUROR:  No.  And my father was a

23  captain on law enforcement.

24             MR. BALLIN:  Memphis police?  What was your dad's

25  name?

                   UNREDACTED TRANSCRIPT

285

1          PROSPECTIVE JUROR:  Bradley Bland.

2          THE COURT:  We need to get that mike there.  I'm

3  not sure what's happened here, but we need to get that mike

4  there.

5          MR. BALLIN:  Captain Bland?

6          PROSPECTIVE JUROR:  Yes.

7          MR. BALLIN:  Okay.

8          Anyone else have connections with law

9  enforcement?

10         No. 9?

11         PROSPECTIVE JUROR:  I know people.

12         PROSPECTIVE JUROR:  I do too.

13         MR. BALLIN:  Well, let's stop at 12.  Tell me

14  about your connection with law enforcement folks.

15         PROSPECTIVE JUROR:  Well, a friend of mine is

16  married to one, and his name is Richard McKinney.

17         MR. BALLIN:  The follow-up question is based on

18  that relationship:  Will that relationship affect your

19  ability to be fair and impartial?

20         PROSPECTIVE JUROR:  No.

21         MR. BALLIN:  That's the issue.

22         PROSPECTIVE JUROR:  No.

23         MR. BALLIN:  You understand why I'm asking?

24         PROSPECTIVE JUROR: (Moving head up and down.)

25         MR. BALLIN:  Okay.  And No. 9?

UNREDACTED TRANSCRIPT

286

1          PROSPECTIVE JUROR:  I know -- I used to coach

2   competitive baseball in Arlington where I live.  Two of the

3   dads were cops.  One of them was a U.S. Marshal.

4          MR. BALLIN:  Okay.  Do you know a guy named

5   Headley, sheriff's department?

6          PROSPECTIVE JUROR:  No.  I have a neighbor whose

7   last name is Headley, but he's not --

8          MR. BALLIN:  But with the competitive baseball

9   stuff?

10          PROSPECTIVE JUROR:  No.

11          MR. BALLIN:  Based on that relationship that you

12   have with law enforcement, does it lessen the burden of

13   proof?  Does it lessen the presumption?

14          PROSPECTIVE JUROR:  No, it won't affect in any

15   way.

16          MR. BALLIN:  Presumption of what?

17          PROSPECTIVE JUROR:  Innocence.

18          MR. BALLIN:  Okay.

19          No. 8, did you have anybody?

20          PROSPECTIVE JUROR:  No.

21          MR. BALLIN:  How about any connections with a

22   prosecutor's office?

23          And No. 5?  If we can pass that down.

24          PROSPECTIVE JUROR:  I have a friend who works in

25   the DA's Office.

                    UNREDACTED TRANSCRIPT

287

1          MR. BALLIN:  Here in Shelby County?

2          PROSPECTIVE JUROR:  Yes.

3          MR. BALLIN:  In what capacity?

4          PROSPECTIVE JUROR:  I think her position is

5     assistant city attorney.

6          MR. BALLIN:  Okay.  Do you have any legal

7     training?

8          PROSPECTIVE JUROR:  I took a museum law class in

9     grad school.

10         MR. BALLIN:  Anyone else have legal training?

11         What if, No. 2 -- Juror -- Mr. -- Juror No. 2,

12    what if Ms. -- what if our client decides not to testify?

13         PROSPECTIVE JUROR:  That's well within her right.

14         MR. BALLIN:  I've been married 47 years, and my

15    wife, best mom, wife, grandma, she wouldn't be a good juror

16    because she would say, I need to hear.

17         What's your response to my wife not being a good

18    juror?

19         PROSPECTIVE JUROR:  Not being able to hear?

20         MR. BALLIN:  No, that she would need to hear from

21    the accused?

22         PROSPECTIVE JUROR:  Oh, oh, she wouldn't be a

23    good juror if she needed to hear from the defendant.

24         MR. BALLIN:  Do you understand, everyone, that if

25    our client doesn't testify, can you follow the law that the

UNREDACTED TRANSCRIPT

1    judge will give you that you're not to make any inference

2    whatsoever from her failure to testify?

3              And doesn't that fit nicely with the presumption

4    of innocence and the burden of proof?  And can you follow the

5    law that the presumption of innocence is like a witness until

6    it's overcome by proof to prove otherwise beyond further than

7    a -- I can't hear you?

8              PROSPECTIVE JURORS:  Reasonable doubt.

9              MR. BALLIN:  Thank you.

10             Jury No. 14, in deliberations, can you return a

11   verdict of not guilty 10 to 2?

12             PROSPECTIVE JUROR:  I don't know.  I'm not a

13   lawyer.  You tell me.

14             MR. BALLIN:  Do you want to be?

15             PROSPECTIVE JUROR:  No.

16             MR. BALLIN:  Let's go.

17             The judge, I believe, will tell you, can you

18   follow the law that your verdict has to be unanimous?

19             PROSPECTIVE JUROR:  Yes.

20             MR. BALLIN:  Okay.  So it's going to be 12 one

21   way and --

22             PROSPECTIVE JUROR:  Right.

23             MR. BALLIN:  -- and 12 one way?

24             PROSPECTIVE JUROR:  Yes.

25             MR. BALLIN:  Will you listen to the opinion of

UNREDACTED TRANSCRIPT

1   your fellow jurors in arriving at your verdict?

2              PROSPECTIVE JUROR:  Yeah.

3              MR. BALLIN:  Can you -- I'm going to use this

4   term.  Hopefully, it will be the last time we hear it.  Can

5   you stick to your own conviction as to the weight of the

6   evidence, but not change your decision just for the sole

7   purpose of returning a verdict?

8              PROSPECTIVE JUROR:  No.  I'm hard-headed.

9              MR. BALLIN:  Okay.  Can everybody be hard-headed

10  in that regard?  Be your own person in the jury room.  Do you

11  understand you have that right and obligation?  Do you

12  understand that?

13             In this case, the length of the trial -- we've

14  taken a long time to get to this point.  We don't expect the

15  length of the trial to be that long, but I'll ask you if you

16  understand that the length of the trial doesn't take away the

17  importance of it, especially to our client, Ms. Grayson.  Do

18  you understand that?

19             The judge will charge you what the elements of

20  the offense are, what the Government has to prove.  It's not

21  proving one of the elements, two of the elements, three or

22  four.  Whatever the judge tells you, you understand that the

23  burden of proof of beyond a reasonable doubt applies to each

24  element.  And the failure to prove every element beyond a

25  reasonable doubt results in a not guilty verdict.  Does

UNREDACTED TRANSCRIPT

290

1    everybody agree with that?

2            Juror No. 2, you indicated that you stopped

3    social media?

4            PROSPECTIVE JUROR:  Yes, sir.

5            MR. BALLIN:  How long ago?

6            PROSPECTIVE JUROR:  Not too long after the whole

7    Cambridge analytical debacle.

8            MR. BALLIN:  Why did you stop?

9            PROSPECTIVE JUROR:  I'm sorry?

10           MR. BALLIN:  Why did you stop participating --

11   using, I'm sorry, social media?

12           PROSPECTIVE JUROR:  It's been beneficial for my

13   mental health.

14           MR. BALLIN:  Are you comfortable in explaining

15   further?  If not, I'm --

16           PROSPECTIVE JUROR:  No, I just -- I don't --

17   sorry, I have a background in software development, and I

18   know the algorithms and how they manipulate people, and I

19   don't appreciate that, so I choose not to participate any

20   longer.

21           MR. BALLIN:  Has anyone ever heard the concept

22   that saying something doesn't make it true?  Does anyone

23   think there has never been a lie told in a courtroom?  The

24   judge will tell you how to judge the credibility of

25   witnesses.  And I'll ask if you can follow that law as it

                    UNREDACTED TRANSCRIPT

 1    applies to the witnesses?

 2              If Ms. Grayson chooses to testify, will anybody

 3    disbelieve her simply because she is the accused?  Again,

 4    that's going to be a decision that she and Mr. Levine,

 5    Mr. Palmer, and I, along with her, will make that decision

 6    when the time comes.  Excuse my language, but we ain't there

 7    yet.  Okay?  It will come.  And we'll make a decision.

 8              But if she does testify, will anybody disbelieve

 9    her simply because she is the accused?

10              Anybody been a victim of a crime other than if

11    you've already been up here to testify at side-bar?  You

12    don't need to rehash that, but anyone been a victim of a

13    crime that has not voiced what that was?

14              Okay.  No. 2, you've already talked.  You wanted

15    to say something else?

16              PROSPECTIVE JUROR:  I mean, that was more about

17    violent crime, but as far as, you know, had my car broken

18    into.

19              MR. BALLIN:  Okay.  And we're talking to Juror

20    No. 2 now, correct?

21              PROSPECTIVE JUROR:  That's correct.

22              MR. BALLIN:  All right.  And how long ago was

23    your car break-in?

24              PROSPECTIVE JUROR:  I don't know.  It's happened

25    several times.  There's most recently probably a few months

                        UNREDACTED TRANSCRIPT

292

1   ago, they stole some cables out of the back.

2           MR. BALLIN:  Would the fact that you've been

3   victimized have any effect on your ability to be fair and

4   impartial?

5           PROSPECTIVE JUROR:  No, sir.  This is Memphis.

6   It comes with the territory.

7           THE COURT:  Okay.  No. 5, I think you raised your

8   hand?  Is it something that you're comfortable talking about

9   in open?

10          PROSPECTIVE JUROR:  Yeah.  I just had my car

11  broken into, catalytic converter stolen.  That's it.

12          MR. BALLIN:  Same question, you'll be fair and

13  impartial?

14          PROSPECTIVE JUROR:  Yes.

15          MR. BALLIN:  You'll give the presumption of

16  innocence?

17          PROSPECTIVE JUROR:  Yes.

18          MR. BALLIN:  You'll require the Government to

19  prove to their case each element of the case beyond further

20  than a reasonable doubt?

21          PROSPECTIVE JUROR:  Yes.

22          MR. BALLIN:  If you have a reasonable doubt and

23  the judge will tell you what that definition is, but you

24  understand you decide this case for yourself.  And we've

25  talked a little bit earlier about actually being two verdicts

UNREDACTED TRANSCRIPT

1    in one:  Your individual verdict, you understand, and your

2    collective verdict.

3              Do you understand you'll never have to justify

4    your decision?  It's important.  Okay?

5              Anybody have that concern if they were asked

6    after the case is over, what was your decision?  Do you

7    understand, A, you don't have to answer, and B, if you do,

8    you still don't have to justify what your decision is?

9              If we, as lawyers, say something that offends

10   you, not intentional, I'll talk for these guys too.  Talk to

11   us about it later, if you want, but don't hold it against our

12   respective clients, the Government nor the defense.

13   Everybody in agreement?

14             Anybody have anything at home or in their

15   business that would cause their attention to be diverted from

16   the witness stand to not hear what the witnesses say, not be

17   able to see if there are any videos, not be able to hear any

18   audio, anything that would divert your attention from being

19   that attentive juror that we need here?  No. 18 -- 14?

20             PROSPECTIVE JUROR:  Yeah, I mean, I got a lot

21   going on right now at work.  I've got a lot of bids due

22   tomorrow, Wednesday, Thursday.  I mean, so my week is pretty

23   swamped, but, I mean, it could keep me from focusing on that

24   by daydreaming, thinking about work and what I need to get

25   done and things of that sort.  I mean, that's my livelihood,

1  that's how I feed my kids, so it's most definitely in my

2  mind.  It's been in my mind all day today.

3             MR. BALLIN:  What we're going to do, can you

4  stick with us and even though it will be difficult and on

5  your mind, can you still pay attention to what's going on

6  here in this courtroom?

7             PROSPECTIVE JUROR:  I mean, I'll try.  That's all

8  I can tell you.  I can try.

9             MR. BALLIN:  Okay.  You have coworkers that can

10  cover?

11             PROSPECTIVE JUROR:  Somewhat.  Somewhat.

12             MR. BALLIN:  Okay.

13             PROSPECTIVE JUROR:  Not everything.

14             MR. BALLIN:  Nobody does it as well as you do, I

15  guess?

16             PROSPECTIVE JUROR:  I'll tell you that.

17             MR. BALLIN:  Are you sure you're not a lawyer?

18             PROSPECTIVE JUROR:  I don't want the headache.

19             MR. BALLIN:  Let me talk to you --

20             Your Honor, can I have one moment, please?

21             THE COURT:  Certainly.

22             (Conference between defense counsel.)

23             MR. BALLIN:  Do any of you know any of the other

24  jurors?  It may be hard to believe, I tried a case once in

25  Tipton County that I had a husband and wife on the jury, and

UNREDACTED TRANSCRIPT

```
 1    I had to ask the husband about you understand unanimous means
 2    you don't do what she tells you.
 3              Anybody write reviews on social media?  And we
 4    have people that don't act out on TikTok but look at TikTok,
 5    right?  That's Juror No. 10 and 11 and 12?
 6              PROSPECTIVE JUROR:  I don't.
 7              MR. BALLIN:  Ten and 12.
 8              Lawyer 14, do you use social media outside of
 9    work?
10              PROSPECTIVE JUROR:  Yes, I do.
11              MR. BALLIN:  And tell me what you do.
12              PROSPECTIVE JUROR:  Instagram, Snapchat, TikTok,
13    Twitter.
14              MR. BALLIN:  Do you believe everything on there?
15              PROSPECTIVE JUROR:  Everything.  No, I'm just
16    playing.  No.
17              MR. BALLIN:  Serious, that's a --
18              PROSPECTIVE JUROR:  No, I do not believe
19    everything on there.
20              MR. BALLIN:  Judge, thank you.  That's all I
21    have, sir.
22              THE COURT:  Certainly.
23              Mr. Scholl?
24              MR. SCHOLL:  Thank you, Your Honor.
25              Well, heck, I finally get to say something today.
```

UNREDACTED TRANSCRIPT

296

1   I said that the unfortunate part of going last down the list

2   is you're last down the list, and no one wants to listen to

3   you at this point.  And everybody has already said what I

4   wanted to say.

5           I'm proud to be here representing Mr. Grayson.

6   And so I wanted -- one concept I wanted to talk with you all

7   about is when you walked in and the judge explained to you

8   who the parties were, they said Mr. and Mrs. Grayson, right?

9   And so you were asked a question, Juror No. 1, right now,

10  they asked you about Mrs. Grayson, but right now, what would

11  your verdict have to be with regards to Mr. Grayson?

12          PROSPECTIVE JUROR:  Innocent.

13          MR. SCHOLL:  Juror No. 2?  Innocent?

14          PROSPECTIVE JUROR:  Innocent.

15          MR. SCHOLL:  Why?

16          PROSPECTIVE JUROR:  Because you're presumed

17  innocent until proven.

18          MR. SCHOLL:  Beyond?

19          PROSPECTIVE JUROR:  Reasonable doubt.

20          MR. SCHOLL:  I'm not going to do the same thing

21  Mr. Ballin did, but, what I do want to point out, though, is,

22  Juror No. 2, did you pair them up as defendants?

23          PROSPECTIVE JUROR:  I'm not sure I understand.

24          MR. SCHOLL:  Do you think that they're both

25  considered defendants together?  As a couple?

UNREDACTED TRANSCRIPT

297

1           PROSPECTIVE JUROR:  No, they're two individual

2   people.

3           MR. SCHOLL:  Right.  Anybody here think that they

4   are defendants as a couple?

5           So let me ask you this, Juror No. 2, can you, if

6   the judge instructs you that Mr. Grayson is to get his own

7   separate trial here, okay?  You're supposed to listen to the

8   proof as you hear it from the witnesses and render a verdict

9   to him separately outside of Ms. Grayson, can you do that?

10          PROSPECTIVE JUROR:  Yes.

11          MR. SCHOLL:  Juror No. 3?

12          PROSPECTIVE JUROR:  Yes.

13          MR. SCHOLL:  Juror No. 4?

14          PROSPECTIVE JUROR:  Yes.

15          MR. SCHOLL:  Juror No. 5?

16          PROSPECTIVE JUROR:  Well, I guess I have a

17  question.

18          MR. SCHOLL:  Okay.

19          PROSPECTIVE JUROR:  So both individuals --

20          THE COURT:  Speak up and let me see what you're

21  saying.

22          PROSPECTIVE JUROR:  Sure.

23          So both individuals are being tried

24  simultaneously, but have each separate considerations?

25          THE COURT:  Let me tell you, each will have a

UNREDACTED TRANSCRIPT

1   separate verdict form because every individual has to be

2   proven individually to be guilty.  It's not uncommon for us

3   to have a case in which we might have three, four, or five,

4   or more defendants tried at the same time, but the fact that

5   you might find No. 3 guilty beyond a reasonable doubt on

6   Count 4 does not mean that anybody else is guilty of Count --

7   of that same count.  So every individual in every case in the

8   United States District Court is entitled to a judgment as to

9   their case, an individual judgment.

10              So let's be very specific.  If you found that

11   Mr. Grayson was not guilty, with all due respect to

12   Ms. Grayson, that does not mean that you would reach the same

13   verdict as to Ms. Grayson and vice versa.  In other words,

14   whatever you find as to one defendant is not binding in any

15   way, in any way, or persuasive in any way, as to the verdict

16   as to the other defendant.

17              Good question, though.  Good question.

18              PROSPECTIVE JUROR:  Got it.  Thank you.

19              MR. SCHOLL:  Very good question.

20              Thank you, Your Honor.

21              THE COURT:  Certainly.

22              MR. SCHOLL:  Very good question.  And that was a

23   big thing that I wanted to point out because that can get

24   confusing when you have more than one person sitting over at

25   that table.  And, of course, when you all came, there was a

UNREDACTED TRANSCRIPT

1  whole row of people over there, and understand that myself

2  and Mr. Grayson are down here.  That's who I'm concerned

3  about is Mr. Grayson.

4           So one of the big concepts is even more difficult

5  when you have a couple, a married couple that comes in, to

6  separate them out and to listen to the proof separately.  Can

7  each of you do that?  Can you do that for us?

8           PROSPECTIVE JUROR:  Yes.

9           PROSPECTIVE JUROR:  Yes.

10          MR. SCHOLL:  Juror No. 6?

11          PROSPECTIVE JUROR:  Yes.

12          MR. SCHOLL:  Juror No. 7?

13          PROSPECTIVE JUROR:  Yes.

14          MR. SCHOLL:  No. 14?

15          PROSPECTIVE JUROR:  Yes.

16          THE COURT:  I got an interesting question.  I'm

17  not going to pick on you because you're the lawyer, and I'm

18  not going to pick on you.

19          PROSPECTIVE JUROR:  Watch yourself now.  Watch

20  yourself.

21          MR. SCHOLL:  I'll trade.

22          And so -- but Mr. Ballin had asked you a question

23  about the things weighing on your mind this week, the work,

24  that type of thing.  One of the things, this is a very

25  important case.  Okay?

UNREDACTED TRANSCRIPT

1          It's the most important case for Mr. Grayson.  So

2    knowing that, can you give your undivided attention to the

3    case even if you have all this other stuff going around.

4          PROSPECTIVE JUROR:  I mean, like I said, I'll

5    try.  It's all about what I can get done, you know, during

6    the day, things of that sort, before tomorrow or Wednesday or

7    whenever this thing starts.

8          MR. SCHOLL:  Well, I want you to understand that

9    as far as during the day goes -- what's going to happen --

10          PROSPECTIVE JUROR:  If it has to be a yes or no

11   answer, I'd have to say, no, I'm not going to be able to give

12   my full, undivided attention at this time.

13          MR. SCHOLL:  Okay.

14          THE COURT:  Let's talk about that at side-bar.

15          MR. SCHOLL:  Thank you, Your Honor.

16          PROSPECTIVE JUROR:  Now?

17          THE COURT:  Yes.

18              (At side-bar on the record.)

19          THE COURT:  Well, the reason we're doing it at

20   side-bar is it's more appropriate.  It's more fair to you.

21          MR. SCHOLL:  That's why I stopped, Judge.

22          THE COURT:  Sure.  Absolutely.  Absolutely.

23          We all understand that everybody has lots of

24   other things to do, and yet the civic obligation to serve on

25   a jury is really important.

UNREDACTED TRANSCRIPT

1    If you can't do this and give it your full

2    attention, then, you know, we should let you be excused.  The

3    only negative thing is that we lose somebody on the jury who

4    has your background, your experience, and all the things that

5    help us have a diverse jury.

6         For example, we no longer excuse lawyers because

7    they're lawyers.  We no longer excuse teachers because

8    they're teachers.  We know that they need to be in the

9    classroom, but we don't do that anymore.

10   PROSPECTIVE JUROR:  Correct.

11   THE COURT:  We have kept CFOs of companies

12   because we need a diverse jury, but we also know that you've

13   got things going on.

14   PROSPECTIVE JUROR:  Right.

15   THE COURT:  So kind of help us out a little bit

16   to understand that.  And we're almost certain that the case

17   will not take in terms of presentation by the parties, you

18   know, a full two, two-and-a-half days' presentation is

19   probably about it.

20   PROSPECTIVE JUROR:  Right.

21   THE COURT:  So this case is, is it fair to say,

22   going to end this week, a high, high, high probability?

23   PROSPECTIVE JUROR:  Right.

24   THE COURT:  And maybe Thursday.  I just don't

25   know.

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  So, like I said, the only

2    issue I have is that I have three bids that are due for

3    Shelby County schools tomorrow --

4          THE COURT:  Sure.

5          PROSPECTIVE JUROR:  -- that at 11 a.m., I have to

6    have those three bids electronically in.  I've been trying to

7    talk with the project manager during breaks to see if he

8    could help me out.

9          THE COURT:  Sure.

10          PROSPECTIVE JUROR:  So I'm trying to work that

11    process through, but right now, it's still up in the air on

12    who is going to handle that for me.

13          I've got another bid due on Wednesday with

14    Jonesboro, Arkansas, school district that I'm going to have

15    to get in.  So it's just -- you know, it kind of hit at the

16    wrong time for me on when this came, and I understand

17    everybody --

18          THE COURT:  Absolutely.

19          PROSPECTIVE JUROR:  -- has things going on, but

20    it does weigh on my mind.  Like I said, it's been weighing on

21    my mind all day today.

22          THE COURT:  We need a little perspective here.

23    Just a little.  How much money are we talking about in these

24    bids?

25          PROSPECTIVE JUROR:  Shelby County schools,

UNREDACTED TRANSCRIPT

1  probably close to $200,000 for Shelby County schools, and

2  then maybe 50,000 for Jonesboro-Hodge.

3            THE COURT:  This helps us understand.

4            PROSPECTIVE JUROR:  I understand.  I get it.

5            THE COURT:  Ok.  Well, let's just see if the

6  Government has any questions here?

7            MR. OLDHAM:  No, Your Honor.

8            THE COURT:  Or, Mr. Ballin, any questions?

9            I tell you what, have a seat in the green chair.

10  I'm going to see what we need to do.

11            You know, he's in an unusual circumstance.

12  What's the Government think?  Any problem with letting him be

13  excused.

14            MR. OLDHAM:  Anytime you have somebody who

15  doesn't have a salary where --

16            THE COURT:  Yeah, I think he's a commissioned --

17            MR. OLDHAM:  Where this directly would affect his

18  money coming in, we aren't going to oppose.

19            THE COURT:  I mean, is that your impression?

20            MR. SCHOLL:  That's why I went a little bit

21  further with that.

22            THE COURT:  Normally, if you're a commissioned

23  employee, you're about to lose a big contract, we don't keep

24  you.

25            MR. PALMER:  These are schools.

UNREDACTED TRANSCRIPT

1          THE COURT:  I can reschedule him for another

2    month, also three or four months in the summer.

3          MR. BALLIN:  That's none of my business, but we

4    have no objection to him being excused in this trial.

5          THE COURT:  Okay.

6          MR. SCHOLL:  I move to strike for cause, Judge.

7          THE COURT:  Okay.

8          MR. OLDHAM:  No objection.

9          THE COURT:  We're going to let him be excused.  I

10   think we've got an issue there.

11         Mr. Sample, I'm not going to reschedule him.

12   He's been here a whole day.

13         MR. SCHOLL:  Does Your Honor wish for me to sit

14   down while we place another juror in the jury box?

15         THE COURT:  Yes.

16         MR. SCHOLL:  Okay.

17         THE COURT:  I need you to do that.

18         Okay.  We need to let you be excused.  We

19   understand.

20         PROSPECTIVE JUROR:  I'm sorry, Your Honor.

21         THE COURT:  No, thanks for the explanation.

22         PROSPECTIVE JUROR:  I just didn't feel right if I

23   was thinking about something else.

24         THE COURT:  Do you want to come back in the

25   summer or some other time that's not so busy?  What do you

UNREDACTED TRANSCRIPT

305

1    want to do?

2              PROSPECTIVE JUROR:  Yeah, I mean, for sure.  Not

3    for sure, but, yeah.

4              THE COURT:  We'll put you down and see how that

5    works out, but we'll move you until -- is summer a better

6    time for you?

7              PROSPECTIVE JUROR:  No, not really, I mean, I've

8    got kids in baseball and soccer and all that.  It's never

9    really a good time.

10              THE COURT:  Fall is better.

11              PROSPECTIVE JUROR:  Maybe.

12              THE COURT:  September?

13              PROSPECTIVE JUROR:  I mean, if you just want to

14    wait two more years.

15              THE COURT:  We'll put it off for a while, and

16    you'll get a notice.

17              PROSPECTIVE JUROR:  All right.  Thank you, Judge.

18              THE COURT:  Thank you.  No problem.

19               (End of discussion at side-bar.)

20              THE COURT:  We're going to let our juror in Seat

21    No. 7 be excused, and we're going to call another person to

22    take his place.  I'm sorry, 14.  I'm not letting you go.

23    You're staying.  Atoka is not going anywhere.  You are stuck.

24    We're keeping you.  No. 14 -- I'm sorry, 14.

25              CASE MANAGER:  Your Honor, the next juror is

UNREDACTED TRANSCRIPT

1    0041.

2                    THE COURT:  Okay.

3                    CASE MANAGER:  No. 41.

4                    THE COURT:  All right.  I need to ask you a

5    couple of questions to start with:

6                    What's the most important characteristic for

7    somebody who is going to serve on a jury.

8                    PROSPECTIVE JUROR:  I believe being honest.

9                    THE COURT:  Okay.  Absolutely.  We want to be

10   honest.  Absolutely.  I am going to ask, you work in retail;

11   is that right?

12                   PROSPECTIVE JUROR:  Yes.

13                   THE COURT:  If I was going to go find you in

14   retail, is there a type of store I'd go find you in?

15                   PROSPECTIVE JUROR:  Yes, Kroger.

16                   THE COURT:  Kroger.  Okay.  And would I have to

17   go out east to find you or midtown or what?

18                   CASE MANAGER:  No, Whitehaven area.  No,

19   actually, in Southaven.

20                   THE COURT:  Southaven.  Absolutely.  Okay.  You

21   work in Mississippi then?

22                   PROSPECTIVE JUROR:  Yes.

23                   THE COURT:  Okay.  And what makes the jury

24   different?  That's probably the most important thing for us

25   to think about conceptually.  Why is the jury different?  Why

UNREDACTED TRANSCRIPT

1  is the jury able to reach a verdict when -- that's fair and

2  impartial, complies with the Constitution, whereas for

3  individuals, it would be difficult?

4              PROSPECTIVE JUROR:  Because the jury has to come

5  together as one to make a decision.

6              THE COURT:  It has to be unanimous.

7              PROSPECTIVE JUROR:  Correct.

8              THE COURT:  It has to be unanimous, absolutely.

9  In this case, do you know of any reason that you could not

10 serve on the jury, anything at all?

11             PROSPECTIVE JUROR:  No.

12             THE COURT:  Okay.  Do you know the nature of the

13 allegations?  What do you understand the central allegation

14 is in this case as to each defendant?

15             PROSPECTIVE JUROR:  Yes.

16             THE COURT:  And I'm going to let you tell me what

17 it is.  What do you understand?

18             PROSPECTIVE JUROR:  Repeat the question.  I'm

19 sorry.

20             THE COURT:  Well, this is a case in which the

21 charge is murder for hire.  That's sort of sounds awful,

22 right?

23             PROSPECTIVE JUROR:  Right.

24             THE COURT:  But we don't know what happened yet,

25 right?

UNREDACTED TRANSCRIPT

308

1           PROSPECTIVE JUROR:  Right.

2           THE COURT:  So we can't -- how do the defendants

3  sit here before you today?  What are they -- what are they

4  right now?

5           PROSPECTIVE JUROR:  Where are they?

6           THE COURT:  What are they right now?

7           PROSPECTIVE JUROR:  Innocent.

8           THE COURT:  Innocent.  Right.  Exactly.

9           And what's the Government's burden of proof in

10  this case?

11           PROSPECTIVE JUROR:  Beyond a reasonable doubt.

12           THE COURT:  Beyond a reasonable doubt, exactly.

13  If the Government does prove its case as to one or both of

14  the defendants beyond a reasonable doubt, what verdict would

15  you have to return?

16           PROSPECTIVE JUROR:  You said if they do?

17           THE COURT:  If the Government does prove it.

18           PROSPECTIVE JUROR:  Guilty.

19           THE COURT:  If the Government fails to prove it

20  as to either defendant, as to that defendant, what verdict

21  would you have to return?

22           PROSPECTIVE JUROR:  Not guilty.

23           THE COURT:  Would you even hesitate in your

24  returning the verdict that the law and the facts require?

25           PROSPECTIVE JUROR:  No.

UNREDACTED TRANSCRIPT

1        THE COURT:  Okay.  Now are you a big social media

2  fan?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Oh, my.  Okay.

5        Let's ask this question:  What is the type of

6  social media -- do you use it regularly every day.

7        PROSPECTIVE JUROR:  Yes.

8        THE COURT:  What would be the site or locations

9  that you go to for social media?

10        PROSPECTIVE JUROR:  Instagram and Facebook.

11        THE COURT:  Okay.  Okay.  Do you tend to believe

12  everything that's on social media?

13        PROSPECTIVE JUROR:  No.

14        THE COURT:  Okay.  Now, I'm going to ask you if

15  you've ever heard of the defendants in this case?

16        PROSPECTIVE JUROR:  No.

17        THE COURT:  If there is some proof -- and I think

18  there probably will be, but we'll wait and see -- that they

19  have a presence on social media, or at least Ms. Grayson has

20  presence on social media, we'll wait and see, would that

21  cause you to treat the case differently than if there was not

22  a presence on social media?

23        PROSPECTIVE JUROR:  No.

24        THE COURT:  In other words -- and I don't mean

25  this in a bad way, but we don't want to have, whatever you

UNREDACTED TRANSCRIPT

```
 1   want to call it, we don't want to have celebrity spill over.

 2   Does that make sense?  Everybody is treated equally before

 3   the law.  Is that okay?

 4               PROSPECTIVE JUROR:  Yes.

 5               THE COURT:  So I don't know how it's going to

 6   come out.  You don't know how it's going to come out.  And

 7   that it can't be influenced by things that are outside the

 8   record or that don't have anything to do with proving the

 9   case.  Is that okay?

10               PROSPECTIVE JUROR:  Yes.

11               THE COURT:  Okay.  I'm going to ask you this:

12   How long have you been with Kroger?

13               PROSPECTIVE JUROR:  Seven and a half years.

14               THE COURT:  Okay.  All right.  Exactly.

15               What was the biggest improvement they made in the

16   area that's near the vegetables?  You may not remember this.

17               PROSPECTIVE JUROR:  Actually, I work in -- I

18   don't work directly in the store, so . . .

19               THE COURT:  Oh, you don't?

20               PROSPECTIVE JUROR:  No.

21               THE COURT:  They added the better cheese

22   department.  Do you remember that?  And they also added --

23   they added a lot of sushi, didn't they?

24               PROSPECTIVE JUROR:  In certain stores, yes.

25               THE COURT:  Okay.  Now, you've now told me
```

UNREDACTED TRANSCRIPT

1   something that I want to understand.  You don't work directly

2   in that context, so we are going to ask you in what context

3   do you work?

4               PROSPECTIVE JUROR:  I actually work in the fuel

5   center where the gasoline is sold.

6               THE COURT:  Okay.  Exactly.

7               And do you know how much cheaper it is to buy

8   fuel at the Kroger Fuel Center with your card than it is to

9   typically buy fuel.

10              PROSPECTIVE JUROR:  Yes, $0.03.

11              THE COURT:  Okay.

12              PROSPECTIVE JUROR:  Everyone gets $0.03.

13              THE COURT:  It's certainly cheaper than that.

14   But if you were going to buy fuel in Atoka, how much more

15   might you pay than down here, do you know?

16              PROSPECTIVE JUROR:  I have no idea.  They may be

17   cheaper.

18              THE COURT:  It can be quite a bit -- quite a bit

19   different.  Quite a bit different, absolutely.

20              All right.  Well, anything else -- I am going to

21   ask you:  Have you ever been in a situation where there's

22   been a threat of violence or harm to you or a family member?

23              PROSPECTIVE JUROR:  Yes.

24              THE COURT:  Let's talk about that at side-bar.

25                   (At side-bar on the record.)

UNREDACTED TRANSCRIPT

312

1          THE COURT:  You know in the non-Kroger brand,

2   sometimes it's as much as $0.30 difference?  It's amazing.

3   It's amazing.  And you get the discount at the store?

4          PROSPECTIVE JUROR:  Yes, I have a card, a Kroger

5   Plus card.

6          THE COURT:  Absolutely.

7          All right.  Tell me what happened.

8          PROSPECTIVE JUROR:  I guess you could say both

9   myself, I had a disagreement with an associate and she called

10  my mom up there, and she spoke with the manager, but then she

11  later came up and confronted me about what happened between

12  me and her daughter and made all kinds of threats like she

13  was going to do in our argument back and forth.

14         THE COURT:  And did that take place in the fuel

15  center?

16         PROSPECTIVE JUROR:  No.  I was at a different

17  store then.

18         THE COURT:  Okay.  All right.  Did you feel

19  concerned about your safety?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Okay.  Were you behind -- were you

22  protected in some way?

23         PROSPECTIVE JUROR:  Yes.  I was actually

24  behind -- I was at customer service working at the time, and

25  it's a locked door back there.

UNREDACTED TRANSCRIPT

1          THE COURT:  Okay.  I am going to ask this,

2    though:  How did that affect you emotionally at the time?

3          PROSPECTIVE JUROR:  At the time, it really didn't

4    bother me, but sometimes I run into that young lady.  And I

5    actually ran into her mom too, but at the time, I didn't

6    realize it was her, after the fact.  Like, I know that lady

7    from somewhere, and I was, like, that's that lady that I got

8    into it with, I had words with.

9          THE COURT:  Okay.  And I can tell that now you

10   think back on it, it's disturbing?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Okay.  Is that -- how long ago would

13   that have been?  Must have been within the last --

14         PROSPECTIVE JUROR:  Maybe almost two years now.

15         THE COURT:  Two years ago?  Did you report it to

16   management at the time?

17         PROSPECTIVE JUROR:  Actually, management was

18   called.  There was several associates that worked with me

19   then, and they were calling for management.

20         THE COURT:  Did they come and support you?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Was an officer called?

23         PROSPECTIVE JUROR:  No.

24         THE COURT:  Either private security or an

25   officer?

UNREDACTED TRANSCRIPT

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Is that something you think about

3  every now and then?

4          PROSPECTIVE JUROR:  Yes.

5          THE COURT:  This is certainly not the same

6  circumstance, but it's important to know about it.

7          PROSPECTIVE JUROR:  Right.

8          THE COURT:  Has there been any other circumstance

9  where you or family member or close friend had been the

10  subject of a threat of physical violence?

11          PROSPECTIVE JUROR:  Yes.  Maybe back in November,

12  my brother, he's a supervisor -- he was a supervisor at

13  Walmart.  He had an altercation with one of his employees,

14  and that person called their brother that was recently

15  released from prison up there and, basically, my brother had

16  to pull out a firearm because he was scared he was going to

17  be attacked.

18          THE COURT:  Sure.  Do you know which Walmart

19  store that was?

20          PROSPECTIVE JUROR:  Yes.  It is a Walmart in Horn

21  Lake, Mississippi.

22          THE COURT:  Did that shake you up when you heard

23  about it?

24          PROSPECTIVE JUROR:  A little bit.  I was scared

25  for my brother.

UNREDACTED TRANSCRIPT

1              THE COURT:  Okay.  Any other circumstance where a

2    family member has been threatened with physical violence?

3              PROSPECTIVE JUROR:  No.

4              THE COURT:  Okay.  Now, in this case, it's

5    different, but it's something we would want to know about --

6    those factors are something we would want to know about.

7    Would those facts in any way affect you in deciding the

8    case -- this case?

9              PROSPECTIVE JUROR:  No.

10             THE COURT:  Okay.  Did you start carrying a

11   pistol after that incident with you?

12             PROSPECTIVE JUROR:  No.

13             THE COURT:  But your brother did or does?

14             PROSPECTIVE JUROR:  He had it with him then.

15             THE COURT:  The reason I asked is you said your

16   brother had a firearm at the time.

17             PROSPECTIVE JUROR:  He still does.

18             THE COURT:  Did he get in any trouble for doing

19   what he did?

20             PROSPECTIVE JUROR:  He lost his job.

21             THE COURT:  Okay.  Did you think that was unjust?

22             PROSPECTIVE JUROR:  Yes.

23             THE COURT:  Because he was simply defending

24   himself?

25             PROSPECTIVE JUROR:  Exactly.  Even the police

UNREDACTED TRANSCRIPT

316

```
 1  told him he did nothing wrong in the situation because he
 2  didn't know, it was dark, he didn't know who that was
 3  approaching him at the time.
 4              THE COURT:  Sure.  Exactly.
 5              Questions from the Government?
 6              MR. OLDHAM:  No, Your Honor.
 7              THE COURT:  Questions from defense?
 8              MR. BALLIN:  Were you able to hear the names that
 9  I called out when you were in the back?
10              PROSPECTIVE JUROR:  Yes.
11              MR. BALLIN:  Did you know any of the names?
12              PROSPECTIVE JUROR:  No, no.
13              MR. BALLIN:  If you recognize any of the -- any
14  witnesses by face, even though not by name, will you bring it
15  to your attention?
16              PROSPECTIVE JUROR:  Yes, yes.
17              MR. PALMER:  May I have a moment?
18              THE COURT:  Sure, sure, sure.
19              We're going to leave in about five minutes.  As
20  everybody knows, we'll be back tomorrow.
21              MR. PALMER:  Thank you, Judge.
22              THE COURT:  Have you been doing okay?
23              PROSPECTIVE JUROR:  Yes, I'm fine.  Long day.
24              THE COURT:  Well, it is a long day.
25              Do you usually work the -- I am going to ask your
```

UNREDACTED TRANSCRIPT

317

1   work schedule so I will know and, hopefully, they will

2   listen.  What is your regular work schedule.

3                   PROSPECTIVE JUROR:  Actually, I'm the lead in my

4   department.  I normally work six to three, 6 a.m. to 3 p.m.

5                   THE COURT:  Okay.  And you realize that during

6   jury duty, you can't go to work?

7                   PROSPECTIVE JUROR:  Right.

8                   THE COURT:  I just want to be sure.  I just want

9   to be sure.  Okay.

10                   PROSPECTIVE JUROR:  They know.

11                   THE COURT:  And you're the lead?

12                   PROSPECTIVE JUROR:  Yes.

13                   THE COURT:  Okay.  Got it.

14                   Any other questions?

15                   MR. BALLIN:  No, sir.

16                   THE COURT:  Any questions?

17                   MR. SCHOLL:  No, Your Honor.

18                   THE COURT:  Okay.  We're going to let you go back

19   to your seat, and I'm going to check briefly with counsel.

20                   PROSPECTIVE JUROR:  Okay.

21                   THE COURT:  Thank you.

22                   PROSPECTIVE JUROR:  Thank you.

23                   THE COURT:  Okay.  Anybody else from the

24   Government?

25                   MR. OLDHAM:  No, Your Honor.

UNREDACTED TRANSCRIPT

```
1              THE COURT:  Anything else from Defendant 2?
2              MR. SCHOLL:  With regards to that juror, no, Your
3    Honor.
4              THE COURT:  Anything else?
5              MR. BALLIN:  No, sir.
6              THE COURT:  Okay.  I think we're fine.  We're
7    going to let the panel go in just a moment.
8              MR. SCHOLL:  And we're going to start -- I guess
9    we'll start back with me tomorrow morning, Judge, my
10   questions?
11             THE COURT:  Well, I hope so, yes.
12             MR. SCHOLL:  I just wanted to make sure.
13             THE COURT:  We'll plan on that, and then we'll
14   catch up around -- when we're done.
15             MR. SCHOLL:  That will be fine.  Thank you,
16   Judge.
17               (End of discussion at side-bar.)
18             THE COURT:  I'm going to ask our juror in Seat 14
19   a question about the exercise we went through at the
20   beginning with Jurors 1, 2, 3, and 4.  It's really for
21   everybody to remind everything.
22             What was the lesson from the exercise where the
23   jurors in Seats 1, 2, 3, and 4, looked out and attempted to
24   identify people by the role that they had in the courtroom?
25   What was the lesson?
```

                        UNREDACTED TRANSCRIPT

319

1          PROSPECTIVE JUROR:  You were trying to see by

2  looking at someone if you could tell if they were guilty or

3  not?

4          THE COURT:  Right.  And we decided in that case

5  that if this was a Boeing aircraft and you're putting bolts

6  on it, and you get it 67 percent right, is that good enough?

7  Right?

8          PROSPECTIVE JUROR:  Right.

9          THE COURT:  Maybe it's 65, but I have to think

10  about it.  That's not good enough.  That is not good enough

11  in this case either, is it?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  We have to have proof beyond a

14  reasonable doubt, which is a significant standard, a high

15  standard.  Is that okay?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Okay.  And, finally, if somebody

18  brings up something they're not supposed to bring up, I want

19  to make sure we've covered this very carefully, what do you

20  need to say?  One, will you say something?

21          PROSPECTIVE JUROR:  Yes.

22          THE COURT:  What would you say?

23          PROSPECTIVE JUROR:  I will tell them to stick

24  with the facts of this case.  Other cases or past experiences

25  don't matter.  We're just here for this -- only this case.

                    UNREDACTED TRANSCRIPT

1          THE COURT:  Absolutely.  Stick with the facts and

2     the law, shortcut there.  Stick with the facts and the law,

3     absolutely.

4          Now, ladies and gentlemen, we will move much more

5     quickly.  I had hoped to get a little further, significantly

6     further today, but that's okay.  Our job is to do it right,

7     not to do it fast.  But we will do it much faster tomorrow

8     morning, I think.  So I'm going to have all of you come back.

9          When you come back in, our 14 jurors, you, of

10    course, come back to these seats.  When all of you come in,

11    of course, you come back to your seats there.  It is very

12    important, very important that you be here tomorrow at 8:30.

13    If you cannot be here -- I'm talking about downstairs in jury

14    assembly, downstairs in jury assembly.

15         So if for some reason, something happens, you get

16    hit by a gravel truck, make sure -- or something happens,

17    then please attempt to -- before you go to the hospital, call

18    us and tell us.  Tell us that that has happened because we

19    will be -- we have to wait -- we will have to look for you.

20    We'll have to wait for you.  It's very, very important to be

21    here on time.

22         If everybody is here on time, we will start in

23    here before nine o'clock, and we will then get our jury

24    selected.  I would suggest to you we're within -- just taking

25    a while today, but we will be within two hours of that for

UNREDACTED TRANSCRIPT

1    sure, certainly before lunch.  Certainly before lunch, and

2    then we'll move through the case rather quickly.

3              Everybody can understand, though, that there's

4    really no point in having a jury trial if you're not going to

5    make sure that the jury understands their role and is

6    prepared to do it.  This is the most -- one of the most

7    important things we do.  So I hope you please will bear with

8    us.  We apologize for not being faster, but no one here, if

9    we were sitting in either seat, any seat out there, would

10   want to put speed in front of justice.  That is not what we

11   do.

12             So, for all of you, what time are you going to be

13   here?

14             PROSPECTIVE JURORS:  8:30.

15             THE COURT:  8:30.  8:30.  And we will start in

16   here before nine o'clock and, hopefully, if everybody is here

17   really at 8:30, we'll probably start in here at a quarter

18   till.  And then we'll have our jury, and that will move the

19   case right along.

20             Thank you all for your patience today.  We're

21   going to let you be excused, but I've got to tell them seven

22   things.

23             MR. BALLIN:  Judge, I know you'll hate me, but I

24   need to ask you one thing before you excuse them.

25             THE COURT:  Oh, okay.  Do you want to come to

UNREDACTED TRANSCRIPT

322

 1   side-bar and tell me real quickly?

 2               MR. BALLIN:  It will be two seconds.

 3               THE COURT:  Then I've got to tell them seven

 4   things to remember, which they probably remember already.

 5                    (At side-bar on the record.)

 6               THE COURT:  Well, I think I've got enough to go

 7   ahead.

 8               MR. BALLIN:  There's a very close family friend

 9   in the audience.

10               THE COURT:  They need to be excused.

11               MR. BALLIN:  Nathan Franklin.  It's a young --

12   Nathan Franklin.

13               THE COURT:  We'll get him.

14               MR. BALLIN:  Okay.

15                  (End of discussion at side-bar.)

16               THE COURT:  I am going to have one of our jurors,

17   who we will need to excuse, come up, and I'm looking for his

18   name right now.

19               Have you got it there, Mr. Sample?

20               MR. BALLIN:  Judge, there's another one.

21               THE COURT:  I've got them all.

22               MR. BALLIN:  There's two.  Judge, there's another

23   one.

24               THE COURT:  I think there are two individuals who

25   know some people well in the case.  Oh, I see them back

                    UNREDACTED TRANSCRIPT

1    there, absolutely.

2              So I'm going to ask you to stay as soon as we let

3    everybody go, and there's one other person.  Where is the

4    young man?  We'll have you stay just for a moment because I

5    need to make sure that --

6              MR. BALLIN:  And the pretty lady next to him.

7              THE COURT:  I got it.  I got them all.  So if you

8    don't mind staying, we may need to let you go because of

9    several circumstances.

10             All right.  Now, seven things to remember.  First

11   thing, don't discuss the case among yourselves.  Please don't

12   do that.  In fact, try to be kind and don't say anything

13   about us at all because, you know, you may be complaining

14   today.  It's better not to.  Just keep an open mind.  Enjoy

15   your basketball or whatever else you want to this evening,

16   but don't talk among yourselves about the case.

17             Don't talk with anybody else about the case.

18   You're going to go home or go -- you'll be going home

19   probably, and you will then be asked, what are you doing?  I

20   will know tomorrow if I'm going to be on a criminal case in

21   federal district court, and it will be -- it will conclude

22   this week, and I cannot tell you anything else.

23             And, of course, sometimes people say, well, you

24   can tell me.  And the answer is, no, I cannot.  So do not --

25   just -- that's all you can say.

UNREDACTED TRANSCRIPT

324

1          So also don't speak to the witnesses, lawyers, or
2    parties.  Now, we try to keep everybody clearly separated,
3    but you might run into somebody.  Do not speak to them.
4    Certainly don't get on the same elevator with them.  Now,
5    they will be here earlier than -- they will be here early
6    tomorrow, and they will be in a different part of the
7    building.  They should be most of the time.  And that will be
8    true of the Government also.  But if you see them do not
9    speak to them at all because they have to tell me if they
10   spoke to you, and it's a little complicated, so please don't
11   do that.  It would look like they were trying to tamper with
12   the jury, and they cannot do that.
13          The fourth thing is if somebody tries to talk to
14   you about this case, and I'm going to warn you that that
15   could happen.  I'm not saying it will, but it could.  If
16   somebody tries to talk to you as you leave the building, if
17   somebody tries to talk to you as you enter the building,
18   don't talk to them about the case, period, zero, none at all.
19          So be very cautious about that.  If you have an
20   issue in that regard, if somebody does that, let us know, and
21   we'll take the appropriate steps.
22          The fifth thing is don't do any research or make
23   any inquiry.  Absolute prohibition.  No exceptions.  No
24   research of any kind, and that includes anything, obviously,
25   on social media and whoever the TikTok fans were.  I had one

UNREDACTED TRANSCRIPT

1    or two.  I know.  No checking these things out, absolutely

2    not.

3            I will tell you that if you do that, one, you

4    shouldn't.  But the second thing is you really have to tell

5    me.  You're not going to get in trouble but without telling

6    me, we create a terrible issue that we don't want to have in

7    the case.  You will not get in trouble, but you've got to

8    tell me, so don't do it in the first place.  If somehow you

9    make a mistake and something happens, just tell them, I've

10   got to see the judge tomorrow.  And we'll take care of it

11   appropriately.  We understand that things can happen, but

12   very important.

13           The fifth thing is -- let's see what we got.

14   Okay.  And we also -- Seat No. 11.  Apparently, we need to

15   see Seat No. 11 also.  Is that right?  Just briefly we're

16   going to ask you to stay just for a moment.  I don't think

17   there's a problem.  I just want to be sure.

18           Okay.  Well, we were down to don't do any

19   research of any kind.  You've got that nailed down.  Avoid

20   the media about the case.  Media includes everything in the

21   world.  That includes social media, absolutely no being

22   influenced by that.  Mistakes can happen.  You just have to

23   tell me about it.  And the last thing is keep an open mind.

24           This case will move quite quickly once we have

25   our jury, but recognizing that what we're doing is essential

UNREDACTED TRANSCRIPT

326

 1   to the constitutional application of the law in the United

 2   States.  So this is very important.

 3           Well, for all of you, I'm going to keep a couple

 4   of you.  I'm going to keep my juror in Seat 11 just for a

 5   moment.  I'm going to keep my two potential jurors back there

 6   for just a few minutes.

 7           For all the rest of you, we need you to go to

 8   jury assembly.  That is on the second floor.  The rest of

 9   you, tomorrow morning, when you come in at 8:30, you will

10   actually gather outside this courtroom.

11           So ladies and gentlemen, we're going to have to

12   be here at 8:15 for all of you, staff.  For the defense

13   counsel, Government counsel, and my staff we'll be here

14   early.  Sorry, that's what we're going to have to do.

15           We have another case that's starting.  We've got

16   another case that's running on the ninth floor.  We have

17   another case that will start on this floor in the opposite

18   courtroom, so we're very busy.  Be happy that we're busy,

19   guys.  We're doing the work that we're supposed to be doing.

20   So we're okay with that, but it's going to mean that we are

21   calling on you for patience tomorrow.  We're going to have to

22   work this out.

23           You're going to check out downstairs on the

24   second floor.  What time will I see you back?  I saw you

25   earlier.  8:30.  Okay.  And we'll see you on this floor,

UNREDACTED TRANSCRIPT

1    which is a surprise.  I wasn't going to do that.

2            Thank you all very much.  We're going to let you

3    be excused.  We'll see you tomorrow at 8:30.

4            I am going to keep juror in Seat No. 11.  Come

5    around to the side-bar.  And we'll have counsel come to

6    side-bar.

7                    (At side-bar on the record.)

8            THE COURT:  How are you doing?

9            PROSPECTIVE JUROR:  I'm good.

10           THE COURT:  Good.  Good.  Good.  Well, it's been

11   slow today, sometimes faster.

12           Yes, ma'am, our situation?

13           MR. PALMER:  I saw her raise her hand, so that's

14   why I was -- maybe I misread you.

15           PROSPECTIVE JUROR:  I was going to ask -- I was

16   asking you just told us if we came here or if we assembled

17   downstairs.

18           THE COURT:  You are actually going to come here

19   because we have another group coming in for jury assembly

20   tomorrow.  And we'll try to -- and jury assembly will be

21   informed that they might need to remind everybody.  It's

22   going to mean that we will start as close to 8:30 as we can.

23   It probably will be at least ten minutes, but just because we

24   don't like to have people to have to congregate in the hall.

25   So we will move as fast as he can.  Good deal.  Thank you

                        UNREDACTED TRANSCRIPT

328

1    very much.

2              Okay.  I'm going to have my potential jurors come

3    up.  At least -- I think I can have both of them, is that

4    okay?

5              MR. BALLIN:  Dory Greenberg and Nathan Franklin.

6              THE COURT:  Okay.

7              MR. BALLIN:  Dory's brother is my brother-in-law.

8              THE COURT:  Memphis is a small town.

9              MR. BALLIN:  Nathan's best friend is my nephew.

10             MR. SCHOLL:  We'll keep them both.

11             THE COURT:  How are you doing today?  Do you know

12   that guy?

13             PROSPECTIVE JUROR:  Yeah, but I couldn't scream

14   that out or anything.  I didn't think that was appropriate.

15             THE COURT:  No, that's all right.  I wouldn't

16   have been --

17             PROSPECTIVE JUROR:  We both do.

18             THE COURT:  And you're Mr. Franklin?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  Okay.  It sounds like both of you

21   should be allowed not to come back tomorrow.  I think the

22   Government agrees with that?

23             MR. OLDHAM:  Sure, Your Honor.

24             THE COURT:  Because we know that you're related

25   in some way?

UNREDACTED TRANSCRIPT

329

1                    PROSPECTIVE JUROR:  Yeah, yeah.

2                    THE COURT:  In some way to Mr. Ballin.  I know

3    that you're going to miss being here.  How old are you?

4                    PROSPECTIVE JUROR:  Twenty-nine.

5                    THE COURT:  Twenty-nine.  We've had a really

6    older jury today.  It's been very unusual.  Usually, we have

7    a lot of youngsters.

8                    Well, thanks for being here, and we're going to

9    let both of you be excused.  Don't worry about it.  We will

10   not see you.  If you need any paperwork, you do need to get

11   it on the second floor.  Good deal.  Thank you.

12                   PROSPECTIVE JUROR:  Thank you so much.

13                   THE COURT:  We have one more that needs to see

14   us.

15                   Yes, sir, if you would come up.  We have one more

16   gentleman who needs to see us.

17                   Mr. Minard?

18                   PROSPECTIVE JUROR:  Minard.

19                   THE COURT:  Okay.  M-I-N-A-R-D?

20                   PROSPECTIVE JUROR:  Yes, sir.

21                   THE COURT:  Okay.  Exactly.  Were you in the

22   Navy?

23                   PROSPECTIVE JUROR:  Yeah, I'm retired.

24                   THE COURT:  You're retired.  Well, which rank

25   were you in when you retired?

UNREDACTED TRANSCRIPT

330

1          PROSPECTIVE JUROR:  A chief.

2          THE COURT:  Okay.  And you -- they run the Navy,

3   right, chiefs run the Navy?

4          PROSPECTIVE JUROR:  Yes, sir.

5          THE COURT:  That's always what I've understood,

6   and they say you were an essential member of our team.  I

7   assume that you run the team and the officer claims credit.

8          PROSPECTIVE JUROR:  I run the QA section for the

9   officers.

10          THE COURT:  Right.  Well, when we get a note from

11   the United States Navy, and it says that it will be a

12   disruption to their operations, we normally let you be

13   excused, and so I don't have any problem with that.

14          But I want to check with the United States and

15   any problem with that?

16          MR. OLDHAM:  No, Your Honor.

17          THE COURT:  Mr. Ballin, what's your thought?

18          PROSPECTIVE JUROR:  No problem.

19          THE COURT:  Okay.

20          MR. SCHOLL:  And no problem from me.

21          THE COURT:  Well, we appreciate you being here

22   today, and where are you -- are you from Millington area?

23   Where are you from?

24          PROSPECTIVE JUROR:  I work out of Drummonds.

25          THE COURT:  You work out of Drummonds.  Okay,

UNREDACTED TRANSCRIPT

1   exactly.  Do you know the history of Drummonds?

2              PROSPECTIVE JUROR:  A little bit.

3              THE COURT:  Okay.  They built a new school there

4   and not that many years ago, right?

5              PROSPECTIVE JUROR:  Yes.

6              THE COURT:  Yeah, it's a big improvement.  Did

7   you ever see the old school?

8              PROSPECTIVE JUROR:  It's a church now.

9              THE COURT:  But this new school is a big

10  improvement.

11             PROSPECTIVE JUROR:  I'm a migrant here.  I came

12  in here -- I retired here in 2003.

13             THE COURT:  Okay.  Well, we're glad to have you.

14  And, you know, everybody agrees that you should be excused.

15  And so thank you for your service, obviously.  You know I'm

16  Army?

17             PROSPECTIVE JUROR:  I went to my first day at

18  school at Fort Underwood.

19             THE COURT:  Really?  Absolutely.  Absolutely.

20             PROSPECTIVE JUROR:  Your people, they treated me

21  good.

22             THE COURT:  Absolutely.  It's a good place.

23  We're going to let you be excused.  I'm going to let you keep

24  this.  I don't think I need to keep this information.  You

25  may want to keep it just to remind your deputy commander

UNREDACTED TRANSCRIPT

1   every now and then of what he said about you.

2               PROSPECTIVE JUROR:  Do I need to let them know

3   I've been excused down below?

4               THE COURT:  When you go to the second floor, tell

5   them that you've been excused in the case, and you will not

6   need to report again tomorrow.

7               PROSPECTIVE JUROR:  Yes, sir.

8               THE COURT:  Okay.  Thank you, all.

9               PROSPECTIVE JUROR:  Thank you.

10              CASE MANAGER:  Juror 55 is in the gallery.

11              THE COURT:  Yes, Juror 55.  How are you doing?

12              PROSPECTIVE JUROR:  About yourself or your family

13  members being threatened, I know a few years back, an

14  ex-boyfriend had threatened me and my family and threatened

15  to come and hurt us.

16              THE COURT:  Let me ask just because I know your

17  name, but they don't and we only know numbers here.  You're

18  55 to them.  But I am going to ask just to state your name

19  because this is not going to -- this will take care of it I

20  think.

21              PROSPECTIVE JUROR:  Okay.

22              THE COURT:  Your full name is?

23              PROSPECTIVE JUROR:  Shunta.  It's S-H-U-N-T-A.

24  And the last name is Katron.

25              THE COURT:  K-A-T-R-O-N.

UNREDACTED TRANSCRIPT

333

1          PROSPECTIVE JUROR:  Uh-huh.

2          THE COURT:  Okay.  The reason I was checking is

3   we have to convey information to jury assembly, and I've got

4   the numbers, but now I've got your name.  Do you think you

5   need to be excused in this case?  I think that was the

6   question or what do you think?

7          PROSPECTIVE JUROR:  I think so because it's still

8   kind of a stressful thing for me.

9          THE COURT:  I tell you what, tell me what

10  happened so we'll understand a little better.

11         PROSPECTIVE JUROR:  He called and threatened me,

12  my mother and my sisters and came to the house, like, banging

13  on the door and everything and threatened to hurt us

14  physically.

15         THE COURT:  Did you call the authorities?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Did anything happen as a result of

18  that?

19         PROSPECTIVE JUROR:  No.

20         THE COURT:  Okay.  Do you need to be excused or

21  you just want to let me know?  And I'm not -- I'm not sure

22  which one it is.

23         PROSPECTIVE JUROR:  I think I might have to be

24  excused.

25         THE COURT:  Okay.  Was this -- how long ago was

UNREDACTED TRANSCRIPT

334

1   this event?

2           PROSPECTIVE JUROR:  Like about four years ago.

3           THE COURT:  Was it a traumatic event that

4   affected you at the time?

5           PROSPECTIVE JUROR: (Moving head up and down.)

6           THE COURT:  Yes or no?

7           PROSPECTIVE JUROR:  Yes.  Yes, Your Honor.

8           THE COURT:  And did it affect anyone else in your

9   family?

10          PROSPECTIVE JUROR:  I think it affected my

11  sisters.

12          THE COURT:  Okay.  Let me check one thing.

13          Let me let you have a seat over there, and let me

14  talk briefly to the lawyers because I think I can tell them

15  something that might be of assistance.

16          She is way down on the list to be called.  It's

17  highly unlikely that we would ever get to her.  And then if

18  we did, of course, we'd have to have a long discussion

19  probably about some other things.

20          MR. SCHOLL:  Because this one was out in the

21  hallway with the person of concern.

22          THE COURT:  I know.  So I'm feeling like maybe

23  she realizes that she probably shouldn't be on the case

24  having sat next to someone in the hallway that we shouldn't

25  be sitting next to.  Isn't that your impression?

UNREDACTED TRANSCRIPT

335

1            MR. SCHOLL:  That was my impression.

2            THE COURT:  I think that -- I can't read -- mind

3    read.  I'm just like you.  I'm thinking -- I think maybe

4    we're having a response.  I can ask her about that, but I

5    feel like that might be --

6            MR. OLDHAM:  I think if we all agree that she be

7    let off --

8            THE COURT:  Sure.

9            MR. OLDHAM:  -- then would you ask her if

10   somebody was trying to communicate just, so we know if there

11   is a roaming element out there, and she's already off the

12   case.

13           THE COURT:  That's very fair.  I think that's the

14   only way I can do that.

15           MR. OLDHAM:  I think that's the way I would

16   request that you do that, Your Honor.

17           MR. SCHOLL:  No objection.

18           MR. BALLIN:  No objection.

19           THE COURT:  Let me have you come up for a moment.

20           Ms. Katron?  I'm going to need to let you be

21   excused in the case, so we're going to dismiss you.  I do

22   need to know one piece of information, and if you can, tell

23   me did you -- were you sitting next to someone who attempted

24   in any way to speak to others in the case or spoke out in an

25   attempt to call out to perhaps Ms. Grayson or somebody else

UNREDACTED TRANSCRIPT

1   or one of the lawyers?  Were you there when someone did that

2   or do you remember?

3                PROSPECTIVE JUROR:  I know when I was sitting on

4   the bench, I didn't know -- in the hallway, I didn't know

5   that they were witnesses or somehow connected to the case.

6   And they were saying some things about the case, and I wasn't

7   sure.

8                THE COURT:  And by they, you mean some people

9   that were sitting near you or with you?

10               PROSPECTIVE JUROR:  Yes, Your Honor.

11               THE COURT:  Did that person attempt to speak to

12  you or did they attempt to be overheard by you?  It's a

13  little difference there, but did they either try to speak to

14  you or did they speak in such a way to make sure that you

15  heard?

16               PROSPECTIVE JUROR:  It was spoke in a way to make

17  sure they were heard.

18               THE COURT:  Okay.

19               Questions by the Government?

20               MR. OLDHAM:  Was it things about the case or

21  about specific witnesses that they were talking about?

22               PROSPECTIVE JUROR:  They were just -- they just

23  mentioned the defendants' names.

24               MR. OLDHAM:  Okay.

25               THE COURT:  Was it unfavorable or a way to speak

                         UNREDACTED TRANSCRIPT

337

1    unfavorably or do you know?

2               PROSPECTIVE JUROR:  They seemed friendly towards

3    the defendants.  I'm not sure.  It seemed friendly, but . . .

4               THE COURT:  But it might not have been, you just

5    couldn't tell?

6               PROSPECTIVE JUROR:  Yeah.

7               THE COURT:  But they were speaking about persons

8    in the case, though?

9               PROSPECTIVE JUROR:  Yes.  Yes, Your Honor.

10              THE COURT:  Okay.  All right.

11              Other questions then?

12              MR. SCHOLL:  Were there other jurors around when

13   they were doing this?

14              PROSPECTIVE JUROR:  No.  It was another juror,

15   but she was all the way on the other end of the hallway.

16              MR. SCHOLL:  So it was just you by yourself on

17   the bench?

18              PROSPECTIVE JUROR:  Uh-huh.

19              MR. BALLIN:  No questions.

20              THE COURT:  We really appreciate your willingness

21   to serve but also you were willing to tell us that

22   information.  I don't know it will be necessary for anybody

23   to recontact you in that regard.  If it is necessary for

24   anybody to recontact you, ask them if they received authority

25   from me, from Judge McCalla, to contact you.  Otherwise, they

UNREDACTED TRANSCRIPT

 1   should not be contacting you about this matter.

 2              PROSPECTIVE JUROR:  Okay.

 3              THE COURT:  Now, if someone, a person on the

 4   bench attempts to contact you, you should notify the Court.

 5   You should tell Mr. Nabors, and you should tell him he must

 6   tell Judge McCalla.  So if you don't mind doing that?

 7              PROSPECTIVE JUROR:  Yes, Your Honor.

 8              MR. PALMER:  Did you see anybody in the parking

 9   lot or doing anything?

10              PROSPECTIVE JUROR:  No.

11              MR. PALMER:  Okay.  Just making sure.

12              THE COURT:  Okay.  We appreciate your being here,

13   and we're going to let you be excused.  Just go down to the

14   second floor, and make sure you have any paperwork you need.

15              PROSPECTIVE JUROR:  Okay.  Thank you.

16              THE COURT:  That's it.  Okay.  We're going back

17   to our positions just for a moment.  All right.

18                  (End of discussion at side-bar.)

19              THE COURT:  All right.  I think we're going to

20   have to leave in just a moment, and I'm going to ask you --

21   I don't usually ask you to -- well, sometimes I do.  I don't

22   usually ask you to be here in position by 8:20, but I need

23   you to be here by 8:20 tomorrow.  It's just too many people

24   in the building.

25              In order to avoid a problem, I need everybody to

                       UNREDACTED TRANSCRIPT

339

1   be here early.  I don't know that we have anything else that

2   we need to cover.

3              Now, Mr. Scholl, we're going to start back with

4   you, but then everybody else gets a little bit of --

5              MR. SCHOLL:  I'm sorry, Your Honor.  I'm having

6   problems hearing.  I apologize.

7              THE COURT:  Do you want me just to start -- or

8   let the Government or do you want to go in the regular

9   rotation?

10             MR. SCHOLL:  Doesn't matter to me, Your Honor.  I

11   can start back tomorrow because I haven't finished my first

12   round anyhow.

13             THE COURT:  Right.  I know, but do you want me to

14   start back with you or do you just want to finish?  Do you

15   want to start back and run through the rotation again?

16             MR. SCHOLL:  If I can finish mine, Judge, it

17   won't take very long.

18             THE COURT:  No, that's fine.  That's fine.  I

19   just want to make sure we're in sequence.  So we'll start

20   back with you tomorrow.  Then I'll come to the Government and

21   ask if there are any additional questions and I'll come back

22   to Mr. Ballin and ask if there are any additional questions

23   for those that have not been -- as to which inquiry has not

24   been made.  So that's how we'll handle that.

25             Now, everybody understands I want to reconfirm

UNREDACTED TRANSCRIPT

1  how I'm going to receive the strike sheets.  I'm just

2  reconfirming -- well, I actually don't know for sure.  I know

3  I get the Government's strike sheet.

4          Mr. Scholl, how are we handing that?  Are you

5  going to let Mr. Ballin fill it out or are you going to fill

6  it out?

7          MR. SCHOLL:  I'll fill it out, Your Honor.

8          MR. BALLIN:  I'm prohibited from writing things

9  in state court because they just don't read my writing.

10          THE COURT:  It's because we can't read your

11  writing.

12          MR. SCHOLL:  And mine is not much better, Your

13  Honor, but at least I'll feel like I've done something.

14          THE COURT:  I think that that's a good idea.  So

15  I'll get the strike sheets, single strike sheet from the

16  defense.

17          All right.  Well, we've taken a little too long,

18  but that's the way it is.  Anything else then from -- I'm

19  just going to ask you in order.

20          Anything else from the Government?

21          MR. OLDHAM:  No, Your Honor.  Thank you.

22          THE COURT:  No problem.

23          Mr. Palmer, anything else from the defense?

24          MR. PALMER:  Can't think of anything, Your Honor.

25          THE COURT:  Okay.

UNREDACTED TRANSCRIPT

1           Mr. Scholl, anything else from Defense 2?

2           MR. SCHOLL:  No, Your Honor.  Thank you.

3           THE COURT:  Okay.  Thank you all very much.

4    We'll let you all be excused.

5           (Adjournment.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNREDACTED TRANSCRIPT

342

1                   C E R T I F I C A T E

2

3

4           I, TINA DuBOSE GIBSON, do hereby certify that the

5    foregoing 341 pages are, to the best of my knowledge, skill

6    and abilities, a true and accurate transcript from my

7    stenotype notes of the trial held on the 25th day of

8    March, 2024, in the matter of:

9

10   UNITED STATES OF AMERICA

11   vs.

12   ASHLEY GRAYSON AND JOSHUA GRAYSON

13

14

15   Dated this 7th day of May, 2024.

16

17

18

19                       S/Tina DuBose Gibson

20                       _____
                         TINA DuBOSE GIBSON, RPR, RCR
21                       Official Court Reporter
                         United States District Court
22                       Western District of Tennessee

23

24

25

                   UNREDACTED TRANSCRIPT